UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATTHEW GEBERT, | |
| *Plaintiff*, | |
| v. | Civil Action No. 22-2939 (DLF) |
| U.S. DEPARTMENT OF STATE et al., | |
| *Defendants*. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

BACKGROUND ............................................................................................................... 1

I.     Gebert's White Nationalist Activities and Associations, and Efforts to Conceal Them .... 1

II.    The Department Discovers and Investigates Gebert's Dishonesty About His Extensive
       White Nationalist Activities and Associations, and Revokes His Security Clearance ....... 4

LEGAL STANDARDS ..................................................................................................... 7

ARGUMENT .................................................................................................................... 8

I.     This Court Lacks Personal Jurisdiction as to the Individual Defendants ......................... 9

II.    Gebert's Summonses Were Defective ............................................................................ 10

III.   Gebert Failed to Effect Service on Defendants .............................................................. 11

IV.    Gebert Fails Plausibly to Allege that His Clearance Revocation was Retaliation for
       His Extensive White Nationalist Activities and Associations .......................................... 14

V.     Gebert Fails Plausibly to Allege a Due Process Violation ............................................... 22

       A.     Gebert Fails Plausibly to Allege a Substantive Due Process Violation ............... 22

       B.     Gebert Fails Plausibly to Allege a Procedural Due Process Violation ................. 25

              1.     Gebert fails to identify a protected interest other than that in his
                     reputation ....................................................................................................... 25

                     a.     Gebert has no protected interest in his clearance .......................... 25

                     b.     Gebert was not deprived of his ability to express his opinions ..... 26

                     c.     Gebert was not denied a protected employment opportunity ....... 26

                     d.     Gebert had no protected interest in using his accrued leave prior
                            to his suspension .............................................................................. 28

              2.     Gebert is receiving all the process that he is due ....................................... 28

       C.     Gebert Fails Plausibly to Allege an Equal Protection Violation ........................... 31

VI.    Gebert Fails to State an APA Violation ........................................................................... 31

       A.     Gebert's APA Challenges to His Clearance Revocation Fails .............................. 32

       B.     Gebert Fails Plausibly to Allege that the Alleged Termination of His Health
              Insurance Coverage was Arbitrary or Capricious ................................................. 32

VII.   Gebert Failed to Reasonably Describe the Records that He Sought ............................... 33

VIII.  Gebert is Not Entitled to Damages ................................................................................. 37

       A.     The *Bivens* Doctrine Does Not Supply a Cause of Action ................................... 37

              1.     Gebert's claims arise in a new *Bivens* context ........................................... 39

              2.     Special factors counsel against a *Bivens* remedy ...................................... 41

       B.     The Individual Defendants Are Entitled to Qualified Immunity .......................... 43

CONCLUSION ................................................................................................................. 44

# TABLE OF AUTHORITIES

**Cases**

*Ali v. District of Columbia,*
  278 F.3d 1  (D.C. Cir. 2002) ............................................................... 9, 10

*Ali v. Rumsfeld,*
  649 F.3d 762 (D.C. Cir. 2011) ............................................................... 41

*Am. Bd. of Internal Med. v. Rushford,*
  841 F. App'x 440 (3d Cir. 2020) ............................................................... 20

*Am. Ctr. for L. & Just. v. Dep't of Homeland Sec.,*
  573 F. Supp. 3d 78 (D.D.C. 2021) ............................................................... 35

*Anderson v. Gates,*
  20 F. Supp. 3d 114 (D.D.C. 2013) ............................................................... 12

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................... passim

*Ayres v. Jacobs Crumplar, P.A.,*
  99 F.3d 565 (3d Cir. 1996) ............................................................... 11

*Bd. of Regents of State Colleges v. Roth,*
  408 U.S. 564 (1972) ............................................................... 23

*Beattie v. Boeing Co.,*
  43 F.3d 559 (10th Cir. 1994) ............................................................... 41

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
  403 U.S. 388 (1971) ............................................................... 37

*Black Lives Matter D.C. v. Trump,*
  544 F. Supp. 3d 15 (D.D.C. 2021) ............................................................... 18

*Bloem v. Unknown Dep't of the Interior Emps.,*
  24 F. Supp. 3d 97 (D.D.C. 2014) ............................................................... 13

*Brown v. Vilsack,*
  923 F. Supp. 2d 118 (D.D.C. 2013) ............................................................... 24

*Brown v. Wachovia Bank,*
  Civ. A. No. 06-0153 (RMC), 2007 WL 1378491 (D.D.C. May. 10, 2007) ............................ 13

iii

**Cases (cont.)**

*Bush v. Lucas,*
    462 U.S. 367 (1983) ................................................................................................ 41, 42, 43

*Cambridge Holdings v. Federal Ins.,*
    489 F.3d 1356 (D.C. Cir. 2007) .............................................................................. 8

*Campbell v. Dep't of Just.,*
    164 F.3d 20 (D.C. Cir. 1998) ................................................................................ 34

*Carlson v. Green,*
    446 U.S. 14 (1980) ................................................................................................ 38

*Chapman v. Heath,*
    Civ. A. No. 17-1735 (CKK), 2019 WL 5653445 (D.D.C. Oct. 31, 2019) .............................. 13

*Chesna v. Dep't of Def.,*
    850 F. Supp. 110 (D. Conn. 1994) ........................................................................ 27

*City of Tahlequah v. Bond,*
    142 S. Ct. 9 (2021) ................................................................................................ 43, 44

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,*
    690 F.2d 1240 (9th Cir. 1982) .............................................................................. 17

*CNN, Inc. v. FBI,*
    271 F. Supp. 3d 108 (D.D.C. 2017) ...................................................................... 36

*Com. Drapery Contr. v. United States,*
    133 F.3d 1 (D.C. Cir. 1998) .................................................................................. 12

*Comm. on Ways & Means v. Dep't of Treasury,*
    45 F.4th 324 (D.C. Cir. 2022) .............................................................................. 14

*Cornish v. United States,*
    885 F. Supp. 2d 198 (D.D.C. 2012) ...................................................................... 12

*Corr. Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ................................................................................................ 42

*Ctr. for the Study of Servs. v. Dep't of Health & Human Servs.,*
    874 F.3d 287 (D.C. Cir. 2017) .............................................................................. 33

*Dale v. IRS,*
    238 F. Supp. 2d 99 (D.D.C. 2002) ........................................................................ 37

**Cases (cont.)**

*Davis v. Passman,*
  442 U.S. 228 (1979) ........................................................................................... 38

*Dep't of Navy v. Egan,*
  484 U.S. 518 (1988) ..................................................................... 17, 25, 32, 39

*DiBacco v. Dep't of the Army,*
  926 F.3d 827 (D.C. Cir. 2019) ......................................................................... 34

*Diggs v. Potter,*
  700 F. Supp. 2d 20 (D.D.C. 2010) ................................................................... 24

*Dobbs v. Jackson Women's Health Org.,*
  142 S. Ct. 2228 (2022) ..................................................................................... 22

*Doe v. Casey,*
  796 F.2d 1508 (D.C. Cir. 1986) ....................................................................... 30

*Doe v. Cheney,*
  885 F.2d 898 (D.C. Cir. 1989) ............................................................... 25, 28, 30

*Doe v. Dep't of Just.,*
  753 F.2d 1092 (D.C. Cir. 1985) ....................................................................... 30

*Doe v. Lee,*
  Civ. A. No. 19-0085 (DLF), 2020 WL 759177 (D.D.C. Feb. 14, 2020) ................. 21

*Doe v. Rumsfeld,*
  683 F.3d 390 (D.C. Cir. 2012) ......................................................................... 41

*Doe v. Webster,*
  769 F. Supp. 1 (D.D.C. 1991) ......................................................................... 17

*Donald J. Trump for Pres., Inc. v. Sec'y of Pa.,*
  830 F. App'x 377 (3d Cir. 2020) ..................................................................... 22

*Dong v. Smithsonian Inst.,*
  125 F.3d 877 (D.C. Cir. 1997) ......................................................................... 23

*Dorfmont v. Brown,*
  913 F.2d 1399 (9th Cir. 1990) ......................................................................... 32

*Egbert v. Boule,*
  142 S. Ct. 1793 (2022) ............................................................................... passim

**Cases (cont.)**

*Erwin-Simpson v. Berhad*,
   985 F.3d 883 (D.C. Cir. 2021) ............................................................................. 7

*Evangelou v. District of Columbia*,
   63 F. Supp. 3d 96 (D.D.C. 2014) ....................................................................... 27

*Evans v. Fed. Bureau of Prisons*,
   951 F.3d 578 (D.C. Cir. 2020) ........................................................................... 33

*FDIC v. Meyer*,
   510 U.S. 471 (1994) ........................................................................................... 41

*First Chi. Int'l v. United Exch. Co.*,
   836 F.2d 1375 (D.C. Cir. 1988) ........................................................................... 7

*Freedom Watch, Inc. v. CIA*,
   895 F. Supp. 2d 221 (D.D.C. 2012) ................................................................... 36

*Freedom Watch, Inc. v. Dep't of State*,
   925 F. Supp. 2d 55 (D.D.C. 2013) ..................................................................... 36

*George Wash. Univ. v.*
   *District of Columbia*, 318 F.3d 203 (D.C. Cir. 2003) ................................... 23, 24

*Gill v. Dep't of Just.*,
   875 F.3d 677 (D.C. Cir. 2017) ................................................................. 14, 26, 30

*Gill v. Dep't of Just.*,
   Civ. A. No. 15-0824 (RMC), 2016 WL 3982450 (D.D.C. July 22, 2016) ............... 27

*Gorman v. Ameritrade Holding Corp.*,
   293 F.3d 506 (D.C. Cir. 2002) ........................................................................... 11

*Graham v. Dep't of Just.*,
   Civ. A. No. 02-1231, 2002 WL 32511002 (D.D.C. Nov. 20, 2002) ..................... 27

*Hairston v. Vance-Cooks*,
   773 F.3d 266 (D.C. Cir. 2014) ........................................................................... 20

*Hardy v. Joseph I. Sussman, P.C.*,
   953 F. Supp. 2d 102 (D.D.C. 2013) ..................................................................... 7

*Harrison v. Bowen*,
   815 F.2d 1505 (D.C. Cir. 1987) ......................................................................... 31

**Cases (cont.)**

*Hartness v. Bush*,
   919 F.2d 170 (D.C. Cir. 1990) ............................................................ 17

*Hedgepeth v. Wash. Metro. Area Transit Auth.*,
   386 F.3d 1148 (D.C. Cir. 2004) .......................................................... 31

*Hegab v. Long*,
   716 F.3d 790 (4th Cir. 2013) ............................................................. 21

*Hendricks v. Paulson*,
   520 F. Supp. 2d 65 (D.D.C. 2007) ..................................................... 24

*Hernandez v. Mesa*,
   140 S. Ct. 735 (2020) ......................................................................... 39

*Hill v. Air Force*,
   795 F.2d 1067 (D.C. Cir. 1986) .......................................................... 34

*Hoska v. Dep't of Army*,
   677 F.2d 131 (D.C. Cir. 1982) ............................................................ 16

*Hurd v. District of Columbia*,
   864 F.3d 671 (D.C. Cir. 2017) .............................................................. 1

*Hutchins v. District of Columbia*,
   144 F.3d 798 (D.C. Cir. 1998) ............................................................ 22

*Huynh v. Carlucci*,
   679 F. Supp. 61 (D.D.C. 1988) ........................................................... 16

*I.T. Consultants v. Republic of Pakistan*,
   351 F.3d 1184 (D.C. Cir. 2003) ............................................................ 7

*Ivy v. CIR*,
   877 F.3d 1048 (D.C. Cir. 2017) .......................................................... 37

*Johnson v. Dep't of Treasury*,
   Civ. A. No. 10-1013 (JEB) (D.D.C. Oct. 4, 2011) .............................. 10

*Kaspersky Lab, Inc. v. Dep't of Homeland Sec.*,
   909 F.3d 446 (D.C. Cir. 2018) .............................................................. 1

*Kowalczyk v. Dep't of Just.*,
   73 F.3d 386 (D.C. Cir. 1996) ........................................................ 35, 37

**Cases (cont.)**

*LaChance v. Erickson,*
    522 U.S. 262 (1998) ........................................................................................................... 17

*Latham v. Dep't of Just.,*
    658 F. Supp. 2d 155 (D.D.C. 2009) .................................................................................. 36

*Lee v. Barr,*
    Civ. A. No. 19-2284 (DLF), 2020 WL 3429465 (D.D.C. June 23, 2020) ................... 40, 41, 42

*Lee v. Stewart,*
    No. 20-5952, 2021 WL 6932349 (6th Cir. Aug. 24, 2021) .................................................... 18

*Lewis v. Lhu,*
    696 F. Supp. 723 (D.D.C. 1988) ....................................................................................... 17

*Lewis v. Mutond,*
    568 F. Supp. 3d 47 (D.D.C. 2021) ...................................................................................... 7

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ........................................................................................................... 34

*Light v. Wolf,*
    816 F.2d 746 (D.C. Cir. 1987) ............................................................................................ 8

*Linnas v. INS,*
    790 F.2d 1024 (2d Cir. 1986) ............................................................................................ 31

*M.K. v. Tenet,*
    99 F. Supp. 2d 12 (D.D.C. 2000) ....................................................................................... 14

*Magassa v. Mayorkas,*
    52 F.4th 1156 (9th Cir. 2022) ............................................................................................ 27

*Mason v. Callaway,*
    554 F.2d 129 (4th Cir. 1977) ............................................................................................. 36

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ........................................................................................................... 28

