UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

MATTHEW GEBERT,

        *Plaintiff*,

v.

U.S. DEPARTMENT OF STATE et al.,

        *Defendants*.

Civil Action No. 22-2939 (DLF)

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………………iii

BACKGROUND…………………………………………………………………………1

ARGUMENT……………………………………………………………………………2
I.     This Court Has Personal Jurisdiction over the Individual Defendants…………….........2
II.    Defendants' Requests to Dismiss for Defective Summonses and Failure to Effect
       Service on Defendants are Moot and Should be Denied………................................5
III.   Gebert Has Adequately Alleged Claims Under the First Amendment……...............6
       A.     Gebert Has Established a *Prima Facie* Case of First Amendment Retaliation…...6
       B.     *Egan* Does Not Bar Plaintiff's First Amendment Claims…………………….16
IV.    Defendants' Request to Dismiss Plaintiff's Due Process Claims Fail to Accurately
       Identify the Property Interests at Stake and the Extent of the Deprivation and Should
       be Denied……………………………………………………………………………22
       A.     Defendants' claim that Gebert Failed to Plausibly Allege a Substantive Due
              Process Violation is Baseless and Should be Denied…………………………..22
       B.     Defendants' claim that Gebert Failed to Plausibly Allege a Procedural
              Due Process Violation is Baseless and Should be Denied……………………24
       C.     Stigma-Plus Theory……………………………………………………………32
       D.     Gebert's Equal Protection Claims………………………………………...........34
V.     Gebert has Adequately Claimed Defendants Committed APA Violations.....................35
       A.     Gebert's APA Challenge to Defendants' Flouting of 12 FAM 230, *et al*.............35
       B.     Defendants' Termination of Gebert's Health Insurance Coverage was
              Arbitrary, Capricious, an Abuse of Discretion, and Otherwise not in
              Accordance with Law……………………………………………………………37
VI.    Plaintiff's Reasonable Description of Records...............................................................38
VII.   Gebert is Entitled to Damages ……………………………………………………39
       A.     Plaintiff's *Bivens* Claims Remain Viable Despite the Recent Ruling
              in *Egbert*, and Plaintiff's Claims Should not be Dismissed……………………40
              1.     Plaintiff's Due Process Claims do not Arise in a New Context...............41
              2.     Plaintiff's First Amendment Claims do Arise in a New Context,
                     but no Special Factors Exist to Preclude a *Bivens* Remedy.....................42
       B.     The Individual Defendants Are Not Entitled to Qualified Immunity...................44

CONCLUSION……………………………………………………………………………45

## <u>TABLE OF AUTHORITIES</u>

*Al Haramain v. Dep't of the Treasury*,
   686 F.3d 965  (9th Cir. 2012) ………………………………………………………...27

*Abdus-Shahid M.S. Ali v. District of Columbia*
   (U.S. App. D.C. 2002) …………………………………..………………………….…...4

*Ali v. Rumsfeld*,
   649 F.3d 762 (D.C. Cir. 2011) ………………………...…………………………………..42

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*,
   564 U. S. 721 (2011) …………………………………………………………………35

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) ……………………………………………………………………45

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ……………………………………………………………………41

*Atherton v. D.C. Office of the Mayor*
   567 F.3d 672 (D.C. Cir. 2009) …………………………………………...…………..45

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*
   403 U.S. 388 (1971)...…………………………………………….…………4,5,39,40,41,42,43

*Black Lives Matter D.C. v. Trump*,
   *No*. 20-cv-1469 (DLF), 2021 WL 2530722, at *55 (D.D.C. June 21, 2021) ……………...….11,18

*Board of Regents of State Colleges v. Roth*,
   408 U.S. 564 (1972) …………………………………………………...…………23,25

*Brown v. Fogle*,
   819 F. Supp. 2d 23 (D.D.C. 2011) ……………………………………………………45

*Bush v. Lucas*,
   462 U.S. 367 (1983)....................................................................................................41,42

*Carlson v. Green*,
   446 U.S. 14 (1980) ……………………………………………………………………40

*Chambers v. U.S. Dep't of Interior*,
   568 F.3d 998 (D.C. Cir. 2009) ……………………………………………….…………38

*Citizens United v. FEC*,
   558 U. S. 310 (2010) …………………………………………………...……………35

*City of Tahlequah v. Bond,*
  142 S. Ct. 9 (2021) ……………………………………………………..…….44

*Cleveland Board of Education v. Loudermill,*
  470 U.S. 551 (1985) ………………………………….……………………….28

*Connick v. Myers,*
  461 U.S. 138 (1983) …………………………………………………………45

*Davis v. Passman,*
  442 U.S. 228 (1979)...............................................................................................40

*Department of the Navy v. Egan,*
  484 U.S. 518 (1988)……………………………………...………………*Passim*

*Doe v. Cheney,*
  885 F.2d 898 (D.C. Cir. 1989) …………………………………...………….24

*Doe v. Rumsfeld,*
  683 F.3d 390 (D.C. Cir. 2012) ………………………………….…………..42

*Egbert v. Boule,*
  142 S. Ct. 1793 (2022)...…………………………………...……………40,41,43

*Elrod v. Burns,*
  427 U.S. 347 (1976)………………………………………….………………45

*Empire HealthChoice Assur., Inc. v. McVeigh,*
  126 S. Ct. 2121 (2006)……………………………………..…………..28,40

*Fares v. Smith,*
  901 F.3d 315 (D.C.C. 2018) ……………………………………...……27, 29

*Garcia v. Pompeo,*
  No. 18-cv-1822, 2020 WL 134865 (D.D.C. Jan. 13, 2020)…………………..………..16,17

*George Wash. Univ. v. District of Columbia,*
  318 F.3d 203 (D.C. Cir. 2003) …………………………..……………….....24

*Gilbert v. Homar,*
  520 U.S. 924 (1997) …………………………….…..…………………….25,28

*Gill v. United States DOJ,*
  875 F.3d 677 (D.C. Cir. 2017) …………………………………………….18,24,36,43

*Greene v. McElroy,*
  360 U.S. 474 (1959) …………………………………………...……………….……33

*Gustave-Schmidt v. Chao,*
  226 F. Supp. 2d 191 (D.D.C. 2002) …………..……………………….…………….......2

*Hartley v. Wilfert,*
  918 F. Supp. 2d 45 (D.D.C. 2013) ………………………………………….....44,45

*Hedgepeth v. Wash. Metro. Area Transit Auth.,*
  386 F.3d 1148 (D.C. Cir. 2004) ………………………………………………….……34

*Hill v. U.S. Air Force,*
  795 F.2d 1067 (D.C. Cir. 1986) …………………………………………………...……39

*Hinton v. Corr. Corp. of Am.,*
  624 F. Supp. 2d 45 (D.D.C. 2009)……………………………………………………2,22

*Horsey v. U.S. Dep't of State,*
  70 F.Supp. 3d 256 (D.C. Cir. 2016) …………………………………………………19

*Jefferson v. Harris,*
  170 F. Supp. 3d 194 (D.D.C. 2016) ……………………………………………………32

*Kartseva v. Dep't of State,*
  37 F.3d 1524 (D.C. Cir. 1994) ……………………………………...……………33,34

*Mathews v. Eldridge,*
  424 U.S 319 (1976) ………………………………………………………….....27,28,30, 31

*Meshal v. Higgenbotham,*
  804 F.3d 417 (D.C. Cir. 2015) …………………………………………...……42

*Moncrief v. Lexington Herald-Leader Co.,*
  807 F.2d 217 (D.C. Cir. 1986)…………………………………………………….……4

*Mpoy v. Fenty,*
  901 F. Supp. 2d 144 (D.D.C. 2012……………………………………………………44

*Nat'l Fed'n of Fed. Emps. v. Greenberg,*
  983 F.2d 286 (D.C. Cir. 1993)……………………….……………………….…………17,19,20

*Navab-Safavi v. Broad. Bd.,*

650 F. Supp. 2d 40 (D.D.C. 2009)………………………………….………………..……4

*Newdow v. Roberts,*
  603 F.3d 1002 (D.C. Cir. 2010) ……………………………………...……………….….……5

*NCORI  v. Dep't of State,,*
  251 F.3d 192 (D.C. Cir. 2001)…………………………………………………………….27

*O'Donnell v. Barry,*
  148 F.3d 1126 (D.C. Cir. 1998) ……………………………...…………….………32

*Ozonoff v. Berzak,*
  744 F.2d 224 (1st Cir. 1984) ………………………………………..……12,20

*Palmieri v. United States,*
  72 F. Supp. 3d 191 (D.D.C. 2014) ………………………………..………24

*Palmieri v. United States,*
  896 F.3d 579 (D.C. Cir. 2018) ……………………………………..………4

*Parrino v. FHP, Inc.,*
146 F.3d 699 (9th Cir. 1998) ......................................................2

*Pearson v. Callahan*
  555 U.S. 223 (2009) ……………………………………….………...…………44

*Pension Benefit Guaranty Corporation v. White Consolidated Industries, Inc.,*
  998 F.2d 1192 (3d Cir. 1993)………………………………………………2

*Perry* v. *Sindermann,*
  408 U.S. 593 (1972) ……………….…………………………..……………25

*Pickering v. Board of Ed.,*
  391 U.S. 563 (1968) ……………………………………………………45

*Pollack v. Meese,*
  737 F. Supp. 663 (D.D.C. 1990) ……………………………………………4

*Quality Air Servs., L.L.C. v. Milwaukee Valve Co., Inc.,*
  567 F. Supp. 2d 96 (D.D.C. 2008) …………………………………………..……3

*Rasul v. Myers,*
  563 F.3d 527 (D.C. Cir. 2009) ……………………………….……..……42

*Rattigan v. Holder*,
  689 F.3d 764 (D.C. Cir. 2012) …………………………………………………………19

*Rattigan v. Holder*,
  780 F.3d 413 (D.C. Cir. 2015) ………………………………………………..………19

*Reichle v. Howards*,
  566 U.S. 658 (2012) …………………………………………………………………41

*Rivas-Villegas v. Cortesluna*,
  142 S. Ct. 4 (2021)……………………………………………………………………44

*Ryan v. Reno*,
  168 F.3d 520 (D.C. Cir. 1999) …………………………...………………………….17

*Savage v. Bioport*,
  460 F. Supp. 2d 55 (D.D.C. 2006) ………………………………………..…………3

*Simmons v. District of Columbia*,
  750 F. Supp. 2d 43 (D.D.C. 2011) ………………………………………………..…6

*Texas v. Johnson*,
  491 U.S. 397 (1989) …………………………………………………………………8

*U.S. v. Kerik*,
  615 F. Supp. 2d 256 (S.D.N.Y. 2009) …………………………………………..…21

*United States v. National Treasury Emples. Union*,
  513 U.S. 454 (1995) …………………………………………………………………45

*United States Information Agency v. Krc*,
  905 F.3d 389 (D.C. Cir. 1990) ………………………………………………………17

*W. Va. State Bd. Of Educ. V. Barnette*,
  319 U.S. 624 (1943)…………………………………………………………………35

*Ward v. D.C. Dep't of Youth Rehab. Servs.*,
  768 F. Supp. 2d 117 (D.D.C. 2011)………………..…………………………….....2

*Wilkie v. Robbins*,
  551 U.S. 537 (2007)…………………………………………………………….…..41

*Wilson v. Libby*,
  535 F.3d 697 (D.C. Cir. 2008)………………………………………………………42

*Wood v. Moss*,

572 U.S. 744 (2014) ...............................................................................................41

*Wormley v. United States,*
  601 F. Supp. 2d 27 (D.D.C. 2009) ...................................................................5

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017)...................................................................................41

**Statutes**

D.C. Code § 13-423...................................................................................................3

D.C. Code §§ 13.423(a)(3) ....................................................................................3-5

5 U.S.C. §  89...........................................................................................................37

5 U.S.C. § 552 .........................................................................................................25

