UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MATTHEW GEBERT,

              *Plaintiff*,

    v.

U.S. DEPARTMENT OF STATE et al.,

              *Defendants*.

Civil Action No. 22-2939 (DLF)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

BACKGROUND ............................................................................................................... 1

I.     Gebert's White Nationalist Activities and Associations, and Efforts to Conceal Them .... 1

II.    The Department Discovers and Investigates Gebert's Dishonesty About His Extensive White Nationalist Activities and Associations, and Revokes His Security Clearance ...... 4

LEGAL STANDARDS ..................................................................................................... 7

ARGUMENT .................................................................................................................... 7

I.     This Court Lacks Personal Jurisdiction Over the Individual Defendants .......................... 7

II.    Gebert Failed to Effect Service on the Department, Quiram, or John Does 1-10 ............. 8

III.   Gebert Fails to State a Plausible First Amendment Claim ............................................. 10

     A.     Gebert Does Not Allege a Plausible First Amendment Retaliation Claim ........... 10

         1.     The Department suspended and then revoked Gebert's clearance because it believed he had been dishonest during his clearance adjudication ................................................................................................ 11

         2.     Gebert pleads no facts to support a plausible inference that the suspension and/or revocation of his clearance was retaliation for protected speech ...................................................................................... 14

             a.     Gebert does not plausibly allege that the Department has treated supporters of the Black Lives Matter movement better than him..15

             b.     Remarks by Gebert's former supervisor do not suggest retaliation ............................................................................. 16

             c.     Gebert's conclusory allegation that the Department faced pressure to remove him does not suggest retaliation ................... 17

             d.     The *Sludge* article does not suggest retaliation ............................. 17

             e.     Temporal proximity does not suggest retaliation ......................... 19

             f.     The Department's possession of articles on the circumstances of its discovery of Gebert's dishonesty does not suggest retaliation ................................................................................. 20

             g.     The Department's public statements do not suggest retaliation ... 20

             h.     Gebert's remark on *The Fatherland* does not suggest retaliation. 20

     B.     Gebert Fails to State a Plausible Overbreadth Claim ............................................ 21

IV.   Gebert Fails to State a Plausible Due Process Claim .................................................... 23

     A.     Gebert Fails to State a Plausible Substantive Due Process Claim ....................... 23

     B.     Gebert Fails to State a Plausible Procedural Due Process Claim ........................ 25

         1.     Gebert fails to identify a protected interest ............................................... 26

a.      Gebert has no protected interest in his clearance ......................... 26

b.      Gebert had no protected interest in his job ................................. 26

c.      Gebert was not deprived of his ability to express his opinions..... 27

d.      Gebert had no protected interest in using his accrued leave ......... 28

e.      Gebert has no protected interest in his reputation........................ 28

i.      Gebert cannot state a plausible reputation-plus claim ...... 28

ii.     Gebert cannot state a plausible stigma-plus claim ........... 29

2.      Gebert has received all the process that he is due ................................... 30

A.      Gebert Fails to State a Plausible Vagueness Claim ............................... 33

1.      Gebert's lack of a protected interest defeats his vagueness claim ........... 33

2.      The questions posed to Gebert do not regulate speech ........................... 34

3.      The questions posed to Gebert are not vague ........................................ 34

B.      Gebert Fails to State a Plausible Equal Protection Claim..................... 35

V.      Gebert Fails to State a Plausible APA Claim................................................... 36

A.      Gebert's APA Challenges to His Clearance Revocation Fails ............................. 37

1.      The clearance revocation was committed to agency discretion............... 37

2.      The clearance revocation was not arbitrary or capricious ...................... 37

B.      Gebert Does Not Plausibly Allege that Terminating His Insurance is Unlawful . 37

C.      Gebert Does Not Plausibly Allege that Not Letting Him Use Annual Leave in Lieu of Non-Pay Status During His Suspension Violated the APA ................... 38

VI.     Gebert Failed to Reasonably Describe the Records that He Sought................................. 39

VII.    Gebert is Not Entitled to Damages ...................................................................... 43

A.      The *Bivens* Doctrine Does Not Supply a Cause of Action ................................ 44

1.      Gebert's claims arise in a new *Bivens* context........................................... 45

2.      Special factors counsel against a *Bivens* remedy ..................................... 47

B.      The Individual Defendants Are Entitled to Qualified Immunity ......................... 49

CONCLUSION.................................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**

*A.N.S.W.E.R. Coal. v. Basham,*
    845 F.3d 1199 (D.C. Cir. 2017) ........................................................................ 22

*Ali v. District of Columbia,*
    278 F.3d 1 (D.C. Cir. 2002) ........................................................................ 7, 8

*Ali v. Rumsfeld,*
    649 F.3d 762 (D.C. Cir. 2011) ........................................................................ 48

*Am. Bd. of Internal Med. v. Rushford,*
    841 F. App'x 440 (3d Cir. 2020) ........................................................................ 13

*Am. Ctr. for L. & Just. v. Dep't of Homeland Sec.,*
    573 F. Supp. 3d 78 (D.D.C. 2021) ........................................................................ 41

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................ 7, 17, 20, 35, 38

*Baird v. State Bar of Ariz.,*
    401 U.S. 1 (1971) ........................................................................ 23

*Bd. of Regents of State Colleges v. Roth,*
    408 U.S. 564 (1972) ........................................................................ 24

*Beattie v. Boeing Co.,*
    43 F.3d 559 (10th Cir. 1994) ........................................................................ 47

*Bloch v. Powell,*
    348 F.3d 1060 (D.C. Cir. 2003) ........................................................................ 24

*Buchanan v. Barr,*
    No. 22-5133, 2023 WL 4140065 (D.C. Cir. June 23, 2023) ................................ 47

*Bura v. George Wash. Univ.,*
    Civ. A. No. 15-0533 (CKK), 2018 WL 11489533 (D.D.C. Aug. 15, 2018) ........................ 15

*Bush v. Lucas,*
    462 U.S. 367 (1983) ........................................................................ 47, 48, 49

*Cambridge Holdings v. Fed. Ins. Co.,*
    489 F.3d 1356 (D.C. Cir. 2007) ........................................................................ 9

**Cases (cont.)**

*Camero v. Vilsack,*
 Civ. A. No. 19-1558 (DLF), 2022 WL 17752204 (D.D.C. Dec. 19, 2022) ............................ 15

*Chapman v. Heath,*
 Civ. A. No. 17-1735 (CKK), 2019 WL 5653445 (D.D.C. Oct. 31, 2019) ............................ 10

*Chesna v. Dep't of Def.,*
 850 F. Supp. 110 (D. Conn. 1994) ..................................................................... 27, 37

*Citizens for Resp. & Ethics in Wash. v. Dep't of Just.,*
 846 F.3d 1235 (D.C. Cir. 2017) ................................................................................. 39

*City of Mesquite v. Aladdin's Castle, Inc.,*
 455 U.S. 283 (1982) ................................................................................................... 34

*City of Tahlequah v. Bond,*
 142 S. Ct. 9 (2021) ............................................................................................... 49, 50

*CJ Prods. LLC v. BTC Enters. LLC,*
 Civ. A. No. 10-5878, 2012 WL 1999829 (S.D.N.Y. June 1, 2012) ........................... 28

*Clark v. Library of Congress,*
 750 F.2d 89 (D.C. Cir. 1984) ..................................................................................... 23

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,*
 690 F.2d 1240 (9th Cir. 1982) ................................................................................... 13

*CNN, Inc. v. FBI,*
 271 F. Supp. 3d 108 (D.D.C. 2017) ........................................................................... 42

*Collingsworth v. Drummond Co. Inc.,*
 Civ. A. No. 19-1263 (ABJ), 2020 WL 2800612 (D.D.C. May 29, 2020) ................... 10

*Com. Drapery Contr. v. United States,*
 133 F.3d 1 (D.C. Cir. 1998) ......................................................................................... 9

*Comm. on Ways & Means v. Dep't of Treasury,*
 45 F.4th 324 (D.C. Cir. 2022) ................................................................................... 10

*Corr. Servs. Corp. v. Malesko,*
 534 U.S. 61 (2001) ..................................................................................................... 48

*Cronin v. FAA,*
 73 F.3d 1126 (D.C. Cir. 1996) ................................................................................... 32

**Cases (cont.)**

*Crooks v. Mabus*,
   845 F.3d 412 (D.C. Cir. 2016) ................................................................................ 24

*Ctr. for the Study of Servs. v. Dep't of Health & Human Servs.*,
   874 F.3d 287 (D.C. Cir. 2017) ................................................................................ 40

*Dale v. IRS*,
   238 F. Supp. 2d 99 (D.D.C. 2002) .......................................................................... 43

*Dep't of Navy v. Egan*,
   484 U.S. 518 (1988) ........................................................................... 12, 26, 37, 45

*Deryck v. Dep't of Def.*,
   Civ. A. No. 22-3290 (TNM), 2023 WL 3303832 (D.D.C. May 8, 2023) ......................... 27, 29

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) ........................................................................................ 23

*Doe v. Casey*,
   796 F.2d 1508 (D.C. Cir. 1986) ......................................................................... 32, 33

*Doe v. Cheney*,
   885 F.2d 898 (D.C. Cir. 1989) .................................................................. 26, 30, 32-33

*Doe v. Dep't of Just.*,
   753 F.2d 1092 (D.C. Cir. 1985) .............................................................................. 33

*Doe v. Lee*,
   Civ. A. No. 19-0085 (DLF), 2020 WL 759177 (D.D.C. Feb. 14, 2020) ....................... 15

*Doe v. Rumsfeld*,
   683 F.3d 390 (D.C. Cir. 2012) ................................................................................ 47

*Doe v. Webster*,
   769 F. Supp. 1 (D.D.C. 1991) ................................................................................ 13

*Dong v. Smithsonian Inst.*,
   125 F.3d 877 (D.C. Cir. 1997) ................................................................................ 25

*Dorfmont v. Brown*,
   913 F.2d 1399 (9th Cir. 1990) .......................................................................... 27, 37

*Egbert v. Boule*,
   142 S. Ct. 1793 (2022) .................................................................................... 44-49

**Cases (cont.)**

*Elec. Privacy Info. Ctr. v. IRS*,
  910 F.3d 1232 (D.C. Cir. 2018) ................................................................................................. 39

*Erwin-Simpson v. Berhad*,
  985 F.3d 883 (D.C. Cir. 2021) ...................................................................................................... 7

*Evans v. Fed. Bureau of Prisons*,
  951 F.3d 578 (D.C. Cir. 2020) .................................................................................................... 40

*Expressions Hair Design v. Schneiderman*,
  581 U.S. 37 (2017) ....................................................................................................................... 22

*Fabi Constr. Co. v. Sec'y of Lab.*,
  508 F.3d 1077 (D.C. Cir. 2007) .................................................................................................. 33

*Farrington v. Mayorkas*,
  Civ. A. No. 21-3240 (BAH), 2022 WL 16834018 (D.D.C. Nov. 9, 2022) ............................. 20

*FDIC v. Meyer*,
  510 U.S. 471 (1994) ..................................................................................................................... 46

*First Chi. Int'l v. United Exch. Co.*,
  836 F.2d 1375 (D.C. Cir. 1988) .................................................................................................... 7

*Freedom Watch, Inc. v. CIA*,
  895 F. Supp. 2d 221 (D.D.C. 2012) ........................................................................................... 43

*Freedom Watch, Inc. v. Dep't of State*,
  925 F. Supp. 2d 55 (D.D.C. 2013) ............................................................................................. 42

*Fried v. Hinson*,
  78 F.3d 688 (D.C. Cir. 1996) ...................................................................................................... 25

*George Wash. Univ. v. District of Columbia*,
  318 F.3d 203 (D.C. Cir. 2003) .............................................................................................. 24, 25

*Gilbert v. FDIC*,
  950 F. Supp. 1194 (D.D.C. 1997) ............................................................................................... 43

*Gill v. Dep't of Just.*,
  Civ. A. No. 15-0824 (RMC), 2016 WL 3982450 (D.D.C. July 22, 2016) .............................. 26

*Gorman v. Ameritrade Holding Corp.*,
  293 F.3d 506 (D.C. Cir. 2002) ...................................................................................................... 8

**Cases (cont.)**

*Gutierrez-Rogue v. INS*,
    954 F.2d 769 (D.C. Cir. 1992) ............................................................................. 32

*Hairston v. Vance-Cooks*,
    773 F.3d 266 (D.C. Cir. 2014) ................................................................ 11, 14, 21

*Harrison v. Bowen*,
    815 F.2d 1505 (D.C. Cir. 1987) ........................................................................... 33

*Harrison v. Fed. Bureau of Prisons*,
    248 F. Supp. 3d 172 (D.D.C. 2017) ..................................................................... 39

*Hartness v. Bush*,
    919 F.2d 170 (D.C. Cir. 1990) ...................................................................... 12, 36

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ............................................................................................. 39

*Hedgepeth v. Wash. Metro. Area Transit Auth.*,
    386 F.3d 1148 (D.C. Cir. 2004) ........................................................................... 36

*Henderson v. Kennedy*,
    253 F.3d 12 (D.C. Cir. 2001) ............................................................................... 15

*Hernandez v. Mesa*,
    140 S. Ct. 735 (2020) ........................................................................................... 45

*Hill v. Air Force*,
    795 F.2d 1067 (D.C. Cir. 1986) ........................................................................... 40

*Hill v. Colorado*,
    530 U.S. 703 (2000) ............................................................................................. 21

*Hodge v. Talkin*,
    799 F.3d 1145 (D.C. Cir. 2015) ................................................................... 10, 34

*Hoska v. Dep't of Army*,
    677 F.2d 131 (D.C. Cir. 1982) ............................................................................. 12

*Hurd v. District of Columbia*,
    864 F.3d 671 (D.C. Cir. 2017) ............................................................................... 1

*Hutchins v. District of Columbia*,
    144 F.3d 798 (D.C. Cir. 1998) ............................................................................. 23

**Cases (cont.)**

*Hutchins v. District of Columbia,*
    188 F.3d 531 (D.C. Cir. 1999) ............................................................. 22

*Huynh v. Carlucci,*
    679 F. Supp. 61 (D.D.C. 1988) ............................................................. 12

*In re Matter of Search of Info. Assoc. with Two Accts. Stored at Premises Controlled by Google
    LLC,* Grand Jury No. 22-0028 (BAH), 2022 WL 18673695 (D.D.C. Sept. 27, 2022) ............. 14

*Ivy v. CIR,*
    877 F.3d 1048 (D.C. Cir. 2017) ............................................................. 43

*Kartseva v. Dep't of State,*
    37 F.3d 1524 (D.C. Cir. 1994) ............................................................. 29

*Kaspersky Lab, Inc. v. Dep't of Homeland Sec.,*
    909 F.3d 446 (D.C. Cir. 2018) ............................................................. 1

*Kowalczyk v. Dep't of Just.,*
    73 F.3d 386 (D.C. Cir. 1996) ............................................................. 41, 43

*LaChance v. Erickson,*
    522 U.S. 262 (1998) ............................................................. 14

*Lamb v. Millennium Challenge Corp.,*
    498 F. Supp. 3d 104 (D.D.C. 2020) ............................................................. 27, 30

*Lancaster v. Vance-Cooks,*
    967 F. Supp. 2d 375 (D.D.C. 2013) ............................................................. 20

*Latham v. Dep't of Just.,*
    658 F. Supp. 2d 155 (D.D.C. 2009) ............................................................. 43

*Lee v. Barr,*
    Civ. A. No. 19-2284 (DLF), 2020 WL 3429465 (D.D.C. June 23, 2020) ................... 46, 47, 48

*Lee v. Stewart,*
    No. 20-5952, 2021 WL 6932349 (6th Cir. Aug. 24, 2021) ..................................... 14