*McCormick v. District of Columbia,*
    752 F.3d 980 (D.C. Cir. 2014) ........................................................................................... 25

*Meshal v. Higgenbotham,*
    804 F.3d 417 (D.C. Cir. 2015) ........................................................................................... 41

**Cases (cont.)**

*Morrissey v. Mayorkas*,
  17 F.4th 1150 (D.C. Cir. 2021) ........................................................................ 11, 12

*Murphy Bros., Inc. v. Michetti Pipe Stringing*,
  526 U.S. 344 (1999) ................................................................................................ 11

*N. Am. Butterfly Ass'n v. Wolf*,
  977 F.3d 1244 (D.C. Cir. 2020) ........................................................................ 1, 22

*Nat'l Ass'n for Advancement of Multijurisdiction Prac. v. Howell*,
  851 F.3d 12 (D.C. Cir. 2017) ................................................................................ 31

*Nat'l Family Planning & Repro. Health Ass'n v. Gonzales*,
  468 F.3d 826 (D.C. Cir. 2006) .............................................................................. 26

*Nat'l Mining Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) .............................................................................. 33

*Nat'l Sec. Couns. v. CIA*,
  969 F.3d 406 (D.C. Cir. 2020) .............................................................................. 33

*Nat'l Treasury Emps. Union v. FLRA*,
  452 F.3d 793 (D.C. Cir. 2006) .............................................................................. 23

*Nat'l Treasury Emps. Union v. Von Raab*,
  489 U.S. 656, 677 (1989) ...................................................................................... 17

*Nguyen v. INS*,
  533 U.S. 53, 78 (2001) .......................................................................................... 25

*Niedermeier v. Office of Max S. Baucus*,
  153 F. Supp. 2d 23, 31 (D.D.C. 2001) ................................................................. 21

*Orange v. District of Columbia*,
  59 F.3d 1267 (D.C. Cir. 1995) .............................................................................. 27

*Oryszak v. Sullivan*,
  576 F.3d 522 (D.C. Cir. 2009) .............................................................................. 32

*Palmieri v. United States*,
  72 F. Supp. 3d 191 (D.D.C. 2014) ................................................................... 26, 27

*Palmieri v. United States*,
  896 F.3d 579 (D.C. Cir. 2018) ..................................................................... 9, 10, 14

**Cases (cont.)**

*Paolone v. Mueller*,
  Civ. A. No. 05-2300 (JDB), 2006 WL 2346448 (D.D.C. Aug. 11, 2006) ............................... 13

*Parsons v. Dep't of Air Force*,
  707 F.2d 1406 (D.C. Cir. 1983) ....................................................................................... 24

*Pinson v. Dep't of Just.*,
  245 F. Supp. 3d 225 (D.D.C. 2017) ................................................................................. 36

*Pinson v. Dep't of Just.*,
  70 F. Supp. 3d 111 (D.D.C. 2014) ................................................................................... 34

*Pollack v. Meese*,
  737 F. Supp. 663 (D.D.C. 1990) ........................................................................................ 9

*Public Citizen v. Nat'l Highway Transp. Safety Admin.*,
  489 F.3d 1279 (D.C. Cir. 2007) ....................................................................................... 26

*Rasul v. Myers*,
  563 F.3d 527 (D.C. Cir. 2009) ......................................................................................... 41

*Reshard v. LaHood*,
  Civ. A. No. 87-2794 (RBW), 2010 WL 1379806 (D.D.C. Apr. 7, 2010) .............................. 24

*Rivas-Villegas v. Cortesluna*,
  142 S. Ct. 4 (2021) ................................................................................................... 43, 44

*Rzayeva v. United States*,
  492 F. Supp. 2d 60 (D. Conn. 2007) ............................................................................... 31

*Sack v. CIA*,
  53 F. Supp. 3d 154 (D.D.C. 2014) ................................................................................... 36

*Safari Club Int'l v. Jewell*,
  47 F. Supp. 3d 29 (D.D.C. 2014) ..................................................................................... 26

*Scahill v. District of Columbia*,
  271 F. Supp. 3d 216 (D.D.C. 2017) ................................................................................. 13

*Scaife v. IRS*,
  Civ. A. No. 02-1805, 2003 WL 23112791 (D.D.C. Nov. 20, 2003) ................................... 34

*Schweiker v. Chilicky*,
  487 U.S. 412 (1988) ........................................................................................................ 41

**Cases (cont.)**

*Second City Music, Inc. v. City of Chi.*,
    333 F.3d 846 (7th Cir. 2003) ................................................................. 26

*Shapiro v. CIA*,
    170 F. Supp. 3d 147 (D.D.C. 2016) ........................................................ 35

*Siegert v. Gilley*,
    500 U.S. 225 (1991) ............................................................................. 14

*Silbaugh v. Chao*,
    942 F.3d 911 (9th Cir. 2019) ................................................................. 11

*Simpkins v. District of Columbia*,
    108 F.3d 366 (D.C. Cir. 1997) .......................................................... 12, 14

*Skrynnikov v. Fed. Nat'l Mortg. Ass'n*,
    Civ. A. No. 11-0609 (TJK), 2021 WL 4989450 (D.D.C. Oct. 27, 2021) ............................... 24

*Smith v. Schlesinger*,
    513 F.2d 462 (D.C. Cir. 1975) ............................................................... 16

*Spagnola v. Mathis*,
    859 F.2d 223 (D.C. Cir. 1988) ............................................................... 42

*Statewide Bonding, Inc. v. Dep't of Homeland Sec.*,
    980 F.3d 109 (D.C. Cir. 2020) ............................................................... 25

*Stehney v. Perry*,
    101 F.3d 925 (3d Cir. 1996) .................................................................. 27

*Superior Fibre Prods., Inc. v. Dep't of the Treasury*,
    156 F. Supp. 3d 54 (D.D.C. 2016) .......................................................... 13

*Taylor v. Dep't of Treasury*,
    127 F.3d 470 (5th Cir. 1997) ................................................................. 35

*Taylor v. FDIC*,
    132 F.3d 753 (D.C. Cir. 1997) ............................................................... 34

*Taylor v. Gearan*,
    979 F. Supp. 1 (D.D.C. 1997) ............................................................... 13

*Taylor v. Solis*,
    571 F.3d 1313 (D.C. Cir. 2009) ............................................................. 23

**Cases (cont.)**

*Town of Castle Rock v. Gonzales*,
   545 U.S. 748 (2005) ........................................................................................................... 23

*Trent v. Dep't of Homeland Sec.*,
   Civ. A. No. 18-2591 (ABJ), 2020 WL 1429881 (D.D.C. Mar. 24, 2020) .............................. 34

*Truitt v. Dep't of State*,
   897 F.2d 540 (D.C. Cir. 1990) ...................................................................................... 35, 37

*U.S. Info. Agency v. Krc*,
   905 F.2d 389 (D.C. Cir. 1990) ................................................................................. 25, 26, 27

*United States v. Alvarez*,
   567 U.S. 709 (2012) ........................................................................................................... 17

*United States v. Fausto*,
   484 U.S. 439 (1988) ........................................................................................................... 30

*United States v. Jones*,
   432 F.3d 34 (1st Cir. 2005) ................................................................................................ 20

*United States v. Kalu*,
   791 F.3d 1194 (10th Cir. 2015) .......................................................................................... 20

*United States v.
Kumpf*, 438 F.3d 785 (7th Cir. 2006) .................................................................................. 31

*United States v. Medline Indus., Inc.*,
   809 F.3d 365 (7th Cir. 2016) .............................................................................................. 21

*United States v. Stanley*,
   483 U.S. 669 (1987) ........................................................................................................... 41

*Voinche v. FBI*,
   412 F. Supp. 2d 60 (D.D.C. 2006) ...................................................................................... 34

*Waters v. Thornburgh*,
   888 F.2d 870 (D.C. Cir. 1989) ........................................................................................... 23

*Webster v. Doe*,
   486 U.S. 592 (1988) ..................................................................................................... 14, 30

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) ........................................................................................... 42

**Cases (cont.)**

*Wine v. Dep't of the Interior*,
   Civ. A. No. 21-3349 (TNM), 2022 WL 888197 (D.D.C. Mar. 25, 2022) ............................... 12

*Xie v. Sklover & Co., LLC*,
   260 F. Supp. 3d 30 (D.D.C. 2017) ........................................................................................ 7

*Yeager v. DEA*,
   678 F.2d 315 (D.C. Cir. 1982) ....................................................................................... 35, 37

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) ........................................................................................... 39, 40, 41

**Statutes**

5 U.S.C. § 552 ........................................................................................................................ 7

5 U.S.C. § 552a ...................................................................................................................... 7
   § 552a(f)(3) ........................................................................................................................ 34

5 U.S.C. § 701(a)(2) ............................................................................................................. 32

5 U.S.C. § 702 ...................................................................................................................... 37

5 U.S.C. § 704 ...................................................................................................................... 33

5 U.S.C. § 706 ...................................................................................................................... 33
   § 706(2)(A) ......................................................................................................................... 32

5 U.S.C. § 1212 .................................................................................................................... 19

**Regulations**

22 CFR § 171.22(b) ............................................................................................................. 34

12 Foreign Affairs Manual
   § 234.1 ................................................................................................................................ 42
   § 234.1(b) ........................................................................................................................... 28
   § 234.1(c), (i) ..................................................................................................................... 29
   § 234.3 ................................................................................................................................ 42
   § 234.3(a)-(f) ...................................................................................................................... 29

**Constitutional Provisions**

U.S. Const. amend. V ........................................................................................................... 22

**Other Authorities**

Andrew Marantz,
  *Birth of a White Supremacist*, New Yorker (Oct. 9, 2017).......................................... 2

*Black Lives Matter and the Hatch Act*,
  Off. of Special Counsel ................................................................................ 19

Exec. Order 12,968,
  60 Fed. Reg. 40,245 (Aug. 2, 1995)............................................................ 16, 18

Michael Edison Hayden,
  *U.S. State Department Official Involved in White Nationalist Movement, Hatewatch
  Determines*, S. Poverty L. Ctr. (Aug. 7, 2019) ............................................. 1

Security Executive Agent Directive-4 .............................................................. 16

**Rules**

Fed. R. Civ. P. 4
  (a)(1)(F)-(G)............................................................................................. 10
  (e) ............................................................................................................ 12
  (i)(1)(A)-(B) ............................................................................................. 11
  (i)(2) ........................................................................................................ 11
  (i)(3) ........................................................................................................ 11

Fed. R. Civ. P. 12
  (b)(2) ....................................................................................................... 7
  (b)(4) ....................................................................................................... 7
  (b)(5) ....................................................................................................... 8
  (b)(6) ....................................................................................................... 8

Fed. R. Evid. 404(b)..................................................................................... 20

Defendants—the Department of State and various current and former Department officials allegedly involved in the decisions to suspend and then revoke Plaintiff Matthew Gebert's security clearance due to his dishonesty about his white nationalist activities and associations, and then suspend him from his job without pay—by and through undersigned counsel, respectfully file this memorandum in support of their motion to dismiss Gebert's complaint, ECF No. 1.

## BACKGROUND

A brief overview of Gebert's efforts to conceal his extensive white nationalist activities and associations, the Department's investigation of Gebert, the suspension and then revocation of his security clearance, and the resulting personnel actions follows.

**I.** **Gebert's White Nationalist Activities and Associations, and Efforts to Conceal Them**

Matthew Gebert used pseudonyms and disguises to hide from the Department that he is a self-avowed white nationalist. Compl. ¶¶ 19, 21, 34, 48. Wearing a disguise, Gebert attended the August 2017 Unite the Right rally in Charlottesville, Virginia, but an article by the Southern Poverty Law Center's Hatewatch program identified him as a foreign affairs officer at the Department. *Id.* ¶¶ 18-19; Michael Edison Hayden, *U.S. State Department Official Involved in White Nationalist Movement, Hatewatch Determines* ("Hatewatch Article"), S. Poverty L. Ctr. (Aug. 7, 2019), https://www.splcenter.org/gebert.[1]

The Hatewatch article revealed that on numerous occasions, Gebert expressed his white nationalist beliefs under pseudonyms. During a May 2018 episode of the white nationalist podcast

---

[1]     Because Gebert discusses the Hatewatch article extensively in his complaint, this Court may consider it for the fact of its contents. *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (court may consider "any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice"); *Kaspersky Lab, Inc. v. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018) ("we have noticed section 1634's legislative record . . . for its existence"); *Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (court can draw "on a filing in an unrelated case as a record of what was said").