5 U.S.C. § 552a ........................................................................................................25

5 U.S.C. § 552(b)(6) .................................................................................................6

5 U.S.C. § 552(b)(7)(C) .........................................................................................6

5 U.S.C. § 7532 ...................................................................................................22,23

5 U.S.C. § 555(b) ....................................................................................................35

5 U.S.C. § 5596........................................................................................................39

5 U.S.C. § 8912........................................................................................................39,40

50 U.S.C.§ 3341(g)(2)(A)(i-ii) ..............................................................................37

50 U.S.C.§ 3341(j)(4)(A) .......................................................................................37

**Regulations**

3 Foreign Affairs Manual  §3418...........................................................................22

3 Foreign Affairs Manual  §3600...........................................................................37

3 Foreign Affairs Manual  §3611...........................................................................37

3 Foreign Affairs Manual §7437............................................................................23

12 Foreign Affairs Manual
 § 234.1…………………………………………………………………………25,36
 § 234.3 …………………………………………..……………………………...36

5 CFR § 890…………………………………………………….…….............37,39

5 CFR § 550, Subpart H……….…………………………………………………39

5 C.F.R. § 550.801…………………………………………………………..…….40

5 C.F.R. §  841.102…………………………………………………………….….27

5 C.F.R. § 890.502(b) ……………………………………………………………37

## Constitutional Provisions

U.S. Const. amend. I…………………..………………………………………*Passim*

U.S. Const. amend. V…………………………………………………..…….*Passim*

## Rules

Federal Rules of Civil Procedure
 12(b)(4) …………………………………………………………………..……….5

Federal Rules of Civil Procedure
 12(b)(5) ……………………………………………………………………………5

Federal Rules of Civil Procedure
 12(b)(6) ……………………………………………………………………………2

Federal Rules of Civil Procedure
 4(a)(1)(F)-(G) ……………………………………………………………..…..5

Federal Rules of Civil Procedure
 4 (i)……………………………………………………………………....…..5

## <u>Other Authorities</u>

Security Executive Agency Directive (SEAD) 4……………………….…………………...…….26,31

Exec. Order 12,968,
 60 Fed. Reg. 40,245 (Aug. 2, 1995)…………………………………...…………25,26,31

Defense Counterintelligence and Security Agency
 https://www.dcsa.mil/mc/pv/mbi/appeals/……………………….............…….............…….34

Michael Edison Hayden,
      *U.S. State Department Official Involved in White Nationalist Movement, Hatewatch*
      *Determines,* S. Poverty L. Ctr. (Aug. 7, 2019)…………..……....…..1,2,6,8,9,11,18,29,30, 31

Alex Kotch
      *Government Employees Donate to White Supremacist Candidate*, Sludge.com (July 3,
      2018)…………...……………………………………………………………………...…7,8

Yaron Steinbuch
      *State Department Official Outed As White Nationalist Leader*, nypost.com (Aug. 8,
      2019)………………………………………………………………………………...……10

Chris Schiano
      *Exposed State Department Official Posted in Nazi Charlottesville Chats*,
      https://unicornriot.ninja (Aug. 7, 2019)…………………………………………………..10

www.dailymail.co.uk
      *State Department Official Accused of Running White Nationalist Group in D.C.*,
      https://www.dailymail.co.uk/news/article-7334157/State-Department-official-accused-
      running-white-nationalist-chapter.html (Aug. 7, 2019)........................................................10

Mallory Simon
      *Brother Called FBI to Investigate State Department Official Over Hate*, www.cnn.com
      (Aug. 15, 2019)…………………………………………………………………………..10

x

## BACKGROUND

The Defendants spend their Background section committing the same error the Plaintiff has been alleging the Defendants have been making for over three years: citing to and relying on a "Hatewatch Article" blog as "facts." Defendants' motion made several false accusations regarding the Hatewatch Article, which all should be stricken from this Court's consideration. For starters, the Defendants claim, "Gebert discusses the Hatewatch article extensively in his complaint," so the "Court may consider it for the fact of its contents." (Def. Mot. at 1). The Defendants go on to falsely allege that "Gebert does not dispute a single fact in the article."

First, Gebert mentioned the Hatewatch Article merely to acknowledge its existence and not to endorse its accuracy or credibility. In fact, Plaintiff specifically mentioned that it was not "reviewed or fact-checked," was "not a credible news source," and that the Hatewatch Article "sensationalized and mischaracterized [Gebert's] activities and involvement to make them seem much more nefarious than they actually were." Compl. ¶¶ 22, 33, 37. Plaintiff did not go through and dispute every "single fact" in the article because this is not a defamation case and the lies spread by the Hatewatch Article are irrelevant to the action against the Defendants. Plaintiff's refusal to engage in a line-by-line refutation of each accusation of the Hatewatch Articled does not mean the point is conceded nor do such accusations morph into "facts." Plaintiff specifically sought to exclude it/refrained from attaching it to his Complaint because of how inaccurate and irrelevant the vast majority of the information actually was. Citing to a document's existence does not meet the standard for the Court to "consider it for the facts of its content."

The Defendants continued reliance on the allegations from the Hatewatch Article is an attempt to exceed the scope of a motion to dismiss. Extrinsic evidence is not allowed in a motion

to dismiss.[1] However, *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), is clear that anything that is not necessarily integral to plaintiff's claim or relied upon by plaintiff to assert their claim constitutes extrinsic evidence and should either be discarded or converted to a motion for summary judgment. *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009).[2] Worse yet, footnotes "2" and "3" in Defendants' motion cites to extrinsic evidence not mentioned nor relied upon, by Plaintiff in his Complaint.

Not only does Plaintiff's Complaint not rely on the contents of the Hatewatch Article whatsoever, but Defendants' defenses to Plaintiff's claims, allegedly, do not rely on the contents of the Hatewatch Article either. The entire basis or excuse for the actions taken by Defendants against Gebert claim to rely on the allegation that Gebert "lied" in his security clearance interview and were not as a result of what he may have said or did prior to the May 2019 routine background investigation. Of course, Defendants' arguments in their motion only reinforce and reiterate what Gebert has maintained this entire time: the actions taken against him were solely as a result of what the Hatewatch Article alleged, and the excuse that it had anything to do with dishonesty, evasiveness, or omissions was merely pretextual. The mere fact that the Defendants have used considerable space in their MTD alleging their own "facts," is highly indicative that dismissing

---

[1]    *See Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117 (D.D.C. 2011) ("In deciding a motion brought under Rule 12(b)(6), a court does not consider matters outside the pleadings, but a court may consider on a motion to dismiss 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint,'") citing *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), or "documents 'upon which the plaintiff's complaint necessarily relies' even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss," *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009) (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998)).

[2]    *See Pension Benefit Guaranty Corporation v. White Consolidated Industries, Inc., 998 F.2d 1192, 1196-1197 (3d Cir. 1993)* ("where a defendant attaches extrinsic evidence to a Rule 12(b)(6) motion, the court ordinarily must convert that motion into one for summary judgment under Rule 56 to give the plaintiff an opportunity to respond . . .")

Plaintiff's complaint at this stage in litigation would be inappropriate, as it is clear there appears to be several instances of genuine issues of material fact.[3]

ARGUMENT

## I.     This Court Has Personal Jurisdiction over the Individual Defendants

Defendants first argue that the Court lacks personal jurisdiction over all individual defendants despite not indicating which defendants are not residents of this District. Regarding which individual defendants may be residents, the Plaintiff requests reasonable discovery to allow him to make this determination. Regarding any individual defendants who are non-residents, this Court has personal jurisdiction over them under the D.C. Long-Arm Statute. Therefore, Defendants' request for the Court to dismiss Plaintiff's Complaint should be denied.

Regarding the non-residents named in Gebert's Complaint, "If a defendant does not reside within or maintain a principal place of business in the District of Columbia, then the District's long-arm statute, D.C. Code § 13-423, provides the only basis [o]n which a court may exercise personal jurisdiction over the defendant." *Quality Air Servs., L.L.C. v. Milwaukee Valve Co., Inc*., 567 F. Supp. 2d 96, 99 (D.D.C. 2008) (quoting *Savage v. Bioport*, 460 F. Supp. 2d 55, 60 (D.D.C. 2006)). Section 13-423 provides in relevant part:

> A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's-
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia . . .

D.C. Code §§ 13-423(a)(3). Section (a)(3) "confers jurisdiction… over a defendant who commits an act in the District which causes an injury in the District, without regard to any other contacts." *Moncrief v. Lexington Herald-Leader Co*., 807 F.2d 217, 221, 257 (D.C. Cir. 1986).

---

[3]     If the court decides to convert this to a Motion for Summary Judgement, we ask that we are provided an opportunity to respond.

Plaintiff asserts that all individual Defendants were employees of the Department of State when they participated in the suspension and revocation of Gebert's security clearance and indefinite suspension of Gebert's employment. Compl. ¶ 6. Like the defendants in *Navab-Safavi v. Broadcasting Board of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009), the Defendants here contend that their presence in D.C. for work purposes cannot provide the basis for the Court to assert personal jurisdiction over them because plaintiff's *Bivens* action only names them in their individual capacities. (Def. Mot. at 9-10). However, the cases that Defendants cite stand only for the proposition that the Court cannot assert personal jurisdiction over a non-resident defendant (1) *who did not work in D.C.* at the time of the conduct at issue and (2) whose only other D.C. contacts consist of federal employment or other "official capacity" relationships.[4]

Here, the Court has jurisdiction over the non-resident defendants pursuant to § 13-423(a)(3). Plaintiff alleges that the non-resident defendants caused him financial and reputational harm through the commission of constitutional torts consisting of the decisions, made in the District, to wit: unlawfully inserting subjective personal biases and intentionally violating policies and regulations while investigating Gebert; intentionally unequally and unlawfully misapplying relevant guidelines, policy, laws, and regulations; suspending and revoking Plaintiff's security clearance; and indefinitely suspending his employment resulting from constitutionally protected

---

[4]        *See Ali v. District of Columbia*, 278 F.3d 1 (D.C. Cir. 2002) (finding no personal jurisdiction over Virginia officials in action brought under 42 U.S.C. § 1983, where the complaint did not allege that "any defendants acting in their individual capacities either transacted business in the District or contracted to do so," officials' only contacts with District were through official relationships with District officials, and tortious acts took place in Virginia); *Palmieri v. United States*, 896 F.3d 579 (D.C. Cir. 2018) (finding no personal jurisdiction where a defendant sued in this District resulting from conduct committed in Bahrain and the only specific contact between the individual defendants and this District was their employment by a federal agency once headquartered in the District); and *Pollack v. Meese*, 737 F. Supp. 663 (D.D.C. 1990) (where the court determined the conduct "clearly took place in Missouri... Therefore, personal jurisdiction cannot be predicated on the long arm statute because plaintiff does not and cannot claim that the defendants caused the alleged tortious injury in the District of Columbia).

conduct. *See generally* Compl. It is enough that defendants "were physically within the District when they took the alleged actions" giving rise to plaintiff's constitutional claims. *Wormley v. United States*, 601 F. Supp. 2d 27, 33 (D.D.C. 2009) (Lamberth, C.J.) (holding that personal jurisdiction was proper under § 13-423(a)(3) over non-resident federal defendants in *Bivens* action). Further, Plaintiff reiterates its request for reasonable discovery to determine individual defendants' residency.