*Lewis v. Lhu,*
    696 F. Supp. 723 (D.D.C. 1988) ............................................................. 13

*Lewis v. Mutond,*
    568 F. Supp. 3d 47 (D.D.C. 2021) ............................................................. 7

**Cases (cont.)**

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014).................................................................................................. 40

*Light v. Wolf*,
    816 F.2d 746 (D.C. Cir. 1987) ....................................................................................... 7

*Linnas v. INS*,
    790 F.2d 1024 (2d Cir. 1986)......................................................................................... 36

*Louis v. Hagel*,
    221 F. Supp. 3d 40 (D.D.C. 2016) ................................................................................. 16

*Magassa v. Mayorkas*,
    52 F.4th 1156 (9th Cir. 2022) ........................................................................................ 26

*Mason v. Callaway*,
    554 F.2d 129 (4th Cir. 1977) ......................................................................................... 42

*Mastro v. Potomac Elec. Power Co.*,
    447 F.3d 843 (D.C. Cir. 2006) ....................................................................................... 28

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)........................................................................................................ 30

*McCormick v. District of Columbia*,
    752 F.3d 980 (D.C. Cir. 2014) ....................................................................................... 26

*Meshal v. Higgenbotham*,
    804 F.3d 417 (D.C. Cir. 2015) ....................................................................................... 47

*Milkovich v. Lorain J.*,
    497 U.S. 1 (1990)....................................................................................................... 28, 29

*Morgan v. Fed. Home Loan Mortg. Corp.*,
    328 F.3d 647 (D.C. Cir. 2003) ....................................................................................... 17

*Morrissey v. Mayorkas*,
    17 F.4th 1150 (D.C. Cir. 2021) ........................................................................................ 9

*Moses v. Howard Univ. Hosp.*,
    474 F. Supp. 2d 117 (D.D.C. 2007)................................................................................ 19

*Murphy Bros., Inc. v. Michetti Pipe Stringing*,
    526 U.S. 344 (1999).......................................................................................................... 9

x

**Cases (cont.)**

*Muwekma Ohlone Tribe v. Salazar,*
    708 F.3d 209 (D.C. Cir. 2013) ........................................................................ 33

*N. Am. Butterfly Ass'n v. Wolf,*
    977 F.3d 1244 (D.C. Cir. 2020) ................................................................... 1, 23

*Nat'l Ass'n for Advancement of Multijurisdiction Prac. v. Howell,*
    851 F.3d 12 (D.C. Cir. 2017) ......................................................................... 36

*Nat'l Family Planning & Repro. Health Ass'n v. Gonzales,*
    468 F.3d 826 (D.C. Cir. 2006) ....................................................................... 27

*Nat'l Sec. Couns. v. CIA,*
    969 F.3d 406 (D.C. Cir. 2020) ....................................................................... 40

*Nat'l Treasury Emps. Union v. Von Raab,*
    489 U.S. 656 (1989) ................................................................. 12, 22, 23, 36

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ..................................................................... 10

*O'Donnell v. Barry,*
    148 F.3d 1126 (D.C. Cir. 1998) ..................................................................... 28

*Oryszak v. Sullivan,*
    576 F.3d 522 (D.C. Cir. 2009) ....................................................................... 37

*Ozonoff v. Berzak,*
    744 F.2d 224 (1st Cir. 1984) ......................................................................... 22

*Palmieri v. United States,*
    896 F.3d 579 (D.C. Cir. 2018) ..................................................................... 7, 8

*Palmieri v. United States,*
    72 F. Supp. 3d 191 (D.D.C. 2014) ................................................................. 26

*Parker v. Levy,*
    417 U.S. 733 (1974) ...................................................................................... 10

*Payne v. District of Columbia,*
    722 F.3d 345 (D.C. Cir. 2013) ....................................................................... 19

*Pinson v. Dep't of Just.,*
    245 F. Supp. 3d 225 (D.D.C. 2017) ............................................................... 42

**Cases (cont.)**

*Pinson v. Dep't of Just.*,
    70 F. Supp. 3d 111 (D.D.C. 2014) ......................................................................... 40

*Pollack v. Meese*,
    737 F. Supp. 663 (D.D.C. 1990) ............................................................................. 8

*Public Citizen v. Nat'l Highway Transp. Safety Admin.*,
    489 F.3d 1279 (D.C. Cir. 2007) ............................................................................. 27

*Qassim v. Trump*,
    927 F.3d 522 (D.C. Cir. 2019) ............................................................................... 32

*Ramsingh v. TSA*,
    40 F.4th 625 (D.C. Cir. 2022) ............................................................................... 33

*Rasul v. Myers*,
    563 F.3d 527 (D.C. Cir. 2009) ............................................................................... 48

*Rivas-Villegas v. Cortesluna*,
    142 S. Ct. 4 (2021) ...................................................................................... 49, 50

*Rodriguez v. Seamans*,
    463 F.2d 837 (D.C. Cir. 1972) ............................................................................... 13

*Rzayeva v. United States*,
    492 F. Supp. 2d 60 (D. Conn. 2007) ...................................................................... 36

*Sack v. CIA*,
    53 F. Supp. 3d 154 (D.D.C. 2014) ......................................................................... 42

*Safari Club Int'l v. Jewell*,
    47 F. Supp. 3d 29 (D.D.C. 2014) ........................................................................... 27

*Scaife v. IRS*,
    Civ. A. No. 02-1805, 2003 WL 23112791 (D.D.C. Nov. 20, 2003) ........................ 41

*Schweiker v. Chilicky*,
    487 U.S. 412 (1988) .............................................................................................. 46

*Second City Music, Inc. v. City of Chi.*,
    333 F.3d 846 (7th Cir. 2003) ................................................................................. 27

*Shapiro v. CIA*,
    170 F. Supp. 3d 147 (D.D.C. 2016) ....................................................................... 42

**Cases (cont.)**

*Siegert v. Gilley*,
500 U.S. 226 (1991) ........................................................................................ 10

*Simpkins v. District of Columbia*,
108 F.3d 366 (D.C. Cir. 1997) ......................................................................... 9

*Slyper v. Att'y Gen.*,
827 F.2d 821 (D.C. Cir. 1987) ....................................................................... 39

*Smith v. Clinton*,
886 F.3d 122 (D.C. Cir. 2018) ....................................................................... 29

*Smith v. Schlesinger*,
513 F.2d 462 (D.C. Cir. 1975) ....................................................................... 12

*Spagnola v. Mathis*,
859 F.2d 223 (D.C. Cir. 1988) ....................................................................... 48

*Sparrow v. United Air Lines, Inc.*,
216 F.3d 1111 (D.C. Cir. 2000) ..................................................................... 20

*Statewide Bonding, Inc. v. Dep't of Homeland Sec.*,
980 F.3d 109 (D.C. Cir. 2020) ....................................................................... 25

*Stehney v. Perry*,
101 F.3d 925 (3d Cir. 1996) ........................................................................... 26

*Taylor v. Dep't of Treasury*,
127 F.3d 470 (5th Cir. 1997) .......................................................................... 41

*Taylor v. FDIC*,
132 F.3d 753 (D.C. Cir. 1997) ....................................................................... 40

*Taylor v. Solis*,
571 F.3d 1313 (D.C. Cir. 2009) ............................................................... 19, 25

*Thomas v. Nat'l Football League Players*,
131 F.3d 198 (D.C. Cir. 1997) ....................................................................... 17

*Town of Castle Rock, Colo. v. Gonzales*,
545 U.S. 748 (2005) ........................................................................................ 24

*Townsend v. United States*,
236 F. Supp. 3d 280 (D.D.C. 2017) ............................................................... 19

**Cases (cont.)**

*Trent v. Dep't of Homeland Sec.*,
 Civ. A. No. 18-2591 (ABJ), 2020 WL 1429881 (D.D.C. Mar. 24, 2020) ............................... 40

*Truitt v. Dep't of State*,
 897 F.2d 540 (D.C. Cir. 1990) ................................................................................. 41, 43

*U.S. Info. Agency v. Krc*,
 905 F.2d 389 (D.C. Cir. 1990) ........................................................................................ 26

*United States v. Alvarez*,
 567 U.S. 709 (2012) ........................................................................................................ 14

*United States v. Cisneros*,
 26 F. Supp. 2d 24 (D.D.C. 1998) .................................................................................... 34

*United States v. Culliton*,
 328 F.3d 1074 (9th Cir. 2003) ........................................................................................ 34

*United States v. Delgado*,
 798 F. App'x 105 (9th Cir. 2020) .................................................................................... 35

*United States v. Dunnigan*,
 507 U.S. 87 (1993) .......................................................................................................... 13

*United States v. Fausto*,
 484 U.S. 439 (1988) ........................................................................................................ 43

*United States v. Hsia*,
 176 F.3d 517 (D.C. Cir. 1999) ........................................................................................ 34

*United States v. Jones*,
 432 F.3d 34 (1st Cir. 2005) ............................................................................................. 13

*United States v. Kalu*,
 791 F.3d 1194 (10th Cir. 2015) ...................................................................................... 13

*United States v. Kerik*,
 615 F. Supp. 2d 256 (S.D.N.Y. 2009) ....................................................................... 34, 35

*United States v. Kumpf*,
 438 F.3d 785 (7th Cir. 2006) .......................................................................................... 36

*United States v. Safavian*,
 528 F.3d 957 (D.C. Cir. 2008) ........................................................................................ 34

**Cases (cont.)**

*United States v. Sarwari*,
  669 F.3d 401 (4th Cir. 2012) ........................................................................................... 35

*United States v. Stanley*,
  483 U.S. 669 (1987).......................................................................................................... 47

*Virginia v. Hicks*,
  539 U.S. 113 (2003) .................................................................................................... 21, 22

*Voinche v. FBI*,
  412 F. Supp. 2d 60 (D.D.C. 2006) ................................................................................... 40

*Waggel v. George Wash. Univ.*,
  957 F.3d 1364 (D.C. Cir. 2020) ....................................................................................... 16

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) .......................................................................................................... 22

*Wash. Legal Clinic v. Barry*,
  107 F.3d 32 (D.C. Cir. 1997) ........................................................................................... 25

*Wilson v. Libby*,
  535 F.3d 697 (D.C. Cir. 2008) ......................................................................................... 48

*Wine v. Dep't of the Interior*,
  Civ. A. No. 21-3349 (TNM), 2022 WL 888197 (D.D.C. Mar. 25, 2022) ........................ 9

*Woodruff v. Peters*,
  482 F.3d 521 (D.C. Cir. 2007) ......................................................................................... 20

*Yeager v. DEA*,
  678 F.2d 315 (D.C. Cir. 1982) .................................................................................... 41, 43

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ......................................................................................... 45, 46, 47

**Statutes**

5 U.S.C. § 552 ............................................................................................................. 6, 39

5 U.S.C. § 552a ............................................................................................................ 6, 40

5 U.S.C. § 701 .................................................................................................................. 37

**Statutes (cont.)**

5 U.S.C. § 702.............................................................................................................38, 43

5 U.S.C. § 704..................................................................................................................39

5 U.S.C. § 706.............................................................................................................37-38

5 U.S.C. § 1212................................................................................................................16

5 U.S.C. § 5596................................................................................................................43

**Regulations**

5 C.F.R. § 890.502...........................................................................................................38

22 C.F.R. § 171.22............................................................................................................40

**Rules**

Fed. R. Civ. P. 4............................................................................................................7, 9

Fed. R. Civ. P. 12...............................................................................................................7

Fed. R. Evid. 201.............................................................................................................16

Fed. R. Evid. 404.............................................................................................................21

**Other Authorities**

3 Foreign Affairs Manual § 3418......................................................................................24

12 Foreign Affairs Manual
    § 234.1...................................................................................................30-31, 48
    § 234.3........................................................................................................31, 48

Alex Kotch,
    *Government Employees Donate to White Supremacist Candidate*, Sludge (July 3, 2018) ...... 17

Andrew Marantz,
    *Birth of a White Supremacist*, New Yorker (Oct. 9, 2017)........................................ 2

Ben LeFebvre & Nahal Toosi,
    *State Department Suspends Energy Staffer Linked to White Supremacist Group*, Politico
    (Aug. 8, 2019)...................................................................................................... 16

**Other Authorities (cont.)**

*Black Lives Matter and the Hatch Act*,
  Off. of Special Counsel (July 14, 2020) ..................................................................... 16

Exec. Order 12,968,
  60 Fed. Reg. 40,234 (Aug. 2, 1995).................................................................... 12, 14

*Individual Contributions*,
  Fed. Election Comm'n ............................................................................................. 18

Michael Edison Hayden,
  *U.S. State Department Official Involved in White Nationalist Movement, Hatewatch
  Determines*, S. Poverty L. Ctr. (Aug. 7, 2019) ......................................................... 1

Office of the Director of National Intelligence,
  *Security Executive Agent Directive 4* (June 8, 2017)......................................... 6, 12

Defendants—the Department of State and various current and former Department officials allegedly involved in the decisions to suspend and then revoke Plaintiff Matthew Gebert's security clearance due to his dishonesty about his white nationalist activities and associations, and then suspend him from his job without pay—by and through undersigned counsel, respectfully file this memorandum in support of their motion to dismiss Gebert's amended complaint, ECF No. 34.

## BACKGROUND

A brief overview of Gebert's efforts to conceal his extensive white nationalist activities and associations, the Department's investigation of Gebert, the suspension and then revocation of his security clearance, and the resulting personnel actions follows.

## I.   Gebert's White Nationalist Activities and Associations, and Efforts to Conceal Them

Matthew Gebert used pseudonyms and disguises to hide from the Department that he is a self-avowed white nationalist. Am. Compl. ¶¶ 25, 27, 46, 65. Wearing a disguise, Gebert attended the August 2017 Unite the Right rally in Charlottesville, Virginia, but an article by the Southern Poverty Law Center's *Hatewatch* program identified him as a foreign affairs officer at the Department. *Id.* ¶¶ 18, 25; Michael Edison Hayden, *U.S. State Department Official Involved in White Nationalist Movement, Hatewatch Determines* ("*Hatewatch* Article"), S. Poverty L. Ctr. (Aug. 7, 2019), https://www.splcenter.org/gebert.[1]

The *Hatewatch* article revealed that on numerous occasions, Gebert expressed his white nationalist beliefs under pseudonyms. During a May 2018 episode of the white nationalist podcast

---

[1]   Because Gebert discusses the *Hatewatch* article extensively in his amended complaint, this Court may consider it for at least the fact if not the truth of its contents. See *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (court may consider "any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice"); *Kaspersky Lab, Inc. v. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018) ("we have noticed" certain material "for its existence"); *Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (court can draw "on a filing in an unrelated case as a record of what was said").