*The Fatherland*, for example, Gebert—using the pseudonym "Coach Finstock"—opined that white people "'need a country of our own with nukes, and we will retake this thing lickety split.'" Hatewatch Article, *supra*. "'That's all that we need,'" Gebert declared. "'We need a country founded for white people with a nuclear deterrent. And you watch how the world trembles.'" *Id.*

The Hatewatch article further revealed that Gebert had held, and hid, his white nationalist beliefs since 2015. Hatewatch Article, *supra*. Posting under the pseudonym "'Finstock' on a white nationalism-focused forum called *The Right Stuff*,"[2] Gebert wrote, "'I got into this [movement] and off the conservative reservation in 2015.'" *Id.* In another appearance on *The Fatherland*, he voiced awareness that public revelation of his white nationalist activities and associations could be detrimental to his career. *Id.* "'There are bigger things than a career and a paycheck,'" he said, "and I don't want to lose mine." *Id.* "'I am prepared to lose mine,'" he continued, "'[b]ecause this is the most important thing to me in my life . . . in tandem with my family, of course.'" *Id.*

According to the Hatewatch article, Gebert engaged in extensive white nationalist activities and associations under pseudonym. As "Coach Finstock," he "helped lead a Washington, D.C., and Northern Virginia-based organizing chapter of" the "*Right Stuff* network called 'D.C. Helicopter Pilots'"—its name an apparent reference "to a meme on the far right inspired by late Chilean dictator Augusto Pinochet," on whose orders "loyalists to his regime threw political opponents out of helicopters as a form of extrajudicial killing." Hatewatch Article, *supra*. Gebert also held gatherings at his home that "typically included people associated with the white

---

[2]     A *New Yorker* article characterized *The Right Stuff* as "a breeding ground for some of the most florid racism on the Internet." Andrew Marantz, *Birth of a White Supremacist*, New Yorker (Oct. 9, 2017), https://www.newyorker.com/magazine/2017/10/16/birth-of-a-white-supremacist. Among the dozens of podcasts it hosted were "Fash the Nation," "Nationalist Public Radio," and "Good Morning White America." *Id.* The "most popular" of these podcasts, however, was "The Daily Shoah," the title of which is "a pun about the Holocaust by way of Comedy Central." *Id.*

nationalist movement," such as Michael Peinovich, *The Right Stuff*'s leader, and "Marcus Halberstram," the "Fash the Nation" podcast's pseudonymous co-host. *Id.* Gebert also attended an event linked to the National Policy Institute, a think tank run by Richard Spencer, "arguably America's most famous white nationalist," where, according to the Hatewatch article, attendees "gave Hitler-salutes and shouted 'Hail Trump!'" *Id.*

Speaking as "Coach Finstock," Gebert admitted he wore a disguise to the Unite the Right rally. *Id.* He alluded to an incident in which a man marching with a neo-Nazi group drove his car into a crowd of counterdemonstrators, killing a woman: "'Dude, we smacked the hornet's nest with a big f*****g stick. . . . And the only question is whether this is valuable accelerationism[3] or whether we just provoked the red guards, like, a year before we had enough time to spare.'" *Id.*

During another episode of *The Fatherland*, Gebert, still as "Coach Finstock," shared his opinion on black people. "'Well, think about it, we're suckers for . . . court jesters . . . are in our DNA,'" Gebert said. *Id.* He continued, "'[w]e like to have a charismatic joker, at least, around us sometimes.'" *Id.* As he saw it, white people tolerate black people due to benevolent condescension. "'I think it reflects the better angels of our white nature that we—despite all of the evidence we have from the criminality to whatnot that we still have a soft spot in our heart for Red Foxx and "Sandford and Son" . . . or Chris Rock,'" he said, referring to two black comedians and a popular sitcom. *Id.* "'Against our better judgment, we still give them the benefit of the doubt,'" he said. *Id.* But Gebert himself felt quite differently—black people, he said, "'do not belong around us for an ocean at least.'" *Id.* Gebert does not appear to have thought very highly of Jews, either. On January 18, 2019, for example, Twitter user "Coach Finstock" posted a picture of the hooded specter of

---

[3]     "'[A]ccelerationism' refers to a phrase used by white nationalists and neo-Nazis which implies that Western civilization must collapse before they can achieve their goal of building an all-white country for non-Jews." *Id.*

death greeting Justice Ruth Bader Ginsburg. *Id.* In a follow-up post, he made an entreaty to his followers: "'when the decrepit old witch finally bites the dust, please one of you make a vid with our crabbies [saying] "The Supreme Court is now officially 11% less Jewish" as [a] caption.'" *Id.*

Gebert's wife, Anna Vuckovic, is also a white nationalist. Posting under the pseudonymous handle "Wolfie James," Vuckovic "wrote blog posts focused on dating tips for white nationalist women and parenting advice for white nationalist moms," for both *The Right Stuff* and other white nationalist publications. Hatewatch Article, *supra*. In one column, she opined that "[i]n an open-borders America [women] should fear the s***s, too—they love their people-smuggling, gang-banging, and drunk driving more than most." *Id.* She also offered white nationalist media criticism, deriding The Man In The Yellow Hat—the human guardian of cartoon monkey Curious George—as "the typical klutzy, r******d white man always being peddled on the Jewtube." *Id.* Gebert and Vuckovic occasionally attended white nationalist events together. On June 17, 2017, for example, the couple booked a babysitter and headed off to a downtown Washington, D.C. hotel for a date night, attending a clandestine dinner with notorious Holocaust denier David Irving. *Id.*

In his complaint, Gebert does not dispute a single fact in the Hatewatch article.[4]

## II.   The Department Discovers and Investigates Gebert's Dishonesty About His Extensive White Nationalist Activities and Associations, and Revokes His Security Clearance

On January 28, 2019, Gebert was interviewed as part of a background reinvestigation necessary to continue holding a Top Secret security clearance. Compl. ¶ 13. During the interview, Gebert was asked the following questions, which are routinely asked of employees and applicants as matter of standard operating procedures: (1) "Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his

---

[4]     The Hatewatch article provides a fuller account of Gebert's and his wife's extensive white nationalist activities and associations than this abridged account. *See* Hatewatch Article, *supra*.

character or qualifications for a government position;" (2) "Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position;" (3) "if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State." *Id.* ¶ 14. Gebert answered each question in the negative. *Id.* ¶ 15. His background reinvestigation concluded on May 9, 2019, and on June 7, he was told that he had been granted continued access to classified information. *Id.* ¶¶ 16-17.

Two months later, on August 7, 2019, Hatewatch published its article on Gebert's white nationalist activities and associations, and use of pseudonyms and disguises to hide these activities and associations. Hatewatch Article, *supra*. On August 16, the Department's Office of Personnel Security and Suitability ("Personnel Security") sent Gebert a memorandum notifying him that it had suspended his security clearance pending the result of a "for cause" investigation. Compl. ¶ 22. The memorandum cited "concerns that [Gebert] concealed and omitted information in [his] periodic reinvestigation completed May 9, 2019," raising "serious security concerns that could be disqualifying under National Security Adjudicative Guidelines E (Personal Conduct)." *Id.* ¶ 23.

Because Gebert's position as a foreign affairs officer required him to hold a Top Secret clearance, the suspension of his security clearance resulted in the Bureau of Human Resources, in a letter issued by defendant Calli Fuller, proposing Gebert's indefinite suspension from his job without pay due to failure to maintain a condition of employment. *Id.* ¶¶ 25-26. Through counsel, Gebert submitted a written reply to the job suspension letter, but Human Resources, through defendant Jeanne Juliao, decided to implement the suspension without pay. *Id.* ¶¶ 27-30.

As part of an investigation regarding Gebert's dishonesty during his personnel security investigation, the Office of Special Investigations ("Special Investigations") interviewed Gebert on September 27, 2019. Compl. ¶ 32. During the interview, Gebert denied withholding information

during his background reinvestigation interview, and declared that "he was not ashamed or embarrassed of any of his views or activities," including his advocacy for "white interests" and his "race realist" and "pro-white" beliefs. *Id.* ¶¶ 33-34, 39. Gebert later "followed up on his September 2019 interview with additional responses," asserting that he "did not think any of his writings, podcasts, or tweets would rise to a level that they would ever be considered an embarrassment to himself or the Department of State; was never a member of any formal white nationalist organization; believed he would be protected as his speech and activities were protected by the First Amendment; and never engaged in any illegal activity." *Id.* ¶ 35.

On July 1, 2020, the Department notified Gebert that it had revoked his clearance under National Security Adjudicative Guideline E due to personal conduct concerns. Compl. ¶¶ 41, 99. The Department's revocation letter cited three specific violations of the government-wide national security adjudicative guidelines issued by the Office of the Director of National Intelligence in Security Executive Agent Directive ("SEAD") 4, Ex. A—specifically, Gebert's:

(1) "refusal to provide, full, frank, and truthful answers to lawful questions of investigators, security officials, or other official representatives in connection with a personnel security or trustworthiness determination;"

(2) "deliberately providing false or misleading information; or concealing or omitting information concerning relevant facts to an employer, investigator, security official, competent medical or mental health professional involved in making a recommendation relevant to a national security eligibility determination, or other official government representative;" and

(3) "personal conduct, or concealment of information about one's conduct that creates a vulnerability to exploitation, manipulation, or duress by a foreign intelligence entity or other individual or group," including "[e]ngaging in activities which, if known, could affect the person's personal, professional, or community standing."

*Id.* ¶ 42.

On July 16 and December 23 and 30, 2020, through counsel, Gebert submitted broad requests for records relating to himself and his clearance revocation under the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a. Compl. ¶¶ 63-66, 70, 72. On February 4, 2021, over seven months after the Department had revoked his clearance, Gebert submitted a written reply, denying the conclusions in the Department's July 1, 2020 clearance revocation letter. *Id.* ¶ 49. Nine months later, on November 23, 2021, Gebert submitted a supplement to his reply, this time alleging violations of FOIA and the Privacy Act. *Id.* § 50.

Nearly a year later, on September 28, 2022, Gebert filed this action. *See* Compl.

## LEGAL STANDARDS

*Personal jurisdiction:* A complaint merits dismissal for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). A plaintiff bears "the burden of establishing the court's personal jurisdiction over the defendant." *Erwin-Simpson v. Berhad*, 985 F.3d 883, 888 (D.C. Cir. 2021) (internal quotation marks omitted). In resolving a motion to dismiss for lack of personal jurisdiction, a court generally takes "the allegations of the complaint as true." *I.T. Consultants v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003). But although a court must "assume the veracity of any well-pleaded factual allegations in the complaint, conclusory allegations are not entitled to the assumption of truth." *Lewis v. Mutond*, 568 F. Supp. 3d 47, 51 (D.D.C. 2021) (cleaned up); *see also First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378-79 (D.C. Cir. 1988) ("It is settled a plaintiff must allege specific acts connecting the defendant with the forum, that the bare allegation of conspiracy or agency is insufficient to establish personal jurisdiction." (cleaned up)).

*Insufficient process:* A complaint also warrants dismissal for insufficient process. Fed. R. Civ. P. 12(b)(4). A motion to dismiss for insufficient process generally is a "challenge to the content of the summons." *Hardy v. Joseph I. Sussman, P.C.*, 953 F. Supp. 2d 102, 106 n.1 (D.D.C. 2013). Such a motion "concerns the form of the process rather than the manner or method of its service." *Xie v. Sklover & Co., LLC*, 260 F. Supp. 3d 30, 38 (D.D.C. 2017) (cleaned up).

*Insufficient service of process:* A complaint likewise warrants dismissal for insufficient service of process. Fed. R. Civ. P. 12(b)(5). A "party on whose behalf service is made has the burden of establishing its validity when challenged." *Light v. Wolf*, 816 F.2d 746, 751 (D.C. Cir. 1987) (internal quotation marks omitted). "[H]e must demonstrate that the procedure employed satisfied the requirements of the relevant portions of Rule 4 and any other applicable provision of law." *Id.* (internal quotation marks omitted). "[U]nless the procedural requirements of effective service of process have been satisfied, the court lacks personal jurisdiction to act with respect to that defendant at all." *Cambridge Holdings v. Federal Ins.*, 489 F.3d 1356, 1361 (D.C. Cir. 2007).

*Failure to state a claim:* Finally, a complaint warrants dismissal for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To state a plausible claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## ARGUMENT

Gebert challenges his security clearance suspension and revocation, as well as associated personnel actions such as his suspension without pay and loss of his health insurance benefits. He raises retaliation claims under the First Amendment; various substantive due process, procedural due process, and equal protection claims under the Fifth Amendment; and various claims under the Administrative Procedure Act ("APA"), FOIA, and Privacy Act. As threshold matters, Gebert fails to establish that this Court has personal jurisdiction over the individual defendants; served defective summonses; and failed to effectuate service on the individual defendants, by purporting to serve them at what he believes are their work addresses.

Turning to the merits, Gebert's claims each fail as a matter of law, are implausibly pled, or both. As to his constitutional claims, Gebert's First Amendment claims fail because, as his own

pleadings demonstrate, the Department revoked his security clearance due to his dishonesty, rather than his extensive white nationalist activities and associations. Gebert's substantive due process claims fail because he identifies no protected interest. Gebert's procedural due process claims likewise fail because he identifies no protected interest except for his reputation, and, regardless, he is receiving all the process that he is due. And Gebert's equal protection claims fail because white nationalists are not a protected class, and his dishonesty furnished a rational basis to suspend and then revoke his clearance, which in turn resulted in his indefinite suspension without pay.

Gebert's statutory claims also fail. His APA claims fail because clearance decisions are committed to agency discretion, and he fails to plausibly allege that his clearance revocation or the other challenged personnel actions were arbitrary and capricious, or otherwise unlawful. His FOIA and Privacy Act claims fail, meanwhile, because he did not reasonably describe the records sought.

Finally, Gebert's damages claims fail for several additional reasons. The Department has not waived its sovereign immunity. A *Bivens* claim is unavailable because Gebert's claims all arise in the national security context, to which *Bivens* does not extend, and special factors counsel against fashioning a *Bivens* remedy related to his security clearance. Regardless, the individual defendants are entitled to qualified immunity, as they did not violate clearly established law.

## I.    This Court Lacks Personal Jurisdiction as to the Individual Defendants

A federal court has subject matter jurisdiction over a claim against a defendant only if it has "personal jurisdiction" over that claim as to that defendant. *Ali v. District of Columbia*, 278 F.3d 1, 5 (D.C. Cir. 2002). When a plaintiff sues a government official "in [a] personal capacity," he must plead facts that establish personal jurisdiction over that official in a personal capacity, not merely in an official capacity. *Palmieri v. United States*, 896 F.3d 579, 589 (D.C. Cir. 2018); *see also Pollack v. Meese*, 737 F. Supp. 663, 666 (D.D.C. 1990) ("The law is clear that a persistent course of conduct may be deemed to constitute the transaction of business for the assertion of

personal jurisdiction only if that persistent conduct is undertaken in that person's individual capacity rather than an official capacity conducting business for his employer").