## II.     Defendants' Requests to Dismiss for Defective Summonses and Failure to Effect Service on Defendants are Moot and Should be Denied

Defendants' motion argues that Plaintiff's Complaint should be dismissed in its entirety due to defective summonses under Fed. R. Civ. P. 4(a)(1)(F)-(G) and for failure to effect service on Defendants under Fed. R. Civ. P. 4(i). Def's. Mot. Plaintiff, acknowledging his error, filed a motion on February 17, 2023 requesting the Court grant an extension in order to properly effectuate service no later than April 1, 2023.  ECF No. 13. This Court via Minute Order on February 21, 2023, granted Plaintiff's request. As of March 20, 2023, all Defendants, excluding John Doe #1, John Doe #2, and John Does 1-10, have been provided and served with proper summons and complaint in accordance with Rule 4. Plaintiff has entered Executed Summonses as ECF Nos. 15, 20, 21, 24, 25, 26, and 27, uploaded March 20, 2023 and March 24, 2023. Because Plaintiff has rectified process and service issues in a timely manner in accordance with the Court's extended deadline, Defendants' motion to dismiss any and all claims under Fed. R. Civ. P. 12(b)(4) and Fed. R. Civ. P. 12(b)(5) should be denied.

Regarding the John Doe Defendants in this case, courts recognize an exception to Rule 4 for cases involving "John Doe" defendants. *Newdow v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir. 2010). This exception applies when discovery will make known "the otherwise unavailable

identity of the defendant[s]."[5] Courts should thus not dismiss John Doe defendants before parties have engaged in discovery because tools such as interrogatories might allow a plaintiff to discover the unknown identity of such defendants[6].

### III.   Gebert Has Adequately Alleged Claims Under the First Amendment

#### A.   Gebert Has Established a *Prima Facie* Case of First Amendment Retaliation

At the outset, Defendants do not even dispute that the first two elements required to state a retaliation claim—whether the plaintiff engaged in "protected conduct" and the "government took some retaliatory action sufficient to deter" continued exercise of protected speech, *id.*—are sufficiently pleaded here. (Def. Mot. at 14-15). Instead, the Defendants challenge only Plaintiff's showing of a "causal link" between his protected speech and the suspension and revocation of his security clearance. Rather, the Defendants argue that Gebert's "own pleadings" demonstrate that the Department revoked Gebert's clearance due to his dishonesty, not his extensive white nationalist activities and associations." (Def. Mot. at 15). Gebert, however, has clearly pleaded, throughout his Complaint, that his security clearance was revoked due to his white nationalist activities and associations and that the Department's dishonesty justification is a guise.

The Department would like this Court to believe that it was not until the Hatewatch Article was published by the Southern Poverty Law Center (SPLC) on August 8, 2019, that they first

---

[5]   *Id.; see also Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 45 (D.D.C. 2011) ("Plaintiff may bring an action against unknown John Doe defendants, but plaintiff must substitute named defendants for those unknown defendants after the completion of discovery.").

[6]   Plaintiff specifically identified these individuals by position in the Complaint header as "Supervisory Special Agent" and "Special Agent" within the Diplomatic Security Division within the Office of Special Investigations. *See* Compl., header. Additionally, Plaintiff further stated that they were the two individuals who interviewed Gebert on September 27, 2019. Compl. ¶ 32. Plaintiff attempted to unveil the names of these individuals through the FOIA and Privacy Act requests, but the names of these individuals were redacted in the documents provided to Plaintiff under FOIA exemptions 5 U.S.C. § 552(b)(6) and (b)(7)(C). Compl. ¶¶ 63-68, 71-76.

became aware of Gebert's ideologies and, therefore, initiated their investigation, which led them to conclude that Gebert concealed and/or was somehow dishonest about his white nationalism. (Def. Mot. at 5). However, an article published by Sludge.com on July 3, 2018 – **more than one year before the SPLC article was published on August 8, 2019** – confirms that the Department of State was aware that Gebert supported white nationalist/pro-white ideologies as early as July of 2018 – if not even sooner.[7]

The article, which is entitled "Government Employees Donate to White Supremacist Candidate," specifically mentions Matthew Gebert by name as well as his position with the Department of State. *Id.* It further indicates that Gebert made campaign contributions to the House campaign of Paul Nehlen, a "racist" and "openly anti-Semitic white supremacist." *Id.* In addition, the article mentions Gebert's prior contributions in 2017 and 2018 to Corey Stewart, a Republican nominee who has been outspoken about preserving public Confederate flags and monuments. *Id.* Moreover, there is no denying that the Department was well aware of this article, as a Department of State Official is quoted in the article as stating: "Matthew Q. Gebert is employed by the Department of State as a foreign affairs officer assigned to the Bureau of Energy Resources in Washington, D.C. Guidelines regarding the political activity of State Department employees can be found in the Foreign Affairs Manual at 11 FAM 614. The Department of State is committed to providing a workplace free from discriminatory harassment." *Id.* In addition, the investigative file contains an annotation stating that the Department received an "anonymous tip" on June 21, 2019 (two months prior to the SPLC article being published), that Gebert "had donated to the campaign of a 'pro-white' candidate, as well to the campaign of a candidate who publicly stated that he

---

[7]     *See*                https://readsludge.com/2018/07/03/government-employees-donate-to-white-supremacist-candidate/

wanted to preserve the Confederate flag and monuments, stating doing so was 'taking back our heritage.'" Compl. ¶ 75.

Despite the Department being made aware of his political and ideological beliefs on at least two separate occasions prior to the publishing of the SPLC article, the Department made no referrals, performed no investigations, and conducted no interviews in response to either of these occasions. *Id.* In short, they did nothing. In fact, Gebert was never even questioned about the Sludge.com article during his routine security clearance reinvestigation interview, which took place on January 28, 2019, just a few months after the Sludge.com article was published. *Id.* If the Department truly believed that Gebert's alleged dishonesty/concealment of his white nationalist ideologies was a national security issue, why wasn't it a national security issue prior to the SPLC article being published? The Department had the same offending information at their disposal well before the SPLC article was published, and instead, they *deliberately* chose to do *nothing* about it – at least *twice.*

This timeline constitutes nothing short of explicit proof that the Department's revocation of Gebert's security clearance was never about "national security." Compl. ¶ 58. Rather, Gebert's clearance was revoked as a result of the significant negative media attention that the Department received as a result of the Hatewatch Article, which led to the Department's so-called "embarrassment" for employing him. *Id.* As such, the Department suspended Gebert's clearance immediately in response to the SPLC article, effectively terminating his employment, to demonstrate to the public that they did not support his viewpoint. *Id.* ¶ 54. This, however, is precisely what the Constitution prohibits the government from doing. *See Texas v. Johnson,* 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that

the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

As soon as the Hatewatch Article was published, which, by all accounts, was highly sensationalized, it resulted in what the Department of State termed a "media frenzy." *Id.* ¶ 22. Dozens of articles were written, shaming the Department for employing Gebert and not vetting him properly during the clearance process. *Id.* In short, the Department was under immense pressure from the public and even members of Congress to remove Gebert from the Department due to his viewpoints. *Id.* Hundreds of pages of "investigative" material in this matter are nothing but copies of media articles discussing Gebert and shaming the Department for employing him. Compl. ¶ 75. Although not required, especially at this early stage of litigation, these articles constitute direct evidence indicating that the Department revoked Gebert's clearance in retaliation for the so-called "embarrassment" the Department endured as a result of Gebert's exercise of his civil liberties.

Even in its Motion to Dismiss, the Department continues to admit that Gebert caused the Department of State "embarrassment" as a result of his viewpoints. (Def. Mot. at 5, 6, and 15). Indeed, the central tenant of the Defendants' argument in this case is that Gebert should have seen that his ideological beliefs would "embarrass" the Department of State. Compl. ¶¶ 56-57. The characterization of Gebert's viewpoints as an "embarrassment" – in and of itself - is direct evidence of the Defendants' personal animus against him. While direct evidence of animus is usually hard to come by, it doesn't get any more direct than this.

So too, throughout the articles, representatives from the Department of State made official statements wherein they explicitly expressed their disapproval of Gebert's ideologies. Compl. ¶ 75. For example, they assured the public that the Department of State was "[c]ommitted to

providing an inclusive workplace," and "to providing a workplace that is free from discriminatory harassment."[8] Ironically, the Department *isn't* saying they are committed to including people with different viewpoints, such as Gebert. Rather, they are expressly condemning Gebert's viewpoints.[9]

To make matters worse, the Department was well aware of how including over 275 pages of these media articles in their investigation would make them look as far as motive goes. Compl. ¶¶ 63-76. Thus, rather than releasing the articles, which were readily accessible on the Internet to the public at large, the Department of State unlawfully withheld hundreds of pages of media articles discussing Gebert and his employment pursuant to a non-existent "national security" exemption. Compl. ¶ 69. If this isn't shocking enough, Gebert had to fight tooth and nail for over one year to get the Department of State to release the portion of the investigative file containing these articles. Compl. ¶¶ 63 - 76.

Given the Department's behavior, it is ironic that they continue to refer to Gebert as the "dishonest" one. (*See* Def. Mot. at 4-6, and 8.) Gebert, in fact, has demonstrated that he has been nothing but honest and forthright throughout. Compl. ¶ 33-34, 36. The Department, on the other hand, has been anything but honest with regard to its motivation for revoking Gebert's clearance, and the Privacy Act/FOIA procedure shows that the Department of State has been blatantly dishonest in withholding evidence that disproves its version of the facts. Compl. ¶¶ 63-76.

---

[8]    *See, e.g.,* https://nypost.com/2019/08/08/state-department-official-outed-as-white-nationalist-leader/; https://unicornriot.ninja/2019/exposed-state-department-official-posted-in-nazi-charlotteville-chats/; https://www.dailymail.co.uk/news/article-7334157/State-Department-official-accused-running-white-nationalist-chapter.html

[9]    The FBI, on the other hand, got it right when their official spokesperson in an article explained, in response to the public outrage regarding Gebert's employment, that they "[c]annot investigate people for holding an ideology or belonging to a certain U.S.-based hate group." *See https://www.cnn.com/2019/08/15/politics/state-dept-white-supremacist-brother-fbi/index.html*

Unfortunately, though, it gets even worse. The Department *continues* unlawfully withholding another approximately 180 pages under the Privacy Act/FOIA. Compl. ¶¶ 75-76. One can only assume that the remaining pages contain more direct evidence of retaliation and animosity toward Gebert. One should also find it suspicious that the Department has not released any internal emails, notes, or memoranda at all concerning the Gebert investigation. Compl. ¶ 24. Besides providing investigative reports and the aforementioned media articles, the Department has not released any other information pursuant to Gebert's Privacy Act/FOIA requests. *Id.*

It is also worth noting that the Hatewatch Article was published on August 8, 2019, while Gebert's security clearance was officially suspended on an indefinite basis just eight days later on August 16, 2019.  *Id.* ¶ 22. As this Court recently concluded in addressing a First Amendment retaliation claim arising from protest activity, "direct evidence of retaliatory animus is not required, especially at this early stage of the proceedings [and] '[c]ausation may be inferred . . . when the retaliatory act follows close on the heels of the protected activity." *Black Lives Matter D.C. v. Trump, No.* 20-cv-1469 (DLF), 2021 WL 2530722, at *55 (D.D.C. June 21, 2021).

In short, the timeline of events, together with the portion of the investigative file that has been provided to Gebert thus far, draws a clear picture. The revocation of Gebert's security clearance was never about national security; it was about the Department being embarrassed for employing someone with Gebert's ideologies and attempting to clean up the so-called "media frenzy" that his employment created. Compl. ¶ 58. As such, the Department, working its way backward, prompted a security investigation, which retrospectively justified the revocation of Gebert's security clearance and cloaked his suspension so as to avoid review. *Id.*

Admittedly, during the investigation, the Department could not find that Gebert had lied on his SF-86, since no questions on the SF-86 ask applicants about their political or ideological

beliefs.[10] Indeed, the government cannot point to even a ***single*** question on the SF-86 that Gebert's conduct violated. *Id.* Gebert has never:

- Been a member of an organization dedicated to terrorism (SF-29.1);
- Engaged in acts of terrorism (SF-29.2);
- Been a member of an organization dedicated to the use of violence or force to overthrow the United States Government (SF-29.3);
- Been a member of an organization that advocates or practices commission of acts of force or violence to discourage others from exercising their rights under the U.S. Constitution or any state of the United States (SF-29.4); or
- Engaged in activities designed to overthrow the U.S. government by force (SF-29.5).