*The Fatherland*, for example, Gebert—using the pseudonym "Coach Finstock"—opined that white people "'need a country of our own with nukes, and we will retake this thing lickety split.'" *Hatewatch* Article, *supra*. "'That's all that we need,'" Gebert declared. "'We need a country founded for white people with a nuclear deterrent. And you watch how the world trembles.'" *Id.*

The *Hatewatch* article further revealed that Gebert had held, and hid, his white nationalist beliefs since 2015. *Hatewatch* Article, *supra*. Posting under the pseudonym "'Finstock' on a white nationalism-focused forum called *The Right Stuff*,"[2] Gebert wrote, "'I got into this [movement] and off the conservative reservation in 2015.'" *Id.* In another appearance on *The Fatherland*, he voiced awareness that public revelation of his white nationalist activities and associations could be detrimental to his career. *Id.* "'There are bigger things than a career and a paycheck,'" he said, "and I don't want to lose mine." *Id.* "'I am prepared to lose mine,'" he continued, "'[b]ecause this is the most important thing to me in my life . . . in tandem with my family, of course.'" *Id.*

According to the *Hatewatch* article, Gebert engaged in extensive white nationalist activities and associations under pseudonym. As "Coach Finstock," he "helped lead a Washington, D.C., and Northern Virginia-based organizing chapter of" the "*Right Stuff* network called 'D.C. Helicopter Pilots'"—its name an apparent reference "to a meme on the far right inspired by late Chilean dictator Augusto Pinochet," on whose orders "loyalists to his regime threw political opponents out of helicopters as a form of extrajudicial killing." *Hatewatch* Article, *supra*. Gebert held gatherings at his home that "typically included people associated with the white nationalist

---

[2]     A *New Yorker* article characterized *The Right Stuff* as "a breeding ground for some of the most florid racism on the Internet." Andrew Marantz, *Birth of a White Supremacist*, New Yorker (Oct. 9, 2017), https://www.newyorker.com/magazine/2017/10/16/birth-of-a-white-supremacist. Among the dozens of podcasts it hosted were *Fash the Nation*, *Nationalist Public Radio*, and *Good Morning White America*. *Id.* The "most popular" of these podcasts, however, was *The Daily Shoah*, the title of which is "a pun about the Holocaust by way of Comedy Central." *Id.*

movement," like *The Right Stuff*'s leader Michael Peinovich and the "Fash the Nation" podcast's pseudonymous co-host "Marcus Halberstram." *Id.* Gebert also attended an event linked to a think tank run by Richard Spencer, "arguably America's most famous white nationalist," where, the *Hatewatch* article recounts, attendees "gave Hitler-salutes and shouted 'Hail Trump!'" *Id.*

Speaking as "Coach Finstock," Gebert admitted he wore a disguise to the Unite the Right rally. *Id*. He alluded to an incident in which a man marching with a neo-Nazi group drove his car into a crowd of counterdemonstrators, killing a woman: "'Dude, we smacked the hornet's nest with a big f*****g stick. . . . And the only question is whether this is valuable accelerationism[3] or whether we just provoked the red guards, like, a year before we had enough time to spare.'" *Id.*

During another episode of *The Fatherland*, Gebert, still as "Coach Finstock," shared his opinion on black people. "'Well, think about it, we're suckers for . . . court jesters . . . are in our DNA,'" Gebert said. *Id.* He continued, "'[w]e like to have a charismatic joker, at least, around us sometimes.'" *Id.* As he saw it, white people tolerate black people due to benevolent condescension. "'I think it reflects the better angels of our white nature that we—despite all of the evidence we have from the criminality to whatnot that we still have a soft spot in our heart for Red Foxx and "Sandford and Son" . . . or Chris Rock,'" he said, referring to two black comedians and a popular sitcom. *Id.* "'Against our better judgment, we still give them the benefit of the doubt,'" he said. *Id.* But Gebert himself felt quite differently—black people, he said, "'do not belong around us for an ocean at least.'" *Id.* Gebert does not appear to have thought very highly of Jews, either. On January 18, 2019, for example, Twitter user "Coach Finstock" posted a picture of the hooded specter of death greeting Justice Ruth Bader Ginsburg. *Id.* In a follow-up post, he made an entreaty to his

---

[3]     "'[A]ccelerationism' refers to a phrase used by white nationalists and neo-Nazis which implies that Western civilization must collapse before they can achieve their goal of building an all-white country for non-Jews." *Hatewatch* Article, *supra*.

followers: "'when the decrepit old witch finally bites the dust, please one of you make a vid with our crabbies [saying] "The Supreme Court is now officially 11% less Jewish" as [a] caption.'" *Id.*

Gebert's wife, Anna Vuckovic, is also a white nationalist. Posting under the pseudonymous handle "Wolfie James," Vuckovic "wrote blog posts focused on dating tips for white nationalist women and parenting advice for white nationalist moms," for both *The Right Stuff* and other white nationalist publications. *Hatewatch* Article, *supra*. In one column, she opined that "[i]n an open-borders America [women] should fear the s***s, too—they love their people-smuggling, gang-banging, and drunk driving more than most." *Id.* She also offered white nationalist media criticism, deriding The Man With The Yellow Hat—the friendly human guardian of cartoon monkey Curious George—as "the typical klutzy, r******d white man always being peddled on the Jewtube." *Id.* Gebert and Vuckovic occasionally attended white nationalist events together. On June 17, 2017, for example, the couple booked a babysitter and headed off to a downtown Washington, D.C. hotel for a date night, attending a clandestine dinner with notorious Holocaust denier David Irving. *Id.*

In his complaint, Gebert does not dispute a single specific fact in the *Hatewatch* article.

## II.   The Department Discovers and Investigates Gebert's Dishonesty About His Extensive White Nationalist Activities and Associations, and Revokes His Security Clearance

On January 28, 2019, Gebert was interviewed as part of a background reinvestigation necessary to continue holding a Top Secret clearance. Am. Compl. ¶ 13. During the interview, Gebert was asked the following questions, which are routinely asked of employees and applicants as a matter of standard operating procedures: (1) "Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position;" (2) "Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position;" (3) "if there was any information regarding members of his family that would be a possible source of

embarrassment to the United States Department of State." *Id.* ¶ 14. Gebert answered each question in the negative. *Id.* ¶ 15. His background reinvestigation concluded on May 9, 2019, and on June 7, he was told that he had been granted continued access to classified information. *Id.* ¶¶ 16-17.

Two months later, on August 7, 2019, *Hatewatch* published its article on Gebert's white nationalist activities and associations, and use of pseudonyms and disguises to hide these activities and associations. *Hatewatch* Article, *supra*. On August 16, the Department's Office of Personnel Security and Suitability ("Personnel Security") sent Gebert a memorandum notifying him that it had suspended his security clearance pending the result of a "for cause" investigation. Am. Compl. ¶ 28. The memorandum cited "concerns that [Gebert] concealed and omitted information in [his] periodic reinvestigation completed May 9, 2019," raising "serious security concerns that could be disqualifying under National Security Adjudicative Guidelines E (Personal Conduct)." *Id.* ¶ 29.

Because Gebert's position as a foreign affairs officer required him to hold a Top Secret clearance, the suspension of his security clearance resulted in the Bureau of Human Resources, in a letter issued by defendant Calli Fuller, proposing Gebert's indefinite suspension from his job without pay due to failure to maintain a condition of employment. Am. Compl. ¶¶ 37-38. Through counsel, Gebert submitted a written reply to the job suspension letter, but Human Resources, through defendant Jeanne Juliao, decided to implement the suspension without pay. *Id.* ¶¶ 39-42.

As part of an investigation regarding Gebert's dishonesty during his personnel security investigation, the Office of Special Investigations ("Special Investigations") interviewed Gebert on September 27, 2019. Am. Compl. ¶ 44. During the interview, Gebert denied withholding information during his background reinvestigation interview, and declared that "he was not ashamed or embarrassed of any of his views or activities," including his advocacy for "white interests" and his "race realist" and "pro-white" beliefs. *Id.* ¶¶ 45-46, 53. Gebert later "followed

up on his September 2019 interview with additional responses," asserting that he "did not think

any of his writings, podcasts, or tweets would rise to a level that they would ever be considered an

embarrassment to himself or the Department of State; was never a member of any formal white

nationalist organization; believed he would be protected as his speech and activities were protected

by the First Amendment; and never engaged in any illegal activity." *Id.* ¶ 46.

On July 1, 2020, the Department notified Gebert that it had revoked his clearance under

National Security Adjudicative Guideline E due to personal conduct concerns. Am. Compl. ¶¶ 58,

116. The Department's revocation letter cited three violations of the government-wide national

security adjudicative guidelines issued by the Office of the Director of National Intelligence in

*Security Executive Agent Directive* ("SEAD") 4 (June 8, 2017), Ex. A—specifically, Gebert's:

(1)    "refusal to provide, full, frank, and truthful answers to lawful questions of investigators, security officials, or other official representatives in connection with a personnel security or trustworthiness determination;"

(2)    "deliberately providing false or misleading information; or concealing or omitting information concerning relevant facts to an employer, investigator, security official, competent medical or mental health professional involved in making a recommendation relevant to a national security eligibility determination, or other official government representative;" and

(3)    "personal conduct, or concealment of information about one's conduct that creates a vulnerability to exploitation, manipulation, or duress by a foreign intelligence entity or other individual or group," including "[e]ngaging in activities which, if known, could affect the person's personal, professional, or community standing."

Am Compl. ¶ 59.

On July 16 and December 23 and 30, 2020, through counsel, Gebert submitted broad

requests for records relating to himself and his clearance revocation under the Freedom of

Information Act ("FOIA"), 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a. Am. Compl. ¶¶ 80-

82, 86, 88. On February 4, 2021, over seven months after the Department revoked his clearance,

Gebert submitted a written reply, denying the conclusions in the Department's July 1, 2020

clearance revocation letter. *Id.* ¶ 66. Nine months later, on November 23, 2021, Gebert submitted

a supplement to his reply, this time alleging violations of FOIA and the Privacy Act. *Id.* ¶ 67.

## LEGAL STANDARDS

*Personal jurisdiction:* A complaint merits dismissal for lack of personal jurisdiction. Fed.

R. Civ. P. 12(b)(2). A plaintiff bears "the burden of establishing the court's personal jurisdiction

over the defendant." *Erwin-Simpson v. Berhad*, 985 F.3d 883, 888 (D.C. Cir. 2021) (cleaned up).

"[A] plaintiff must allege specific acts connecting the defendant with the forum," *First Chi. Int'l*

*v. United Exch. Co.*, 836 F.2d 1375, 1378-79 (D.C. Cir. 1988), and "conclusory allegations" do

not suffice, *Lewis v. Mutond*, 568 F. Supp. 3d 47, 51 (D.D.C. 2021) (cleaned up)).

*Insufficient service of process:* A complaint warrants dismissal for insufficient service of

process. Fed. R. Civ. P. 12(b)(5). A "party on whose behalf service is made has the burden of

establishing its validity." *Light v. Wolf*, 816 F.2d 746, 751 (D.C. Cir. 1987) (cleaned up).

*Failure to state a claim:* Finally, a complaint warrants dismissal for failure to state a claim

upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To state a plausible claim, "a complaint

must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## ARGUMENT

**I.    This Court Lacks Personal Jurisdiction Over the Individual Defendants**

A federal court has subject matter jurisdiction over a claim against a defendant only if it

has "personal jurisdiction" over that claim as to that defendant. *Ali v. District of Columbia*, 278

F.3d 1, 5 (D.C. Cir. 2002). When a plaintiff sues a public official in a "personal capacity," he must

plead facts that establish personal jurisdiction over that official in a personal capacity, not merely

an official capacity. *Palmieri v. United States*, 896 F.3d 579 589 (D.C. Cir. 2018); *see also Pollack*

*v. Meese*, 737 F. Supp. 663, 666 (D.D.C. 1990) ("a persistent course of conduct . . . [supports] the assertion of personal jurisdiction only if that persistent conduct is undertaken in that person's individual capacity rather than an official capacity conducting business for his employer").

Gebert fails to plausibly allege that this Court has personal jurisdiction over his claims against the individual defendants in their personal capacities. He pleads only that they "are/were employees of the government and/or federal officers, at all relevant times herein." Am. Compl. ¶ 6 (internal quotation marks omitted). The "Parties" section of his amended complaint does not even specifically identify the individual defendants, by name or otherwise, referring to them collectively as "individual Defendants." *Id.* He does not allege that the individual defendants live in or have other ties to this District to create personal jurisdiction over them in their personal capacities. To the contrary, he alleges only that the individual defendants undertook the challenged actions only in their official capacities. *See generally* Am. Compl. Such allegations do not suffice to establish personal jurisdiction over the individual defendants in their personal capacities. *See Palmieri*, 896 F.3d at 590 (in challenge to clearance revocation, "the agents' only alleged conduct in the District was undertaken in their official capacity. . . . Without more, the agents' official connections to the District do not suffice." (cleaned up)); *Ali*, 278 F.3d at 7 ("Nowhere in his complaint does Ali allege that any defendants acting in their individual capacities either transacted business in the District or contracted to do so. . . . [they] undertake all such actions in their official capacities.").

## II.    Gebert Failed to Effect Service on the Department, Quiram, or John Does 1-10

"Even if there are sufficient contacts for a court to assert personal jurisdiction over a defendant, it lacks power to do so unless the procedural requirements of effective service of process are satisfied." *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 514 (D.C. Cir. 2002). "[U]nder longstanding tradition in our system of justice," effective service of process "is fundamental to any procedural imposition on a named defendant." *Murphy Bros., Inc. v. Michetti Pipe Stringing*, 526

U.S. 344, 350 (1999). "[U]nless the procedural requirements of effective service of process have been satisfied, the court lacks personal jurisdiction to act with respect to that defendant at all." *Cambridge Holdings v. Fed. Ins. Co.*, 489 F.3d 1356, 1361 (D.C. Cir. 2007).

Gebert failed to serve the Department, Douglas Quiram, or John Does 1-10. First, he failed to serve the Attorney General. *See* Fed. R. Civ. P. 4(i)(1)(B), (2)-(3); Return of Service Affs., ECF No. 6; *Morrissey v. Mayorkas*, 17 F.4th 1150, 1158 (D.C. Cir. 2021) (plaintiff "failed to establish that he properly served the Attorney General" and so "did not complete service"); *Wine v. Dep't of the Interior*, Civ. A. No. 21-3349 (TNM), 2022 WL 888197, at *3 (D.D.C. Mar. 25, 2022) (filing "lacks proof of service because it does not show anything was delivered to the Attorney General").

Second, Gebert failed to effect service on Quiram. Gebert first purported to serve Quiram at the Department's address. *See* Return of Service Affidavit, ECF No. 21. But Rule 4(e) does not let a plaintiff serve an individual sued in a personal capacity at his work address. *See* Fed. R. Civ. P. 4(e); *Com. Drapery Contractors v. United States*, 133 F.3d 1, 8 n.6 (D.C. Cir. 1998) (service in *Bivens* case defective when individual defendants were served at "their official address, as required when a person is sued in an official capacity"); *Simpkins v. District of Columbia*, 108 F.3d 366, 369 (D.C. Cir. 1997) ("defendants in *Bivens* actions must be served as individuals, pursuant to Rule 4(e)"). He then purported to serve a man who plainly is not Quiram—he does not match Quiram's physical description, and Quiram was not home at the time when Gebert claims to have served him. *See* Quiram Decl. ¶¶ 5-7, ECF No. 31-1. Gebert did not serve Quiram until April 26, 2023, *id.* ¶ 8, twenty-five days after the deadline that this Court set, Min. Order (Feb. 27, 2023).

Moreover, Gebert did not serve John Does 1 to 10 at all. It does not matter that he does not know their identities. To sue them in their personal capacities, he must serve them in the manner that Rule 4(e) prescribes. *See Chapman v. Heath*, Civ. A. No. 17-1735 (CKK), 2019 WL 5653445,

at *2 (D.D.C. Oct. 31, 2019) (dismissal proper, as it "is axiomatic that process cannot be issued

for 'John Doe' defendants, much less served on them"). Nor can he show that the identities of John

Does 1 to 10 (as opposed to John Does Nos. 1 and 2) "will eventually be made known through

discovery," *Newdow v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir. 2010), as he pleads no facts about

them. *See Collingsworth v. Drummond Co.*, Civ. A. No. 19-1263 (ABJ), 2020 WL 2800612, at

*14 (D.D.C. May 29, 2020), *aff'd*, 839 F. App'x 567 (D.C. Cir. 2021) (courts dismiss "unnamed

defendants where the complaint fails to allege specific allegations of wrongdoing against them").[4]

### III.   Gebert Fails to State a Plausible First Amendment Claim

Gebert fails to state either a retaliation or overbreadth claim under the First Amendment.[5]

#### A.   Gebert Does Not Allege a Plausible First Amendment Retaliation Claim

Counts I, VII, VIII, IX, XII, XIII, XIV, and XV of the amended complaint raise retaliation

claims under the First Amendment. Am. Compl. ¶¶ 94-104, 144-60, 177-200. The essence of these

claims is Gebert's allegation that the Department revoked his clearance due to his white nationalist

activities and associations. "To state a claim for First Amendment retaliation," a plaintiff "must

allege that [he] engaged in protected conduct, that the government took retaliatory action capable

of deterring another from the same protected activity, and that there is a causal link between the

two." *Comm. on Ways & Means v. Dep't of Treasury*, 45 F.4th 324, 340 (D.C. Cir. 2022). "The

improper motive must be a but-for cause of the government action, meaning that the adverse action

against the plaintiff would not have been taken absent the retaliatory motive." *Id.* (internal

---

[4]     Despite these defects, this Court should address Gebert's *Bivens* claims, given the duty "to weed out" insubstantial *Bivens* claims "expeditiously." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991).