Gebert fails to plausibly allege that this Court has personal jurisdiction over his claims against the individual defendants in their personal capacities. Gebert pleads only that the individual defendants "are/were employees of the government and/or federal officers, at all relevant times herein." Compl. ¶ 6 (internal quotation marks omitted). The "Parties" section of his complaint does not even specifically identify the individual defendants, by name or otherwise, referring to them collectively as "individual Defendants." *Id.* Gebert does not allege that the individual defendants live in this District, or have other ties to this District to support the exercise of personal jurisdiction over them in their personal capacities. To the contrary, his pleadings establish that the individual defendants undertook the challenged actions only in their official capacities. *See generally* Compl. Such allegations do not suffice to establish personal jurisdiction over the individual defendants in their personal capacities. *See Palmieri*, 896 F.3d at 590 (in challenge to clearance revocation, "the agents' only alleged conduct in the District was undertaken in their official capacity. . . . Without more, the agents' official connections to the District do not suffice." (cleaned up)); *Ali*, 278 F.3d at 7 ("Nowhere in his complaint does Ali allege that any defendants acting in their individual capacities either transacted business in the District or contracted to do so. . . . [they] undertake all such actions in their official capacities.").

## II.    Gebert's Summonses Were Defective

A summons must "be signed by the clerk" and "bear the court's seal." Fed. R. Civ. P. 4(a)(1)(F)-(G). None of Gebert's summonses were signed by the Clerk of Court or bear the Court's seal. *See* Summonses, ECF Nos. 3, 3-1, 3-2, 3-3, 3-4, 3-5, 3-6, 3-7. As such, they were defective. *Johnson v. Dep't of Treasury*, Civ. A. No. 10-1013 (JEB), slip op. at 1 (D.D.C. Oct. 4, 2011) (Dkt. No. 7) ("Defendants have not been properly served," as "[n]o summons was ever signed or affixed

with a seal by the Clerk"); *Silbaugh v. Chao*, 942 F.3d 911, 914 (9th Cir. 2019) ("service of a valid summons is necessary . . . and to be valid a summons must indeed be signed by the clerk"); *Ayres v. Jacobs Crumplar, P.A.*, 99 F.3d 565, 568-69 (3d Cir. 1996) ("The Clerk neither signed it nor affixed the seal of the Court . . . . The failure of a plaintiff to obtain valid process . . . is fatal").

## III.    <u>Gebert Failed to Effect Service on Defendants</u>

"Even if there are sufficient contacts for a court to assert personal jurisdiction over a defendant, it lacks power to do so unless the procedural requirements of effective service of process are satisfied." *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 514 (D.C. Cir. 2002). "Service of process is an important requirement that serves as a ritual that marks the court's assertion of jurisdiction over the lawsuit." *Morrissey v. Mayorkas*, 17 F.4th 1150, 1156 (D.C. Cir. 2021) (internal quotation marks omitted). "[U]nder longstanding tradition in our system of justice," effective service of process "is fundamental to any procedural imposition on a named defendant." *Murphy Bros., Inc. v. Michetti Pipe Stringing*, 526 U.S. 344, 350 (1999).

To serve the United States, a plaintiff must deliver the complaint and summons to both the appropriate U.S. Attorney's Office and Attorney General. Fed. R. Civ. P. 4(i)(1)(A)-(B). To serve a federal agency, or a federal officer or employee sued in an official capacity, a plaintiff "must serve the United States and also send a copy of the summons and of the complaint by registered or certified mail to the agency, [ ] officer, or employee." Fed. R. Civ. P. 4(i)(2). "To serve a United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf, a party must serve the United States and also serve the officer or employee under," as relevant here, "Rule 4(e)." Fed. R. Civ. P. 4(i)(3).

Rule 4(e), in turn, enumerates four ways that a plaintiff may serve an individual in a judicial District of the United States: by (1) "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where

service is made;" (2) "delivering a copy of the summons and of the complaint to the individual personally;" (3) "leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there;" or (4) "delivering a copy of each to an agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(e). Rule 4(e) does not authorize service of process on an individual at his or her work address. *See id.*

Gebert failed to effect service of process on Defendants for two reasons. First, he failed to serve the Attorney General, as Rule 4(i)(1)(B) requires. *See* Return of Service Affidavits, ECF No. 6; *Morrissey*, 17 F.4th at 1158 (plaintiff who "failed to establish that he properly served the Attorney General . . . did not complete service"); *Wine v. Dep't of the Interior*, Civ. A. No. 21-3349 (TNM), 2022 WL 888197, at *3 (D.D.C. Mar. 25, 2022) (plaintiff's filing "lacks proof of service because it does not show anything was delivered to the Attorney General").

Second, Gebert failed to effect service on the individual defendants. Gebert served each of the named individual defendants at the Department's address, which Gebert presumably believes is their work address. *See* Return of Service Affidavits. But Rule 4(e) does not allow a plaintiff to serve an individual sued in a personal capacity at his or her work address. *See* Fed. R. Civ. P. 4(e); *see also Com. Drapery Contr. v. United States*, 133 F.3d 1, 8 n.6 (D.C. Cir. 1998) (service of process in *Bivens* case was insufficient where individual defendants were served at "their official address, as required when a person is sued in an official capacity"); *Simpkins v. District of Columbia*, 108 F.3d 366, 369 (D.C. Cir. 1997) ("defendants in *Bivens* actions must be served as individuals, pursuant to Rule 4(e)"); *Anderson v. Gates*, 20 F. Supp. 3d 114, 122 (D.D.C. 2013) (plaintiff who "attempted to serve defendants only at what he believed to be their work addresses" failed to effect service for purposes of *Bivens* claims); *Cornish v. United States*, 885 F. Supp. 2d 198, 205 (D.D.C. 2012) ("mailing process to [individual defendants] at their place of employment"

was insufficient for purposes of *Bivens* claims); *Taylor v. Gearan*, 979 F. Supp. 1, 5 (D.D.C. 1997) ("It is established that a defendant's service on his or her employer or its agents is not sufficient to effect personal service on an individual being sued in his or her personal capacity.").

Moreover, Gebert did not serve the John Doe defendants at all. It does not matter that he does not know the John Doe defendants' identities. To sue them in their personal capacities, Gebert must serve them in the manner Rule 4(e) prescribes. *See Chapman v. Heath*, Civ. A. No. 17-1735 (CKK), 2019 WL 5653445, at *2 (D.D.C. Oct. 31, 2019) (dismissal proper because it "is axiomatic that process cannot be issued for 'John Doe' defendants, much less served on them"); *Superior Fibre Prods., Inc. v. Dep't of the Treasury*, 156 F. Supp. 3d 54, 66 (D.D.C. 2016) ("the alleged Doe defendants . . . remain unidentified and thus cannot be served."); *Bloem v. Unknown Dep't of the Interior Emps.*, 24 F. Supp. 3d 97, 102-03 (D.D.C. 2014) ("Other circuits have also weighed in on the issue, granting [ ] dismissals for the failure to name and serve John Doe defendants" (collecting cases)); *Scahill v. District of Columbia*, 271 F. Supp. 3d 216, 222 n.3 (D.D.C. 2017) (dismissing claims against "John Does in their personal rather than official capacity" who "were never identified and served"); *Brown v. Wachovia Bank*, Civ. A. No. 06-0153 (RMC), 2007 WL 1378491, at *5 (D.D.C. May. 10, 2007) ("Defendants 'John Doe' and 'Jane Doe' will also be dismissed because they cannot be effectively served in order to confer jurisdiction over them in this Court."); *Paolone v. Mueller*, Civ. A. No. 05-2300 (JDB), 2006 WL 2346448, at *3 n.2 (D.D.C. Aug. 11, 2006) ("'John Doe' defendants cannot be effectively served in their individual capacities in order to confer jurisdiction over them in this Court."); *M.K. v. Tenet*, 99 F. Supp. 2d

12, 18 (D.D.C. 2000) (ignorance of John Doe defendants' identities in *Bivens* case did not "obviate the requirement that the plaintiffs properly serve process on persons whom they would sue").[5]

## IV. Gebert Fails Plausibly to Allege that His Clearance Revocation was Retaliation for His Extensive White Nationalist Activities and Associations

Counts I, VII, VIII, IX, XII, XIII, XIV, and XV of Gebert's complaint raise claims under the First Amendment. *See* Compl. ¶¶ 77-87, 127-43, 158-81.[6] The essence of these claims is the allegation that the Department revoked his clearance due to his white nationalist activities and associations. "To state a claim for First Amendment retaliation," a plaintiff "must allege that [he] engaged in protected conduct, that the government took retaliatory action capable of deterring another from the same protected activity, and that there is a causal link between the two." *Comm. on Ways & Means v. Dep't of Treasury*, 45 F.4th 324, 340 (D.C. Cir. 2022). "The improper motive must be a but-for cause of the government action, meaning that the adverse action against the

---

[5]    Notwithstanding the numerous defects in Gebert's summons and service of process, this Court should address Gebert's *Bivens* claims nonetheless, given a court's duty "to weed out" any insubstantial *Bivens* claims "expeditiously." *Siegert v. Gilley*, 500 U.S. 225, 232 (1991); *see also Simpkins v. District of Columbia*, 108 F.3d 366, 370 (D.C. Cir. 1997) ("Dismissing a meritless *Bivens* suit for insufficiency of service of process, like dismissing such a suit for improper venue, also merely postpones the inevitable. Why give the plaintiff the benefit of a second chance?").

[6]    Because Gebert's constitutional claims fail on the merits, this Court need not address the question of whether federal courts can review Executive Branch judgments about whether specific individuals pose a risk to the national security, a question the D.C. Circuit repeatedly has declined to resolve. *See Gill v. Dep't of Just.*, 875 F.3d 677, 682 (D.C. Cir. 2017) ("As interesting as this issue is, we need not reach it"); *see also Palmieri*, 896 F.3d at 590 (Katsas, J., concurring) ("The question whether a plaintiff can seek to undo the denial or revocation of a security clearance, based on non-frivolous constitutional challenges to investigatory or even adjudicatory processes, is weighty and difficult because, in such cases, judicial review bumps up against the President's enumerated and exclusive power as Commander in Chief."). Although *Webster v. Doe*, 486 U.S. 592, 604 (1988), held that precluding judicial review of constitutional challenges to a termination decision raised a "serious constitutional question" even in the national security context, *Webster* did not directly involve the grant or denial of a clearance, nor, as Judge Katsas has explained, did it involve "the Article II authority of the President"—only "the statutory authority of the Director of Central Intelligence." *Palmieri*, 896 F.3d at 590. In any event, *Webster* concluded only that it would raise serious constitutional questions to preclude judicial review of "colorable constitutional claims," 486 U.S. at 603, and for the reasons explained herein, Gebert's claims are not colorable.

plaintiff would not have been taken absent the retaliatory motive." *Id.* (internal quotation marks omitted). Gebert's First Amendment claims fail because even if his white nationalist activities and associations constitute protected activity and his clearance revocation would deter such activity, Gebert pleads no facts supporting a plausible inference of causation between the two. Rather, as Gebert's own pleadings demonstrate, the Department revoked his clearance due to his dishonesty, not his extensive white nationalist activities and associations. Compl. ¶ 42.

During his background reinvestigation interview, Gebert represented that he (1) had no "associations with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position;" (2) was not "aware of any people or organizations that would criticize or oppose his employment in a government position;" and (3) knew no "information regarding members of his family that would be a possible source of embarrassment to the United States Department of State." Compl. ¶ 14. In revoking his clearance, the Department explained that Gebert's conduct had raised potentially disqualifying security concerns under National Security Adjudicative Guideline E (Personal Conduct) in three separate ways. *Id.* ¶ 41. First, Gebert had "refus[ed] to provide full, frank, and truthful answers" during his background reinvestigation interview. *Id.* ¶ 42(i). Second, Gebert had "deliberatively provid[ed] false or misleading information; or conceal[ed] or omit[ed] information concerning relevant facts" during his personnel security interview. *Id.* ¶ 42(ii). And third, Gebert "conceal[ed] [certain] information about [his] conduct that creates a vulnerability to exploitation, manipulation, or duress by a foreign intelligence entity or other individual or group." *Id.* ¶ 42(iii).

Gebert's own pleadings corroborate the Department's conclusions. Gebert concedes that he believed that he might "lose his job" if his extensive white nationalist activities and associations came to light, used "pseudonyms" to conceal his identity online—on forums like *The Right Stuff*,

and social media platforms like Twitter—and wore "a hat and sunglasses" to the Unite the Right Rally in order to avoid public identification. Compl. ¶¶ 19, 21. The steps that Gebert took to avoid public identification as a white nationalist support the Department's conclusion that Gebert had been dishonest about his extensive white nationalist activities and associations.