Gebert was never even asked any questions relating to his political beliefs during the security clearance investigation or reinvestigation process. Compl. ¶ 36. In the entire 136-page SF-86 application, none of the questions on the SF-86 asked Gebert anything even remotely related to his political beliefs, such as whether he identified as republican, democrat, alt-left, or alt-right, etc. *Id.* Nor was he asked any questions related to his beliefs regarding race, immigration, or any other ideologies. *Id.* So too, none of the questions that Gebert was asked during his initial background investigation or during his reinvestigation interview on January 28, 2019, related to any of these issues. *Id.* **Thus, at no point either on the SF-86 or any of the reinvestigation interviews was Gebert ever asked any questions about his political or ideological beliefs, associations, or activities.** *Id.*

Further, there have been no findings -- let alone any allegations -- that Gebert has ever broken any laws or caused any harm. *Id.* ¶ 42. In addition, his allegiance to the U.S. has never been in question. *Id.* Any one of the above-mentioned considerations would, of course, give rise to a legitimate security concern. Yet, none of them are present here.

---

[10]   *Id.* ¶ 23. Rightly so, as this would violate applicants' civil liberties. *See, e.g., Ozonoff v. Berzak,* 744 F.2d 224 (1st Cir. 1984).

Moreover, although Gebert was granted his Top Secret security clearance on April 19, 2013, the Department does not allege that he committed any wrongdoing that would justify the revocation of his clearance until his reinvestigation interview, which took place six years later on January 28, 2019. *Id.* ¶ 12, 14. It was during this interview that the Department alleges Gebert failed to volunteer his white nationalist beliefs in response to the following questions:

1. Do you have an association with any person, group or business venture that could be used, even unfairly, to criticize, impugn or attack your character or qualifications for a government position; and

2. Are you aware of any other information, including information about members of your family that could suggest a conflict of interest or be a possible source of harm or embarrassment to you, the Department or the United States.

Seeing no other basis for revoking his clearance, those tasked with investigating Gebert subsequent to the publishing of the SPLC article concluded that Gebert should have volunteered his constitutionally-protected speech and associations in response to these questions.[11] Because he didn't, the investigators claimed, he concealed his white nationalism and was, therefore, dishonest, rendering him a security threat. *Id.* ¶ 14. **Of course, one cannot conceal or be dishonest about something they were never asked about.** To conclude otherwise defies logic. Yet, this is what the investigators hung their hats on, simply because – well – they had nothing else to hang them on to justify what they had already determined they were going to do.

Moreover, to justify the revocation of his security clearance, the core argument advanced by the Department of State centers around Gebert's alleged "concealment" of his white nationalist activities. *Id.* ¶ 19. For example, the Department raises various instances of Gebert's behavior

---

[11]     Under the Department of State's analysis, failure to disclose information -- though never asked -- constitutes dishonesty/concealment here. Also, under the Department of State's analysis, anyone who does not affirmatively, verbally reveal that they hold unpopular opinions on *any issue* would likewise be guilty of dishonesty/concealment here.

(such as his use of pseudonyms online, the fact that he wore a hat and sunglasses to a protest, etc.) as evidencing his alleged concealment from them of his white nationalism. *Id.* This argument, however, as both the Department and the investigators are fully aware, is a red herring that significantly mischaracterizes the nature of Gebert's privacy regarding his political beliefs.

In fact, this conclusion fails to consider the most logical explanation for Gebert's behavior. If one were to put themselves in Gebert's shoes for a moment, knowing that on a daily basis, he interacts with non-white neighbors, colleagues, co-workers, supervisors, etc., his decision to keep his political and ideological beliefs private can be better understood and possibly even empathized with. Given this, it should be obvious why Gebert chose to keep his political and ideological beliefs private, as he has every right to do.

As he explained throughout his interview, Gebert knows that his opinions are unpopular and that many people would be offended. *Id.* ¶ 19. He knows that society does not accept them. Thus, as Gebert explained, unless he knows that you are what he calls a "like-minded person" (i.e., another white nationalist), he does not talk about his political or other ideological viewpoints with you. In other words, Gebert -- like millions of other Americans -- keeps his political and ideological views private. Gebert has every right to take this approach. Not only were Gebert's coworkers and supervisors not aware of his beliefs, but neither were his neighbors, some of his friends, or most of his acquaintances.  Thus, it wasn't that Gebert was concealing his beliefs from the government out of fear of losing his security clearance. To the contrary, Gebert did not discuss his views with anyone on an unsolicited basis except for those whom he would consider "like-minded" because he knew that his opinions were controversial.

The fact that people have aspects of their lives that they do not, on their own initiative, tell supervisors, associates, neighbors, co-workers, or even close family members does not, however,

imply that those people are security risks. For example, many people have aspects of their lives, such as their sexual preferences or sexual fetishes, that they prefer to keep private. This fact does not mean those people would fail to reveal those issues during the security clearance process – if asked about them. Although Gebert would not expose his beliefs on an unsolicited basis, as was revealed throughout his interview, he prides himself on his integrity. *Id.* ¶¶ 33-34. He is and has always been aware of the importance of being honest and truthful throughout the clearance process. *Id.* Had Gebert ever been asked about his political or ideological beliefs, he would have disclosed them, just as he did during the subsequent investigative interview. As Gebert explained:

> SPECIAL AGENT: And you don't feel that information could be -- have use -- could've been used to exploit you, to blackmail you, coerce you, or anything like that?

> MR. GEBERT: A hundred -- a hundred percent no because I'm not ashamed at all of my views. I can't be bought. I believe what I believe. You know, I'm a true believer, not in any cult sense, but in terms of having informed, you know, beliefs and values that unfortunately in this day and age are judged to be beyond that pale.

> [Gebert Interview 81-15 to 82-3.]

In addition, the Department of State points to various other isolated actions that Gebert took in an effort to show the deliberate concealment of his political and ideological beliefs from the Department of State. *Id.* ¶ 19. All of the evidence of alleged concealment that the Department points to, however, just goes to Gebert's public persona. For example, pointing to the fact that he conducted his activities on the internet under various pseudonyms, such as "Coach Finstock," or that he wore a "hat and sunglasses" to the Charlottesville protest. (Def. Mot. at 2-3). In doing so, the Department of State again ignores the most logical and benign explanation -- that Gebert is simply private regarding his political and ideological views, as he has every right to be since he knows many disagree with him. Notwithstanding this, it also ignores that "usernames" are just that - they are often made up and do not reflect the actual name of the person posting.

In short, all of the information above demonstrates that the allegations in the Complaint show direct and circumstantial evidence of a retaliatory motive. Specifically, Gebert has adequately demonstrated that the Department's revocation of his security clearance was in direct retaliation for the embarrassment he caused the Department of State as a result of his viewpoints. Gebert has thus adequately stated the "causal link" necessary for his First Amendment retaliation claims to proceed. Thus, Gebert has sufficiently alleged claims of First Amendment retaliation.

### B. *Egan* Does Not Bar Plaintiff's First Amendment Claims

Defendants also raise the issue of whether federal courts can review Executive Branch judgments about whether specific individuals pose a risk to national security. (Def. Mot. at 14.) Defendants represent that this is a "question the D.C. Circuit repeatedly has declined to resolve." (Def. Mot. at 14.). To the contrary, the D.C. Circuit **consistently** has held that valid constitutional claims are **not** foreclosed by *Egan*. In *Garcia v. Pompeo*, No. 18-cv-1822, 2020 WL 134865 (D.D.C. Jan. 13, 2020), for example, this Court directly addressed this issue. In that case, Gustavo Garcia, an attorney and U.S.-Mexico dual citizen, applied for a job at the U.S. Embassy in Mexico City and received a conditional offer of employment, which was revoked when he was denied a security clearance. *Id.* at 1. From responses to Garcia's FOIA and Privacy Act requests to the Embassy Regional Security Office, which conducted his background check, he learned that the office:

> had collected and maintained a significant amount of information about [his] First Amendment-protected activities, including his involvement in protests against U.S. immigration policy, his participation in community groups, his publication of a book about the visa process, and his seminars about the visa process, and that it had denied him a security certification based on these activities.  [*Id.*]

Garcia thereafter sued under various legal theories. *Id.* at 2, 11. In Count V of his complaint, Garcia alleged that "when the State Department denied [him] a security certification based on his

First Amendment protected activities, it violated his rights under the Constitution." *Id.* at 7.

Analyzing Garcia's First Amendment claim, the Court held:

> **The D.C. Circuit consistently has held that valid constitutional claims are not foreclosed by *Egan*.** In *Ryan v. Reno*, the D.C. Circuit held that, although *Egan* precludes judicial review of an adverse employment action under Title VII based on the denial or revocation of a security clearance, *Egan* "does not apply to actions alleging deprivation of constitutional rights." 168 F.3d 520, 524 (D.C. Cir. 1999). In *United States Information Agency v. Krc*, the D.C. Circuit cautioned that "judicial authority to consider the constitutional claims resulting from agency personnel decisions" is of "critical importance" because "those constitutional claims may well be the only check on agency actions that determine a person's career." 905 F.3d at 400. Accordingly, "[c]ourts have an obligation to listen to those claims clearly and to consider them carefully." *Id.* And, in *National Federal of Federal Employees v. Greenberg*, the D.C. Circuit held that *Egan* did not bar a constitutional challenge to a Department of Defense security clearance questionnaire, stating that "[i]t is simply not the case that all security-clearance decisions are immune from judicial review." 983 F.2d 286, 289 (D.C. Cir. 1993) (collecting cases)...
>
> But *Egan* does not stand in the way of a well-pleaded constitutional claim that, as here, would appear to have record support. *Egan*, therefore, does not forbid consideration of Plaintiff's First Amendment claim.

[*Id.* (emphasis added.)]

Moreover, in *Garcia,* the Defendants insisted that the Plaintiff was denied a security certification because "he provided false information to visa applicants and assisting in circumventing immigration law" and because "he had for several years exhibited anger and opposition towards the United States embassy and its activities." *Id.* at 18. The Court concluded, however, that Defendants presented "at best, weak evidence to support these claims" and that "[n]one of the cited evidence permits a finding that Plaintiff's First Amendment activities played little or no role in revoking his job offer." *Id.* After examining Garcia's proffered evidence against the requirements of a First Amendment retaliation claim, Judge Mehta concluded that Garcia supplied "ample evidence to create a genuine dispute of material fact" and denied the government's motion for summary judgment. *Id.* at 8.