[5]     Gebert also raises a vagueness claim that he styles a First Amendment claim. But although "the dangers inherent in vague statutes are magnified where laws touch upon First Amendment freedoms," *Parker v. Levy*, 417 U.S. 733, 776 (1974), the "[v]agueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause." *Hodge v. Talkin*, 799 F.3d 1145, 1171 (D.C. Cir. 2015). Defendants thus address it *infra* § V.C, with Gebert's due process claims.

quotation marks omitted). "[T]he key question in this context is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Hairston v. Vance-Cooks*, 773 F.3d 266, 273 (D.C. Cir. 2014) (internal quotation marks omitted).

Gebert's First Amendment retaliation claims fail because he pleads no facts to support a plausible inference that Defendants retaliated against him due to his protected speech. Rather, as his own pleadings amply demonstrate, the Department suspended and then revoked his clearance because it believed that he had not been candid during his clearance adjudication. *See, e.g.*, Am. Compl. ¶ 29. While he marshals an array of facts that he contends show otherwise, his allegations do not support a plausible inference that the Department suspended and/or revoked his clearance due to his protected speech, beliefs, or activities. His First Amendment retaliation claims thus fail.

1. The Department suspended and then revoked Gebert's clearance because it believed he had been dishonest during his clearance adjudication

The Department believed that Gebert had been dishonest during his clearance adjudication. His answers to the questions posed to him during his background reinvestigation interview were false, misleading, and/or materially incomplete, and evidence suggests that this was deliberate. Gebert believed he might "lose his job" if his white nationalist activities and associations came to light, Am. Compl. ¶ 27, and took steps to prevent them from being publicly known. For example, he wore a hat and sunglasses when he attended the white nationalist Unite the Right rally and used "pseudonyms" in posting in online white nationalist communities or appearing on white nationalist podcasts to avoid public identification as a white nationalist. *Id.* ¶ 25. The steps that Gebert took to conceal his white nationalist activities and associations are consistent with the Department's belief that he intentionally concealed his behaviors and was dishonest during his interview.

The common thread linking Gebert's answers to the questions posed to him is dishonesty that cast doubt on his reliability, trustworthiness, and ability to protect classified information. An

employee is eligible for access to classified information only if "facts and circumstances indicate access to classified information is clearly consistent with the national security interests of the United States." Exec. Order 12,968 § 3.1(b), 60 Fed. Reg. 40,234, 40,250 (Aug. 2, 1995). Gebert's false, misleading, and/or materially incomplete statements during his interview called his integrity into question, and obstructed the Department from obtaining information bearing on whether granting him access to classified information was clearly consistent with national security. *See* SEAD-4 ¶ 2(a) ("All available, reliable information about the person, past and present, favorable and unfavorable, should be considered in reaching a national security eligibility determination."); *Hoska v. Dep't of Army*, 677 F.2d 131, 136 (D.C. Cir. 1982) ("The ultimate determination of whether the granting of a clearance must be . . . based upon all available information, both favorable and unfavorable."); *Smith v. Schlesinger*, 513 F.2d 462, 465 (D.C. Cir. 1975) (decision must rest "upon all the information which may properly be considered" (cleaned up)); *Huynh v. Carlucci*, 679 F. Supp. 61, 65 (D.D.C. 1988) ("Accurate information about an individual's background is necessary to make an informed judgment as to whether or not granting a security clearance to an individual is clearly consistent with the national interest.").

By concealing his extensive white nationalist activities and associations, moreover, Gebert made himself vulnerable to blackmail. *See Dep't of the Navy v. Egan*, 484 U.S. 518, 528 (1988) (clearance decision rests on prediction of "whether, under compulsion of circumstances or for other reasons, [a person] might compromise sensitive information"); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 677 (1989) (government "has a compelling interest in protecting truly sensitive information from those who, under compulsion of circumstances or for other reasons, might compromise such information" (cleaned up)); *Hartness v. Bush*, 919 F.2d 170, 172-73 (D.C. Cir. 1990) ("The government's primary concern with regard to [classified information] is that an

12

employee could be induced, perhaps by a blackmailer who is aware of [embarrassing facts], to disclose the information"); *Doe v. Webster*, 769 F. Supp. 1, 3 (D.D.C. 1991) (government "has a legitimate, interest in ensuring that its employees are not susceptible to breaches of security").

Gebert's attempt to minimize the actions he took to conceal his white nationalist activities and associations is unpersuasive. He downplays his use of pseudonyms as "rudimentary online forum protocols," and sarcastically describes donning a hat and sunglasses to hide his identity at the Unite the Right rally as "*sophisticated* anti-detection tactics." Am. Compl. ¶ 25 (emphasis in original). But he does not deny that he did these things—as unsophisticated or rudimentary as they were—to conceal his activities and associations. *See Am. Bd. of Internal Med. v. Rushford*, 841 F. App'x 440, 443 (3d Cir. 2020) ("using a pseudonym and an email address that conceals one's identity are surely suggestive of intent to mislead"); *United States v. Kalu*, 791 F.3d 1194, 1205 (10th Cir. 2015) ("Intent may be inferred from evidence that the defendant attempted to conceal activity"); *United States v. Jones*, 432 F.3d 34, 41 (1st Cir. 2005) ("wearing of hooded sweatshirts tightly wrapped around their heads . . . suggested an intent to disguise the two men's identities"). That his efforts were unsophisticated and ineffective does not mean that they were not deceptive.

Gebert's dishonesty, wholly separate from his white nationalist activities and associations, was a proper basis to revoke his clearance. *See Rodriguez v. Seamans*, 463 F.2d 837, 840 (D.C. Cir. 1972) (agency could fire an employee who has "falsely answered material questions put to him concerning prior associations"); *United States v. Dunnigan*, 507 U.S. 87, 96 (1993) (there is no constitutional "right to commit perjury"); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982) ("There is no first amendment protection for furnishing with predatory intent false information to an administrative or adjudicatory body"); *Lewis v. Lhu*, 696 F. Supp. 723, 729 (D.D.C. 1988) (no right to encourage the "furnishing of false

information to a government agency"); *see also United States v. Alvarez*, 567 U.S. 709, 720 (2012) (distinguishing, for purposes of the First Amendment, a statute prohibiting "false statements made to Government officials, in communications concerning official matters" from a statute criminalizing "false statements . . . made to any person, at any time, in any context"); *cf. LaChance v. Erickson*, 522 U.S. 262, 264 (1998) (Due Process Clause does not prohibit "federal agency from sanctioning an employee for making false statements to the agency regarding alleged employment-related misconduct on the part of the employee"); *Lee v. Stewart*, No. 20-5952, 2021 WL 6932349, at *3 (6th Cir. Aug. 24, 2021) (statements that "posed a potential security risk" were not protected speech in context of security clearance investigation). That is especially so given that "any doubt" at all as to an employee's fitness to access classified information "shall be resolved in favor of the national security." Exec. Order 12,968 § 3.1(b), 60 Fed. Reg. at 40,250. Dishonesty during a background reinvestigation for a job requiring a clearance plainly is not protected speech.

2.  Gebert pleads no facts to support a plausible inference that the suspension and/or revocation of his clearance was retaliation for protected speech

Gebert does not dispute that dishonesty during a background reinvestigation for a position requiring a clearance is a proper basis to revoke one's clearance. He contends only that dishonesty was not the Department's true reason for suspending and then revoking his clearance, but merely pretext for retaliation due to protected speech. But none of the facts he alleges supports a plausible inference that the Department did not "honestly believe[,]" *Hairston*, 773 F.3d at 273 the reasons it gave for suspending and revoking his clearance, and instead did so as retaliation for his protected speech. Gebert marshals an extensive set of allegations in an attempt to show retaliatory motive, "an approach that can best be described as throwing spaghetti at the wall to see what sticks." *In re Matter of Search of Info. Assoc. with Two Accts. Stored at Premises Controlled by Google LLC*, Grand Jury No. 22-0028 (BAH), 2022 WL 18673695, at *4 (D.D.C. Sept. 27, 2022). But even

14

taken collectively, these allegations do not "nudge[ ] his claims of [retaliation] across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680. The sheer number of facts Gebert pleads cannot make up for this shortcoming, for "in law as in mathematics zero plus zero equals zero." *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001). Gebert thus does not plausibly allege retaliation.

<blockquote>
a.  *Gebert does not plausibly allege that the Department has treated supporters of the Black Lives Matter movement better than him*
</blockquote>

Gebert's argument that Defendants treated him worse than supporters of the Black Lives Matter movement, Am. Compl. ¶ 60, is meritless. Gebert does not plausibly allege either that any Department employee who supports the Black Lives Matter movement dishonestly concealed that support during a clearance adjudication, or that the Department has ever treated any such employee differently than him. *See Camero v. Vilsack*, Civ. A. No. 19-1558 (DLF), 2022 WL 17752204, at *5 (D.D.C. Dec. 19, 2022) ("an inference of discrimination can only be drawn from disparate treatment of comparable employees if all of the relevant aspects of the plaintiff's employment situation are nearly identical to those of the comparator" (cleaned up)). He simply presupposes that such an employee might exist, and then presumes, based only "[u]pon information and belief," Am. Compl. ¶ 60, that the Department treated that hypothetical employee better than him. As this Court has explained, such unadorned speculation does not suffice to support a plausible inference of retaliation. *See Doe v. Lee*, Civ. A. No. 19-0085 (DLF), 2020 WL 759177, at *6 (D.D.C. Feb. 14, 2020) ("It is well-settled that such conclusory allegations supported by information and belief are insufficient to survive a motion to dismiss." (internal quotation marks omitted)); *see also Bura v. George Wash. Univ.*, Civ. A. No. 15-0533 (CKK), 2018 WL 11489533, at *11 (D.D.C. Aug. 15, 2018) ("General comparisons to hypothetical employees" are "irrelevant")).

Gebert's reliance on a memorandum from the Office of Special Counsel concluding that employees may voice support for Black Lives Matter on the job, Am. Compl. ¶ 60, is misplaced.

For one thing, the Office of Special Counsel is not part of the Department—it is an entirely separate agency. 5 U.S.C. § 1212. How the memorandum can suggest that the Department retaliated against Gebert thus is unclear. For another, the memorandum concluded only that "the Hatch Act generally allows employees to engage in [Black Lives Matter]-related activity while on duty or in the workplace," so long as they refrain "from combining [such] activity with political activity while on duty or in the workplace and from engaging in partisan political fundraising in connection with [Black Lives Matter]-related organizations." *Black Lives Matter and the Hatch Act*, Off. of Special Counsel, https://www.usgs.gov/media/files/office-special-counsel-advisory-black-lives-matter-and-hatch (July 14, 2020). It did not allow employees to make false, misleading, or incomplete statements during investigations for clearance-level jobs, or let employees with such jobs conceal information that can be used to blackmail them into compromising national security information.

### b. *Remarks by Gebert's former supervisor do not suggest retaliation*

Gebert also cited his "former supervisor" Amos Hochstein's remarks that "Neo-Nazis are not all shaved heads and tattoos, they are hiding in plain sight. I'm horrified Gebert worked for me at the State Department." Am. Compl. ¶ 19. But Hochstein no longer worked at the Department when the *Hatewatch* article was published, *id.* & n.19, and Gebert does not allege that he worked in the office that handles clearances (he did not).[6] *See Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1375 (D.C. Cir. 2020) ("remarks by non-decisionmakers are not generally direct evidence

---

[6]     *See also* Ben LeFebvre & Nahal Toosi, *State Department Suspends Energy Staffer Linked to White Supremacist Group*, Politico (Aug. 8, 2019), https://www.politico.com/story/2019/08/08/state-department-energy-employee-white-supremacist-group-1642628 (describing Hochstein as a "[f]ormer State Department official[ ]"). That Hochstein did not then work at the Department is "not subject to reasonable dispute," Fed. R. Evid. 201(b), and Gebert himself cites the *Politico* article indirectly. *See* Am. Compl. ¶ 19 & n.1 ("*Rolling Stone* stated, 'According to *Politico* . . . .'"); *Louis v. Hagel*, 221 F. Supp. 3d 40, 43 (D.D.C. 2016) ("the Court may consider documents specifically referenced in the complaint where the authenticity of the document is not questioned").

of discrimination"); *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 655 (D.C. Cir. 2003)

(plaintiff "does not allege that the offending employee had any role whatsoever in [the] decision");

*Thomas v. Nat'l Football League Players*, 131 F.3d 198, 204 (D.C. Cir. 1997) ("statements by

people who did not participate in the decisionmaking process" do not suggest discrimination).

> c.    *Gebert's conclusory allegation that the Department faced pressure to remove him does not suggest retaliation*

Gebert's conclusory allegation that "the Department was under immense pressure from the

public and even members of Congress to remove [him] . . . due to his viewpoints," Am. Compl.

¶ 23, does not support a plausible inference of retaliation. He pleads no facts at all to support this

allegation—only "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678.

> d.    *The* Sludge *article does not suggest retaliation*

The *Sludge* article does not suggest that Defendants' given reasons for suspending and then

revoking Gebert's clearance were pretextual. That article reported that Gebert contributed $225 to

a political candidate who had made certain "racist and anti-Semitic statements" and $1,000 to a

candidate who was "outspoken about preserving public Confederate flags and monuments." Alex

Kotch, *Government Employees Donate to White Supremacist Candidate*, Sludge (July 3, 2018),

https://readsludge.com/2018/07/03/government-employees-donate-to-white-supremacist-candida

te/ ("*Sludge* Article"). If anything, the article undermines Gebert's claim. The *Sludge* article shows

only that Gebert provided financial support to certain political candidates, which ordinarily would

not need to be disclosed in a clearance investigation, unlike the activities that the *Hatewatch* article

disclosed, which would have merited a response during his interview. The notion that Defendants

knew "that Gebert supported white nationalist/pro-white ideologies" for over a year before the

*Hatewatch* article came out, Am. Compl. ¶ 30, yet took no action against him until the *Hatewatch*

article brought to light his dishonesty during his clearance adjudication, thus merely underscores

that they acted solely due to his dishonesty during his clearance adjudication, not his ideological beliefs. Gebert's insistence on this narrative is puzzling, as it undercuts, not supports, his claim.

Gebert's argument that the *Sludge* article suggests that Defendants' reasons for suspending and revoking his clearance were pretextual is meritless. The *Sludge* and *Hatewatch* articles differed in significant ways, such that any knowledge Defendants might have had of the *Sludge* article would not support a plausible inference that their concerns relating to the *Hatewatch* article were insincere. *First*, the *Hatewatch* article catalogued behavior that would have merited a response to the questions posed during Gebert's interview, thus suggesting that he had been dishonest during the interview. The *Sludge* article did no such thing—it merely reported on Gebert's donations.