The common thread connecting Gebert's violations is dishonesty that cast doubt on his reliability, trustworthiness, and ability to protect classified information. An employee is eligible for access to classified information only if "facts and circumstances indicate access to classified information is clearly consistent with the national security interests of the United States." Exec. Order 12,968 § 3.1(b), 60 Fed. Reg. 40,245, 40,250 (Aug. 2, 1995), as amended. Gebert's false or misleading statements during his background reinvestigation called his integrity into question, and obstructed the Department from obtaining information bearing on whether granting him access to classified information was clearly consistent with national security. Indeed, Gebert's dishonesty caused the Department to grant him such access despite lacking information necessary to make an informed decision on the matter. *See* SEAD-4 ¶ 2(a) ("All available, reliable information about the person, past and present, favorable and unfavorable, should be considered in  reaching a national security eligibility determination."); *Hoska v. Dep't of Army*, 677 F.2d 131, 136 (D.C. Cir. 1982) ("The ultimate determination of whether the granting of a clearance must be . . . based upon all available information, both favorable and unfavorable."); *Smith v. Schlesinger*, 513 F.2d 462, 465 (D.C. Cir. 1975) (decision must rest "upon all the information which may properly be considered" (cleaned up)); *Huynh v. Carlucci*, 679 F. Supp. 61, 65 (D.D.C. 1988) ("Accurate information about an individual's background is necessary to make an informed judgment as to whether or not granting a security clearance to an individual is clearly consistent with the national interest.").

By concealing his extensive white nationalist activities and associations, moreover, Gebert made himself vulnerable to blackmail. *See Dep't of Navy v. Egan*, 484 U.S. 518, 528 (1988) (clearance decision rests on prediction of "whether, under compulsion of circumstances or for other reasons, [a person] might compromise sensitive information"); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 677 (1989) (government "has a compelling interest in protecting truly sensitive information from those who, under compulsion of circumstances or for other reasons, might compromise such information" (cleaned up)); *Hartness v. Bush*, 919 F.2d 170, 172-73 (D.C. Cir. 1990) ("The government's primary concern with regard to [classified information] is that an employee could be induced, perhaps by a blackmailer who is aware of [embarrassing facts], to disclose the information"); *Doe v. Webster*, 769 F. Supp. 1, 3 (D.D.C. 1991) (the government "has a legitimate, interest in ensuring that its employees are not susceptible to breaches of security").

Gebert's dishonesty, wholly independent of his extensive white nationalist activities and associations, was a proper basis, under the First Amendment, to revoke his clearance. *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982) ("There is no first amendment protection for furnishing with predatory intent false information to an administrative or adjudicatory body."); *Lewis v. Lhu*, 696 F. Supp. 723, 729 (D.D.C. 1988) ("an injunction against encouraging the furnishing of false information to a government agency would not infringe upon defendants' constitutional rights"); *see also United States v. Alvarez*, 567 U.S. 709, 720 (2012) (distinguishing, for purposes of the First Amendment, a statute prohibiting "false statements made to Government officials, in communications concerning official matters" from a statute criminalizing "false statements . . . made to any person, at any time, in any context"); *cf. LaChance v. Erickson*, 522 U.S. 262, 264 (1998) (Due Process Clause does not prohibit "federal agency from sanctioning an employee for making false statements to the agency regarding alleged

employment-related misconduct on the part of the employee"); *Lee v. Stewart*, No. 20-5952, 2021 WL 6932349, at *3 (6th Cir. Aug. 24, 2021) (statements that "posed a potential security risk" were not protected speech in context of security clearance investigation). That is especially so given that "any doubt" at all as to an employee's fitness to access classified information "shall be resolved in favor of the national security." Exec. Order 12,968 § 3.1(b), 60 Fed. Reg. at 40,250. Dishonesty during a background reinvestigation for a job requiring a clearance plainly is not protected speech.

Gebert does not dispute that dishonesty during a background reinvestigation for a position requiring a clearance is a proper basis to revoke one's clearance. He contends only that dishonesty was not the Department's true reason for revoking his clearance, but a mere pretext for viewpoint-based retaliation. He alleges that "Defendants enforce their reasoning unevenly or otherwise fail to apply a similar policy to other groups; namely, authorizing and/or applying significantly reduced application of its harsh position to those who publicly support Black Lives Matter." Compl. ¶ 43. He further alleges "[t]here is no evidence that the Defendants are revoking the security clearance[s] and suspending similarly situated employees for failing to disclose their affiliation and/or content created furthering [Black Lives Matter]." *Id.* To the contrary, he says, "the U.S. Office of Special Counsel [ ] expressly authorizes employees *to publicly support the movement on the job*." *Id.* (emphasis in original). This, Gebert argues, shows that the Department's rationale for revoking his clearance—his dishonesty about his white nationalist activities and associations—is pretextual.

Gebert's argument fails for two reasons.[7] First, Gebert pleads no facts to support a plausible inference that there is any Department employee who holds a clearance, supports Black Lives

---

[7]      Gebert also does not plausibly allege that support for the Black Lives Matter movement—which, as this Court has put it, "protest[s] racial injustice" like "the death of . . . Black people at the hands of law enforcement," *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 26 (D.D.C. 2021)—is akin to support for white nationalism.

Matter, and—most importantly—has engaged in dishonest behavior similar to his. He identifies no such person who offered false or misleading information, or failed to offer full, frank, and truthful answers, during a background reinvestigation or otherwise hid support for Black Lives Matter. Second, even assuming there is at least one Department employee who holds a clearance, supports Black Lives Matter, and engaged in similar dishonest behavior, Gebert pleads no facts to support a plausible inference that Defendants have treated such persons unlike him. In sum, Gebert offers nothing beyond rank speculation of disparate treatment based on his political beliefs. That does not suffice to support a plausible allegation of pretext. *See Iqbal*, 556 U.S. at 678.

Gebert's reliance on a memorandum from the Office of Special Counsel concluding that federal employees may voice support for Black Lives Matter on the job, Compl. ¶ 43, is misplaced. For one thing, the Office of Special Counsel is not part of the Department—it is an entirely separate agency. 5 U.S.C. § 1212. How the memorandum can shed light on whether the Department revoked Gebert's clearance for retaliatory reasons thus is unclear. For another, the memorandum concluded only that "the Hatch Act generally allows employees to engage in [Black Lives Matter]-related activity while on duty or in the workplace," so long as they refrain "from combining [such] activity with political activity while on duty or in the workplace and from engaging in partisan political fundraising in connection with [Black Lives Matter]-related organizations." *Black Lives Matter and the Hatch Act*, Off. of Special Counsel, https://www.usgs.gov/media/files/office-special-counsel-advisory-black-lives-matter-and-hatch. The memorandum did not authorize employees to make false, misleading, or incomplete statements during background investigations for clearance-level jobs, or let employees with such jobs conceal information that can be used to blackmail them.

Gebert also appears to argue that the evidence the Department considered in revoking his clearance does not support a conclusion that he was dishonest. But "the key question" as to pretext

"is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Hairston v. Vance-Cooks*, 773 F.3d 266, 273 (D.C. Cir. 2014) (internal quotation marks omitted). That Gebert disagrees with the reasoning used to revoke his clearance is hardly surprising. But while Gebert may dislike the Department's reasons for revoking his clearance, he does not plausibly allege that the Department itself did not believe these reasons.

First, the Department cited a remark that Gebert made on *The Fatherland*—that "[t]here are bigger things than a career and a paycheck, and I don't want to lose mine"—as proof "that he understood that his connection to white nationalism (if discovered) could end his career with the Department of State." Compl. ¶ 20 (internal quotation marks omitted). Gebert contends that this remark in fact shows that he was willing to lose his job for his beliefs, *id.* ¶ 21, but that is irrelevant. By Gebert's own account, the Department relied on this remark simply to show motive and intent for dishonesty—he knew that his white nationalist activities and associations, if known, could impact his career. *Cf.* Fed. R. Evid. 404(b) (evidence admissible to prove "motive" or "intent").

Second, Gebert minimizes the actions that he took to conceal his extensive white nationalist activities and associations. He downplays his use of pseudonyms as "rudimentary online forum protocols," and sarcastically describes donning a disguise to hide his identity at the Unite the Right rally as "*sophisticated* anti-detection tactics." Compl. ¶ 19 (emphasis in original). But he does not dispute that he used these tactics—however unsophisticated or rudimentary they were—to conceal his white nationalist activities and associations. *See Am. Bd. of Internal Med. v. Rushford*, 841 F. App'x 440, 443 (3d Cir. 2020) ("using a pseudonym and an email address that conceals one's identity are surely suggestive of intent to mislead"); *United States v. Kalu*, 791 F.3d 1194, 1205 (10th Cir. 2015) ("Intent may be inferred from evidence that the defendant attempted to conceal activity"); *United States v. Jones*, 432 F.3d 34, 41 (1st Cir. 2005) ("wearing of hooded sweatshirts

tightly wrapped around their heads . . . suggested an intent to disguise the two men's identities"). That Gebert's efforts to disguise himself were ineffective does not mean they were not deceptive.

Gebert's remaining arguments consist entirely of conclusory allegations of retaliation and pretext, which do not suffice to state a plausible claim. *See Iqbal*, 556 U.S. at 678; *see also, e.g.*, Compl. ¶¶ 44 ("Defendants by discriminatory motive or intent, or through reckless or callous indifference, invoked and implemented a policy to intentionally discriminate against the Plaintiff by using the security clearance and national security laws and regulations to impose barriers that could thwart, and in this case, did thwart the exercise of the Plaintiff's constitutional rights"), 54 ("The Defendant has provided a pretextual reason for revoking Plaintiff's security clearance"), 55 ("the true basis for the revocation" was "the trampling of constitutionally protected rights"); *see also Hegab v. Long*, 716 F.3d 790, 796-97 (4th Cir. 2013) ("Hegab's constitutional claims depend entirely on his disagreement with [agency's] review of the evidence and his conclusion that the agency did not make its decision [regarding clearance revocation] for the reasons that it gave and therefore must have acted from an unconstitutional bias. This type of speculative claim, however, does not state a colorable constitutional claim.").

The fact that Gebert purports to support some of his allegations with "information and belief" is irrelevant. As this Court previously explained, "[i]t is well-settled that such conclusory allegations supported by information and belief are insufficient to survive a motion to dismiss." *Doe v. Lee*, Civ. A. No. 19-0085 (DLF), 2020 WL 759177, at *6 (D.D.C. Feb. 14, 2020) (quoting *Niedermeier v. Office of Max S. Baucus*, 153 F. Supp. 2d 23, 31 (D.D.C. 2001)); *see also United States v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016) ("'on information and belief' can mean as little as 'rumor has it that'"); *Donald J. Trump for Pres., Inc. v. Sec'y of Pa.*, 830 F. App'x

377, 387 (3d Cir. 2020) ("'Upon information and belief' is a lawyerly way of saying that [someone] does not know that something is a fact but just suspects it or has heard it.").[8]

## V.   Gebert Fails Plausibly to Allege a Due Process Violation

Counts II, III, IV, V, and XVI raise claims under the Due Process Clause. Compl. ¶¶ 88-120, 182-88. The Fifth Amendment prohibits deprivations of "life, liberty, or property without due process of law." U.S. Const. amend. V. "The Due Process Clause affords both substantive and procedural protections," *Butterfly Ass'n*, 977 F.3d at 1265, and "contains an equal protection component," *Hutchins v. District of Columbia*, 144 F.3d 798, 806 (D.C. Cir. 1998). But whether framed in substantive, procedural, or equal protection terms, Gebert's due process claims each fail.

### A.   Gebert Fails Plausibly to Allege a Substantive Due Process Violation

To state a substantive due process claim against a federal actor, a plaintiff must identify a right "guaranteed by the first eight Amendments," "deeply rooted in our history and tradition," and/or "essential to our Nation's scheme of ordered liberty," based on "a careful analysis of the history of the right at issue." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022). Gebert alleges two substantive due process violations—the Department's (1) revocation of his clearance "due to him expressing opinions with which Defendant[s] did not agree," Compl. ¶ 95, and (2) denial of his request "to use his annual leave, property, prior to initiation of the [s]uspension without pay," *id.* ¶ 107. Gebert's substantive due process claim based on "expressing opinions," *id.* ¶ 95, fails for the same reasons as his First Amendment claims—as his own pleadings show, the Department revoked his clearance due to his dishonesty, not his white nationalist beliefs.

---

[8]     Gebert claims that "[t]here are currently members of our Congress who are members of white nationalist groups and/or speak at white nationalist events," and that his ideology "mirrors" theirs, and those of "former President Trump, and multiple members of his Cabinet and senior advisors." Compl. ¶ 48. But that is irrelevant to whether Defendants' stated reason is pretextual.