For these reasons, this Court should likewise conclude that Gebert's First Amendment retaliation claims have record support and that *Egan* does not forbid consideration of these claims. In addition, however, there are three more independent reasons why *Egan's* otherwise categorical bar regarding the review of the merits of clearance decisions is inapplicable here. First, Gebert intends to show not only was he treated differently based on his viewpoints, but the Department has a "policy or practice" of treating white nationalists/pro-whites/far-right employees differently based on their viewpoints. Compl. ¶ 43. While it is clear that white nationalist/pro-white/far-right viewpoints have been singled out as a source of embarrassment to the Department, it does not appear that they treat other individuals with different viewpoints, such as those who support the Black Lives Matter movement, similarly. *Id.*

In *Gill v. United States DOJ*, 875 F.3d 677 (D.C. 2017), Gill alleged that the government "treat[ed] him, a Muslim, differently than non-Muslims." Judge Tatel explained, "[if] Gill could show that the government has a policy or practice of treating Muslims or naturalized citizens differently," his claims would not be barred by *Egan,* reasoning that because a challenge to an unconstitutional "policy or practice" did not require courts to review the Executive's discretionary judgments about an employee's trustworthiness – the concern that lay at the core of *Egan's* reasoning – such constitutional challenges should be exempt from *Egan's* bar. *Id.*

Second, Gebert intends to show that the investigators who were assigned to his case subsequent to the publication of the SPLC article were fully aware that the report that they sent to the security clearance adjudicators, in which they determined that Gebert had been dishonest during his September 27, 2019, reinvestigation interview, was false. Compl. ¶ 37, 38, 44, 53, 55. Rather, as explained above, these investigators worked their way backward and concocted the dishonesty justification in an effort to cloak the revocation of his clearance to evade review on the

basis of it being a "national security" concern. *Id.* Given the overwhelming evidence that supports Gebert's position, there is no reasonable way the investigators could have actually believed their own dishonesty justification. As such, Gebert advances a *Rattigan*-based claim related to the Department's revocation of his security clearance.[12]

Finally, Gebert contends that the procedures or methods used by the Department in the clearance process are constitutionally defective. Specifically, Gebert contends that the two subject questions the Department contends he was dishonest in answering are overbroad, vague, and facially unconstitutional. Compl. ¶ 43, 55-59, 61. Accordingly, they cannot serve as a basis for revoking his clearance. In *Greenberg,* this Court explained that "[i]t is simply not the case that all security-clearance decisions are immune from judicial review." 983 F.2d at 290. The Court held that *Egan* presented no bar to a constitutional challenge to the Department of Defense's security clearance questionnaire. *Id.* Although recognizing that the government may have "considerable leeway to determine what information it needs from employees holding security clearances and how to go about getting it . . . [n]o one . . .would suggest [that] the government could, despite the Fourth Amendment, conduct random searches without warrants in the hope of uncovering information about employees seeking security clearance. Still less would anyone consider such unconstitutional searches and seizures to be immune from judicial review." *Id.* In that case, the Court distinguished *Egan* as concerning "a particular employees' security clearance," whereas the

---

[12]      *See* serial holdings in *Rattigan v. Holder,* 689 F.3d 764, 770-771 (D.C. Cir. 2012) (*Rattigan II)* and *Rattigan v. Holder,* 780 F.3d 413, 415 (D.C. Cir. 2015) (*Rattigan III)* (permitting judicial review of decisions pertaining to a particular employee's security clearance where that employee alleged that the informational *inputs* to the clearance process were knowingly false); *see also Horsey v. U.S. Dep't of State,* 170 F.Supp. 3d 256 (D.C. Cir. 2016) (holding that the *Egan* doctrine does not preclude judicial review of a revocation of an employee's security clearance based on a knowingly false report or referral to the securities clearance authorities.)

*Greenberg* exception allowed review only of "the constitutionality of the methods used" for clearance decisions. *Id.*

The Department is interpreting the questions at issue here to require applicants to disclose their political associations and speech as well as their ideological beliefs. These are clearly activities within the freedom of speech, and the concern underlying the overbreadth doctrine – chilling speech – is directly at issue here. In fact, the issues at stake in this case are strikingly similar to those present in *Ozonoff v. Berzak,* 744 F.2d 224 (1st Cir. 1984). In that case, J. Breyer held that an Executive Order, which provided that a person's political associations and speech "*may* be considered" in determining whether a security clearance should be granted, violated the First Amendment as being vaguer and broader than the First Amendment allows.

The two questions the Department contends Gebert was dishonest in answering were not a part of the SF-86 and, therefore, have not been approved by U.S. Office of Personnel Management. Moreover, since they did not directly relate to any questions on the SF-86, they exceeded the scope and authority that the interviewer could lawfully inquire about during the personal interview. The Report of Investigation detailing the September 27, 2019, interview reveals that the interviewer essentially tracked the hundreds of questions contained in the 136-page SF-86 questionnaire *almost verbatim,* with the exception of these two particular questions, which were thrown in at the very end of the interview in a "catch-all" manner. With the exception of these two broad, open-ended questions, the remainder of the interview questions were specific and limited to actual topics/subjects covered in the SF-86. Given the broadness of these questions, it is clear they are nothing more than a fishing expedition. Moreover, in almost every single security clearance case, an investigator would be able to justify a clearance revocation after-the-fact, as was done here, by

contending that an individual should have responded affirmatively to one of these broad and ambiguous questions. This, of course, is a serious problem.

It should also be noted that in *U.S. v. Kerik*, 615 F. Supp. 2d 256 (S.D.N.Y. 2009), the Court analyzed the subject "embarrassment" question. The Court noted, "[p]lainly the meaning of the term 'embarrassing' . . . is open to interpretation. What is embarrassing to one person may not be embarrassing to the next." *Id.*  The Court further held:

> [T]his Court agrees that the term "embarrassing" is not fundamentally ambiguous per se. For example, a question about "embarrassing educational history" or "embarrassing business dealings" would not be fundamentally ambiguous because it provides the answerer with clarity about the specific information sought by his examiner. Moreover, in the context in which questions were asked of Kerik — the vetting process for a high-level executive position — the participants shared a mutual understanding that the questioner sought general information that might be publicly and politically damaging to the nominee or the President. *See Lighte*, 782 F.2d at 373 ("The jury may also consider extrinsic evidence that demonstrates how a declarant interpreted a question."). Nevertheless, as a question becomes more abstract, such mutual understanding becomes more tenuous and ambiguity swells.
>
> With these principles in mind, the Court is troubled by questions one and three from Count Twelve. On October 29, 2002, Kerik was asked whether there was anything embarrassing that he would not want the public to know about. In contrast to the questions above, this level of abstraction renders the term "embarrassing" fundamentally ambiguous. The question does not explicitly limit the context to "associations" or specific affiliations. Rather, the question is more  like a fishing expedition, seeking anything that might embarrass an applicant. Despite the laundry list of answers the Government wishes Kerik would have supplied, it does not follow that Kerik necessarily understood the question in precisely this way. Question three from Count Twelve provides no greater clarity. Thus, the Court finds that these two questions are fundamentally ambiguous and may not serve as predicates for the false statement charges in the Superseding Indictment. [*Id.* at 264.]

Here, there was likewise no qualifier to the word "embarrassing." To expect Gebert to disclose his constitutionally protected speech and associations in response to such an ambiguous question is illogical. Moreover, to require Gebert to volunteer his ideologies and political beliefs in response to overbroad, vague, and facially unconstitutional questions such as these would constitute

an enormous invasion of not only Gebert's civil liberties, but also those of all other individuals whose speech and associations would be chilled as a result of such questions. For these reasons, this is precisely the type of case that calls upon the courts to interject notwithstanding *Egan*.

**IV.   Defendants' Request to Dismiss Plaintiff's Due Process Claims Fail to Accurately Identify the Property Interests at Stake and the Extent of the Deprivation and Should be Denied**

**A.   Defendants' claim that Gebert Failed to Plausibly Allege a Substantive Due Process Violation is Baseless and Should be Denied.**

Defendants have largely ignored the major difference between their cited cases and what the State Department is bound by when it comes to their employees,' such as Gebert's, right to use accrued leave in these circumstances. First, the Defendants pointed out that Plaintiff cited no "Department rules, regulations, or guidelines" to prove his entitlement to the use of accrued leave prior to his suspension. (Def. Mot. at 25). As Plaintiff accurately stated in his Complaint, Gebert accrued leave as part of his employment, he was, in fact, entitled to use it as requested and stated in his Complaint, and the Defendants denied Plaintiff's request. Compl. ¶¶ 104-109. It certainly should not be fatal that Plaintiff omitted the direct citation to the Defendants' own policies, laws, and regulations to which they have access, familiarity, and are bound. However, the applicable policy, 3 FAM 3418, is clearly a "[document] upon which the plaintiff's complaint necessarily relies." *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d at 46 (D.D.C. 2009).

The specific policy, however, only further proves how egregious and blatant Defendants' violations actually were. The applicable State Department policy, which is titled "Annual Leave in Lieu of Non-Pay Status During Suspension," reads, in pertinent part:

> Annual leave in lieu of non-pay status during suspension may not be granted except when an employee is suspended summarily in the interest of national security under the provisions of 5 U.S.C. 7532.  In such case, the employee may request, and with the approval of the appropriate headquarters office, be granted annual leave not to exceed the balance to the employee's credit as of the date of suspension in lieu of

non-pay status.  In the event the employee is restored with back pay, the annual leave charged for the period covered by back pay is restored.

Plaintiff is, according to the Defendants, only "suspended summarily" and it is being done so in the "interest of national security under the provisions of 5 U.S.C. 7532." However, Gebert should have been granted the ability to take his accrued leave, and Plaintiff should have the opportunity to go through discovery to show that the only reason his request was denied was because of the content of his speech. One of the bigger issues and where the harm and deprivation to Gebert is multiplied is when one also reads and considers 3 FAM 7437, which authorizes Gebert to only carry over 240 hours of accrued leave. This results in a continuous and ongoing harm as hours are "use or lose," and Gebert continues to lose.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it," or "a unilateral expectation of it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "He must, instead, have a legitimate claim of entitlement to it." *Id.* Gebert is, of course, entitled to express constitutionally protected opinions, and the claim that this revocation and suspension have been and are based on "dishonesty" is merely pretextual and a complete fabrication. Additionally, unlike the defendant in *Roth*, Gebert has much more than just an "abstract need or desire for it," and more than a "unilateral expectation of" his accrued leave. Accruing leave is part of his compensation package, and denying the use of it only elongated the time period for which he has been without a paycheck, which eclipsed over three years at the time this suit was filed. Compl. ¶¶ 107, 108. That, taken together with the hours he has lost and continues to lose based on the Defendants' unreasonable delay for unlawful reasons, and this deprivation has become substantial.

The amount of time the Defendants have taken and left Plaintiff in purgatory and the unlawfulness underlying their decision meets the requirements of "grave unfairness;" the level of

misconduct by the Defendants rises to the level of the "deliberate flouting of the law that trammels significant personal or property rights" required. *George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 209 (D.C. Cir. 2003). Contrary to Defendants' claim that Plaintiff did not allege Defendants' actions were a "deliberate violation of the law," Plaintiff clearly and specifically identified Defendants actions as "discriminating against [Gebert]" and they were "inserting unconstitutional criteria into [their] processes." Compl. ¶ 109. And, for the reasons stated above, as well as the clearly pleaded fact that it has been over three years without pay - a substantial amount of time without a paycheck - Gebert has clearly described how "significant" Defendants' violations have been. Compl. ¶ 60.

**B.** **Defendants' claim that Gebert Failed to Plausibly Allege a Procedural Due Process Violation is Baseless and Should be Denied**

The Defendants have attempted to whittle Gebert's property interests down to opinions, reputation, future employment, and the aforementioned accrued leave. (Def. Mot. at 25-28). The Defendants further attempt to mischaracterize Plaintiff's property interest claim by citing *Doe v. Cheney*, 885 F.2d 898 (D.C. Cir. 1989), *Palmieri v. United States*, 72 F. Supp. 3d 191 (D.D.C. 2014), and *Gill v. Dep't of Just.*, 875 F.3d 677 (D.C. Cir. 2017) and alleging Plaintiff is suggesting he has a property interest in his security clearance. (Def. Mot. at 25). In reality, Plaintiff has alleged he is a permanent, full-time federal employee who is entitled to due process before he remains indefinitely suspended for over three years. Plaintiff claims that when maintaining a security clearance is a condition of employment and the two are so intertwined - the suspension or revocation of such clearance inevitably results in the suspension or termination of the employment - Plaintiff has a constitutional right to due process. There are procedural due process measures already in place and intended to be provided to Plaintiff through the security clearance process; however, when the Defendants have willfully violated the procedures in place and grossly delayed

such due process, then due process has not been afforded at all.

Plaintiff, a public employee who can only be discharged or suspended for cause, has a constitutionally protected property interest in his employment and cannot be suspended or fired without due process. See *Board of Regents of State Colleges* v. *Roth,* 408 U.S. 564, 578 (1972); *Perry* v. *Sindermann,* 408 U.S. 593, 602-603 (1972). "The protections of the Due Process Clause apply to government deprivation of those perquisites of government employment in which the employee has a constitutionally protected 'property' interest." *Gilbert v. Homar*, 520 U.S. 924, 928 (1997). It is indisputable that Plaintiff is still a federal employee with Defendant, and he has been suspended without pay for over three years.