*Second*, the *Sludge* article, unlike the *Hatewatch* article, did not suggest that Gebert had tried to conceal his activities and associations, and thus did not suggest that he had been dishonest during his clearance adjudication. Nothing in the *Sludge* article indicated that he tried to hide his contributions, and one can find records of them online. *See Individual Contributions*, Fed. Election Comm'n, https://www.fec.gov/data/receipts/individual-contributions/?contributor_name=matthe w%20gebert. The *Hatewatch* article, in contrast, revealed that he tried to conceal his activities and associations, such as by disguising his appearance and using pseudonyms in podcasts and online. *See Hatewatch* Article, *supra*. Gebert's attempts to prevent his activities and associations from becoming public, which the Hatewatch article documented but the Sludge article did not, support Defendants' belief that he was dishonest during his clearance adjudication.

*Third*, the *Hatewatch* article, unlike the *Sludge* article, showed that Gebert had responded untruthfully when asked "if there was any information regarding members of his family that would be a possible source of embarrassment to" the Department. Am. Compl. ¶ 14. The *Hatewatch* article revealed that Gebert's wife had numerous white nationalist activities and associations of

her own. *See Hatewatch* Article, *supra*. The *Sludge* article, in contrast, did not mention her or any other member of Gebert's family. *See Sludge* Article, *supra*. The *Hatewatch* article, unlike the *Sludge* article, thus suggested that Gebert responded dishonestly to the family question, one of the responses forming the basis of the Department's conclusion that he had been dishonest.[7]

### e. Temporal proximity does not suggest retaliation

The temporal proximity between the *Hatewatch* article's publication and the suspension of Gebert's clearance does not support a plausible inference of First Amendment retaliation, either, for two reasons. *First*, it does not suggest that Defendants suspended Gebert's clearance soon after learning of his white nationalist beliefs—by Gebert's own account, Defendants had known about his beliefs for over a year, too long to support a plausible inference of causation. *See* Am. Compl. ¶ 30; *Payne v. District of Columbia*, 722 F.3d 345, 354 (D.C. Cir. 2013) ("there is no temporal proximity" when gap in time is "two-thirds of a year"); *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) ( "two and one-half month[ ]" gap too great to suggest causation).

*Second*, an obvious alternative explanation for the decision to suspend Gebert's clearance —the *Hatewatch* article's revelation of his uncandor during his clearance adjudication—precludes any plausible inference of viewpoint retaliation. *See Townsend v. United States*, 236 F. Supp. 3d 280, 298 (D.D.C. 2017) ("when [a] complaint contains fulsome factual context for the challenged adverse employment action, those allegations must be considered collectively in evaluating the reasonableness and plausibility of the inferences urged by the plaintiff" (internal quotation marks omitted)); *Moses v. Howard Univ. Hosp.*, 474 F. Supp. 2d 117, 125 (D.D.C. 2007) ("closeness in time does not inevitably or necessarily support an inference of causation, particularly where the

---

[7]    Gebert further alleges that the Department received an "anonymous tip" on June 21, 2019, consisting of the same information in the *Sludge* article. Am. Compl. ¶ 33. This tip does not support a plausible inference of retaliation, just as the *Sludge* article does not support such an inference.

inference is undermined by . . . other related events" (internal quotation marks omitted)); *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) ("positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine"); *Farrington v. Mayorkas*, Civ. A. No. 21-3240 (BAH), 2022 WL 16834018, at *3 (D.D.C. Nov. 9, 2022) (same under Rule 12(b)(6)); *Lancaster v. Vance-Cooks*, 967 F. Supp. 2d 375, 388 (D.D.C. 2013) (same); *cf. Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000) (a plaintiff can "plead too much . . . plead himself out of court by alleging facts that [preclude] success on the merits").

> f.      *The Department's possession of articles on the circumstances of its discovery of Gebert's dishonesty does not suggest retaliation*

Gebert's assertion that "[h]undreds of pages of 'investigative' material in this matter are nothing but copies of media articles discussing Gebert and shaming the Department for employing him," Am. Compl. ¶ 93, does not support a plausible inference of retaliation. It is hard to see how the Department's possession of articles about the circumstances that led to the discovery of Gebert's dishonesty during his interview would support a plausible inference of retaliation, and Gebert does not explain why it does—he just insists it does. *See Iqbal*, 556 U.S. at 678.

> g.      *The Department's public statements do not suggest retaliation*

The Department's statements that it is committed to a workplace that is "inclusive" and "free from discriminatory harassment," Am. Compl. ¶ 24, plainly do not suggest retaliation.

> h.      *Gebert's remark on* The Fatherland *does not suggest retaliation*

Gebert's statement, on *The Fatherland*, that "[t]here are bigger things than a career and a paycheck, and I don't want to lose mine," Am. Compl. ¶ 26, does not support a retaliation claim. In suspending his clearance, the Department cited this remark as evidence "that he understood that his connection to white nationalism (if discovered) could end his career with the Department of State." *Id.* While Gebert argues that this remark shows that he was willing to lose his job for his

beliefs, *id.* ¶ 27, the Department relied on it only as evidence of motive and intent for dishonesty—

he believed his activities and associations, if known, could harm his career, and so concealed them.

*Cf.* Fed. R. Evid. 404(b) ("motive" or "intent" evidence is admissible). While Gebert disputes that,

"the key question in this context" is just whether the Department "honestly" believed it is true, not

whether it is true. *Hairston*, 773 F.3d at 273. Gebert does not plausibly allege that the Department

did not believe it. *See Hegab v. Long*, 716 F.3d 790, 796 (4th Cir. 2013) (rejecting as "speculative"

plaintiff's First Amendment challenge to revocation that "depend[s] entirely on his disagreement

with [agency's] review of the evidence and his conclusion that the agency did not make its decision

for the reasons that it gave and therefore must have acted from an unconstitutional bias").

## B.     Gebert Fails to State a Plausible Overbreadth Claim

Count XXII raises an overbreadth claim. Am. Compl. ¶¶ 242-48. This claim fails at the

threshold, however, because the questions at issue do not regulate speech at all. A law is overbroad

for First Amendment purposes only if it "punishes a substantial amount of protected free speech,

judged in relation to [its] plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)

(internal quotation marks omitted). But none of the questions regulated, much less prohibited, any

speech at all—they were, after all, simply questions. *See Bryant v. Gates*, 532 F.3d 888, 893 (D.C.

Cir. 2008) ("because [a regulation] does not threaten [the plaintiff] (or anyone else) with a sanction

for prohibited speech, and therefore does not seem likely to deter anyone from engaging in any

protected speech, it is not clear whether the vagueness doctrine applies here at all"). The only

potential regulation of speech at issue in this case is not any of the questions posed to Gebert during

his interview, but the general prohibition on dishonesty during a clearance adjudication.[8]

---

[8]     Any claim that Defendants would have suspended or revoked Gebert's clearance had he
answered the questions honestly is pure speculation, because he did not answer them honestly. *See
Hill v. Colorado*, 530 U.S. 703, 733 (2000) ("speculation about possible vagueness in hypothetical

Even if the questions somehow could be construed to punish speech, they would not be overbroad. Gebert offers no reason to think that any speech they prohibit is "substantial . . . in relation to [their] plainly legitimate function," *Hicks*, 539 U.S. at 118, of learning what a malign actor can exploit to coerce or blackmail a person into sharing classified information. *See Ozonoff v. Berzak*, 744 F.2d 224, 230 (1st Cir. 1984) ("'overbreadth' must be measured in light of whatever special job-related security requirements that governmental security . . . needs may reasonably dictate"); *Von Raab*, 489 U.S. at 677; Exec. Order 12,968, § 3.1(b), 60 Fed. Reg. at 40,250.

Gebert's claim that the questions "require applicants to disclose their political associations and speech as well as their ideological beliefs," Am. Compl. ¶ 245, is inaccurate. These questions on their face do not directly elicit information about political associations, speech, or ideological beliefs. Am. Compl. ¶ 14. To the extent a person might disclose such information while providing full and truthful answers to these questions, eliciting such information would be, at most, only an ancillary, incidental byproduct of the questions, not their primary purpose. *See A.N.S.W.E.R. Coal. v. Basham*, 845 F.3d 1199, 1210 (D.C. Cir. 2017) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017) (law's "effect on speech would be only incidental to its primary effect"). And even if the questions resulted in disclosure of "an individual's beliefs and associations," they would be proper nonetheless as "necessary to protect [the] legitimate state interest" in ensuring that those with access to classified information are not

---

situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications" (internal quotation marks omitted)); *Hutchins v. District of Columbia*, 188 F.3d 531, 546 (D.C. Cir. 1999) ("That the fertile legal imagination can conjure up hypothetical cases in which the meaning of disputed terms could be questioned does not render the provision unconstitutionally vague" (internal quotation marks omitted)).

vulnerable to coercion or blackmail. *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6-7 (1971).[9]

## IV.   **Gebert Fails to State a Plausible Due Process Claim**

Counts II, III, IV, V, VI, XVI, and XVII raise claims under the Due Process Clause. Am. Compl. ¶¶ 105-43, 201-213. "The Due Process Clause affords both substantive and procedural protections," *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1265 (D.C. Cir. 2020), prohibits vague laws, *Hodge v. Talkin*, 799 F.3d 1145, 1171 (D.C. Cir. 2015), and "contains an equal protection component," *Hutchins v. District of Columbia*, 144 F.3d 798, 806 (D.C. Cir. 1998). But whether framed in substantive, procedural, vagueness, or equal protection terms, each of these claims fail.

### A.   **Gebert Fails to State a Plausible Substantive Due Process Claim**

To state a substantive due process claim against a federal actor, a plaintiff must identify a right "guaranteed by the first eight Amendments," "deeply rooted in our history and tradition," and/or "essential to our Nation's scheme of ordered liberty," based on "a careful analysis of the history of the right at issue." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022). Gebert alleges two substantive due process violations—the Department's (1) revocation of his clearance "due to him expressing opinions with which Defendant[s] did not agree," Am. Compl. ¶ 112, and (2) denial of his request "to use his annual leave, property, prior to initiation of the [s]uspension without pay," *id.* ¶ 123. His substantive due process claim based on "expressing opinions," *id.* ¶ 112, fails for the same reasons as his First Amendment claims—as his pleadings show, the Department revoked his clearance due to his dishonesty, not his white nationalist beliefs.

Gebert's substantive due process claim based on the failure to let him use his accrued leave

---

[9]     *Clark v. Library of Congress*, 750 F.2d 89, 94-95 (D.C. Cir. 1984), which required a "vital" rather than merely legitimate interest and a least restrictive means analysis, is inapposite, because the questions were not "motivated solely by [Gebert's] lawful beliefs or associations." Regardless, there is a "compelling" interest in safeguarding classified information, *Von Raab*, 489 U.S. at 677, and withdrawing a clearance due to dishonesty is the least restrictive way to protect it, *infra* § V.D.

prior to his suspension also fails. While substantive due process "normally imposes only very slight burdens on the government to justify its actions, it imposes none at all in the absence of a liberty or property interest." *George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003). Property interests do not arise under the Constitution, but "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (internal quotation marks omitted). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it," or "a unilateral expectation of it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "He must, instead, have a legitimate claim of entitlement to it." *Id.* "To create a protected property interest, regulations must limit discretion by explicitly mandatory language, i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Bloch v. Powell*, 348 F.3d 1060, 1069 (D.C. Cir. 2003) (cleaned up). "Generally, a 'claim of entitlement' is not viable when a government agency wields significant or unfettered discretion in determining whether to award or rescind a particular benefit." *Crooks v. Mabus*, 845 F.3d 412, 419 (D.C. Cir. 2016).

Relevant Department policy did not entitle Gebert to use accrued leave in lieu of non-pay status during his suspension. 3 Foreign Affairs Manual ("FAM" or "Manual") § 3418 provides:

> Annual leave in lieu of non-pay status during suspension may not be granted except when an employee is suspended summarily in the interest of national security under the provisions of 5 U.S.C. 7532. In such case, the employee may request, and with the approval of the appropriate headquarters office, be granted annual leave not to exceed the balance to the employee's credit as of the date of suspension in lieu of non-pay status. In the event the employee is restored with back pay, the annual leave charged for the period covered by back pay is restored.

Thus, Gebert could use accrued leave only if the Department "granted" him its "approval." *Id.*; *see also Crooks*, 845 F.3d at 419 (regulation providing agency "expansive authority and discretion to determine whether an individual should be allowed to remain . . . certainly does not suffice" to

24

create "a protected property interest"); *Wash. Legal Clinic v. Barry*, 107 F.3d 32, 36 (D.C. Cir. 1997) ("no constitutionally protected property interest exists" where "final determination of which eligible individuals receive benefits [is left] to the unfettered discretion of administrators" (cleaned up)); *Fried v. Hinson*, 78 F.3d 688, 692 (D.C. Cir. 1996) ("relevant regulations explicitly permit the agency to not renew an examiner . . . . Because no existing rule even implied that renewal was guaranteed, . . . Fried did not possess a legitimate property interest" (citation omitted)); *cf. Taylor*, 571 F.3d at 1321 (plaintiff "had not obtained . . . prior approval" to use leave, as he was "required to do"); *Dong v. Smithsonian Inst.*, 125 F.3d 877, 877 (D.C. Cir. 1997) ("without seeking permission, plaintiff took annual leave," and was suspended as a result).

Even if Gebert had a property interest in using his accrued leave prior to his suspension, he still fails to plausibly allege a substantive due process violation. "Once a property interest is found, . . . substantive due process constrains only egregious government misconduct." *George Wash. Univ.*, 318 F.3d at 209. A plaintiff must plausibly allege that the challenged action works a "grave unfairness," which requires a (1) "substantial infringement of [the] law prompted by personal or group animus" or (2) "deliberate flouting of the law that trammels significant personal or property rights." *Id.* (internal quotation marks omitted). To the extent Gebert claims the Department did not let him use accrued leave before his suspension due to animus against white nationalists, he fails to plead facts that support a plausible inference of retaliatory animus. *See supra* § IV.A. Nor does he plausibly allege that not letting him use accrued leave before his suspension was a "deliberate" violation of the law, much less a "significant" one. *George Wash. Univ.*, 318 F.3d at 209.

### B.     Gebert Fails to State a Plausible Procedural Due Process Claim

To state a procedural due process claim, a plaintiff must plausibly allege that he (1) was "deprived of a protected interest" (2) without "the process [he was] due." *Statewide Bonding, Inc. v. Dep't of Homeland Sec.*, 980 F.3d 109, 118 (D.C. Cir. 2020). But Gebert identifies no protected

interest, and regardless, has received all the process that he is due.

### 1.   Gebert fails to identify a protected interest

"To sustain a procedural due process claim, a plaintiff must first demonstrate the existence of a protected liberty or property interest." *McCormick v. District of Columbia*, 752 F.3d 980, 987 (D.C. Cir. 2014). But as explained below, none of the interests that Gebert identifies—in his (1) clearance, Am. Compl. ¶ 111, (2) job, *id.* ¶¶ 110, 117, (3) ability to express opinions, *id.* ¶ 112, (4) accrued leave, *id.* ¶ 112, or (5) reputation, *id.* ¶ 128—can support a procedural due process claim.

### a.   *Gebert has no protected interest in his clearance*

Gebert lacked a protected interest in his clearance. *See Egan*, 484 U.S. at 528 ("It should be obvious that no one has a 'right' to a security clearance"); *Doe v. Cheney*, 885 F.2d 898, 909 (D.C. Cir. 1989) (plaintiff "had no entitlement to access to [classified information]. He cannot argue that [agency] has deprived him of a property interest."); *U.S. Info. Agency v. Krc*, 905 F.2d 389, 399 (D.C. Cir. 1990) ("no independent property right attaches to the security clearance").