Gebert's substantive due process claim based on the failure to let him use his accrued leave prior to his suspension also fails. While substantive due process "normally imposes only very slight burdens on the government to justify its actions, it imposes none at all in the absence of a liberty or property interest." *George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003). Property interests do not arise under the Constitution, but "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (internal quotation marks omitted). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it," or "a unilateral expectation of it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "He must, instead, have a legitimate claim of entitlement to it." *Id.*

Gebert asserts that he had a property interest in using his accrued leave prior to the start of his suspension, Compl. ¶ 107, but pleads no facts to make this allegation plausible. *Iqbal*, 556 U.S. at 678. He does not allege, for example, that Department rules, regulations, or guidelines entitled him to use his accrued leave prior to his suspension. Indeed, he pleads virtually no facts about his accrued leave at all, failing even to mention it until Count IV. *See* Compl. ¶ 105. Nor can this Court assume that Gebert had an unfettered right to use his accrued leave whenever or however he pleased. Federal agencies generally restrict employees' use of accrued leave, such as by requiring them to obtain prior supervisory approval, or limiting how much leave they can use at a time.[9]

---

[9]     *See, e.g.*, *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (plaintiff "had not obtained [supervisor's] prior approval" to use leave, "as all auditors were required to do"); *Nat'l Treasury Emps. Union v. FLRA*, 452 F.3d 793, 794-95 (D.C. Cir. 2006) (employer "scheduled local employees' annual leave in accord" with "scheduling requirements" that "dictated the number of employees needed to answer calls on any given day"); *Dong v. Smithsonian Inst.*, 125 F.3d 877, 877 (D.C. Cir. 1997) ("without seeking permission, plaintiff took annual leave," and then was suspended as a result); *Waters v. Thornburgh*, 888 F.2d 870, 871 (D.C. Cir. 1989) (plaintiff "filed a request for . . . annual leave," which supervisor "approved"); *Parsons v. Dep't of Air Force*, 707

Even if Gebert had a property interest in using his accrued leave prior to his suspension, he still fails to plausibly allege a substantive due process violation. "Once a property interest is found, . . . substantive due process constrains only egregious government misconduct." *George Wash. Univ.*, 318 F.3d at 209. A plaintiff must plausibly allege that the challenged action works a "grave unfairness," which requires a (1) "substantial infringement of [the] law prompted by personal or group animus" or (2) "deliberate flouting of the law that trammels significant personal or property rights." *Id.* (internal quotation marks omitted). To the extent Gebert claims the Department did not allow him to use his accrued leave prior to his suspension due to animus against white nationalists, that claim fails for the same reason as his First Amendment claims. *See supra* § IV. Nor does he plausibly allege that not letting him use his accrued leave prior his suspension was a "deliberate" violation of the law by Defendants, or that such any violation was "significant." *George Wash. Univ.*, 318 F.3d at 209. After all, Gebert does not allege that he was permanently deprived of his accrued leave—only that he could not use it precisely when he wanted. Compl. ¶¶ 107-08.

Finally, the Department's reason for not allowing Gebert to use his accrued leave prior to his suspension was not "irrational" in light of his clearance suspension, and so satisfies substantive due process's strictures. *George Wash. Univ.*, 318 F.3d at 210. As Gebert acknowledges, "holding a valid Top Secret security clearance is a condition of [his] employment," so the "suspension of

---

F.2d 1406, 1407 (D.C. Cir. 1983) ("supervisors originally approved [plaintiff's] leave, but" then later "cancelled his leave request . . . due to a shortage of available fire fighters on that date"); *Skrynnikov v. Fed. Nat'l Mortg. Ass'n*, Civ. A. No. 11-0609 (TJK), 2021 WL 4989450, at *4 (D.D.C. Oct. 27, 2021) ("if an employee wishes to use . . . compensatory leave which the employee has accrued," he must meet the "requirements for the taking of such paid leave" (cleaned up)); *Brown v. Vilsack*, 923 F. Supp. 2d 118, 119 (D.D.C. 2013) ("Annual leave will not be granted . . . unless scheduled in advance and approved by the supervisor." (cleaned up)); *Diggs v. Potter*, 700 F. Supp. 2d 20, 29 (D.D.C. 2010) ("annual leave is based on approval from a supervisor"); *Reshard v. LaHood*, Civ. A. No. 87-2794 (RBW), 2010 WL 1379806, at *6 (D.D.C. Apr. 7, 2010) ("annual leave must be requested and approved in advance" (cleaned up)); *Hendricks v. Paulson*, 520 F. Supp. 2d 65, 84 (D.D.C. 2007) (agency restricted use of "annual leave . . . without prior approval").

his security clearance resulted in a proposal to suspend [him] from his employment indefinitely." Compl. ¶ 25. Whether the Department could have vindicated its security concerns as effectively by allowing Gebert to use his accrued leave before being suspended is immaterial to whether or not the Department's choice was rational. *See Nguyen v. INS*, 533 U.S. 53, 78 (2001) ("The fact that other means are better suited to the achievement of governmental ends therefore is of no moment under rational basis review.").

## B.     Gebert Fails Plausibly to Allege a Procedural Due Process Violation

To state a procedural due process claim, a plaintiff must plausibly allege that he (1) was "deprived of a protected interest" (2) without "the process [he was] due." *Statewide Bonding, Inc. v. Dep't of Homeland Sec.*, 980 F.3d 109, 118 (D.C. Cir. 2020). But Gebert identifies no protected interest other than that in his reputation, and regardless, is receiving all the process he is due.

### 1.     Gebert fails to identify a protected interest other than that in his reputation

"To sustain a procedural due process claim, a plaintiff must first demonstrate the existence of a protected liberty or property interest." *McCormick v. District of Columbia*, 752 F.3d 980, 987 (D.C. Cir. 2014). Defendants assume, for purposes of this motion only, that Gebert has a protected interest in his reputation. But none of the remaining interests that he identifies—in his (1) clearance itself, Compl. ¶ 94; (2) ability to express his opinions, *id.* ¶ 95; (3) employment opportunities, *id.* ¶ 102, or (4) accrued leave, *id.* ¶ 108—can support a procedural due process claim.

#### a.     Gebert has no protected interest in his clearance

Gebert lacked a protected interest in his clearance. *See Egan*, 484 U.S. 528 ("It should be obvious that no one has a 'right' to a security clearance"); *Doe v. Cheney*, 885 F.2d 898, 909 (D.C. Cir. 1989) (plaintiff "had no entitlement to access to [classified information]. He cannot argue that [agency] has deprived him of a property interest."); *U.S. Info. Agency v. Krc*, 905 F.2d 389, 399 (D.C. Cir. 1990) ("no independent property right attaches to the security clearance"); *Palmieri v.*

*United States*, 72 F. Supp. 3d 191, 206 (D.D.C. 2014) (employee lacks "liberty or property interest in his security clearance"); *see also Gill*, 875 F.3d at 681 (plaintiff "[c]onced[ed] that he had no constitutionally protected property interest in his security clearance").

> b.    *Gebert was not deprived of his ability to express his opinions*

Gebert does not plausibly allege a deprivation of his right to express opinions for the same reasons that his First Amendment claims fail—by his own pleadings, the Department revoked his clearance due to his dishonesty, not his support for white nationalism. *See supra* § IV. To the extent that Gebert alleges injury due to his "voluntary" decision to not comment publicly on his situation, *see* Compl. ¶ 111 ("Plaintiff has issued no public statements, has rejected all requests for interview, and has never responded to media inquiries regarding his employment with or suspension by Defendant"), he lacks standing to challenge such self-inflicted harms. *See Public Citizen v. Nat'l Highway Transp. Safety Admin.*, 489 F.3d 1279, 1290 (D.C. Cir. 2007) (plaintiff lacks standing to challenge "'self-inflicted' injury not caused by the agency action" at issue); *Nat'l Family Planning & Repro. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing."); *cf. Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 35 (D.D.C. 2014) ("the harm is self-inflicted and, therefore, not the irreparable harm that supports injunctive relief"); *Second City Music, Inc. v. City of Chi.*, 333 F.3d 846, 850 (7th Cir. 2003) ("self-inflicted wounds are not irreparable injury").

> c.    *Gebert was not denied a protected employment opportunity*

Gebert likewise fails plausibly to allege the denial of any protected interest in employment opportunity. He has no protected interest in his job, as there is no right to a job that requires a clearance. *See Krc*, 905 F.2d at 397 ("The loss of some employment opportunities does not amount to an alteration of a legal right, particularly when the loss of employment flows directly from the modification of a security clearance, which itself represents only a change in the terms of an

agency's exercise of its discretion" (cleaned up)); *Gill v. Dep't of Just.*, Civ. A. No. 15-0824 (RMC), 2016 WL 3982450, at \*6 (D.D.C. July 22, 2016) ("the right 'to earn a living' does not extend to jobs requiring a security clearance" (quoting *Palmieri*, 72 F. Supp. 3d at 207)); *Magassa v. Mayorkas*, 52 F.4th 1156, 1169 (9th Cir. 2022) (employee has "no liberty interest in maintaining employment that requires a security clearance"); *Stehney v. Perry*, 101 F.3d 925, 936 (3d Cir. 1996) (employee "has no constitutionally protected liberty or property interest in . . . a job requiring a security clearance"); *Chesna v. Dep't of Def.*, 850 F. Supp. 110, 119 (D. Conn. 1994) (same).

Nor does Gebert plausibly allege the denial of any other employment opportunity. He does not allege that he was denied any job as a result of his clearance revocation. *See Orange v. District of Columbia*, 59 F.3d 1267, 1275 (D.C. Cir. 1995) (due process claims failed where plaintiffs failed to show challenged action "foreclosed their opportunities for future government employment"); *Graham v. Dep't of Just.*, Civ. A. No. 02-1231, 2002 WL 32511002, at \*5 (D.D.C. Nov. 20, 2002) (rejecting due process claim where "[t]here is no evidence that the letter interposes any barrier that would prevent plaintiff from obtaining future government employment"). To the contrary, Gebert acknowledges that following his suspension, he received job offers from both the Postal Service and the Census Bureau, but chose to turn them both down. Compl. ¶¶ 116-17; *see also Krc*, 905 F.2d at 397-98 (no due process claim where plaintiff continued to work for federal agency after modification of his clearance); *Evangelou v. District of Columbia*, 63 F. Supp. 3d 96, 104 (D.D.C. 2014) (for purposes of due process claim, "Plaintiff's failure to seek employment opportunities precludes him from proving that his termination foreclosed opportunities for future employment"). Gebert's insistence that he "is unwilling," and should not "be forced to, resign his employment with [the] Department while they continue to fail to act on his matters," Compl. ¶ 117, meanwhile, only reinforces the voluntary nature of his refusal to accept numerous other offers of employment.

> **d.** *Gebert had no protected interest in using his accrued leave prior to his suspension*

As Defendants explained, Gebert lacked a protected interest in using his accrued leave prior to his suspension. *See supra* § V.A. Just as he had no such interest for purposes of his substantive due process claim, he lacked such an interest for purposes of his procedural due process claim.

> **2.** Gebert is receiving all the process that he is due

Gebert is receiving all the process he is due. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted). In the clearance revocation context, "due process entitle[s]" a person simply "to a hearing in order to refute the charges against him and to clear his name." *Doe*, 885 F.2d at 910. The comprehensive procedures the Department has established to govern clearance revocation amply satisfy due process's strictures. And the Civil Service Reform Act ("CSRA") affords due process as to all Gebert's remaining personnel claims.

Before revoking a clearance, Personnel Security "notif[ies] the individual, in writing, of its decision to . . . revoke that individual's clearance." 12 Foreign Affairs Manual ("FAM" or "Manual") § 234.1(b), https://fam.state.gov/fam/12fam/12fam0230.html. "The notification will provide as comprehensive and detailed a written explanation of the basis for the decision as the national security interests of the United States and other applicable law permit." *Id.* The individual may (1) "[b]e represented by counsel or other representative at his/her own expense;" (2) request "any documents, records, and reports" on which the revocation "is based," to the extent that such materials would be provided under FOIA or the Privacy Act, which Personnel Security "will endeavor to provide . . . within 30 days;" (3) request "their entire investigative file, to the extent permitted by national security and other applicable law," which Diplomatic Security Service ("Diplomatic Security") "will provide . . . promptly and prior to the time set for the individual's

written reply;" (4) "[s]ubmit . . . a written reply to, and request for review of, the decision to . . . revoke his/her eligibility for access to classified information" (and request "an extension of time to submit the written reply and request for review"); and (5) "[b]e provided written notice of and reasons for the results of the review, the identity of the deciding authority, and written notice of the right to appeal." *Id.* § 234.1(c). Should the individual seek review of the decision, Diplomatic Security will review the decision and the individual's reply, and provide "written notice of and reasons for the results of the review and, where appropriate, of the right to appeal." *Id.* § 234.1(i).

An individual may appeal the Diplomatic Security decision to the Department's Security Appeal Panel, and request "a personal appearance before the [Panel]." 12 FAM § 234.3(a). The Panel "will endeavor to schedule a meeting to hear the appeal within four weeks of receiving the appeal." *Id.* § 234.3(a). Personnel Security will notify the individual of the hearing date, "promptly provide the individual with the materials provided to the panel to the extent the documents would be provided if requested under [FOIA] or the Privacy Act, as applicable," and "advise the individual of relevant procedures and of the panel's final decision in the case." *Id.* § 234.3(c). The individual may also submit "any additional written arguments and any relevant documents, materials, and information the individual wants the panel to consider," including "any witness statements that the individual wishes to introduce" *Id.* § 234.3(d)-(e). "The individual will have an opportunity to appear before the [Panel] in person," and "[t]he personal appearance will not be adversarial in nature." *Id.* § 234.3(e). "The [Panel] may request additional information from the individual or from the Department prior to rendering its decision." *Id.* § 234.3(f).

Gebert's pleadings establish that he not only received, but availed himself of, the extensive procedural protections that the Department offered him. As Gebert acknowledges, the Department told him that it would suspend his clearance "pending the outcome of a 'for cause' investigation,"

and allowed him "to respond orally, in writing, or both," during that investigation. Compl. ¶¶ 22, 26. Gebert submitted a written reply "through his legal representative," and Department officials interviewed him about the matter. *Id.* ¶¶ 27-32. Later, he submitted "additional responses" to the Department. *Id.* ¶ 35. When the Department revoked his clearance, it informed him that he "was entitled to provide written and oral responses" to the decision. *Id.* ¶ 60. Gebert has availed himself of some of these opportunities, "provid[ing] a written rebuttal . . . denying the allegations" against him "in their entirety" and giving a "Supplemental Response," each time by counsel. *Id.* ¶¶ 49-50.