Plaintiff contends his right to the materials that were relied upon in order to indefinitely suspend his employment and strip him of his livelihood for such a lengthy amount of time - by way of a security clearance - goes beyond just the rights afforded to a regular individual requesting records through FOIA/Privacy Act. As mentioned, Plaintiff's rights to due process are conferred upon Plaintiff through binding Executive Orders and their implementing guidance on which Defendants rely, 12 FAM 230, *et al.*, which detail the minimum due process rights for civilian employees who face proposed suspensions or revocations of their security clearance. The Defendants' Manual, at 12 FAM 234.1, explains that once the individual acknowledges receipt of the notice of intent to suspend or revoke his/her clearance and indicates their intent to respond in writing, which Gebert did in a timely manner, then the following will occur:

> Consistent with E.O. 12968, as amended, the notification letter will advise the individual of his/her right to:
>
> (2)  Request, in writing and within 10 days of receipt of the letter, any documents, records, and reports upon which the denial or revocation of eligibility *or assignment restriction* is based, to the extent that the documents would be provided if requested under the Freedom of Information Act (5 U.S.C. 552) or the Privacy Act (5 U.S.C. 552a).  If so requested, DS/SI/PSS will endeavor to provide the documents within

30 days;

(3)  Request, in writing and within 10 days of receipt of the letter, *their* entire investigative file, to the extent permitted by national security and other applicable law.  If so requested, DS will provide the file promptly and prior to the time set for the individual's written reply; [and]

(4)  Submit within 30 days of receipt of the notification, or if the investigative file or any other documents, records, and/or reports are requested, within 30 days of receipt of the investigative file and/or such documents, a written reply to, and request for review of, the decision to deny or revoke his/her eligibility for access to classified information *or to issue a security clearance with an assignment restriction.*  If timely requested and deemed appropriate, DS/SI/PSS may grant an extension of time to submit the written reply and request for review; and

The due process requirements afforded to federal employees within Executive Order 12968 include but are not limited to at least the rights granted and discussed above and within 12 FAM 234. The Executive Order 12968 more clearly reflects that these rights "shall be" afforded to an individual prior to revoking his/her security clearance. Executive Order 12968, ¶ 5.2. Plaintiff made these requests in a timely manner, and the Defendants have not provided the materials relied upon. *See generally* Compl. When the Defendants define what the process is for "due process," they have determined those are the minimum requirements afforded to an individual whose security clearance has been suspended or revoked. When the Defendants fail to follow what they have identified as the minimum requirements for due process, then they should be foreclosed to claim that due process was provided.[13]

This Circuit has recognized that, "Excluding parties from directly accessing the evidence

---

[13]      SEAD 4 makes clear to whom this guidance applies, where paragraph "C" (Applicability) unequivocally states, "This Directive applies to any executive branch agency authorized or designated to conduct adjudications of covered individuals to determine eligibility for initial or continued access to classified national security information or eligibility to hold a sensitive position." This becomes critical when reading para. "E.6", which reads, "When an adjudicative determination is made to deny or revoke eligibility for access to classified information or eligibility to hold a sensitive position, review proceedings, to the extent they are made available in Executive Order 12968, as amended, Part 5, shall be afforded covered individuals at a minimum."

against them is strongly disfavored . . ." *Fares v. Smith*, 901 F.3d 315, 324 (D.C.C. 2018). In *Fares*, this statement was made regarding a defendant relying on "undisclosed classified evidence." *Id.* Considering the evidence withheld from Plaintiff in the instant case has never been claimed as privileged, the acts by Defendants in this case appear to be more egregious and more clearly rise to the level of violating Plaintiff's right to due process.

More technically, Plaintiff is claiming Defendants' failure to provide all relied upon and requested documents and materials has resulted in a constitutionally inadequate notice that prevents Plaintiff from meaningfully availing himself of his opportunity to be heard; as such, this Court should weigh three factors under the *Mathews v. Eldridge* balancing test: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement, would entail." 424 U.S 319, 335 (1976); *see NCORI v. Dep't of State*, 251 F.3d 192, 206-09 (D.C. Cir. 2001) (applying *Mathews* to this court's evaluation of the designation process under AEDPA); *Al Haramain v. Dep't of the Treasury*, 686 F.3d, 965, 979-80 (9th Cir. 2012) (similarly applying *Mathews* in reviewing a designation).

Regarding Plaintiff's private interest that will be/has been affected by the Defendants' actions, like the plaintiff in *Fares*, the effect on his private interest is "dire." *Fares*, 901 F.3d at 323. Plaintiff has been without his paycheck for over three years, and in no realm and no job - private or public - could three years in an unpaid status ever be deemed acceptable. That is not even mentioning the health insurance, retirement, and other benefits that have been hindered, jeopardized, and/or parallelly suspended. See, generally, 5 CFR § 841.102 - Regulatory structure

for the Federal Employees Retirement System (FERS). The lost income and time towards retirement is substantial, and this is an important consideration for this Court. The court in *Gilbert* specifically stated, "So long as a suspended employee receives a sufficiently prompt post-suspension hearing, the lost income is relatively insubstantial, and fringe benefits such as health and life insurance are often not affected at all." *Gilbert*, 520 U.S. at 932. Plaintiff is not contending, as the respondent had done in *Gilbert*, that he is entitled to or has an absolute right to an uninterrupted paycheck; he is, however, focusing his argument on the contention that over three years in this process with no end in sight cannot be deemed "sufficiently prompt" and that the impact has been substantial. The court in *Loudermill* discussed how a nine, 10, or even 11-month delay could be acceptable, but there is a vast difference between 11 months and the chilling effect of over three years, especially in the context of measuring the amount of time someone has not received their paycheck: "The hardship inevitably increases as the days go by . . ." *Loudermill*, 470 U.S. at 551 (Marshall, J., concurring).

It is also interesting to point out that the *Gilbert* court, when discussing what amount of time might be "insubstantial," pointed to "health and life insurance" not being "affected at all." Defendants, in fall of 2021, retroactively canceled Gebert's health insurance effective September 2019, causing Gebert to pay for previously covered medical expenses. Compl. ¶¶ 154-155; in other words, he has *lost* his Federal Employees Health Benefits (FEHB) for over three years. It is undeniable that this delay is/has been substantial and has had *significant* adverse effects to his financial stability, health, and wellbeing. *Empire HealthChoice Assur., Inc. v. McVeigh*, 126 S. Ct. 2121, 2134-2135 (2006). (FEHB's jurisdictional provision…opens the federal district-court door).

As Plaintiff has demonstrated a significant personal interest in receiving the procedural due process, the second step in the *Mathews* balancing test would be to consider the "the risk of an

erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." In *Fares*, the government froze a respondent business's assets based on "redacted evidence - thereby limiting the designee's opportunity to probe or cross-examine on that evidence," *Fares*, 901 F.3d at 323-324, and acknowledged, in those circumstances "the risk of erroneous deprivation [was] especially high. Judges are necessarily wary of one-sided process because there is an exceptionally high risk of erroneous deprivation when undisclosed information is used." *Id* at 324.

Here, Plaintiff has alleged not only that relevant and releasable records were improperly and/or overly redacted, but that several documents and materials have been withheld in their entirety. Namely, after months of improper and unnecessary delay and a series of improper withholdings whereby Defendants unlawfully cited to exemptions not recognized under FOIA or the Privacy Act (Compl. ¶ 69), the Defendants gave perplexing and conflicting responses on the exact same day: both responses improper and still in violation of law.[14] Certainly if the "risk of erroneous deprivation is especially high when the government provides redacted records," then it stands to reason that withholding the release of entire documents would result in an exponentially higher risk of erroneous deprivation.

In Gebert's case, the timing and sequence of events are far more persuasive and compelling - and let us not forget truthful - than the concocted, pretextual reason provided as the basis of suspension and revocation later conveyed by the Defendants on August 16, 2019. Compl. ¶¶ 22, 23. The Hatewatch Article was published on August 7, 2019.[15] The next day, on August 8, 2019,

---

[14]     Their first response indicated they were still continuing to (improperly) partially redact 171 pages and have fully redacted (read: withheld entirely) seven additional pages. Compl. ¶ 75. Their subsequent response indicated 296 pages were released in full, and 124 pages were withheld in their entirety because "they are about other persons." Compl. ¶ 76.
[15]     https://www.splcenter.org/gebert

several news sources (reputable ones, actually) confirmed that Gebert had already been suspended no later than on that day.[16] Gebert's former supervisor at the State Department, Amos Hochstein, was specifically quoted, "Neo-Nazis are not all shaved heads and tattoos, they are hiding in plain sight. I'm horrified Gebert worked for me at the State Department." Gebert was not suspended on August 8, 2019 because he was "dishonest" to questions from a January 2019 interview; the comments by Hochstein more accurately reflect the sentiment of the State Department in regard to allegations made against Gebert, and they simply disagreed with his viewpoint.

The Defendants realized their suspension of Gebert on the basis of his viewpoints could not possibly stand, especially after the subsequent September 27, 2019, interview, where Gebert easily refuted and dispelled the allegations that he was a "Neo-Nazi" or some other type of extremist. Compl. ¶¶ 32-35. When finally given the chance to express his pro-white and political beliefs, he clearly articulated beliefs that are protected, and this became problematic for the State Department. Plaintiff is left with no other plausible conclusion other than that the withheld information that was relied upon must be of such high probative value to outweigh or cancel what has been made available. If that is the case, then it becomes imperative for Plaintiff to be able to review, assess, and cross examine and challenge the information.

The last step in the *Mathews* balancing test is to determine "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." The Plaintiff would contend that the fiscal and

---

[16]     *Rolling Stone* stated, "According to *Politico*, however, two sources close to the state department have confirmed that Gebert has been suspended following the Hatewatch report. His former boss, Amos Hochstein, who supervised Gebert during his tenure as coordinator for the State Department's international energy affairs, told *Politico* he found it 'inconceivable' that Gebert could've gotten security clearance not once, but twice. (The State Department conducts security screenings upon hiring and again after an employee has worked there for five years, according to Hochstein.).        https://www.rollingstone.com/culture/culture-news/matthew-gebert-hatewatch-report-white-supremacy-state-department-869051/.

administrative burdens placed on the Government, if any, are extremely low and overwhelmingly support Plaintiff's request for and definition of what qualifies as sufficient due process under the given circumstances. The Plaintiff is merely requesting that the court enforce the Defendants own rules such as 12 FAM 234, EO 12968, and SEAD 4. Compl. ¶¶ 144-149.  Lastly, as the Complaint makes clear, the Defendants have these documents in their possession, and are improperly withholding relevant documents. As such, the burden on the Government to have complied is so very, very low in this case.

Plaintiff has clarified that he has a constitutionally recognized property interest tied to his federal employment and benefits of said employment. As indicated herein, Plaintiff was suspended and continues to be suspended because of what the Hatewatch Article alleged he *said*, which was constitutionally protected speech. *See Supra* § III. The fact that the Department knew of his ties to pro-white or white nationalist candidates well before the Hatewatch Article further serves to (a) diminish the need for Gebert to have to disclose what was already known and condoned, and (b) proves that the actions they took were because the media condemned Gebert's speech and the State Department became concerned about the perception of continuing to employ a "white nationalist." *Id*.  The difference is the media can condemn for those purposes, but when the State Department followed suit, as a government actor, it violated Gebert's First Amendment protections. Further, Gebert was not provided the leave during his suspension because the State Department did not want it leaked to the press that Gebert was on "paid leave;" again, catering to the public perception that was basing condemnation of Gebert on his protected political ideology, speech, and activity.