### b.   *Gebert had no protected interest in his job*

Gebert does not plausibly allege the denial of a protected interest in employment, as there is no right to a job requiring a clearance. *See Krc*, 905 F.2d at 397 ("The loss of some employment opportunities does not amount to an alteration of a legal right, particularly when the loss of employment flows directly from the modification of a security clearance, which itself represents only a change in the terms of an agency's exercise of its discretion" (cleaned up)); *Gill v. Dep't of Just.*, Civ. A. No. 15-0824 (RMC), 2016 WL 3982450, at *6 (D.D.C. July 22, 2016) ("the right 'to earn a living' does not extend to jobs requiring a security clearance" (quoting *Palmieri v. United States*, 72 F. Supp. 3d 191, 207 (D.D.C. 2014))); *Magassa v. Mayorkas*, 52 F.4th 1156, 1169 (9th Cir. 2022) (there is "no liberty interest in maintaining employment that requires a security clearance"); *Stehney v. Perry*, 101 F.3d 925, 936 (3d Cir. 1996) (employee "has no constitutionally

protected liberty or property interest in . . . a job requiring a security clearance"); *Dorfmont v. Brown*, 913 F.2d 1399, 1403 (9th Cir. 1990) ("If there is no protected interest in a security clearance, there is no liberty interest in employment requiring such clearance"); *Chesna v. Dep't of Def.*, 850 F. Supp. 110, 119 (D. Conn. 1994) (same). Any other result "would swallow the rule that an employee cannot hold a property interest in a security clearance. . . . [F]or jobs that require a clearance," the job and the clearance "form one indivisible whole." *Lamb v. Millennium Challenge Corp.*, 498 F. Supp. 3d 104, 111 (D.D.C. 2020). Thus, "[w]hile some federal employees may have property interests in their jobs, those who must hold security clearances do not." *Deryck v. Dep't of Def.*, Civ. A. No. 22-3290 (TNM), 2023 WL 3303832, at *3 (D.D.C. May 8, 2023).

c.     *Gebert was not deprived of his ability to express his opinions*

Gebert does not plausibly allege a deprivation of his right to express opinions for the same reasons that his First Amendment retaliation claims fail—the Department revoked his clearance due to his dishonesty, not his support for white nationalism. *See supra* § IV.A. To the extent he alleges injury due to his "voluntary" decision to not comment publicly on his situation, Am. Compl. ¶ 128 ("Plaintiff has issued no public statements, has rejected all requests for interview, and has never responded to media inquiries regarding his employment with or suspension by Defendant"), he lacks standing to challenge such self-inflicted harms. *See Pub. Citizen v. Nat'l Highway Transp. Safety Admin.*, 489 F.3d 1279, 1290 (D.C. Cir. 2007) (plaintiff lacks standing to challenge "'self-inflicted' injury not caused by the agency action" at issue); *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing."); *cf. Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 35 (D.D.C. 2014) ("the harm is self-inflicted and, therefore, not the irreparable harm that supports injunctive relief"); *Second City Music, Inc. v. City of Chi.*, 333 F.3d 846, 850 (7th Cir. 2003) ("self-inflicted wounds are not irreparable injury").

### d. Gebert had no protected interest in using his accrued leave

As Defendants explained, Gebert lacked a protected interest in using his accrued leave prior to his suspension. *See supra* § V.A. Just as he had no such interest for purposes of his substantive due process claim, he lacked such an interest for purposes of a procedural due process claim.

### e. Gebert has no protected interest in his reputation

Lastly, Gebert had no protected interest in his reputation. "[S]tigma alone is not actionable" as a due process violation "without a showing that a right or status previously recognized by state law has been distinctly altered or extinguished." *O'Donnell v. Barry*, 148 F.3d 1126, 1139 (D.C. Cir. 1998) (internal quotation marks omitted). A plaintiff can state a due process claim based on reputational harm only in "two circumstances"—under a "reputation-plus" theory or a "stigma-plus" theory. *Id.* at 1140-41. As explained below, Gebert cannot state a claim under either theory.

### i. Gebert cannot state a plausible reputation-plus claim

A plaintiff states a reputation-plus claim where he "points to the conjunction of official defamation and adverse employment action." *O'Donnell*, 148 F.3d at 1140. Under District of Columbia law, defamation requires a "false and defamatory statement," *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006) (citation omitted), but Gebert identifies no false or defamatory statement by Defendants. He alleges that "representatives from the Department . . . made official statements wherein they explicitly expressed their disapproval of [his] ideologies," but the only examples he offers are assurances that the Department is committed to providing a workplace that is "inclusive" and "free from discriminatory harassment." Am. Compl. ¶ 24. These statements (1) "cannot reasonably be interpreted as stating actual facts about" Gebert, (2) were not "sufficiently factual to be susceptible of being proved true or false," *Milkovich v. Lorain J.*, 497 U.S. 1, 20-21 (1990) (cleaned up), and (3) did not even mention him, even indirectly, *see CJ Prods. LLC v. BTC Enters. LLC*, Civ. A. No. 10-5878, 2012 WL 1999829, at *5 (S.D.N.Y. June 1, 2012)

("no rational juror could find . . . that the letters—which did not even mention defendants or their products—falsely described those products"). The most that one possibly could infer from these statements is that the Department had "disagreement" with Gebert's views, which does not "constitute defamation" even if it is "combative"—Gebert is not entitled to have the Department endorse his views. *Smith v. Clinton*, 886 F.3d 122, 129 (D.C. Cir. 2018) (citation omitted). Nor is it clear how such statements can cause "damage to [his] reputation," *Milkovich*, 497 U.S. at 11, if, as he says, he is "not ashamed or embarrassed of any of his views or activities." Am. Compl. ¶ 45.

ii.    Gebert cannot state a plausible stigma-plus claim

Nor can Gebert state a stigma-plus claim. A stigma-plus claim requires "the combination of an adverse employment action and a stigma or other disability that foreclosed the plaintiff's freedom to take advantage of other employment opportunities." *O'Donnell*, 148 F.3d at 1140 (cleaned up). But a clearance revocation is not the sort of stigma or disability that can support a stigma-plus claim even if it forecloses jobs that require a security clearance, as no protected interest can lie in a job requiring a clearance. *See supra* § V.B.1.b; *Deryck*, 2023 WL 3303832, at *4 n.5 ("Some tension exists between the stigma-plus line of cases and those affirming the Government's broad discretion to revoke security clearances in the interests of national security. Surely, if the Government considers an employee an ongoing threat, it may preclude that individual from holding a clearance-level position again."); *Garcia v. Pompeo*, Civ. A. No. 18-1822 (APM), 2020 WL 134865, at *7 (D.D.C. Jan. 13, 2020) (no stigma-plus claim where "the loss of employment flow[ed] directly from the modification of a security clearance").[10]

---

[10]    *Kartseva v. Department of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994), does not suggest a different result. It did not involve a security clearance—only a "background check," *id.* at 1536— and thus did not implicate the principle that no protected interest can lie in a security clearance or a job requiring one. *See id.* at 1528 n.16 ("denial of security clearances . . . were not the actions taken against Kartseva . . . . Had she been denied a security clearance, she would have been entitled

2.        Gebert has received all the process that he is due

Gebert is receiving all the process he is due. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted). In the clearance revocation context, "due process entitle[s]" a person simply "to a hearing in order to refute the charges against him and to clear his name." *Doe*, 885 F.2d at 910. The comprehensive procedures the Department has established to govern clearance revocation amply satisfy due process's strictures. And the Civil Service Reform Act ("CSRA") affords due process as to all Gebert's remaining personnel claims.

Before revoking a clearance, Personnel Security "notif[ies] the individual, in writing, of its decision to . . . revoke that individual's clearance." 12 Foreign Affs. Manual ("FAM") § 234.1(b). "The notification will provide as comprehensive and detailed a written explanation of the basis for the decision as the national security interests of the United States and other applicable law permit." *Id.* The individual may (1) "[b]e represented by counsel or other representative at his/her own expense;" (2) request "any documents, records, and reports" on which a revocation "is based," to the extent such materials would be provided under FOIA or the Privacy Act, which Personnel Security "will endeavor to provide . . . within 30 days;" (3) request "their entire investigative file, to the extent permitted by national security and other applicable law," which Diplomatic Security Service ("Diplomatic Security") "will provide . . . promptly and prior to the time set for the

---

to extensive procedural safeguards"). Nor is *O'Donnell* to the contrary—while it characterized *Kartseva* as involving a "security clearance" denial, 148 F.3d at 1140, it seems to have been using that term in a loose, colloquial sense to refer merely to an ordinary background check, not an actual security clearance, given that *Kartseva* expressly did not involve a security clearance. Lastly, *Lamb* is not to the contrary, either. In concluding that a stigma-plus claim based on a security clearance denial was viable, the court misread *Kartseva*—a decision that it characterized as "on point"—as involving a clearance, when in fact, *Kartseva* did not involve a clearance, as explained above. 498 F. Supp. 3d at 113. Significantly, *Lamb* did not enjoy the benefit of full adversarial briefing on the question of *Kartseva*'s significance, as "neither party" there had "cited" *Kartseva* at all. *Id.*

individual's written reply;" (4) "[s]ubmit . . . a written reply to, and request for review of, the decision to . . . revoke his/her eligibility for access to classified information" (and seek "an extension of time to submit the written reply and request for review"); and (5) "[b]e provided written notice of and reasons for the results of the review, the identity of the deciding authority, and written notice of the right to appeal." *Id.* § 234.1(c). Should the individual seek review of the decision, Diplomatic Security will review it and any reply to it, and provide "written notice of and reasons for the results of the review and, where appropriate, of the right to appeal." *Id.* § 234.1(i).

An individual may appeal the Diplomatic Security decision to the Department's Security Appeal Panel, and request "a personal appearance before the [Panel]." 12 FAM § 234.3(a). The Panel "will endeavor to schedule a meeting to hear the appeal within four weeks of receiving the appeal." *Id.* § 234.3(a). Personnel Security will notify the individual of the hearing date, "promptly provide the individual with the materials provided to the panel to the extent the documents would be provided if requested under [FOIA] or the Privacy Act, as applicable," and "advise the individual of relevant procedures and of the panel's final decision in the case." *Id.* § 234.3(c). The individual may also submit "any additional written arguments and any relevant documents, materials, and information the individual wants the panel to consider," including "any witness statements that the individual wishes to introduce" *Id.* § 234.3(d)-(e). "The individual will have an opportunity to appear before the [Panel] in person," and "[t]he personal appearance will not be adversarial in nature." *Id.* § 234.3(e). "The [Panel] may request additional information from the individual or from the Department prior to rendering its decision." *Id.* § 234.3(f).

Gebert's pleadings establish that he not only received, but availed himself of, the extensive procedural protections that the Department offered him. As Gebert acknowledges, the Department told him it would suspend his clearance "pending the outcome of a 'for cause' investigation," and

allowed him "to respond orally, in writing, or both," during that investigation. Am. Compl. ¶¶ 28, 38. Gebert submitted a written reply "through his legal representative," and Department officials interviewed him about the matter. *Id.* ¶¶ 39-44. Later, he submitted "additional responses" to the Department. *Id.* ¶ 46. When the Department revoked his clearance, it informed him that he "was entitled to provide written and oral responses" to the decision. *Id.* ¶ 77. Gebert has availed himself of these opportunities, "provid[ing] a written rebuttal . . . denying the allegations" against him "in their entirety" and giving a "Supplemental Response," each time by counsel. *Id.* ¶¶ 66-67. And because the administrative process remains ongoing, any contention that it is constitutionally inadequate, whether on its face or as applied here, is premature. *See Cronin v. FAA*, 73 F.3d 1126, 1132 (D.C. Cir. 1996) (procedural due process claim was premature prior to the administrative process's completion); *Gutierrez-Rogue v. INS*, 954 F.2d 769, 773 (D.C. Cir. 1992) (same); *see also Qassim v. Trump*, 927 F.3d 522, 530 (D.C. Cir. 2019) (applying, in the due process context, "[t]he rule against the premature adjudication of constitutional questions" (cleaned up)).

The Department thus is providing Gebert all the process that he is due as to his clearance revocation. *See Gill v. Dep't of Just.*, 875 F.3d 677, 681 (D.C. Cir. 2017) ("he received all the process that was due: a full hearing . . . where he had the right to counsel and the opportunity to make his case"); *Doe*, 885 F.2d at 910 (plaintiff "received appropriate process" where he was notified of revocation recommendation, "submitted lengthy written materials in support of his argument," and "had an interview with [agency's] Director . . . in the context of very sensitive agencies, . . . the Constitution does not require more" (internal quotation marks omitted)); *Doe v. Casey*, 796 F.2d 1508, 1524 (D.C. Cir. 1986), *aff'd in part, rev'd in part sub nom. Webster v. Doe*, 486 U.S. 592 (1988) (plaintiff "was given a meaningful opportunity" to respond where he had "notice" of agency's concerns and could "examine the polygraph officer's report" and "submit

lengthy written arguments on his behalf . . . . In the context of a very sensitive agency . . . we cannot say that the Constitution requires more"); *Doe v. Dep't of Just.*, 753 F.2d 1092, 1112 (D.C. Cir. 1985) ("the proper remedy for . . . infringement of Doe's liberty interest in reputation is an opportunity for Doe to refute the charges and clear her name").

Finally, as to Gebert's other personnel claims, the CSRA provides all the process he was due. *See Harrison v. Bowen*, 815 F.2d 1505, 1519 (D.C. Cir. 1987) (CRSA's "extensive procedural protections provided . . . at least as much process as [ ] was due as a matter of constitutional right"). As to Gebert's ostensible reputational interest, the Department's clearance revocation procedures offer an adequate opportunity to clear his name. *See Gill*, 875 F.3d at 681; *Doe*, 885 F.2d at 910 (revocation process adequate "to refute the charges against [plaintiff] and to clear his name"); *Doe*, 796 F.2d at 1524 (revocation process gave adequate "opportunity to clear [plaintiff's] name").

## A.      Gebert Fails to State a Plausible Vagueness Claim

Gebert's vagueness claims fail for three reasons: (1) he was not deprived of a protected interest, (2) the questions at issue do not regulate speech, and (3) the questions are not vague.

### 1.      Gebert's lack of a protected interest defeats his vagueness claim

The vagueness doctrine is rooted in due process's requirement of "fair notice." *Ramsingh v. TSA,* 40 F.4th 625, 636 (D.C. Cir. 2022). But an agency must provide fair notice only when it is actually "taking away someone's life, liberty, or property." *Johnson v. United States*, 576 U.S. 591, 595 (2015). An agency need not "provide fair notice" at all if it is not "depriving a party" of any protected interest in the first place. *Fabi Constr. Co. v. Sec'y of Lab.*, 508 F.3d 1077, 1088 (D.C. Cir. 2007); *see also Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 220 (D.C. Cir. 2013) (due process "requires a hearing only if [someone] can show deprivation of a [protected] interest"). Because none of the interests Gebert asserts are protected, *see supra* § V.B.1, he was not entitled to any notice at all, and thus cannot complain that the questions' vagueness deprived him of notice.

33

2.     The questions posed to Gebert do not regulate speech

In any event, the vagueness doctrine does not apply because the questions do not regulate speech. The vagueness doctrine applies only if a "regulation of speech" is not "clear enough to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "avoid fostering arbitrary and discriminatory application." *Bryant*, 532 F.3d at 893 (cleaned up); *see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) ("an enactment is void for vagueness if its *prohibitions* are not clearly defined"). But as explained, the questions at issue do not regulate speech at all. *See supra* § IV.B. The vagueness doctrine thus does not apply.