The Department thus is providing Gebert all the process that he is due as to his clearance revocation. *See Gill*, 875 F.3d at 681 ("he received all the process that was due: a full hearing . . . where he had the right to counsel and the opportunity to make his case"); *Doe*, 885 F.2d at 910 (plaintiff "received appropriate process" where he was notified of revocation recommendation, "submitted lengthy written materials in support of his argument," and "had an interview with [agency's] Director . . . in the context of very sensitive agencies, . . . the Constitution does not require more" (internal quotation marks omitted)); *Doe v. Casey*, 796 F.2d 1508, 1524 (D.C. Cir. 1986), *aff'd in part, rev'd in part sub nom. Webster*, 486 U.S. 592 (plaintiff "was given a meaningful opportunity" to respond where he had "notice" of concerns and could "examine the polygraph officer's report" and "submit lengthy written arguments on his behalf . . . . In the context of a very sensitive agency . . . we cannot say that the Constitution requires more"); *Doe v. Dep't of Just.*, 753 F.2d 1092, 1112 (D.C. Cir. 1985) ("the proper remedy for . . . infringement of Doe's liberty interest in reputation is an opportunity for Doe to refute the charges and clear her name").

Finally, as to Gebert's claims regarding his suspension and loss of insurance, the CSRA— which "established a comprehensive system for reviewing personnel action taken against federal employees," *United States v. Fausto*, 484 U.S. 439, 455 (1988)—provides all the process he was

due. *See Harrison v. Bowen*, 815 F.2d 1505, 1519 (D.C. Cir. 1987) (CRSA's "extensive procedural protections provided . . . at least as much process as [ ] was due as a matter of constitutional right").

### C.    Gebert Fails Plausibly to Allege an Equal Protection Violation

Count XVII raises an equal protection claim, while Count VI alludes to equal protection principles, too. "The first step in analyzing [a] claim that [allegedly] disparate treatment violated equal protection is to determine the proper level of scrutiny." *Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1153 (D.C. Cir. 2004). If an action "does not infringe a fundamental right or disadvantage a suspect class, no more than rational basis review is required." *Nat'l Ass'n for Advancement of Multijurisdiction Prac. v. Howell*, 851 F.3d 12, 18 (D.C. Cir. 2017).

Rational basis review governs Gebert's equal protection claim. As explained, Gebert fails plausibly to allege a violation of his First Amendment or due process rights. *See supra* §§ IV-V.A-B. Nor does his support for white nationalism place him in a protected class. *Cf. United States v. Kumpf*, 438 F.3d 785, 791 (7th Cir. 2006) (denaturalization of Nazi concentration camp guard did not violate equal protection principles); *Linnas v. INS*, 790 F.2d 1024, 1032 (2d Cir. 1986) ("Nazi war criminals" are not a protected class); *Rzayeva v. United States*, 492 F. Supp. 2d 60, 82 (D. Conn. 2007) ("anti-Semites" are not a protected class). And for the reasons explained, Gebert's dishonesty about his extensive white nationalist activities and associations furnishes a rational basis for revoking his clearance. *See supra* § IV.

### VI.    Gebert Fails to State an APA Violation

Gebert raises three claims under the APA. Count VI challenges his clearance revocation. Compl. ¶ 121-26. Count X challenges the Department's alleged failure to respond to his written replies. *Id.* ¶ 144-49. And Count XI challenges the Department's alleged termination of his health insurance coverage. *Id.* ¶ 150-57. As explained further below, each of these APA claims fails.

### A.    Gebert's APA Challenges to His Clearance Revocation Fails

Counts VI and X allege that Gebert's clearance revocation violate SEAD-4 and the Manual. Compl. ¶¶ 126, 146. But the "decision to revoke [a] security clearance [is] a decision committed to agency discretion by law." *Oryszak v. Sullivan*, 576 F.3d 522, 524 (D.C. Cir. 2009) (citing *Egan*, 484 U.S. at 527). And the APA does not apply if "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). These counts thus fail. *Id.*; *Dorfmont v. Brown*, 913 F.2d 1399, 1402 n.1 (9th Cir. 1990) (claim that agency violated clearance regulation would "eviscerate *Egan*").

These claims also fail on the merits. Gebert alleges "that the crux of [the decision to revoke his clearance] stem[s] from what [he] said or failed to say about what [he] previously said." *Id.* ¶ 123. It is hard to understand what this means. But as Defendants have explained, Gebert's own pleadings show that the Department revoked his clearance due to his dishonesty—a reason that is not arbitrary, capricious, or contrary to law. *See* 5 U.S.C. § 706(2)(A); *supra* § IV. His allegation that his clearance revocation violated SEAD-4, Compl. ¶ 126, meanwhile, is entirely conclusory. He does not explain how the revocation violated SEAD-4, or cite a specific provision of SEAD-4 that the revocation purportedly violated. And his allegations that the revocation violated his free speech right or equal protection principles fail for the reasons explained. *See supra* §§ IV, V.C.

### B.    Gebert Fails Plausibly to Allege that the Alleged Termination of His Health Insurance Coverage was Arbitrary or Capricious

Finally, Count XI alleges that the Department "retroactively terminated [Gebert's] health benefits as of the date of his suspension without pay." Compl. ¶ 155. But Gebert pleads no facts to support a plausible inference that this alleged act was unlawful. Gebert alleges only that the termination of his health insurance violated unspecified "law, regulation, and policy, as well as the [APA]." *Id.* ¶ 156. But he does not even identify which laws, regulations, or policies ostensibly required the Department to maintain his insurance (other than the APA), much less explain why

32

the termination of his insurance supposedly violated such laws, regulations, or policies. That is just the sort of "unadorned, the-defendant-unlawfully-harmed-me accusation . . . devoid of further factual development" that does not state a plausible claim. *Iqbal*, 556 U.S. at 678. And Gebert fails to explain why it would be arbitrary or capricious to terminate the insurance coverage of an employee placed on indefinite suspension from his job without pay.[10]

## VII.   Gebert Failed to Reasonably Describe the Records that He Sought

FOIA requires an agency to conduct an adequate search for responsive records and release any non-exempt, reasonably segregable portions thereof only if a request "reasonably describes such record." 5 U.S.C. § 552(a)(3)(A); *see also Nat'l Sec. Couns. v. CIA*, 969 F.3d 406, 410 (D.C. Cir. 2020) (agency "need not honor" and "can decline to process" request that does not reasonably describe records sought (internal quotation marks omitted)); *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 584 (D.C. Cir. 2020) ("an agency is only obligated to release nonexempt records if it receives a request that 'reasonably describes such records.'"); *Ctr. for the Study of Servs. v. Dep't of Health & Human Servs.*, 874 F.3d 287, 288 (D.C. Cir. 2017) (only request reasonably describing records sought "triggers the agency's obligation to search for and disclose all responsive records");

---

[10]    Gebert also alleges that the Department failed to "notify [him] of his option to continue receiving health insurance for up to 365 days by way of paying his own premiums." Compl. ¶ 151-52. Whether this is meant to be a freestanding claim is unclear, but if so, it fails. First, this action plainly is not "final" within the APA's meaning. 5 U.S.C. § 704; *see also Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) ("An agency action is final only if it is both the consummation of the agency's decisionmaking process and a decision by which rights or obligations have been determined or from which "legal consequences will flow." (cleaned up)). Second, while Gebert alleges that "law and policy" required the Department to provide him such notice, Compl. ¶ 152, he cites no law or policy imposing such a requirement, making this allegation wholly conclusory. *See Iqbal*, 556 U.S. at 678. Third, any error the Department committed was harmless. *See* 5 U.S.C. § 706 (harmless error rule). Gebert does not allege that he did not know, at the time he was suspended, that he could maintain his coverage by paying his own premiums, and thus inadvertently allowed his insurance to lapse, or that the Department impeded him from paying his premiums so as to remain covered.

*Pinson v. Dep't of Just.*, 70 F. Supp. 3d 111, 118 (D.D.C. 2014) ("to prevail on a FOIA cause of action, the plaintiff first must show that he made a FOIA request that reasonably described the records sought"); *Voinche v. FBI*, 412 F. Supp. 2d 60, 66 (D.D.C. 2006) (this rule is one of FOIA's "statutory requirements"). This requirement, "like any other element of a cause of action . . . must be adequately alleged at the pleading stage in order for the case to proceed." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 29 (2014); *accord Taylor v. FDIC*, 132 F.3d 753, 761 (D.C. Cir. 1997) (failure "to allege all the material elements of [a] cause of action" is fatal).[11]

The Privacy Act, meanwhile, requires each agency that maintains a system of records to "establish procedures for the disclosure to an individual upon his request of his record or information pertaining to him." 5 U.S.C. § 552a(f)(3). Pursuant to this mandate, the Department requires that all "[r]equests for access should describe the requested record(s) in sufficient detail to permit identification of the record(s)." 22 CFR § 171.22(b). A Privacy Act claim may proceed only if a request comports with agency regulations. *See Hill v. Air Force*, 795 F.2d 1067, 1070 (D.C. Cir. 1986) ("A Privacy Act plaintiff, however, must exhaust his or her administrative remedies prior to bringing an amendment suit."); *Trent v. Dep't of Homeland Sec.*, Civ. A. No. 18-2591 (ABJ), 2020 WL 1429881, at *3 (D.D.C. Mar. 24, 2020) ("A failure to seek review in accordance with the agency's procedures makes a lawsuit subject to dismissal for failure to exhaust administrative remedies."); *Scaife v. IRS*, Civ. A. No. 02-1805, 2003 WL 23112791, at *3 (D.D.C. Nov. 20, 2003) (dismissing Privacy Act claim because plaintiff "failed to give the name of the system or subsystem or categories of records to which he had sought access"); *Taylor v. Dep't of*

---

[11]    In this way, the requirement that a request reasonably describe the records sought differs from other FOIA requirements where the agency bears the burden of proof, such as that an agency conduct an adequate search, *see DiBacco v. Dep't of the Army*, 926 F.3d 827, 832 (D.C. Cir. 2019), and justify its withholdings, *see Campbell v. Dep't of Just.*, 164 F.3d 20, 30 (D.C. Cir. 1998).

*Treasury*, 127 F.3d 470, 474 (5th Cir. 1997) ("failure to present a request that comported with applicable Privacy Act regulations constituted a failure to exhaust administrative remedies").

In determining whether a request reasonably describes the records sought, "[t]he linchpin inquiry is whether the agency is able to determine precisely what records are being requested." *Yeager v. DEA*, 678 F.2d 315, 326 (D.C. Cir. 1982) (cleaned up). A request thus suffices only if "a professional employee of the agency who was familiar with the subject area of the request [can] locate the record[s] with a reasonable amount of effort." *Truitt v. Dep't of State*, 897 F.2d 540, 545 n.36 (D.C. Cir. 1990). A request requiring an agency to "speculate about" what it seeks, in contrast, does not suffice. *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996). "FOIA envisions that applicants will reasonably describe the records they seek, and agencies are entitled to demand it." *Am. Ctr. for L. & Just. v. Dep't of Homeland Sec.*, 573 F. Supp. 3d 78, 88 (D.D.C. 2021).

In *American Center*, Judge McFadden explained that "[a] request for documents that merely 'reference' certain topics might not be unreasonable," because "responsive documents could probably be found with a simple keyword search across agency databases." 573 F. Supp. 3d at 85. But a request for all records that "relate to" a topic, or that uses similarly "expansive" and indeterminate language, "would sweep in any [record] even remotely related to" that topic. *Id.* (cleaned up). Indeed, "a record need not even discuss [a topic] to still relate" to the topic. *Id.* Such "broad descriptions . . . leave the unfortunate FOIA processor assigned to such a case in a hopeless muddle without clear guidance about what documents are being sought." *Id.*

Other judges in this District have expressed this sentiment, as well. In *Shapiro v. CIA*, 170 F. Supp. 3d 147, 154 (D.D.C. 2016) (internal quotation marks omitted), for example, Judge Cooper explained that "[b]ecause a record may pertain to something without specifically mentioning it," such phrasing leaves "the agency to guess at the plaintiff's intent." Judge Sullivan, meanwhile, has

explained that "because a record may pertain to something without specifically mentioning it . . . the lack of clarity leaves the agency to guess at the plaintiff's intent." *Sack v. CIA*, 53 F. Supp. 3d 154, 164 (D.D.C. 2014). Or, as Judge Collyer aptly put it, "life, like law, is a seamless web, and all documents 'relate' to all others in some remote fashion." *Freedom Watch, Inc. v. Dep't of State*, 925 F. Supp. 2d 55, 61 (D.D.C. 2013) (cleaned up). Nor are judges in this District alone in reaching this result. As the Fourth Circuit has held, "concerning," "pertaining to," "relating to," and similar terms "typif[y] the lack of specificity that Congress sought to preclude in the requirement . . . that records sought be reasonably described." *Mason v. Callaway*, 554 F.2d 129, 131 (4th Cir. 1977).

Gebert's FOIA and Privacy Act claims fail because he did not describe the records sought reasonably and in enough detail to permit their identification. Gebert's request sought "all records relating to [him] that are held by the Department of State," including (1) "all interagency and intra-agency correspondence pertaining to the above," (2) "all interagency and intra-agency records related to the individual," (3) "all interagency and intra-agency correspondence pertaining to the Security Clearance Revocation," and (4) "all investigation and standard forms pertaining to the above." Ex. B. As judges in this District have repeatedly recognized, requests such as this, seeking all records in an agency's possession that relate or pertain to multiple topics, fail to reasonably describe the records sought. *See supra* cases cited at 35-36; *see also CNN, Inc. v. FBI*, 271 F. Supp. 3d 108, 112 (D.D.C. 2017) ("the language 'relate in any way to' [a topic] was too vague"); *Pinson v. Dep't of Just.*, 245 F. Supp. 3d 225, 244 (D.D.C. 2017) (request for records "concerning" a topic was "too vague to expect an [agency] employee familiar with the subject area to conduct a search" (internal quotation marks omitted)); *Freedom Watch, Inc. v. CIA*, 895 F. Supp. 2d 221, 229 (D.D.C. 2012) (request for records "relating to" a given topic failed to reasonably describe the records sought); *Latham v. Dep't of Just.*, 658 F. Supp. 2d 155, 161 (D.D.C. 2009) (request for records

"that pertain in any form or sort to" a given topic "is overly broad"); *Dale v. IRS*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (request for records "that refer or relate in any way to" a topic did "not describe the records sought with reasonably sufficient detail" (internal quotation marks omitted)).