Therefore, Plaintiff was and is entitled to due process before the Government can deprive him of his property interests. Defendants have failed to provide the requisite notice and opportunity to be heard that the constitution and case law require. When applying the *Mathews* balancing test

and determining what specific dictates of due process apply, they appear to weigh overwhelmingly in Plaintiff's favor, especially at this phase of litigation and based on the facts pleaded by Plaintiff. Because Plaintiff has a significant personal interest at stake, the risk of erroneous deprivation is extremely high, and the Government's burden to simply provide the due process it is already required to provide is so very low, the Court should deny Defendants' motion to dismiss Plaintiff's due process claims.

### C.    Stigma-Plus Theory

The D.C. Circuit has recognized two legal theories to establish a due process violation based on reputational injury. The first, known as "reputation plus," requires "the conjunction of official defamation and [an] adverse employment action." *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). The second is known as the "stigma plus" theory. It "differs from the [reputation-plus theory] in that it does not depend on official speech, but on a continuing stigma or disability arising from official action." *Id.* "In other words, where a 'reputation plus' theory requires some form of defamatory or stigmatizing speech by the government, the latter depends only on governmental imposition of 'a continuing stigma or other disability arising from official action' that 'foreclosed the plaintiff's freedom to take advantage of other employment opportunities.'" *Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016) (emphasis omitted) (quoting *O'Donnell*, 148 F.3d at 1140).

Official spokespersons for the Department of State made various statements to the media directly expressing how they did not condone or agree with Gebert's viewpoints. Moreover, the action of revoking his security clearance, in and of itself, was intended by the Department to send a clear message to the public that they did not support Gebert. As such, Plaintiff was both defamed and stigmatized by the Department of State, satisfying the reputation plus standard.

Under the stigma-plus line of cases, "a government action that potentially constrains future employment opportunities must involve a tangible change in status." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1527 (D.C. Cir. 1994). Such "tangible change" can be shown in one of two ways. The first is if the government's action "formally or automatically excludes" the plaintiff "from other government employment opportunities," such as by official debarment or some other "binding determination to disqualify." *Id.* at 1528. Defendants' actions are the equivalent of a constructive bar to federal positions for which Plaintiff is qualified. Plaintiff has been a foreign affairs officer for the past 10 years, and this can essentially only be done by working with/through the federal government. Therefore, Plaintiff's employment history requires a security clearance, and he has worked himself into a very specific niche that does not have a civilian equivalent.

Plaintiff also relies on the second method, which requires that the government action must have "a broad effect of largely precluding [the plaintiff] from pursuing [his] chosen career." *Kartseva*, 37 F.3d at 1528. The employee must show that the government has "seriously affected, if not destroyed, his ability to obtain employment in [his] field." Id. (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959)). Plaintiff has been employed by the Defendant, State Department, since May 19, 2013, in the role of Foreign Affairs Officer in the Bureau of Energy Resources, Office of Energy Diplomacy, Middle East & Asia Division (ENR/EDP/MEA). Compl. ¶ 11. As part of his position, Plaintiff underwent a background investigation that resulted in him being granted a Top Secret security clearance on April 19, 2013; holding and maintaining this level of security clearance is a condition of Plaintiff's employment. *Id.* ¶ 12. This is a very niche career path where the federal government is effectively the only employer, and the jobs that require his skill set require a security clearance.

Plaintiff also relies on the second method, which requires that the government action must

have "a broad effect of largely precluding [the plaintiff] from pursuing [his] chosen career." *Kartseva*, 37 F.3d at 1528. Here, Plaintiff's security clearance is currently revoked, and the revocation, along with the Defendants' biased, unsupported-by-fact version of events, is in the Defense Information System for Security (DISS).[17] Compl. ¶ 41. This database is accessible by security managers for contractors and every government agency. At a minimum, any potential employer will see that Plaintiff's security clearance has been revoked and will deny him employment.[18] Plaintiff asserted that the revocation of his security clearance prior to Defendants providing him **a complete copy** underlying materials relied upon in making that decision is a clear violation of his due process.  Effectively, Defendants' are intentionally excluding Plaintiff from employment opportunities by revoking his security clearance which means he has to wait for a minimum of one year until he can reapply for his security clearance.[19]

### D.    Gebert's Equal Protection Claims

Defendants' equal protection defense fails because they apply the incorrect level of scrutiny; therefore, Defendants' request to dismiss Counts VI and XVII must be denied. See *Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148 (D.C. Cir. 2004). For the reasons discussed above, Gebert has demonstrated that his fundamental rights, namely, his First Amendment protected speech and activities and his due process rights has been violated. The

---

[17]      DISS is the system of record to perform comprehensive personnel security, suitability and credential eligibility management for all Military, civilian, and DOD contractor personnel. In other words, DISS is the online, secure database of U.S.A. persons' security clearances and public trust

[18]      While Plaintiff's Complaint makes mention that he was offered employment opportunities, a suitability determination and review of an applicant's security clearance status does not occur until after the applicant accepts a conditional offer of employment. Compl. ¶ 116. However, Gebert was unable to accept these offers or move on to the next stage because he is not entitled to accept a job offer while maintaining employment with another federal agency. Compl. ¶ 115. Contrary to Defendants' assertions, it is not reasonable for Gebert to have to resign his employment because his employer is violating his rights.

[19]      *See* the Defense Counterintelligence and Security Agency's (DCSA) website, the largest issuer of security clearances, https://www.dcsa.mil/mc/pv/mbi/appeals/.

Supreme Court has long considered political and ideological speech to be at the core of the First Amendment, including speech concerning "politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). A government regulation that implicates political or ideological speech receives strict scrutiny in the courts, whereby the government must show that the law is narrowly tailored to achieve a compelling government interest. *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U. S. 721, 734 (2011)) (quoting *Citizens United*, 558 U. S. 310, 340 (2010)). Thus, it is the Defendants' burden to demonstrate that their policies and practices, which regulate idelological and political speech, furthers a compelling governmental interest and is narrowly tailored to that end. While they may claim the all-encompassing "national security" to meet the "compelling governmental interest," they have not and cannot demonstrate that it is "narrowly tailored."

**V.   Gebert has Adequately Claimed Defendants Committed APA Violations**

Gebert raises two claims under the APA. First, Count X challenges the Department's failure to follow process and procedure, which is being done in an arbitrary and capricious manner and is an abuse of discretion. Compl. ¶¶ 144-149. Plaintiff has also successfully pleaded the State Department's decision is being unlawfully withheld and unreasonably delayed.[20] Count XI challenges the Department's arbitrary, capricious, and unlawful termination of Gebert's health insurance coverage. As explained further below, each of these APA claims is properly pleaded, and, thus, Defendants' request for dismissal should be denied.

**A.    Gebert's APA Challenge to Defendants' Flouting of 12 FAM 230, *et al***

Plaintiff's case is easily distinguishable from the authority relied upon by Defendants to support their argument that Gebert's APA claim under Count X must fail. Defendants' position

---

[20]     5 U.S.C. § 555(b); 5 U.S.C. §§ 551–559

Gebert's APA claims as "challenging the clearance revocation." Def. Mot., at 32. However, Gebert is not challenging the decision or the end result (i.e. the revocation); Gebert is challenging the fact that the agency's processes and procedures to reach their conclusion were not followed, the delay in progressing through the process and making a decision is unreasonably long, and that the underlying information relied upon to reach their decision is unconstitutional. So, while the clearance revocation is committed to agency discretion by law, the premise of *Gill* can and should be applied here; the Court is not being asked to make a ruling on an agency's decision, but the Court is in the best position to determine if the decision is being reached with the insert of arbitrary, capricious, abuse of discretion and/or otherwise in violation of the constitution. 875 F.3d at 680.

Plaintiff has already provided significant detail discussing Defendants' actions that run afoul of 12 FAM 234.1. *See Supra IV, B*. Defendants issued Plaintiff notice of their decision to revoke his security clearance on July 1, 2020. Compl. ¶ 41. Since that time, Gebert has adhered to the requirements placed on the employee under 12 FAM 234.1(c)2-4, but the Defendants have not. Nor have they moved on to step 5 of 12 FAM 234.1(c), which is to provide notice of and reasons for their decision and notice of his right to appeal. It has now been two years and eight months with no decision for Gebert to even appeal. The Plaintiff has argued that Defendants are delaying and withholding such decision in bad faith because the appeals process within 12 FAM 234.3 starts to impose deadlines on the Defendants. The Appeals Procedure section gives the employee 30 days to appeal the decision, and then, "After receipt of the appeal, DS/SI/PSS will transmit the appeal and other relevant material to the [*Security Appeal Panel*] *SAP*, which will endeavor to schedule a meeting to hear the appeal within four weeks of receiving the appeal."

The significance of the Department's incredibly unreasonable delay cannot be understated. Knowing Gebert cannot hold more than one federal position at a time and considering Gebert has

a family to support and has not had a paycheck from his employer for over three years, the Department need only wait out Gebert to resign. Gebert resigning would result in the loss of jurisdiction by the Agency over Gebert's security clearance, and he would no longer be able to appeal the agency's security clearance decision. In other words, Gebert resigning would wipe the Defendants' slate clean of their due process and APA violations, as well as their extensive problematic violations of Gebert's First Amendment rights. *Supra III*.[21]

**B.      Defendants' Termination of Gebert's Health Insurance Coverage was Arbitrary, Capricious, an Abuse of Discretion, and Otherwise not in Accordance with Law**

Plaintiff would first point out that Defendants do not deny that their actions regarding Gebert's health insurance were in violation of law; the Defendants merely stated Gebert did not mention the *specific* law. Fortunately, Plaintiff alleged violations of 3 FAM 3600, *et al*. This Manual section is based on, promulgated under, and incorporates 5 U.S.C. 89/5 CFR § 890, *et al*. See 3 FAM 3611. Specifically, 5 CFR § 890.502(b) lists *several* requirements that the employer agency "must" do that the State Department clearly violated:

> ***(b) Procedures when an employee enters a leave without pay (LWOP) status or pay is insufficient to cover premium.*** The employing office ***must*** tell the employee about available health benefits choices as soon as it becomes aware that an employee's premium payments cannot be made because he or she will be or is already in a leave without pay (LWOP) status or any other type of nonpay status… The employing office ***must*** also tell the employee about available choices when an employee's pay is not enough to cover the premiums.
>
> (1) The employing office ***must*** give the employee written notice of the choices and consequences as described in paragraphs (b)(2)(i) and (ii) of this section and will send a letter by first class mail if it cannot give it to the employee directly. (***Emphasis*** added)

It is clear Defendants had an obligation to provide Plaintiff notice regarding his health

---

[21]      50 U.S. Code § 3341(g)(2)(A)(i-ii) provides timeliness guidelines of 60 days for 90 percent of security clearance investigations. Further, the Code does not allow appeals of suspensions for timeliness that are less than one year. 50 U.S. Code § 3341(j)(4)(A).

insurance options before they terminated them (especially retroactively). It is clear that Plaintiff pleaded Defendants were required to do so and failed to do so. Compl. ¶¶ 151-157.

If this is not arbitrary and capricious behavior occurring as a result ot Gebert's specific viewpoints, then the Defendants would ask the Court to believe that the State Department routinely violates the Federal Employees Health Benefits (FEHB) Program as a matter of practice. Not only do they fail to take affirmative steps, such as provide required notice, but Defendants also went the extra step with Gebert to retroactively cancel coverage for periods over which he had already paid the premiums, thereby causing Plaintiff to suffer significant economic damages. Compl. ¶ 151. Count XI should not be dismissed because Defendants violated laws, regulations, and policies, and additional discovery would prove that Defendants acted in bad faith and had nothing to do with his alleged "dishonesty."

**VI.**   **Plaintiff's Reasonable Description of Records**

Defendants incorrectly argue that the Plaintiff's FOIA and Privacy Act request were not specific yet the Defendants provided part of the investigation while conspicuously omitting agent notes and other relevant documents that comprise the investigation.  Compl. ¶ 73-76. In short, the Defendants are being dishonest and deceitful when they knowingly and willfully withheld records that Plaintiff was entitled to under FOIA and the Privacy Act. .