3.     The questions posed to Gebert are not vague

None of the questions at issue are unconstitutionally vague, and certainly not when "[r]ead in context." *United States v. Hsia*, 176 F.3d 517, 525 n.4 (D.C. Cir. 1999) (internal quotation marks omitted). To the extent they reflected any ambiguity at all, "it was well within the province of the [Department] to determine what [Gebert] meant." *United States v. Safavian*, 528 F.3d 957, 966 n.9 (D.C. Cir. 2008); *see also United States v. Cisneros*, 26 F. Supp. 2d 24, 42 (D.D.C. 1998) ("specific questions asked . . . regarding [responder's] past" were not fundamentally ambiguous); *United States v. Culliton*, 328 F.3d 1074, 1078 (9th Cir. 2003) ("the existence of some ambiguity in a falsely answered question will not shield [one] from a perjury or false statement prosecution"). While the questions at issue might occasionally produce close cases, "close cases can be imagined under virtually any statute, and it is a mistake to believe that the mere fact that close cases can be envisioned renders a statute vague." *Hodge*, 799 F.3d at 1173 (cleaned up).

Gebert stresses the term "embarrassing" in the family question, Am. Compl. ¶¶ 252-54, but "the term 'embarrassing' is not fundamentally ambiguous *per se*." *United States v. Kerik*, 615 F. Supp. 2d 256, 273 (S.D.N.Y. 2009). His claim that "there was no qualifier, clarification, or context to the word 'embarrassing,'" Am. Compl. ¶ 254, meanwhile, is simply incorrect. The question

asked him whether "there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State,"—not whether he had anything "embarrassing" to disclose at all. *Id.* ¶ 14. By limiting the scope of inquiry to "members of his family," *id.*, the question offered "clarity about the specific information sought." *Kerik*, 615 F. Supp. 2d at 273. And both the question's specific reference to the Department and the "context" of a clearance adjudication suggested "a mutual understanding" that the question sought to elicit information that someone might exploit to coerce or blackmail one into disclosing classified information. *Id.* ("the context" of "vetting process for a high-level executive position" suggests "a mutual understanding that the questioner sought general information that might be publicly and politically damaging to the nominee or the President"); *see also Bryant*, 532 F.3d at 893 ("the context in which that term appears . . . makes clear that it relates specifically to elections and policy matters of concern to public officials"); *United States v. Delgado*, 798 F. App'x 105, 107 (9th Cir. 2020) (question asked during background reinvestigation for security clearance not unduly vague given "the context of the inquiry"); *United States v. Sarwari*, 669 F.3d 401, 408 (4th Cir. 2012) ("The context here—an application for a United States passport—is a formal one . . . . [W]e cannot conclude that [a term] is fundamentally ambiguous"). As to the remaining two questions, Gebert does not even attempt to explain how they ostensibly are vague—he simply insists, in a conclusory fashion, that they were, Am. Compl. ¶¶ 252-54, which does not suffice, *Iqbal*, 556 U.S. at 678.[11]

## B.    Gebert Fails to State a Plausible Equal Protection Claim

Count XVII raises an equal protection claim, while Count VI alludes to equal protection principles, too. "The first step in analyzing [a] claim that [allegedly] disparate treatment violated

---

[11]    Gebert alleges that the interviewer was "virtually unintelligible," due to "a medical throat issue," Am. Compl. ¶ 255, but not that this actually impeded his ability to understand the questions.

equal protection is to determine the proper level of scrutiny." *Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148, 1153 (D.C. Cir. 2004). If an action "does not infringe a fundamental right or disadvantage a suspect class, no more than rational basis review is required." *Nat'l Ass'n for Advancement of Multijurisdiction Prac. v. Howell*, 851 F.3d 12, 18 (D.C. Cir. 2017). Rational basis review governs Gebert's equal protection claim. As explained, Gebert fails plausibly to allege a violation of his First Amendment or due process rights. *See supra* §§ IV-V.A-C. Nor does his support for white nationalism place him in a protected class. *Cf. United States v. Kumpf*, 438 F.3d 785, 791 (7th Cir. 2006) (denaturalization of Nazi concentration camp guard did not violate equal protection principles); *Linnas v. INS*, 790 F.2d 1024, 1032 (2d Cir. 1986) ("Nazi war criminals" are not a protected class); *Rzayeva v. United States*, 492 F. Supp. 2d 60, 82 (D. Conn. 2007) ("anti-Semites" are not a protected class). And as explained, Gebert's dishonesty during his clearance adjudication furnishes a rational basis for revoking his clearance. *See supra* § IV.A.1.

Even if strict scrutiny applied, the Department has a "compelling interest in protecting [classified] information from those who . . . might compromise such information." *Von Raab*, 489 U.S. at 677 (cleaned up). Suspending and revoking Gebert's clearance due to his dishonesty during his clearance adjudication was the least restrictive means to protect that interest, as the alternative is to grant access to classified information to one "who, under compulsion of circumstances . . . might compromise such information," *id.*, such as to a "blackmailer," *Hartness*, 919 F.2d at 173.

## V.     **Gebert Fails to State a Plausible APA Claim**

Gebert raises four APA claims. Counts VI and X challenge his clearance suspension and revocation on the merits, Am. Compl. ¶¶ 138-43, 161-66, Count XI challenges the Department's termination of his health insurance coverage, *id.* ¶¶ 167-76, and Count XXI challenges its refusal to let him use annual leave in lieu of unpaid status, *id.* ¶¶ 229-41. These claims all fail. And to the extent he challenges the Department's response to his records request, that claim would fail too.

### A. Gebert's APA Challenges to His Clearance Revocation Fails

Counts VI and X allege that the clearance revocation violates SEAD-4 and/or the Manual. Am. Compl. ¶¶ 138, 161. But the revocation is unreviewable, and was not arbitrary or capricious.

#### 1. The clearance revocation was committed to agency discretion

The APA does not apply where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). And the "decision to revoke [a] security clearance [is] a decision committed to agency discretion by law." *Oryszak v. Sullivan*, 576 F.3d 522, 524 (D.C. Cir. 2009) (citing *Egan*, 484 U.S. at 527). Gebert's APA challenges to the revocation thus fail. *Id.*; *see also Dorfmont*, 913 F.2d at 1402 n.1 (while "courts normally [can review] claims that a federal agency did not follow one of its own regulations, . . . . [t]o undertake such review" as to a regulation that governs "the merits of [a clearance] decision . . . . is to eviscerate *Egan*"); *Chesna*, 822 F. Supp. at 95 (same).

#### 2. The clearance revocation was not arbitrary or capricious

These claims also fail on the merits. Gebert alleges "that the crux of" the decision to revoke his clearance "stem[s] from what [he] said or failed to say about what [he] previously said." Am. Compl. ¶ 140. It is hard to understand what this means. But as explained, the Department revoked his clearance because it believed he was dishonest during his clearance adjudication, which is not arbitrary, capricious, or contrary to law. *See* 5 U.S.C. § 706(2)(A); *supra* § IV.A. His allegation that the revocation violated SEAD-4, Am. Compl. ¶ 138, meanwhile, is entirely conclusory. He does not explain how the revocation violated SEAD-4, or cite a specific provision of SEAD-4 that the revocation purportedly violated. And his allegations that the revocation violated his free speech right or equal protection principles fail for the reasons explained. *See supra* §§ IV, V.D.

### B. Gebert Does Not Plausibly Allege that Terminating His Insurance is Unlawful

Although Gebert alleges that the Department "retroactively terminated [his] health benefits as of the date of his suspension without pay," Am. Compl. ¶ 173, he pleads no facts to support a

plausible inference that this alleged act was unlawful. Gebert alleges only that the termination of his health insurance violated unspecified "law, regulation, and policy" (and, thus, also violated the APA). *Id.* ¶ 175. But he does not specify which laws, regulations, or policies ostensibly required the Department to maintain his insurance (other than the APA), much less explain why terminating his insurance supposedly violated them. The only law he cites is 5 C.F.R. § 890.502(b), which just requires an agency to furnish an employee certain information when he enters leave without pay status or his pay is insufficient to cover his premiums—it does not actually prevent an agency from terminating that employee's insurance coverage. Gebert's assertion that terminating his insurance coverage was unlawful is the sort of "unadorned, the-defendant-unlawfully-harmed-me accusation . . . devoid of further factual development" that fails to state a claim. *Iqbal*, 556 U.S. at 678.

Gebert also asserts that the Department did not "notify [him] of his option to continue receiving health insurance for up to 365 days by way of paying his own premiums," Am. Compl. ¶ 168, but any such error was harmless. *See* 5 U.S.C. § 706 (harmless error rule). Gebert does not allege that he did not know, at the time that he was suspended, that he could maintain his coverage by paying his own premiums, and thus inadvertently let his insurance lapse, or that the Department somehow impeded him from paying his premiums so as to remain covered. Nor is it clear what relief this Court could even grant Gebert. He prays for "an injunction compelling [the Department] pursuant to the APA to follow its self-imposed mandate of 3 FAM 3600, *et al.*," Am. Compl. ¶ 176, but what this Court could enjoin the Department to do is uncertain—tell Gebert something that he plainly already knows by now? And "money damages" is unavailable. 5 U.S.C. § 702.

### C. Gebert Does Not Plausibly Allege that Not Letting Him Use Annual Leave in Lieu of Non-Pay Status During His Suspension Violated the APA

Nor does Gebert plausibly allege that not allowing him to use annual leave in lieu of non-pay status during his suspension violated the APA. Gebert was not entitled to use annual leave in

lieu of non-pay status. *See supra* § V.A. And because there are no limits on or criteria to guide the Department's discretion as to whether to grant or deny a suspended employee's request to use his accrued leave prior to unpaid status, 3 FAM § 3418, that decision is committed to the Department's discretion by law. *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (action committed to agency discretion when text "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"); *Slyper v. Att'y Gen.*, 827 F.2d 821, 823 (D.C. Cir. 1987) (absence of "standard or criterion upon which the [agency] is to base a decision . . . is clear and convincing evidence" of commitment to agency discretion (internal quotation marks omitted)).

### D.      Gebert Cannot Challenge the Response to his Records Request Under the APA

Finally, to the extent Gebert's pleadings could be construed to challenge the Department's response to his records request under the APA, that claim would fail, too. APA review is available only where, as relevant here, "there is no other adequate remedy." 5 U.S.C. § 704. Because FOIA and the Privacy Act provide adequate remedies to compel the production of any withheld records, Gebert cannot premise an APA claim on the Department's failure to produce any such records. *See Citizens for Resp. & Ethics in Wash. v. Dep't of Just.*, 846 F.3d 1235, 1246 (D.C. Cir. 2017) ("FOIA offers an 'adequate remedy' within the meaning of [the APA] such that [an] APA claim is barred."); *Elec. Privacy Info. Ctr. v. IRS*, 910 F.3d 1232, 1244 (D.C. Cir. 2018) (no APA claim because FOIA provides "the very relief [plaintiff] seeks"); *Harrison v. Fed. Bureau of Prisons*, 248 F. Supp. 3d 172, 182 (D.D.C. 2017) ("a plaintiff cannot bring an APA claim to obtain relief for an alleged Privacy Act violation" (internal quotation marks omitted)).

### VI.    Gebert Failed to Reasonably Describe the Records that He Sought

FOIA requires an agency to conduct an adequate search for responsive records and release any non-exempt, reasonably segregable portions thereof only if a request "reasonably describes such record." 5 U.S.C. § 552(a)(3)(A); *see also Nat'l Sec. Couns. v. CIA*, 969 F.3d 406, 410 (D.C.

Cir. 2020) (agency "need not honor" and "can decline to process" request that does not reasonably

describe records sought (internal quotation marks omitted)); *Evans v. Fed. Bureau of Prisons*, 951

F.3d 578, 584 (D.C. Cir. 2020) ("an agency is only obligated to release nonexempt records if it

receives a request that 'reasonably describes such records.'"); *Ctr. for the Study of Servs. v. Dep't

of Health & Human Servs.*, 874 F.3d 287, 288 (D.C. Cir. 2017) (only request reasonably describing

records sought "triggers the agency's obligation to search for and disclose all responsive records");

*Pinson v. Dep't of Just.*, 70 F. Supp. 3d 111, 118 (D.D.C. 2014) ("to prevail on a FOIA cause of

action, the plaintiff first must show that he made a FOIA request that reasonably described the

records sought"); *Voinche v. FBI*, 412 F. Supp. 2d 60, 66 (D.D.C. 2006) (this rule is one of FOIA's

"statutory requirements"). This requirement, "like any other element of a cause of action . . . must

be adequately alleged at the pleading stage in order for the case to proceed." *Lexmark Int'l, Inc. v.

Static Control Components, Inc.*, 572 U.S. 118, 29 (2014); *accord Taylor v. FDIC*, 132 F.3d 753,

761 (D.C. Cir. 1997) (failure "to allege all the material elements of [a] cause of action" is fatal).

The Privacy Act, meanwhile, requires each agency that maintains a system of records to

"establish procedures for the disclosure to an individual upon his request of his record or

information pertaining to him." 5 U.S.C. § 552a(f)(3). Pursuant to this mandate, the Department

requires that all "[r]equests for access should describe the requested record(s) in sufficient detail

to permit identification of the record(s)." 22 C.F.R. § 171.22(b). A Privacy Act claim may proceed

only if a request comports with agency regulations. *See Hill v. Air Force*, 795 F.2d 1067, 1070

(D.C. Cir. 1986) ("A Privacy Act plaintiff, however, must exhaust his or her administrative

remedies prior to bringing an amendment suit."); *Trent v. Dep't of Homeland Sec.*, Civ. A. No. 18-

2591 (ABJ), 2020 WL 1429881, at *3 (D.D.C. Mar. 24, 2020) ("A failure to seek review in

accordance with the agency's procedures makes a lawsuit subject to dismissal for failure to exhaust

administrative remedies.”); *Scaife v. IRS*, Civ. A. No. 02-1805, 2003 WL 23112791, at *3 (D.D.C. Nov. 20, 2003) (dismissing Privacy Act claim because plaintiff “failed to give the name of the system or subsystem or categories of records to which he had sought access”); *Taylor v. Dep’t of Treasury*, 127 F.3d 470, 474 (5th Cir. 1997) (“failure to present a request that comported with applicable Privacy Act regulations constituted a failure to exhaust administrative remedies”).

In determining whether a request reasonably describes the records sought, “[t]he linchpin inquiry is whether the agency is able to determine precisely what records are being requested.” *Yeager v. DEA*, 678 F.2d 315, 326 (D.C. Cir. 1982) (cleaned up). A request thus suffices only if “a professional employee of the agency who was familiar with the subject area of the request [can] locate the record[s] with a reasonable amount of effort.” *Truitt v. Dep’t of State*, 897 F.2d 540, 545 n.36 (D.C. Cir. 1990). A request requiring an agency to “speculate about” what it seeks, in contrast, does not suffice. *Kowalczyk v. Dep’t of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996). “FOIA envisions that applicants will reasonably describe the records they seek, and agencies are entitled to demand it.” *Am. Ctr. for L. & Just. v. Dep’t of Homeland Sec.*, 573 F. Supp. 3d 78, 88 (D.D.C. 2021).