Such indeterminate, open-ended descriptions do not enable FOIA processors to determine "precisely" which records Gebert requested, *Yeager*, 678 F.2d at 326, much less "with a reasonable amount of effort," *Truitt*, 897 F.2d at 545. Rather, such descriptions require the Department to "speculate about" which records Gebert is seeking. *Kowalczyk*, 73 F.3d at 389. Gebert thus failed to describe the records sought reasonably and with enough detail to permit their identification.

## VIII.   <u>Gebert is Not Entitled to Damages</u>

Because Gebert's claims fail for the reasons discussed above, he is not entitled to money damages. But his damages claims also merit dismissal for additional reasons. As an initial matter, sovereign immunity bars his damages claims as to the Department. *See Ivy v. CIR*, 877 F.3d 1048, 1049 (D.C. Cir. 2017) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); 5 U.S.C. § 702 (waiving sovereign immunity except for damages).

Gebert's claims against the individual defendants, meanwhile, merit dismissal for two more reasons. The *Bivens* doctrine does not furnish a cause of action under the circumstances presented. And even if it did, the individual defendants nonetheless would be entitled to qualified immunity.

### A.   The *Bivens* Doctrine Does Not Supply a Cause of Action

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971), the Supreme Court created a cause of action, available under limited circumstances, against a "federal agent acting under color of his authority . . . for damages consequent upon his unconstitutional conduct." *Bivens* involved Fourth Amendment claims for a warrantless search and excessive force arising from a handcuffing and arrest at the plaintiff's apartment. *Id.* at 389-90. Over the next nine years, the Court applied *Bivens* to fashion causes of action only twice—"first,

for a former congressional staffer's Fifth Amendment sex-discrimination claim and second, for a federal prisoner's inadequate-care claim under the Eighth Amendment." *Egbert v. Boule*, 142 S. Ct. 1793, 1802 (2022) (citing *Davis v. Passman*, 442 U.S. 228 (1979), and *Carlson v. Green*, 446 U.S. 14 (1980) (cleaned up)). "Since these cases, the Court has not implied additional causes of action under the Constitution." *Id.* Indeed, it has "declined 11 times" over 43 years "to imply a similar cause of action for other alleged constitutional violations." *Id.* at 1799-800 (citing cases).

Today, "recognizing a cause of action under *Bivens* is a disfavored judicial activity." *Egbert*, 142 S. Ct. at 1803. In considering a proposed *Bivens* claim, a court's inquiry proceeds in two stages. *Id.* The court first asks "whether the case presents a new *Bivens* context—i.e., is it meaningfully different from the three cases in which the Court has implied a damages action." *Id.* (cleaned up). Even if so, "a *Bivens* remedy is unavailable if there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Id.* (internal quotation marks omitted). One such "special factor" is that "Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure." *Id.* at 1804 (cleaned up). Indeed, "[i]f there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* (internal quotation marks omitted).

These two "steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 142 S. Ct. at 1803. "When asked to imply a *Bivens* action, [the] watchword is caution." *Id.* (internal quotation marks omitted). "If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." *Id.* (internal quotation marks omitted); *accord id.* ("Even a single sound reason to defer to Congress is enough to require a court to refrain from creating such

a remedy" (cleaned up)). This is a difficult standard to meet, by design—"in most every case," the Court has stressed, there will be "a rational reason to think" that Congress rather than the courts "should decide whether to provide for a damages remedy," and so, "no *Bivens* action may lie." *Id.*

Whether the *Bivens* inquiry is framed as two questions or only one, Gebert's claims fail at every step. His First Amendment *Bivens* claims fail because *Egbert* squarely held that "there is no *Bivens* cause of action for [a] First Amendment retaliation claim." 142 S. Ct. at 1807. And even setting that aside, his claims involve new contexts and/or special factors foreclosing *Bivens* relief.

       1.   <u>Gebert's claims arise in a new *Bivens* context</u>

Gebert's *Bivens* claims, which turn on or relate to his clearance suspension and revocation, arise in the "national security" context, which the Supreme Court has held is a "new context for *Bivens* purposes." *Egbert*, 142 S. Ct. at 1804; *see also Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020) (fact that context "unquestionably has national security implications . . . provides reason to hesitate before extending *Bivens*"); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) (rejecting idea that "an inquiry into sensitive issues of national security" is "allowed in a private suit for damages" under *Bivens*). "The grant of a clearance requires an affirmative act of discretion on the part of the granting official," based on a finding that granting the clearance would be "clearly consistent with the interests of the national security." *Egan*, 484 U.S. at 528 (internal quotation marks omitted). *Egbert*'s point-blank admonition "that a *Bivens* cause of action may not lie where, as here, national security is at issue," 142 S. Ct. at 1805, suffices to dispose of Gebert's *Bivens* claims.

The "separation-of-powers principles [that] are or should be central to [a *Bivens*] analysis," *Ziglar*, 137 S. Ct. at 1857, buttress this conclusion. As the Supreme Court has recognized, "foreign policy [is] the province and responsibility of the Executive," one of the primary "areas of Art[icle] II duties the courts have traditionally shown the utmost deference to Presidential responsibilities." *Egan*, 484 U.S. at 529-30 (internal quotation marks omitted). "Since World War I, the Executive

Branch has engaged in efforts to protect national security information by means of a classification system graded according to sensitivity." *Id.* at 527. "Presidents, in a series of Executive Orders, have sought to protect sensitive information and to ensure its proper classification throughout the Executive Branch by delegating this responsibility to the heads of agencies." *Id.* "Predictive judgment" as to who can or cannot safely be entrusted with classified information "must be made by those with the necessary expertise in protecting classified information." *Id.* at 529. As the Court has recognized, the reasons why "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it," are "too obvious to call for enlarged discussion." *Id.* (internal quotation marks omitted). And this Court has previously declined to recognize "a judicially-created remedy that could interfere with this important executive branch function." *Lee v. Barr*, Civ. A. No. 19-2284 (DLF), 2020 WL 3429465, at *6 (D.D.C. June 23, 2020).

Even setting aside the national security dimensions of Gebert's *Bivens* claims, the context here would still be new. Gebert's First Amendment and Fifth Amendment Due Process Clause claims are unlike the Fourth Amendment search and seizure claim, "former congressional staffer's Fifth Amendment sex-discrimination claim," or "federal prisoner's inadequate-care claim under the Eighth Amendment" that the Supreme Court has recognized. *Egbert*, 142 S. Ct. at 1802; *accord Ziglar*, 137 S. Ct. at 1860 (plaintiff's "claims bear little resemblance to the three *Bivens* claims the Court has approved in the past: a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma."). Indeed, the Court has specifically rejected *Bivens* claims resting on First Amendment, procedural due process, and substantive due process theories. *See Ziglar*, 137 S. Ct. at 1853-54 (substantive due process); *FDIC v. Meyer*, 510

U.S. 471, 484 (1994) (procedural due process); *Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988) (same); *United States v. Stanley*, 483 U.S. 669, 671-72, 683-84 (1987) (substantive due process);[12] *Bush v. Lucas*, 462 U.S. 367, 368 (1983) (First Amendment). And of course, as noted, the Court has specifically rejected *Bivens* First Amendment retaliation claims. *See Egbert*, 142 S. Ct. at 1807.

2.   Special factors counsel against a <i>Bivens</i> remedy

Special factors also counsel against allowing a *Bivens* remedy. Just as the national security concerns that security clearance decisions entail present a new *Bivens* context, so too are they a special factor that weighs against a *Bivens* action here. *See Egbert*, 142 at 1804-05 (the same national security concerns both "presented a new context for *Bivens* purposes" and also controlled "[t]he special-factors inquiry," showing that courts are "not undoubtedly better positioned than Congress to authorize a damages action in th[e] national-security context"); *Lee*, 2020 WL 3429465, at *6 (*Bivens* claims based on a clearance revocation both "involve new contexts and implicate special concerns counselling hesitation" (internal quotation marks omitted)); *Beattie v. Boeing Co.*, 43 F.3d 559, 563 (10th Cir. 1994) ("the predominant issue of national security clearances amounts to such a special factor counselling against recognition of a *Bivens* claim").

And more generally, the D.C. Circuit repeatedly has reaffirmed the principle that national security considerations are a special factor precluding *Bivens* relief. *See Meshal v. Higgenbotham*, 804 F.3d 417, 425-26 (D.C. Cir. 2015) ("special factors . . . have foreclosed *Bivens* remedies in cases involving . . . national security, or intelligence" (cleaned up)); *Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012) ("national security" is a special factor); *Ali v. Rumsfeld*, 649 F.3d 762, 773 (D.C. Cir. 2011) ("national security" is a special factor precluding a *Bivens* action); *Rasul v. Myers*, 563 F.3d 527, 532 n.5 (D.C. Cir. 2009) ("The danger of obstructing U.S. national security

---

[12]   While *Stanley* did not characterize the claims at issue there as involving "substantive due process," *Ziglar* later characterized *Stanley* as "a substantive due process suit." 137 S. Ct. at 1857.

policy" is a special factor precluding a *Bivens* action); *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008) (fact that a claim would entail "judicial intrusion into matters of national security and sensitive intelligence information" is a special factor weighing against *Bivens* action).

Additionally, both Congress and the Department have "provided alternative remedies for aggrieved parties in [Gebert's] position that independently foreclose a *Bivens* action here." *Egbert*, 142 S. Ct. at 1806; *see also Lee*, 2020 WL 3429465, at *6 (the existence of an "alternative remedial structure" for clearance revocation "can suffice to preclude a *Bivens* claim"). Through the CSRA, Congress "preclude[d] the creation of a *Bivens* remedy for civil service employees . . . who advance constitutional challenges to federal personnel actions." *Spagnola v. Mathis*, 859 F.2d 223, 230 (D.C. Cir. 1988); *accord Bush*, 462 U.S. at 380 (no *Bivens* remedies for civil servants "[g]iven the history of the development of civil service remedies and the comprehensive nature of the remedies currently available"). And as explained, the Department has established comprehensive procedures governing clearance revocation that provide Gebert robust protections, letting him be represented by counsel and providing for certain discovery, submission of a written reply, and appeal of an adverse ruling. *See supra* § V.B.2; 12 FAM §§ 234.1, 234.3; *Egbert*, 142 S. Ct. at 1806 (regulation requiring agency to "accept grievances from any persons wishing to lodge a complaint" precluded *Bivens* claim (cleaned up)); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("remedial mechanisms established by" agency including ability to file "grievances" through "Administrative Remedy Program" precluded a *Bivens* action).

Whether the CSRA and/or the Department's clearance revocation procedures offer Gebert redress for the specific injuries he asserts is immaterial. An alternative remedial scheme precludes a *Bivens* claim "even if a court independently concludes that [existing] procedures are not as effective as an individual damages remedy," harm "would otherwise go unaddressed," or "existing

42

remedies do not provide complete relief." *Egbert*, 142 S. Ct. at 1804, 1807; *see also Bush*, 462 U.S. at 388 (whether to augment civil service remedies with *Bivens* action "obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff"). "Rather, the court must ask only whether it, rather than the political branches, is better equipped to decide whether existing remedies "should be augmented by the creation of a new judicial remedy." *Egbert*, 142 S. Ct. at 1804 (cleaned up).

> **B.  The Individual Defendants Are Entitled to Qualified Immunity**

Even were *Bivens* claims available, the individual defendants would be entitled to qualified immunity. "The doctrine of qualified immunity shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (internal quotation marks omitted). "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right," meaning that "existing precedent [has] placed the statutory or constitutional question beyond debate . . . in light of the specific context of the case"— not simply "as a broad general proposition." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (internal quotation marks omitted). "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Bond*, 142 S. Ct. at 11 (internal quotation marks omitted). Qualified immunity thus "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

Gebert cannot show that the rights he asserts were violated were clearly established so as to pierce the shield of qualified immunity. As best as Defendants are aware, there is no case law holding that suspension or revocation of an employee's security clearance for dishonest behavior, or an unpaid suspension resulting from such an action, supports a First or Fifth Amendment claim.

Rather, in light of the authorities cited herein, the questions that Gebert raises were not squarely

beyond debate in the specific context in which this case arises. *See Cortesluna*, 142 S. Ct. at 7.

Reasonable officers in the individual defendants' positions thus would not have known that their

conduct was unlawful (and in fact, their conduct was not unlawful). *See Bond*, 142 S. Ct. at 11.

The individual defendants accordingly are each entitled to qualified immunity.

## CONCLUSION

For all of the foregoing reasons, this Court should dismiss Gebert's complaint.

Dated: February 14, 2023              Respectfully submitted,

                                      MATTHEW M. GRAVES
                                      D.C. Bar No. 481052
                                      United States Attorney

                                      BRIAN P. HUDAK
                                      Chief, Civil Division

                                      By: /s/ _____
                                         BRADLEY G. SILVERMAN
                                         D.C. Bar No. 1531664
                                         Assistant United States Attorney
                                         601 D Street NW
                                         Washington, DC 20530
                                         (202) 252-2575

                                      *Attorneys for the United States of America*

44