Plaintiff's request specifically references the security clearance revocation and specifically states: "On his behalf [Plaintiff], I am requesting all records pertaining to Mr. Gebert that are held by the U.S. Department of State." Under both the Privacy Act and FOIA, an agency must conduct an adequate and reasonable search for relevant records. See *Chambers v. U.S. Dep't of Interior, 568 F.3d 998, 1003, 386 U.S. App. D.C. 239 (D.C. Cir. 2009)* (stating that "the Privacy Act, like FOIA, requires that a search "be reasonably calculated to uncover all relevant documents." In this

Circuit, courts apply the same standard under both statutes to determine the adequacy of a search. See *Id.*; *Hill v. U.S. Air Force*, 795 F.2d 1067, 1069, 254 U.S. App. D.C. 171 (D.C. Cir. 1986) (per curiam) (affirming search's adequacy under Privacy Act for the same reasons the search was affirmed under FOIA). The Defendants understood the request because they provided responsive records, albeit not all the responsive records; therefore, their claims that the request was ambiguous is disingenuous at best.

Further, Plaintiff submitted a subsequent request on December 30, 2020 wherein Plaintiff further clarified that he was asking for all the records related to his security clearance revocation so he could have a meaningful opportunity to defend himself. Compl. ¶ 72-73. Plaintiff specifically asks for "all records pertaining to Matthew Gebert's security clearance revocation." The request specifically addressed the failure to provide properly exempted material. *Id.*

Defendants' claims that Plaintiff failed to reasonably describe records are inconsistent with Defendants' release of portions of the investigation, and should be dismissed for those reasons.

**VII.     Gebert is Entitled to Damages**

Gebert is entitled to damages under a *Bivens* claim, the Back Pay Act, 5 U.S.C. § 5596 and 5 CFR § 550, Subpart H, (2023), and 5 U.S.C. § 8912 and 5 CFR § 890 (2023), *et al*. The Back Pay Act provides an explicit waiver to sovereign immunity. Because Plaintiff raises valid constitutional and other claims they are entitled to damages pursuant to the Back Pay Act, 5 U.S.C. § 5596. In this case, the Plaintiff has been in an indefinite suspension since September 24, 2019. Compl. ¶ 28. An indefinite suspension would meet the criteria of when an "employee is found by an appropriate authority to have been affected by an unjustified or unwarranted personnel action that resulted in the withdrawal, reduction, or denial of all or part of the pay, allowances, and differentials otherwise due to the employee. This subpart should be read together with this section

39

of law." 5 C.F.R. § 550.801 (2023). Further, 5 U.S.C. § 8912, FEHB, specifically provides the federal district courts with original jurisdiction of "civil action or claim against the United States founded on this chapter." *Empire HealthChoice Assur., Inc*, 126 S. Ct. at 2129.

**A.     Plaintiff's *Bivens* Claims Remain Viable Despite the Recent Ruling in *Egbert*, and Plaintiff's Claims Should not be Dismissed**

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971), the Supreme Court created a cause of action, available under limited circumstances, against a "federal agent acting under color of his authority . . . for damages consequent upon his unconstitutional conduct." *Bivens* involved Fourth Amendment claims for a warrantless search and excessive force arising from a handcuffing and arrest at the plaintiff's apartment. *Id.* at 389-90. Over the next nine years, the Court applied *Bivens* to fashion causes of action only twice—"first, for a former congressional staffer's Fifth Amendment sex-discrimination claim and second, for a federal prisoner's inadequate-care claim under the Eighth Amendment." *Egbert v. Boule*, 142 S. Ct. 1793, 1802 (2022) (citing *Davis v. Passman*, 442 U.S. 228 (1979), and *Carlson v. Green*, 446 U.S. 14 (1980) (cleaned up)).

Plaintiff acknowledges that at this time, "recognizing a cause of action under *Bivens* is a disfavored judicial activity," *Egbert*, 142 S. Ct. at 1803: Disfavored but not entirely foreclosed. In considering a proposed *Bivens* claim, a court's inquiry proceeds in two stages. *Id.* The court first asks "whether the case presents a new *Bivens* context—i.e., is it meaningfully different from the three cases in which the Court has implied a damages action." *Id.* (cleaned up). If the context is new, then the court must ask "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages" and whether there are "any special factors counseling hesitation

before authorizing a new kind of federal litigation." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (citing *Bush v. Lucas*, 462 U.S. 367, 378 (1983)).

       1.    <u>Plaintiff's Due Process Claims do not Arise in a New Context</u>

*Egbert* made recovery for plaintiffs under *Bivens* more difficult, but not impossible, and the door remains open to bringing claims against federal government officials who willfully violate the constitutional rights of others while in their private capacities. Specifically, *Egbert* does not appear to explicitly foreclose *Bivens'* potential extension to Plaintiff's Fifth Amendment claims. Applying this framework, this is a proper case for a *Bivens* claim. First, the context is not new. Even imagining the context was somehow new, there are no special factors, such as a comprehensive remedial scheme or national security in the traditional context previously discussed by precedent, that counsel hesitation applying *Bivens* to Gebert's case.

       Gebert's Fifth Amendment claims do not arise in a new context, and he should be allowed to proceed. Gebert's *Bivens* claims align closer to the *Davis* decision by the Supreme Court than the plaintiffs' cases within *Ziglar, Egbert*, and *Hernandez* that attempted and failed to have the Court extend *Bivens* to their claims. Therefore, Gebert's claims warrant a thorough analysis and review.

       2.    <u>Plaintiff's First Amendment Claims do Arise in a New Context, but no Special Factors Exist to Preclude a *Bivens* Remedy</u>

       Regarding Gebert's First Amendment claims, Plaintiff concedes that it would be a new context, but the Supreme Court has repeatedly assumed (without definitively holding as much) that *Bivens* extends to First Amendment claims. See *Wood v. Moss* , 572 U.S. 744, 757 (2014), Reichle v. Howards , 566 U.S. 658, 663, n. 4 (2012), and See *Ashcroft* v. *Iqbal,* 556 U.S. 662, 675 (2009) (assuming without deciding that a First Amendment free exercise claim is actionable under

*Bivens*); But *Cf. Bush* v. *Lucas,* 462 U.S. 367, 368 (1983) (refusing to extend *Bivens* to a First Amendment speech claim involving federal employment).

The Defendants allege that because a security clearance has been discussed in this case that this automatically results in an issue of "national security," which could be found to be a "special factor." However, courts have had the opportunity to close the door on *all* cases even mentioning national security, but have still refrained from doing so. One of the reasons no such foreclosure has occurred is that not all "national security" issues are alike or carry the same level of importance or exigency.

In several cases in this Circuit where the court has determined that the risk or implications of national security rose to the level of a "special factor," they are all readily distinguishable from Gebert's case. *See Meshal v. Higgenbotham*, 804 F.3d 417, 425-26 (D.C. Cir. 2015) ("special factors . . . have foreclosed *Bivens* remedies in cases involving . . . national security, or intelligence" (cleaned up)); *Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012); *Ali v. Rumsfeld*, 649 F.3d 762, 773 (D.C. Cir. 2011); *Rasul v. Myers*, 563 F.3d 527, 532 n.5 (D.C. Cir. 2009) ("The danger of obstructing U.S. national security policy" is a special factor precluding a *Bivens* action); *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008) (fact that a claim would entail "judicial intrusion into matters of national security and sensitive intelligence information" is a special factor weighing against *Bivens* action). Reviewing these cases, one thing is clear: these cases involve actual serious matters of concern related to our intelligence (including torture tactics), military strategy decisions, and national security in the wake of 9/11. Gebert's case is a case where established due process was clearly not followed in a post-deprivation situation for a U.S. citizen and federal employee who is not a suspected terrorist or accused of jeopardizing national security.

When put into proper context, this is a case in an area that would benefit greatly from judicial intervention in this very limited, fact-specific situation. The Defendants state that "both Congress and the Department have provided alternative remedies for aggrieved parties in [Gebert's] position that independently foreclose a Bivens action here. (Def. Mot. at 42). The Defendants go on to discuss how the CSRA would preclude a *Bivens* remedy for civil service employees. However, this argument ignores the very holding in *Egan* that prevents the Merit System Protection Board from reviewing the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse action. *Egan*, 484 U.S. at 532.

Regarding the "alternative remedies" allegedly made available by the Department, Gebert's case is distinguishable from the cases cited by Defendants. The defendant agencies in *Egbert, Malesko*, and *Bush* had an established process and went through the process, but the respective plaintiffs disagreed with the process and/or the result. None of these cases contemplate *Bivens* in the context of when the defendant agency blatantly ignores and/or refuses to actually go *through* the process. In Gebert's case, the Defendants have simply grinded the process to a halt, and any semblance of going through any part of the process has been marred with inserting unlawful, subjective criteria into the equation.

The courts have determined that, even in the context of national security and security clearances, a court is in the best position to weigh-in and determine if another branch is violating the Constitution or not. *See generally Gill*, 875 F.3d 677. Precluding judicial involvement, especially when determining the constitutionality of established processes and procedures (or lack thereof or lack of following said processes), simply because another branch is designated the authority actually runs afoul of the government's systems of check and balances. This responsibility falls squarely within the designated powers of the judicial branch.

### B.    The Individual Defendants Are Not Entitled to Qualified Immunity

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Id*. *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021). Considering the positions of the individually-named defendants involved in this case and their egregious violations of constitutional rights, Gebert is alleging they fall under the former or latter buckets of employees excepted under *Bond*. It is well established that "The doctrine of qualified immunity shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right," meaning that "existing precedent [has] placed the statutory or constitutional question beyond debate . . . in light of the specific context of the case"— not simply "as a broad general proposition." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021).

This court has previously stated, "To determine whether an official is entitled to qualified immunity, the Court must consider whether the facts, viewed in the light most favorable to the plaintiff, establish a violation of a constitutional right and, if so, whether that right was clearly established at the time of the alleged violation." *Mpoy v. Fenty*,  901 F. Supp. 2d 144, 157 (D.D.C. 2012) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). A court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Again, this case goes beyond alleging that qualified immunity; the overarching issue remains firmly rooted within the First Amendment and due process under the Fifth Amendment.

Regarding the second prong, "to reject an official's claim of qualified immunity, 'the unlawfulness' of his action must be apparent 'in the light of pre-existing law.'" *Hartley v. Wilfert*,

918 F. Supp. 2d 45, 56 (D.D.C. 2013), citing Atherton v. Dist. of Columbia Office of Mayor, 567 F.3d 672, 689- 90 (D.C. Cir. 2009). Further, "[A]n official is not shielded where he could be expected to know that certain conduct would violate statutory or constitutional rights." *Id*. citing *Brown v. Fogle*, 819 F. Supp. 2d 23, 28-29 (D.D.C. 2011). This does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

It is well known that public employees are still entitled to a level of free speech. While a government employer may impose restraints on employee speech, the employees have the right to speak on matters of public concern, typically those concerning government policies of interest to the public at large. See *Connick v. Myers,* 461 U.S. 138 (1983); *Pickering v. Board of Ed.*, 391 U.S. 563 (1968). And when they speak or write on their own time on a topic unrelated to their employment, the speech can have First Amendment protection, absent a governmental justification "far stronger than mere speculation" for regulating it. *United States v. National Treasury Emples. Union*, 513 U.S. 454, 465 (1995). Specifically, it is well-known a public employee cannot face adverse employment actions simply because of their political beliefs or affiliations. *Elrod v. Burns*, 427 U.S. 347 (1976).

## CONCLUSION

For the above-mentioned reasons, the Defendants' Motion to Dismiss should be dismissed in its entirety.

Respectfully submitted,

Dated:  March 31, 2023

*/s/ Brett J. O'Brien*
Brett J. O'Brien
Bar 1753983
NATIONAL SECURITY LAW FIRM
1250 Connecticut Ave, Washington, DC 20036
202-600-4996