In *American Center*, Judge McFadden explained that “[a] request for documents that merely ‘reference’ certain topics might not be unreasonable,” because “responsive documents could probably be found with a simple keyword search across agency databases.” 573 F. Supp. 3d at 85. But a request for all records that “relate to” a topic, or that uses similarly “expansive” and indeterminate language, “would sweep in any [record] even remotely related to” that topic. *Id.* (cleaned up). Indeed, “a record need not even discuss [a topic] to still relate” to the topic. *Id.* Such “broad descriptions . . . leave the unfortunate FOIA processor assigned to such a case in a hopeless muddle without clear guidance about what documents are being sought.” *Id.*

Other judges in this District have expressed this sentiment, as well. In *Shapiro v. CIA*, 170

41

F. Supp. 3d 147, 154 (D.D.C. 2016) (internal quotation marks omitted), for example, Judge Cooper explained that "[b]ecause a record may pertain to something without specifically mentioning it," such phrasing leaves "the agency to guess at the plaintiff's intent." Judge Sullivan, meanwhile, has explained that "because a record may pertain to something without specifically mentioning it . . . the lack of clarity leaves the agency to guess at the plaintiff's intent." *Sack v. CIA*, 53 F. Supp. 3d 154, 164 (D.D.C. 2014). Or, as Judge Collyer aptly put it, "life, like law, is a seamless web, and all documents 'relate' to all others in some remote fashion." *Freedom Watch, Inc. v. Dep't of State*, 925 F. Supp. 2d 55, 61 (D.D.C. 2013) (cleaned up). Nor are judges in this District alone in reaching this result. As the Fourth Circuit has held, "concerning," "pertaining to," "relating to," and similar terms "typif[y] the lack of specificity that Congress sought to preclude in the requirement . . . that records sought be reasonably described." *Mason v. Callaway*, 554 F.2d 129, 131 (4th Cir. 1977).

Gebert's FOIA and Privacy Act claims fail because he did not describe the records sought reasonably and in enough detail to permit their identification. Gebert's request sought "all records relating to [him] that are held by the Department of State," including (1) "all interagency and intra-agency correspondence pertaining to the above," (2) "all interagency and intra-agency records related to the individual," (3) "all interagency and intra-agency correspondence pertaining to the Security Clearance Revocation," and (4) "all investigation and standard forms pertaining to the above." Ex. B. As judges in this District have repeatedly recognized, requests such as this, seeking all records in an agency's possession that relate or pertain to multiple topics, fail to reasonably describe the records sought. *See supra* cases cited at 41-42; *see also CNN, Inc. v. FBI*, 271 F. Supp. 3d 108, 112 (D.D.C. 2017) ("the language 'relate in any way to' [a topic] was too vague"); *Pinson v. Dep't of Just.*, 245 F. Supp. 3d 225, 244 (D.D.C. 2017) (request for records "concerning" a topic was "too vague to expect an [agency] employee familiar with the subject area to conduct a search"

(internal quotation marks omitted)); *Freedom Watch, Inc. v. CIA*, 895 F. Supp. 2d 221, 229 (D.D.C. 2012) (request for records "relating to" a given topic failed to reasonably describe the records sought); *Latham v. Dep't of Just.*, 658 F. Supp. 2d 155, 161 (D.D.C. 2009) (request for records "that pertain in any form or sort to" a given topic "is overly broad"); *Dale v. IRS*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (request for records "that refer or relate in any way to" a topic did "not describe the records sought with reasonably sufficient detail" (internal quotation marks omitted)).

Such indeterminate, open-ended descriptions do not enable FOIA processors to determine "precisely" which records Gebert requested, *Yeager*, 678 F.2d at 326, much less "with a reasonable amount of effort," *Truitt*, 897 F.2d at 545. Rather, such descriptions require the Department to "speculate about" which records Gebert is seeking. *Kowalczyk*, 73 F.3d at 389. Gebert thus failed to describe the records sought reasonably and with enough detail to permit their identification.

## VII.   Gebert is Not Entitled to Damages

Because Gebert's claims fail for the reasons discussed above, he is not entitled to money damages. But his damages claims also merit dismissal for additional reasons. As an initial matter, sovereign immunity bars his damages claims as to the Department. *See Ivy v. CIR*, 877 F.3d 1048, 1049 (D.C. Cir. 2017) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); 5 U.S.C. § 702 (no waiver for "money damages"). Nor does the Back Pay Act abrogate that immunity. That statute applies only where "a timely appeal or an administrative determination" results in a favorable finding by an "appropriate authority," 5 U.S.C. § 5596(b)(1), a term that here means "the agency itself, or the [Merit System Protection Board] or the Federal Circuit," *United States v. Fausto*, 484 U.S. 439, 454 (1988). Gebert, however, has not sought administrative review under the CSRA or filed an appeal of any sort, and no appropriate authority has ruled in his favor. *See Gilbert v. FDIC*, 950 F. Supp. 1194, 1198 (D.D.C. 1997) ("an independent determination has not been made by any authority (including this court) that [plaintiff]

suffered an unwarranted or unjustified personnel action"). Gebert's claims against the individual defendants, meanwhile, merit dismissal for two independent reasons. The *Bivens* doctrine does not furnish a cause of action under the circumstances presented. And even if it did, the individual defendants nonetheless would be entitled to qualified immunity.

### A.    The *Bivens* Doctrine Does Not Supply a Cause of Action

"[R]ecognizing a cause of action under *Bivens* [*v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 389 (1971)] is a disfavored judicial activity." *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022). In considering a proposed *Bivens* claim, a court's inquiry proceeds in two stages. *Id.* The court first asks "whether the case presents a new *Bivens* context—i.e., is it meaningfully different from the three cases in which the Court has implied a damages action." *Id.* (cleaned up). Even if so, "a *Bivens* remedy is unavailable if there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Id.* (internal quotation marks omitted). One such "special factor" is that "Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure." *Id.* at 1804 (cleaned up). Indeed, "[i]f there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* (internal quotation marks omitted).

These two "steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 142 S. Ct. at 1803. "When asked to imply a *Bivens* action, [the] watchword is caution." *Id.* (internal quotation marks omitted). "If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." *Id.* (internal quotation marks omitted); *accord id.* ("Even a single sound reason to defer to Congress is enough to require a court to refrain from creating such a remedy" (cleaned up)). This is a difficult standard to meet, by design—"in most every case," the

Court has stressed, there will be "a rational reason to think" that Congress rather than the courts "should decide whether to provide for a damages remedy," and so, "no *Bivens* action may lie." *Id.*

Whether the *Bivens* inquiry is framed as two questions or only one, Gebert's claims fail at every step. His First Amendment *Bivens* claims fail because *Egbert* squarely held that "there is no *Bivens* cause of action for [a] First Amendment retaliation claim." 142 S. Ct. at 1807. And even setting that aside, his claims involve new contexts and/or special factors foreclosing *Bivens* relief.

1.      Gebert's claims arise in a new *Bivens* context

Gebert's *Bivens* claims, which turn on or relate to his clearance suspension and revocation, arise in the "national security" context, which the Supreme Court has held is a "new context for *Bivens* purposes." *Egbert*, 142 S. Ct. at 1804; *see also Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020) (fact that context "unquestionably has national security implications . . . provides reason to hesitate before extending *Bivens*"); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) (rejecting idea that "an inquiry into sensitive issues of national security" is "allowed in a private suit for damages" under *Bivens*). "The grant of a clearance requires an affirmative act of discretion on the part of the granting official," based on a finding that granting the clearance would be "clearly consistent with the interests of the national security." *Egan*, 484 U.S. at 528 (internal quotation marks omitted). *Egbert*'s point-blank admonition "that a *Bivens* cause of action may not lie where, as here, national security is at issue," 142 S. Ct. at 1805, suffices to dispose of Gebert's *Bivens* claims.

The "separation-of-powers principles [that] are or should be central to [a *Bivens*] analysis," *Ziglar*, 137 S. Ct. at 1857, buttress this conclusion. As the Supreme Court has recognized, "foreign policy [is] the province and responsibility of the Executive," one of the primary "areas of Art[icle] II duties the courts have traditionally shown the utmost deference to Presidential responsibilities." *Egan*, 484 U.S. at 529-30 (internal quotation marks omitted). "Since World War I, the Executive Branch has engaged in efforts to protect national security information by means of a classification

system graded according to sensitivity." *Id.* at 527. "Presidents, in a series of Executive Orders, have sought to protect sensitive information and to ensure its proper classification throughout the Executive Branch by delegating this responsibility to the heads of agencies." *Id.* "Predictive judgment" as to who can or cannot safely be entrusted with classified information "must be made by those with the necessary expertise in protecting classified information." *Id.* at 529. As the Court has recognized, the reasons why "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it," are "too obvious to call for enlarged discussion." *Id.* (internal quotation marks omitted). And this Court has previously declined to recognize "a judicially-created remedy that could interfere with this important executive branch function." *Lee v. Barr*, Civ. A. No. 19-2284 (DLF), 2020 WL 3429465, at *6 (D.D.C. June 23, 2020).

Even setting aside the national security dimensions of Gebert's *Bivens* claims, the context here would still be new. Gebert's First Amendment and Fifth Amendment Due Process Clause claims are unlike the Fourth Amendment search and seizure claim, "former congressional staffer's Fifth Amendment sex-discrimination claim," or "federal prisoner's inadequate-care claim under the Eighth Amendment" that the Supreme Court has recognized. *Egbert*, 142 S. Ct. at 1802; *accord Ziglar*, 137 S. Ct. at 1860 (plaintiff's "claims bear little resemblance to the three *Bivens* claims the Court has approved in the past: a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma."). Indeed, the Court has specifically rejected *Bivens* claims resting on First Amendment, procedural due process, and substantive due process theories. *See Ziglar*, 137 S. Ct. at 1853-54 (substantive due process); *FDIC v. Meyer*, 510 U.S. 471, 484 (1994) (procedural due process); *Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988)

(same); *United States v. Stanley*, 483 U.S. 669, 671-72, 683-84 (1987) (substantive due process);[12]
*Bush v. Lucas*, 462 U.S. 367, 368 (1983) (First Amendment). And of course, as noted, the Court
has specifically rejected *Bivens* First Amendment retaliation claims. *See Egbert*, 142 S. Ct. at 1807.

<u>2.    Special factors counsel against a *Bivens* remedy</u>

Special factors also counsel against allowing a *Bivens* remedy. Just as the national security
concerns that security clearance decisions entail present a new *Bivens* context, so too are they a
special factor that weighs against a *Bivens* action here. *See Egbert*, 142 at 1804-05 (the same
national security concerns both "presented a new context for *Bivens* purposes" and also controlled
"[t]he special-factors inquiry," showing that courts are "not undoubtedly better positioned than
Congress to authorize a damages action in th[e] national-security context"); *Lee*, 2020 WL
3429465, at *6 (*Bivens* claims based on a clearance revocation both "involve new contexts and
implicate special concerns counselling hesitation" (internal quotation marks omitted)); *Beattie v.
Boeing Co.*, 43 F.3d 559, 563 (10th Cir. 1994) ("the predominant issue of national security
clearances amounts to such a special factor counselling against recognition of a *Bivens* claim").
Indeed, only last month, the D.C. Circuit held point-blank "that national security is a special factor
counselling hesitation against extending *Bivens* to [a new] context." *Buchanan v. Barr*, No. 22-
5133, 2023 WL 4140065, at *3 (D.C. Cir. June 23, 2023).

And more generally, the D.C. Circuit repeatedly has reaffirmed the principle that national
security considerations are a special factor precluding *Bivens* relief. *See Meshal v. Higgenbotham*,
804 F.3d 417, 425-26 (D.C. Cir. 2015) ("special factors . . . have foreclosed *Bivens* remedies in
cases involving . . . national security, or intelligence" (cleaned up)); *Doe v. Rumsfeld*, 683 F.3d
390, 394 (D.C. Cir. 2012) ("national security" is a special factor); *Ali v. Rumsfeld*, 649 F.3d 762,

---

[12]    *Ziglar* characterized *Stanley* as "a substantive due process suit." 137 S. Ct. at 1857.

773 (D.C. Cir. 2011) ("national security" is a special factor precluding a *Bivens* action); *Rasul v. Myers*, 563 F.3d 527, 532 n.5 (D.C. Cir. 2009) ("The danger of obstructing U.S. national security policy" is a special factor precluding a *Bivens* action); *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008) (fact that a claim would entail "judicial intrusion into matters of national security and sensitive intelligence information" is a special factor weighing against *Bivens* action).

Additionally, both Congress and the Department have "provided alternative remedies for aggrieved parties in [Gebert's] position that independently foreclose a *Bivens* action here." *Egbert*, 142 S. Ct. at 1806; *see also Lee*, 2020 WL 3429465, at *6 (the existence of an "alternative remedial structure" for clearance revocation "can suffice to preclude a *Bivens* claim"). Through the CSRA, Congress "preclude[d] the creation of a *Bivens* remedy for civil service employees" who challenge "personnel actions." *Spagnola v. Mathis*, 859 F.2d 223, 230 (D.C. Cir. 1988); *accord Bush*, 462 U.S. at 380 (no *Bivens* remedies for civil servants "[g]iven the history of the development of civil service remedies and the comprehensive nature of the remedies currently available"). And as explained, the Department has created comprehensive procedures governing clearance revocation that provide Gebert robust protections, letting him be represented by counsel and obtain certain discovery, submit a written reply, and appeal an adverse ruling. *See supra* § V.B.2; 12 FAM §§ 234.1, 234.3; *Egbert*, 142 S. Ct. at 1806 (regulation requiring agency to "accept grievances from any persons wishing to lodge a complaint" precluded *Bivens* claim (cleaned up)); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("remedial mechanisms established by" agency including ability to file "grievances" through "Administrative Remedy Program" precluded a *Bivens* action).

Whether the CSRA and/or the Department's clearance revocation procedures offer Gebert redress for the specific injuries he asserts is immaterial. An alternative remedial scheme precludes a *Bivens* claim "even if a court independently concludes that [existing] procedures are not as

48

effective as an individual damages remedy," harm "would otherwise go unaddressed," or "existing remedies do not provide complete relief." *Egbert*, 142 S. Ct. at 1804, 1807; *see also Bush*, 462 U.S. at 388 (whether to augment civil service remedies with *Bivens* action "obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff"). "Rather, the court must ask only whether it, rather than the political branches, is better equipped to decide whether existing remedies "should be augmented by the creation of a new judicial remedy." *Egbert*, 142 S. Ct. at 1804 (cleaned up).

### B.   The Individual Defendants Are Entitled to Qualified Immunity

Even were *Bivens* claims available, the individual defendants would be entitled to qualified immunity. "The doctrine of qualified immunity shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (internal quotation marks omitted). "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right," meaning that "existing precedent [has] placed the statutory or constitutional question beyond debate . . . in light of the specific context of the case"—not simply "as a broad general proposition." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (internal quotation marks omitted). "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Bond*, 142 S. Ct. at 11 (internal quotation marks omitted). Qualified immunity thus "protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks omitted).

Gebert cannot show that the rights he asserts were violated were clearly established so as to pierce the shield of qualified immunity. As best as Defendants are aware, there is no case law holding that suspension or revocation of an employee's security clearance for dishonest behavior,

or an unpaid suspension resulting from such an action, supports a First or Fifth Amendment claim. Rather, in light of the authorities cited herein, the questions that Gebert raises were not squarely beyond debate in the specific context in which this case arises. *See Cortesluna*, 142 S. Ct. at 7. To the contrary, the issue is not clearly established—the D.C. Circuit expressly has left open the issue of whether "clearance decisions" can "deprive[ ] an individual of their constitutional rights." *Gill*, 875 F.3d at 682; *see also Palmieri*, 896 F.3d at 590 (Katsas, J., concurring) ("At some point, we will likely need to decide it"). As such, any violation of Gebert's constitutional rights would not have been clearly established. Reasonable officers in the individual defendants' positions thus would not have known their conduct was unlawful (and, in fact, it was not unlawful). *See Bond*, 142 S. Ct. at 11. The individual defendants accordingly are each entitled to qualified immunity.

## CONCLUSION

For all the foregoing reasons, this Court should dismiss Gebert's complaint.

Dated: July 5, 2023

Respectfully submitted,

MATTHEW M. GRAVES
D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By: /s/ _____
     BRADLEY G. SILVERMAN
     D.C. Bar #1531664
     Assistant United States Attorney
     601 D Street NW
     Washington, DC 20530
     (202) 252-2575
     bradley.silverman@usdoj.gov

*Attorneys for the United States of America*