UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

MATTHEW GEBERT,

                *Plaintiff*,

v.

U.S. DEPARTMENT OF STATE et al.,

                *Defendants*.

Civil Action No. 22-2939 (DLF)

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………….   iv

ARGUMENT……………………………………………………………………………..   1

I.      This Court Has Personal Jurisdiction over the Individual Defendants……………   1

II.     Defendants' Requests to Dismiss for Failure to Effect Service on the Department,
        Quiram, and John Does 1-10 are Moot and Should be Denied……………………...   2

III.    Gebert Has Adequately Alleged Claims Under the First Amendment ………………   3

        A.      First Amendment Retaliation Claims ………………………………………   3

                1.      The Security Clearance Process Does Not Screen for Political or
                        Ideological Beliefs or Associations As Those Considerations Are
                        Constitutionally Protected, and Allowing the Government to
                        Circumvent These Restrictions By Requiring Applicants to Self-Report
                        in Response to Catch-All Questions Violates the Constitution……..   3

                2.      Defendant's Dishonesty Justification Is Pretext As It Is a Circular
                        Argument that Cannot be Separated From Gebert's Underlying White
                        Nationalist Speech, Activities, and Associations……………………   7

                3.      The Record Reveals the Defendants'  Dishonesty Justification Is
                        Pretext and Defendants Relied on Impermissible Considerations to
                        Revoke Gebert's Clearance……………………………………………   10

        B.      Gebert has Made a Plausible Overbreadth Claim……………………………   20

IV.     Defendants' Request to Dismiss Plaintiff's Due Process Claims Fail to Accurately
        Identify the Property Interests at Stake and the Extent of the Deprivation and Should
        be Denied…………………………………….........................................................   23

        A.      Defendants' claim that Gebert Failed to Plausibly Allege a Substantive
                Due Process Violation is Baseless and Should Be Denied ………………….   23

        B.      Defendants' claim that Gebert Failed to Plausibly Allege a Procedural Due
                Process Violation is Baseless and Should be Denied...................................   25

                1.      Gebert's Protected Interests…………………………………………..   25

                        a.      Gebert's protected interests in job-related benefits …………..   25

                        b.      Gebert's protected interests in his speech and opinions………   27

                        c.      Gebert's Reputational Injury and Stigma Plus Theory  ………   28

|  | i. | Gebert's Reputation-Plus Claim………………………………………… | 28 |
|  | ii. | Gebert's Stigma-Plus Claim………………………………………….. | 30 |
|  | 2. | Ongoing Deprivation of Due Process Rights………………………… | 32 |
| C. |  | Gebert's Vagueness Claim…………………………………………… | 33 |
| D. |  | Gebert's Equal Protection Claims…………………………………........ | 38 |

V.    Gebert has Adequately Claimed Defendants Committed APA Violations................... 40

     A.    Gebert's APA Challenge to Defendants' Flouting of 12 FAM 230, et al.......... 40

     B.    Defendants' Termination of Gebert's Health Insurance Coverage was Arbitrary, Capricious, an Abuse of Discretion, and Otherwise not in Accordance with Law………………………………………………….. 43

VI.    Plaintiff's Reasonable Description of Records.............................................. 44

VII.    Gebert is Entitled to Damages ……………................................................ 45

     A.    Plaintiff's Bivens Claims Remain Viable Despite the Recent Ruling in Egbert. 45

         1.    Plaintiff's Due Process Claims do not Arise in a New Context............. 46

         2.    No Special Factors Exist in Plaintiff's First Amendment Claims.......... 46

     B.    The Individual Defendants Are Not Entitled to Qualified Immunity................ 49

CONCLUSION………………………………………………………………… 50

# **TABLE OF AUTHORITIES**

**Cases**

*Ali v. District of Columbia*, 278 F.3d 1 (D.C. Cir. 2002) .................................................. 2

*Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011) ........................................................... 47

*Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U. S. 721 (2011) ............. 38

*Arnett v. Kennedy*, 416 U.S. 134 (1974) ..................................................................... 33

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ................................................................... 49

*Ashcroft* v. *Iqbal,* 556 U.S. 662 (2009) ...................................................................... 46

*Atherton v. Dist. of Columbia Office of Mayor*, 567 F.3d 672 (D.C. Cir. 2009) ...................... 49

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) ......................................... 24

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) ...................................... 25

*Brown v. Fogle*, 819 F. Supp. 2d 23 (D.D.C. 2011) ....................................................... 49

*Bryant v. Gates*, 532 F.3d 888 (D.C. Cir. 2008) ........................................................... 34

*Bush v. Lucas*, 462 U.S. 367 (1983) ......................................................................... 45

*Cf. Bush* v. *Lucas*, 462 U.S. 367 (1983) .................................................................... 46

*Chambers v. U.S. Dep't of Interior*, 568 F.3d 998 *(D.C. Cir. 2009)* .................................. 44

*Citizens United*, 558 U. S. 310 (2010) ...................................................................... 38

*City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) ....................................................... 48

*Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548 (1973) ........................... 34

*Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968 (9th Cir. 1996) ................................... 34

*Connick v. Myers,* 461 U.S. 138 (1983) ..................................................................... 50

*Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, (6th Cir. 1995) ........................................... 34

*Department of the Navy v. Egan,* 484 U.S. 518 (1988) .................................................... 21

*Doe v. Casey*, 796 F.2d 1508 (D.C. Cir. 1986) ............................................................. 33

*Doe v. Cheney*, 885 F.2d 898 (D.C. Cir. 1989) ....................................................... 25, 33

*Doe v. Rumsfeld*, 683 F.3d 390 (D.C. Cir. 2012) ........................................................... 47

*Egbert v. Boule*, 142 S. Ct. 1793 (2022) .................................................................... 45

*Empire HealthChoice Assur., Inc. v. McVeigh*, 126 S. Ct. 2121 (2006) ................................ 45

*Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077 (D.C. Cir. 2007) ................................... 34

*Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991) .................................................... 33

*George Wash. Univ. v. District of Columbia*, 318 F.3d 203 (D.C. Cir. 2003) .......................... 24

*Gilbert v. Homar*, 520 U.S. 924 (1997) ..................................................................... 25

*Gill v. Dep't of Just.*, 875 F.3d 677 (D.C. Cir. 2017) ..................................................... 25

*Gill v. Dep't of Just.*, Civ. A. No. 15-0824 (RMC), 2016 WL 3982450 (D.D.C. July 22, 2016) 26

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ..................................................................... 26

*Grayned*, 408 U.S.108 (1972) ................................................................................. 35

*Greene v. McElroy*, 360 U.S. 474 (1959) ................................................................... 31

*Hartley v. Wilfert*, 918 F. Supp. 2d 45 (D.D.C. 2013) .................................................... 49

*Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148 (D.C. Cir. 2004) .................... 38

*Hicks*, 539 U.S. 118 ........................................................................................... 20

*Hill v. U.S. Air Force*, 795 F.2d 1067 (D.C. Cir. 1986) .................................................. 44

*Jefferson v. Harris*, 170 F. Supp. 3d 194 (D.D.C. 2016) ................................................. 28

*Kartseva v. Dep't of State*, 37 F.3d 1524 (D.C. Cir. 1994) .............................................. 30

*Kartseva*, 37 F.3d 1528 ....................................................................................... 31

*Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967) ....................................................... 33

*Khine v. U.S. Dep't of Homeland Sec.*, 943 F.3d 959 (D.C. Cir. 2019)......................................42

*McGehee v. Casey*, 718 F.2d 1137 (D.C. Cir. 1983)...................................................................39

*Meshal v. Higgenbotham*, 804 F.3d 417 (D.C. Cir. 2015).........................................................47

*Moncrief v. Lexington Herald-Leader Co.*, 807 F.2d 217 (D.C. Cir. 1986)................................1

*Mpoy v. Fenty*, 901 F. Supp. 2d 144 (D.D.C. 2012)...................................................................49

*Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209 (D.C. Cir. 2013) ..........................................34

*N.A.A.C.P. v. Button*, 371 U.S. 415 ..........................................................................................33

*National Federation of Federal Employees v. Greenberg*, 983 F.2d 286 (D.C. Cir. 1993).........21

*Navab-Safavi v. Broadcasting Board of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009)..............1

*Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010) ..................................................................3

*O'Donnell v. Barry*, 148 F.3d 1126 (D.C. Cir. 1998)................................................................28

*Ozonoff v. Berzak,* 744 F.2d 224 (1st Cir. 1984) ......................................................................22

*Palmieri v. United States*, 72 F. Supp. 3d 191 (D.D.C. 2014)..............................................25, 26

*Palmieri v. United States*, 896 F.3d 579 (D.C. Cir. 2018)............................................................2

*Pearson v. Callahan*, 555 U.S. 223 (2009)................................................................................49

*Perry v. Sindermann*, 408 U.S. 593 (1972)................................................................................25

*Pickering v. Board of Ed.*, 391 U.S. 563 (1968).........................................................................50

*Pollack v. Meese*, 737 F. Supp. 663 (D.D.C. 1990).....................................................................2

*Quality Air Servs., L.L.C. v. Milwaukee Valve Co., Inc.*, 567 F. Supp. 2d 96 (D.D.C. 2008).........1

*Ramsingh v. TSA* (40 F. 4th 625 (D.C. Cir. 2022).....................................................................33

*Rasul v. Myers*, 563 F.3d 527 (D.C. Cir. 2009) .........................................................................47

*Reichle v. Howards*, 566 U.S. 658  (2012) ...............................................................................46

*Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021).....................................................................49

*Ryan v. Reno,* 168 F.3d 520 (D.C. Cir. 1999)............................................................................41

*Savage v. Bioport*, 460 F. Supp. 2d 55 (D.D.C. 2006) ................................................................1

*Shapiro v. Thompson*, 394 U.S. 618 (1969)...............................................................................26

*Simmons v. District of Columbia*, 750 F. Supp. 2d 43.D.C. 2011)...............................................3

*Solomon v. Off. of Architect of Capitol*, 539 F. Supp. 2d 347 (D.D.C. 2008) ...........................32

*Texas v. Johnson,* 491 U.S. 397, 414 (1989) ............................................................................18

*Townsend v. Burke*, 334 U.S. 736 (1948) .................................................................................32

*U.S. Info. Agency v. Krc*, 905 F.2d 389 (D.C. Cir. 1990) ..........................................................26

*U.S. v. Hansen*, 599 U.S. ___ (Jun. 23, 2023) ..........................................................................20

*United States Information Agency v. Krc,* 983 F.2d 286 (D.C. Cir. 1993)..................................41

*United States v. Kerik*, 615 F. Supp. 2d 256 (S.D.N.Y. 2009) ...................................................36

*United States v. National Treasury Emples. Union*, 513 U.S. 454 (1995) ...................................50

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000)................................39

*United States v. Safavian*, 528 F.3d 957 (D.C. Cir. 2008)..........................................................36

*United States v. Williams*, 553 U.S. 285 (2008) ........................................................................20

*Virginia v. Hicks*, 539 U.S. 113 (2003).....................................................................................20

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943)......................................................38

*Wilkie v. Robbins*, 551 U.S. 537 (2007)....................................................................................45

*Wilson v. Libby*, 535 F.3d 697 (D.C. Cir. 2008) .......................................................................47

*Wisconsin v. Constantineau*, 400 U.S. 433 (1971) ....................................................................32

*Wood v. Moss* , 572 U.S. 744 (2014) ........................................................................................46

*Wormley v. United States*, 601 F. Supp. 2d 27 (D.D.C. 2009) .....................................................2

**Statutes**

§ 13-423(a)(3) ............................................................................................ 1, 2
5 C.F.R. § 550.801 (2023) ................................................................................ 45
5 CFR § 550, Subpart H, (2023) ...................................................................... 45
5 CFR § 890 (2023) .......................................................................................... 45
5 U.S.C. § 555(b) .............................................................................................. 39
5 U.S.C. § 5596 ................................................................................................. 44
5 U.S.C. § 8912 ................................................................................................. 45
5 U.S.C. §§ 551–559 .......................................................................................... 39
5 U.S.C. 7532 ..................................................................................................... 23
5 U.S.C. 89/5 CFR § 890 ................................................................................... 42
50 U.S. Code § 3341(g)(2)(A)(i-ii) ................................................................... 42
50 U.S. Code § 3341(j)(4)(A) ............................................................................ 42

**Other Authorities**

12 Fam 230 ........................................................................................................ 40
3 FAM 7437 ....................................................................................................... 23
D.C. Code § 13-423 ............................................................................................. 1
D.C. Code §§ 13-423(a)(3). Section (a)(3) ......................................................... 1
*https://wexton.house.gov/news/documentsingle.aspx?DocumentID=457, February 21, 2021.*
    *Accessed Online July 7, 2023.* ..................................................................... 5
https://www.dcsa.mil/mc/pv/mbi/appeals ......................................................... 32
*Stewart v. Erwin*, 503 F.3d 488 (6th Cir. 2007) ............................................... 32
www.cnn.com/2019/08/09/politics/matthew-gebert-splc/index.html ............... 29

**Rules**

Fed. R. Civ. P. 4(i)(1)(B)(2)-(3) ......................................................................... 3

**Regulations**

12 FAM 234.1(c), ............................................................................................. 41
12 FAM 234.1(c)2-4 ......................................................................................... 41
3 FAM 3600 ...................................................................................................... 42
3 FAM 3611 ...................................................................................................... 43

**Constitutional Provisions**

U.S. Const. amend. I……………………..…………………………………………*Passim*

U.S. Const. amend. V……………………………………………………..……*Passim*

**ARGUMENT**

I.      **This Court Has Personal Jurisdiction over the Individual Defendants**

Defendants argue that the Court lacks personal jurisdiction over all individual defendants despite not indicating which defendants are not residents of this District. Regarding which individual defendants may or may not be residents, the Plaintiff requests reasonable discovery to allow him to make this determination. Regarding any individual defendants who are non-residents, this Court has personal jurisdiction over them under the D.C. Long-Arm Statute. Therefore, Defendants' request for the Court to dismiss Plaintiff's Complaint should be denied.

Regarding the non-residents named in the Amended Complaint, "If a defendant does not reside within or maintain a principal place of business in the District of Columbia, then the District's long-arm statute, D.C. Code § 13-423, provides the only basis [o]n which a court may exercise personal jurisdiction over the defendant." *Quality Air Servs., L.L.C. v. Milwaukee Valve Co., Inc*., 567 F. Supp. 2d 96, 99 (D.D.C. 2008) (quoting *Savage v. Bioport*, 460 F. Supp. 2d 55, 60 (D.D.C. 2006)). Section 13-423 provides in relevant part:

> A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's… (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia . . .

D.C. Code §§ 13-423(a)(3). Section (a)(3) "confers jurisdiction… over a defendant who commits an act in the District which causes an injury in the District, without regard to any other contacts." *Moncrief v. Lexington Herald-Leader Co*., 807 F.2d 217, 221 (D.C. Cir. 1986).

Plaintiff asserts that all individual Defendants were employees of the Department when they participated in the suspension and revocation of Gebert's security clearance and indefinite suspension of Gebert's employment. Am. Compl. ¶ 6. Like the defendants in *Navab-Safavi v. Broadcasting Board of Governors*, 650 F. Supp. 2d 40 (D.D.C. 2009), the Defendants here contend

that their presence in D.C. for work purposes cannot provide the basis for the Court to assert personal jurisdiction over them because Plaintiff's *Bivens* action only names them in their individual capacities. (Def. Mot. at 8). However, the cases that Defendants cite stands for the proposition that the Court cannot assert personal jurisdiction over a non-resident defendant (1) *who did not work in D.C.* at the time of the conduct at issue and (2) whose only other D.C. contacts consist of federal employment or other "official capacity" relationships.[1]

Here, the Court has jurisdiction over the non-resident defendants pursuant to § 13-423(a)(3). Plaintiff alleges that the non-resident defendants caused him financial and reputational harm through the commission of constitutional torts consisting of the decisions, made in the District of Columbia *See generally* Am. Compl. It is enough that defendants "were physically within the District when they took the alleged actions" giving rise to plaintiff's constitutional claims. *Wormley v. United States*, 601 F. Supp. 2d 27, 33 (D.D.C. 2009) (Lamberth, C.J.) (holding that personal jurisdiction was proper under § 13-423(a)(3) over non-resident federal defendants in *Bivens* action). Further, Plaintiff reiterates his request for reasonable discovery to determine the residency of individual defendants.

## II.   Defendants' Requests to Dismiss for Failure to Effect Service on the Department, Quiram, and John Does 1-10 are Moot and Should be Denied

---

[1]      *See Ali v. District of Columbia*, 278 F.3d 1 (D.C. Cir. 2002) (finding no personal jurisdiction over Virginia officials where the complaint did not allege that "any defendants acting in their individual capacities either transacted business in the District or contracted to do so," officials' only contacts with District were through official relationships with District officials, and tortious acts took place in Virginia); *Palmieri v. United States*, 896 F.3d 579 (D.C. Cir. 2018) (finding no personal jurisdiction where a defendant sued in this District resulting from conduct committed in Bahrain and the only specific contact between the individual defendants and this District was their employment by a federal agency once headquartered in the District); and *Pollack v. Meese*, 737 F. Supp. 663 (D.D.C. 1990) (where the court determined the conduct "clearly took place in Missouri... Therefore, personal jurisdiction cannot be predicated on the long arm statute because plaintiff… cannot claim…the defendants caused the alleged tortious injury in the District of Columbia).

Defendants' motion argues that Plaintiff's Amended Complaint should be dismissed as it relates to the Department, Quiram, and John Does 1-10 for failure to effect service. Regarding the Department, counsel for the Defendants has graciously agreed to accept service on behalf of the Attorney General, which satisfies Plaintiff's obligation.  Fed. R. Civ. P. 4(i)(1)(B)(2)-(3). See Exhibit A.

Regarding the John Doe Defendants in this case, courts recognize an exception to Rule 4 for cases involving "John Doe" defendants. *Newdow v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir. 2010). This exception applies when discovery will make known "the otherwise unavailable identity of the defendant[s]."[2] Courts should thus not dismiss John Doe defendants before parties have engaged in discovery because tools such as interrogatories might allow a plaintiff to discover the unknown identity of such defendants.

**III.   Gebert Has Adequately Alleged Claims Under the First Amendment**

**A.   First Amendment Retaliation Claims**

Defendants argue that Plaintiff has not pleaded enough facts to support a plausible inference that Defendants retaliated against him due to protected speech and that Plaintiff's First Amendment Retaliation claims should be dismissed. For the reasons described below, however, this Court should conclude that Plaintiff has instead introduced overwhelming evidence that Defendants' dishonesty justification is a mere pretext for retaliating against Gebert based on his white nationalist ideology. As such, this Court should deny Defendants' Motion.

**1.   The Security Clearance Process Does Not Screen for Political or Ideological Beliefs or Associations As Those Considerations Are Constitutionally Protected, and Allowing the Government to Circumvent These Restrictions By Requiring Applicants to Self-Report in Response to Catch-All Questions Violates the Constitution.**

---

[2]   *Id.; see also Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 45 (D.D.C. 2011) ("Plaintiff may bring an action against unknown John Doe defendants, but plaintiff must substitute named defendants for those unknown defendants after the completion of discovery.").

The central tenet of the Defendants' defense is that they revoked Gebert's security clearance due to his alleged dishonesty and not because of his white nationalist activities and associations. The obvious and most challenging problem that the Defendants fail to address – the metaphorical "elephant in the room" – is the fact that security clearance guidelines do not screen for white nationalist and/or pro-white ideologies. **Not one** of the hundreds of questions asked on the 136-page SF-86 asked Gebert to disclose anything remotely related to his political or ideological speech, beliefs, and/or activities – white nationalist or otherwise. This is for good reason, of course, as such considerations are constitutionally protected.

None of the questions on the SF-86 asked Gebert about anything related to his political beliefs, such as whether he identified as Republican, Democrat, alt-left, alt-right, etc. Am. Compl. ¶ 49. Nor was he asked any questions related to his beliefs regarding race, immigration, or any other ideologies. *Id.* So too, none of the questions that Gebert was asked during his initial background investigation or during his reinvestigation interview on January 28, 2019, related to any of these issues. *Id.* Thus, at no point either on the SF-86 or any of the reinvestigation interviews was Gebert ever asked questions about his political or ideological beliefs, associations, or activities. *Id.*

Thus, the Department could not find that Gebert had lied on his SF-86 since no questions on the SF-86 ask applicants about their political or ideological beliefs; the government cannot point to even a *single* question on the SF-86 that Gebert's conduct violated. *Id.* at 48. Gebert has never:

- Been a member of an organization dedicated to terrorism (SF-29.1);
- Engaged in acts of terrorism (SF-29.2);
- Been a member of an organization dedicated to the use of violence or force to overthrow the United States Government (SF-29.3);

- Been a member of an organization that advocates or practices commission of acts of force or violence to discourage others from exercising their rights under the U.S. Constitution or any state of the United States (SF-29.4); or
- Engaged in activities designed to overthrow the U.S. government by force (SF-29.5).

Further, there have been no findings -- let alone any allegations -- that Gebert has ever broken any laws or caused any harm. *Id.* In addition, his allegiance to the U.S. has never been in question. *Id.* Any one of the above-mentioned considerations would, of course, give rise to a legitimate security concern. Yet, none of them are present here.

In fact, in February 2021, members of Congress specifically urged the Director of National Intelligence ("DNI") to update current security clearance guidelines to begin screening for "white supremacists, neo-Nazis, and other far-right extremists."[3] In doing so, they specifically mentioned Gebert's case with the Department. *Id*. They further explained that "[u]nder current guidelines, individuals are not explicitly **required to self-report** involvement with extremist groups unless the organization professes to be a terrorist organization, seeks to overthrow the United States government, or uses violence." *Id.*[emphasis added]

Of course, updating the guidelines in this manner, as requested by these members of Congress, would violate the First Amendment, especially as it applies to Gebert, who never advocated violence and simply belonged to a group that holds unpopular beliefs. Nonetheless, the fact that current guidelines do not screen for membership in these groups *is* material. How Defendants can argue Gebert was dishonest for failing to self-report his white nationalist ideology when current clearance guidelines prohibit the Department from screening applicants regarding their political and ideological beliefs, activities, and associations – including whether or not they identify as pro-white, white nationalist, or otherwise – is incomprehensible.

---

[3]     *Id.https://wexton.house.gov/news/documentsingle.aspx?DocumentID=457, February 21, 2021.  Accessed Online July 7, 2023.*

Moreover, with this in mind, it is apparent that the Department is relying on broad, "catch-all" questions to circumvent the fact that they are not permitted to ask applicants directly for such information. But, just as asking applicants directly for information regarding their political and ideological beliefs, activities, and associations would violate the Constitution, so does requiring them to self-report their political and ideological associations and speech in response to "catch-all" questions. Thus, not only is it clear that the Defendants' dishonesty justification is pretextual, but it is also clear that the Department is using the "catch-all" questions in a manner designed to outmaneuver clear constitutional prohibitions.

And yet, the Department continues to defend its actions by arguing that it believed that Gebert was dishonest during the security clearance process. Perhaps realizing that their dishonesty justification is unsupported by the record, Defendants now argue that it is not the "correctness" of the reasons offered but whether the Department "honestly believe[d] in the reasons it offers." Def. Mot. at 11. However, the Department knew the security clearance process did not screen for constitutionally-protected ideological and/or political speech, activities, and associations and that Gebert was under no obligation to self-report his white nationalist ideology.

Moreover, for the multitude of reasons described in further detail below, Defendants – at no point – could have honestly believed that Gebert was dishonest during the clearance process. Regardless, Defendants cannot escape that the Department's underlying reason for concluding that Gebert was dishonest - because he failed to self-report information that the Department was constitutionally prohibited from asking him about to begin with - is unconstitutional. Defendants cannot be insulated from liability when their reasoning for concluding that Gebert was dishonest is unconstitutional.

For these reasons, the Defendants' dishonesty justification should be disregarded by this Court. Defendants knew they could not ask Gebert any questions about his political or ideological beliefs, associations, or activities, as current security clearance guidelines prohibit the government from screening applicants for their political or ideological beliefs, including white nationalist or pro-white political ideologies. Moreover, just as directly asking applicants to disclose their political and ideological beliefs, associations, and activities would violate the Constitution, so does requiring them to self-report such considerations in response to broad, "catch-all" questions. Given this, the Department had absolutely no justification for concluding that Gebert was dishonest during the clearance process. This Court should find that Plaintiff has pleaded abundant facts to support a plausible inference that Defendants' dishonesty justification is clear pretext for the Department's retaliation against him due to protected speech, associations, and viewpoints, and, therefore, deny Defendants' Motion.

2.    **Defendant's Dishonesty Justification Is Pretext As It Is a Circular Argument that Cannot be Separated From Gebert's Underlying White Nationalist Speech, Activities, and Associations.**

Even if this Court were to allow Defendants to circumvent the constitutional considerations discussed above by concluding that Defendants were permitted to require Gebert to self-report his white nationalist ideology in response to broad, "catch-all" questions – a conclusion that Plaintiff strongly disagrees with for the reasons mentioned above – Defendants' reliance on these "catch-all" questions proves, again, that the Defendants' dishonesty justification is pretext as it is a circular argument that cannot be wholly separated from Gebert's underlying white nationalist speech, activities, and associations.

Although Gebert was granted his Top Secret security clearance on April 19, 2013, the Department does not allege that he committed any wrongdoing that would justify the revocation

of his clearance until his reinvestigation interview, which took place six years later on January 28, 2019. Am. Compl. ¶¶ 12, 13. It was during this interview that the Department alleges Gebert failed to volunteer his white nationalist beliefs in response to the following questions:

1. Do you have an association with any person, group or business venture that could be used, even unfairly, to criticize, impugn or attack your character or qualifications for a government position; and

2. Are you aware of any other information, including information about members of your family that could suggest a conflict of interest or be a possible source of harm or embarrassment to you, the Department or the United States.

To accomplish what they had already set out to do (i.e., terminate Gebert's position with the Department due to the Congressional and public outrage that his employment caused), those tasked with investigating Gebert after the publishing of the Hatewatch article reviewed the record with a fine-toothed comb – hoping to find something to justify the revocation of his clearance. Seeing no legitimate reason to revoke his clearance, however, the Department had no choice but to hang its hat on these vague, broad, and open-ended "catch-all" questions, which could, quite literally, justify the revocation of *anyone's* security clearance. Notably, these questions are not even located on the SF-86 and, instead, were orally asked of Gebert at the very end of the hundreds of questions that he was asked during his subject interview.

Moreover, the Defendants' entire defense is that "Gebert's dishonesty, wholly separate from his white nationalist activities and associations, was a proper basis to revoke his clearance." Def. Mot. at 13. Ironically, though, to conclude that Gebert was dishonest, the Department first had to find that Gebert's white nationalist activities, speech, and associations were a source of embarrassment to the United States and/or the Department and that he, therefore, should have disclosed them in response to the "embarrassment" question. In other words, despite Defendants' insistence that his clearance was revoked due to "dishonesty" and had nothing to do with his white

nationalist ideology, the Defendants cannot find Gebert dishonest without first engaging in brazen viewpoint discrimination against his white nationalist activities, associations, and beliefs by classifying them as "embarrassing." Thus, despite the Defendants' arguments, Gebert's underlying white nationalist ideology cannot be separated from his alleged "dishonesty."

Not only does this prove the Defendants' dishonesty justification is a guise for viewpoint discrimination as the dishonesty justification necessarily relies on his underlying white nationalist beliefs, but it also directly proves the Defendants' outright animus and viewpoint discrimination toward Gebert by classifying his activities, beliefs, and associations as a source of "embarrassment" to them. Under the Department's analysis, it seems as though anyone who does not affirmatively, verbally reveal that they hold unpopular opinions on *any issue* would be dishonest. Whom of the following should self-report under the Department's analysis: Black Lives Matter (BLM) supporters? Racists? Feminists? Sexists? Antisemites? Atheists? And, more importantly, who decides?  In sum, this Court should see the Defendants' dishonesty justification for what it is: a circular argument that cannot be separated from Gebert's protected speech, activities, and associations and a pretext for retaliation. Thus, despite the Defendants' claim that it was his dishonesty, as opposed to his white nationalist activities and associations, that formed the basis for the revocation of his clearance, it is logically impossible for this to be true.

For these reasons, the Defendants' dishonesty justification should again be disregarded by this Court, and this Court should find that Plaintiff has pleaded abundant facts to support a plausible inference that the Defendants' dishonesty justification is clear pretext for the Department's retaliation against him due to protected speech, associations, and viewpoints. This Court, therefore, should deny the Defendants' Motion.

>    3.    **The Record Reveals the Defendants' Dishonesty Justification Is Pretext and Defendants Relied on Impermissible Considerations to Revoke Gebert's Clearance.**

Just as the government's reliance on the embarrassment question is direct evidence that his clearance was revoked for unconstitutional reasons, the record is full of evidence proving pretext and that the Department relied on impermissible criteria when revoking Gebert's clearance. In fact, not only is the underlying record (including the Letter of Suspension, Letter of Revocation, Notice of Proposed Action, Transcript of Subject Interview, etc.) rife with evidence of the Defendants' reliance on specific instances of Gebert's protected speech, activities and associations, but Defendants' Motion itself devotes the first four pages to discussing these impermissible considerations at length and in a manner intended to inflame this Court based on Gebert's viewpoints. Def. Mot. at 1-4. Thus, even during this litigation, Defendants continue to be unable to separate impermissible considerations, such as specific instances of Gebert's speech, activities, and associations, that are constitutionally protected from their arguments.

The fact that Gebert associated with other white nationalists, made specific inflammatory statements about Jews and/or African Americans, or attended parties where swastika cookies were served has nothing to do with any alleged dishonesty and, instead, only proves that the Defendants were – and continue to be – more focused on impermissible considerations such as specific instances of Gebert's beliefs, associations, and activities that they disagree with. The overwhelming majority of the record focuses on such impermissible considerations. If the Defendants' actual motive was alleged dishonesty, as opposed to Gebert's beliefs, activities, and associations, then why is any of that information even relevant? It only serves to prove that Defendants, to this day, continue to conflate the issues and are unable to separate permissible from impermissible considerations in the security clearance decision-making process.

In fact, Plaintiff can find only two instances of alleged conduct that Defendants cite that can even arguably be based on considerations other than Gebert's constitutionally-protected beliefs, activities, and associations. The first is the fact that Gebert attended a rally wearing a hat and sunglasses, and the second is the fact that Gebert posted online using pseudonyms. Def. Mot. at 1-2. There is literally no other conduct that Gebert engaged in that the Defendants can point to in support of their dishonesty argument.

Moreover, neither of these instances can even plausibly be argued as directed toward concealing his white nationalist ideology from the government during the security clearance process.  Instead, these were Gebert's attempts to keep his unpopular political/ideological beliefs private from the world at large, *as he has every right to do*. In fact, this conclusion fails to consider the most logical explanation for Gebert's behavior. If one were to put themselves in Gebert's shoes for a moment, knowing that daily he interacts with non-white neighbors, colleagues, co-workers, supervisors, etc., his decision to keep his political and ideological beliefs private can be better understood and possibly even empathized with. Am. Compl. ¶ 55. Given this, it should be obvious why Gebert chose to keep his political and ideological beliefs private. Notwithstanding this, it also ignores that "usernames" are just that, and they are often made up and do not reflect the actual name of the person posting.

As he explained throughout his interview, Gebert knows that his opinions are unpopular and that many people would be offended. Am. Compl. at ¶ 54. He knows that society does not accept them. Thus, as Gebert explained, unless he knows that you are what he calls a "like-minded person" (i.e., another white nationalist), he does not talk about his political or other ideological viewpoints with you. *Id.* In other words, Gebert -- like millions of other Americans -- keeps his political and ideological views private. *Id.* Gebert has every right to take this approach. Not only

were Gebert's coworkers and supervisors not aware of his beliefs, but neither were his neighbors, some of his friends, or most of his acquaintances. *Id.* ¶ 55. Thus, it was not that Gebert was concealing his beliefs from the government out of fear of losing his security clearance. To the contrary, Gebert did not discuss his views with anyone on an unsolicited basis except for those whom he would consider "like-minded" because he knew that his opinions were controversial. *Id.*

The fact that people have aspects of their lives that they do not, on their own initiative, tell supervisors, associates, neighbors, co-workers, or even close family members does not, however, imply that those people are security risks or that they would conceal this information from the government. For example, many people have aspects of their lives, such as their sexual preferences or sexual fetishes, that they prefer to keep private. This fact does not mean those people would fail to reveal those issues during the security clearance process if asked about them. Although Gebert would not expose his beliefs on an unsolicited basis, as was revealed throughout his interview, he prides himself on his integrity. *Id.* ¶ 56. He is and has always been aware of the importance of being honest and truthful throughout the clearance process. *Id.* Had Gebert ever been asked about his political or ideological beliefs, he would have disclosed them, just as he did during the subsequent investigative interview. As Gebert explained:

> SPECIAL AGENT: And you don't feel that information could be -- have use -- could've been used to exploit you, to blackmail you, coerce you, or anything like that?
>
> MR. GEBERT: A hundred -- a hundred percent no because I'm not ashamed at all of my views. I can't be bought. I believe what I believe. You know, I'm a true believer, not in any cult sense, but in terms of having informed, you know, beliefs and values that unfortunately in this day and age are judged to be beyond that pale.

[*Id.*]

In short, these issues only further highlight why questions directed to security clearance applicants' ideological and political beliefs, activities, and associations are not asked during the

clearance process to begin with: first, because they are simply nobody's business, and individuals have a right to privacy regarding the same, and, second, because the government's reliance on them violates the Constitution. To use an analogy, under the government's analysis, if a homosexual male wore a hat and sunglasses to an LGBTQ+ nightclub and posted online in LGBTQ+ forums under pseudonyms, this would somehow constitute concealment and, therefore, dishonesty, if not self-reported in response to the embarrassment question during the clearance process. So too, if a BLM supporter attended a protest with a hat and sunglasses on and posted in online forums under pseudonyms, this would likewise constitute concealment/dishonesty if not self-reported in response to the embarrassment question. It should go without saying that the government's reasoning is problematic.

Defendants make bald statements regarding vulnerability to blackmail, yet they provide no context or support for this argument. Def. Mot. at 12-13. Again, however, one cannot conceal that which they were never asked about to begin with, and there is a clear difference between one's right to privacy from the public and active concealment from the government. More importantly, it again evidences the underlying viewpoint discrimination and animus that the Department holds for Gebert specifically. Are sexists who failed to self-report their beliefs susceptible to blackmail? What about LGBTQ+ applicants who are not "out" to the public and remain private regarding their sexuality?

The Department relies heavily on one statement that Gebert allegedly made as proof that he intentionally concealed his white nationalism from them. Specifically, the Department argues, "Gebert understood that his connection to white nationalism (if discovered) could end his career with the Department of State" when he stated in an article: "There are bigger things than a career and a paycheck, and I don't want to lose mine." Am. Compl. ¶¶ 26, 27. To the contrary, this

statement means the exact opposite of what the Department alleges it does and proves that Gebert was not susceptible to blackmail. While the Department twists this statement to mean Gebert will do anything, including lie, to conceal his white nationalism to keep his job, it says just the opposite. *Id.* While Gebert acknowledges that he does not want to lose his job ("I don't want to lose mine"), when read together with the phrase at the beginning of the sentence ("There are bigger things than a career and a paycheck"), it is clear that what Gebert is saying is that his beliefs are *more important* to him than his job is. In other words, Gebert says that if he were ever forced to decide between his beliefs and his career, he would choose his beliefs. *Id.* Thus, the statement negates the very point the Department alleges that it proves. *Id.* It also clearly evidences that Gebert is proud of his beliefs, that he has integrity and conviction, and that he is not subject to blackmail based on his beliefs. *Id.*

In addition, in accordance with their dishonesty justification, the Department would like this Court to believe that it was not until the Hatewatch Article was published by the Southern Poverty Law Center (SPLC) on August 8, 2019, that they first became aware of Gebert's ideologies and, therefore, initiated their investigation, which led them to conclude that Gebert concealed and/or was somehow dishonest about his white nationalism. Am. Compl. ¶ 30. However, an article published by Sludge.com on July 3, 2018 – more than one year before the Hatewatch article was published on August 8, 2019 – confirms that the Department was aware that Gebert supported white nationalist/pro-white ideologies as early as July of 2018 – if not even sooner.

The article, which is entitled "Government Employees Donate to White Supremacist Candidate," explicitly mentions Gebert by name as well as his position with the Department. Am. Compl. ¶ 31. It further indicates that Gebert made campaign contributions to the House campaign of Paul Nehlen, a "racist" and "openly anti-Semitic white supremacist." *Id.* In addition, the article

mentions Gebert's prior contributions in 2017 and 2018 to Corey Stewart, a Republican nominee who has been outspoken about preserving public Confederate flags and monuments. *Id.* Moreover, there is no denying that the Department was well aware of this article, as a Department official is quoted in the article as stating: "Matthew Q. Gebert is employed by the Department of State as a foreign affairs officer assigned to the Bureau of Energy Resources in Washington, D.C. Guidelines regarding the political activity of State Department employees can be found in the Foreign Affairs Manual at 11 FAM 614. The Department is committed to providing a workplace free from discriminatory harassment." Am. Compl. ¶ 32. In addition, the investigative file contains an annotation stating that the Department received an "anonymous tip" on June 21, 2019 (two months prior to the Hatewatch article being published), that Gebert "had donated to the campaign of a 'pro-white' candidate, as well as to the campaign of a candidate who publicly stated that he wanted to preserve the Confederate flag and monuments, stating doing so was 'taking back our heritage.'" Am. Compl. ¶ 33.

Despite the Department being made aware of his political and ideological beliefs on at least two separate occasions prior to the publishing of the Hatewatch article, the Department made no referrals, performed no investigations, and conducted no interviews in response to either of these occasions. Am. Compl. ¶ 34. In short, they did nothing. In fact, Gebert was never even questioned about the *Sludge* article during his routine security clearance reinvestigation interview, which took place on January 28, 2019, just a few months after the *Sludge* article was published. Am. Compl. ¶ 35. If the Department truly believed that Gebert's alleged dishonesty/concealment of his white nationalist ideologies was a national security issue, why was it not a national security issue before the Hatewatch article was published? The Department had the same offending information at its

disposal well before the Hatewatch article was published, and instead, it *deliberately* chose to do *nothing* about it – at least *twice*.

Defendants contend the fact that they were aware of Gebert's white nationalist ideologies as a result of the *Sludge* article and that they did not revoke his clearance at that time further proves that they acted solely due to his dishonesty during the clearance process, not his ideological beliefs. Def. Mot. at 17-18. This grossly oversimplifies the issue. First, as discussed above, if Gebert's alleged dishonesty was a national security issue at the time of the Hatewatch article, why was it not an issue at the time of the *Sludge* article? Defendants cannot convincingly answer this question. As discussed above, the Department had the same offending information at their disposal (i.e., that Gebert was a white nationalist and this was not self-reported during the clearance process). In fact, Gebert was never even questioned about the *Sludge* article during his routine security clearance reinvestigation interview, which took place on January 28, 2019, just a few months after the Sludge.com article was published.  Am. Compl. ¶ 35.

Instead, the Defendants vaguely assert that the Hatewatch article somehow revealed additional activities (other than the protected fact that he was a white nationalist) that demonstrated Gebert's lack of candor during his clearance adjudication. Def. Mot. at 17-18. They fail to articulate, however, which specific instances of behavior or speech of Gebert's that the Hatewatch article discussed that they concluded revealed his dishonesty. Was it the fact that he associated with other white nationalists? Or that he made statements they found offensive? Or was it that he went to a party where Swastika cookies were served? In other words, was it that the article revealed that – as a white nationalist – Gebert engaged in white nationalist activities, was friends with other white nationalists, and said things that white nationalists would say? If so, these are protected activities and associations that the Government is prohibited from relying on. Exactly what

additional information the Hatewatch article provided that revealed Gebert's dishonesty, which the Department was not aware of (or at least should not have been aware of given he was a white nationalist), is unclear.

The articles uncovered nothing additional that would trigger a security concern. The government knew back in at least 2018 that Gebert was a white nationalist and that this was never discussed as part of his security clearance. Perhaps somewhat ironically, despite Defendants' arguments that the Hatewatch article revealed additional information that proved Gebert's dishonesty, the Hatewatch article *itself* admitted it could find no basis for misconduct in Gebert's situation. The subject Hatewatch article, when addressing grounds for which Gebert could lose his job, specifically explained:

> State Department employees are restricted from engaging in some outside political activities while working for the federal government, according to the Hatch Act. Some of those restrictions include engaging "in political activity in an official capacity" and engaging in "political activity while on duty or in the workplace."

The SPLC then admitted that it had not determined that Gebert violated any of those provisions. So what, precisely, the Department contends the Hatewatch article revealed, which it was unaware of or at least should have been aware of based on its admitted knowledge of Gebert's white nationalism, is puzzling.

So too, the fact that Gebert openly provided financial support to white nationalist political candidates – which he knew the government would see – directly undermines the Defendants' concealment argument. If Gebert were trying to conceal his political and ideological beliefs from the Government, as opposed to the public, he would not have made political contributions that he knew the government would see.

In short, the record tells the whole story in this matter. It was not until the Department was under immense pressure and scrutiny from the public regarding their employment of Gebert due

to his beliefs and associations that they decided to take action. This timeline constitutes nothing short of explicit proof that the Department's revocation of Gebert's security clearance was never about "national security." Rather, Gebert's clearance was revoked as a result of the significant negative media attention that the Department received as a result of the Hatewatch Article, which led to the Department's so-called "embarrassment" for employing him. Am. Compl. ¶¶ 22, 23. As such, the Department suspended Gebert's clearance immediately in response to the Hatewatch article, effectively terminating his employment, to demonstrate to the public that they did not support his viewpoint. *Id.* This, however, is precisely what the Constitution prohibits the government from doing. *See Texas v. Johnson,* 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

As soon as the Hatewatch Article was published, which, by all accounts, was highly sensationalized, it resulted in what the Department termed a "media frenzy." Am. Compl. ¶ 22. Dozens of articles were written, shaming the Department for employing Gebert and not vetting him properly during the clearance process. *Id.* In short, the Department was under immense pressure from the public and even members of Congress to remove Gebert from the Department due to his viewpoints. *Id.* Hundreds of pages of "investigative" material in this matter are nothing but copies of media articles discussing Gebert and shaming the Department for employing him. Am. Compl. ¶ 93. Although not required, especially at this early stage of litigation, these articles constitute direct evidence indicating that the Department revoked Gebert's clearance in retaliation for the so-called "embarrassment" the Department endured due to Gebert's exercise of his civil liberties.

Throughout the articles, representatives from the Department made official statements wherein they explicitly expressed their disapproval of Gebert's ideologies. Am. Compl. ¶ 24. For example, they assured the public that the Department was "[c]ommitted to providing an inclusive workplace" and "to providing a workplace that is free from discriminatory harassment." Ironically, the Department *is not* saying they are committed to including people with different viewpoints, such as Gebert. Rather, they are expressly condemning Gebert's viewpoints.

To make matters worse, the Department was well aware of how including over 275 pages of these media articles in their investigation would make them look as far as motive goes. Am. Compl. ¶ 93. Thus, rather than releasing the articles, which were readily accessible on the Internet to the public at large, the Department unlawfully withheld hundreds of pages of media articles discussing Gebert and his employment pursuant to a non-existent "national security" exemption. Am. Compl. ¶ 85. If this isn't shocking enough, Gebert had to fight tooth and nail for over one year to get the Department to release the portion of the investigative file containing these articles. Am. Compl. ¶¶ 80-93.

Given the Department's behavior, it is ironic that they refer to Gebert as the "dishonest" one. (*See* Def. Mot. at 4-6, and 11.) Gebert has demonstrated that he has been nothing but honest and forthright throughout. Am. Compl. ¶ 56. The Department, on the other hand, has been anything but honest about its motivation for revoking Gebert's clearance, and the Privacy Act/FOIA procedure shows that the Department has been blatantly dishonest in withholding evidence that disproves its version of the narrative. Am. Compl. ¶¶ 80-93.

Unfortunately, though, it gets even worse. The Department *continues* unlawfully withholding another approximately 180 pages under the Privacy Act/FOIA. *Id*. ¶¶ 92. One can only assume that the remaining pages contain more direct evidence of retaliation and animosity

toward Gebert. One should also find it suspicious that the Department has not released any internal emails, notes, or memoranda concerning the Gebert investigation. Besides providing investigative reports and the aforementioned media articles, the Department has not released any other information pursuant to Gebert's Privacy Act/FOIA requests. *Id*. ¶¶ 90-93.

In sum, all of the above information refutes the Defendants' dishonesty justification and proves that his clearance was revoked in retaliation for his unpopular viewpoints and associations. In short, Defendants' dishonesty justification is not only illogical but it is built on several unconstitutional foundations – a house of cards that will surely collapse. As such, this Court must dismiss the Defendants' Motion.

### B.   Gebert has Made a Plausible Overbreadth Claim

Overbroad laws, regulations, and policies "may deter or 'chill' constitutionally protected speech." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). To guard against those harms, the overbreadth doctrine allows a litigant to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak. *United States v. Williams*, 553 U.S. 285, 292 (2008). In this case, Gebert is able to demonstrate that the Department's inquiry "prohibits a substantial amount of protected speech" relative to its "plainly legitimate sweep"; as such, society's interest in free expression should outweigh its interest in the Departments' questions' lawful application(s), and the Court should hold them as facially invalid. *Id*.; see *Hicks*, 539 U.S. at 118-119.

The Supreme Court recently stated, "To judge whether a statute is overbroad, we must first determine what it covers." *U.S. v. Hansen*, 599 U.S. ___ (Jun. 23, 2023). Herein lies the problem: the questions posed by the Department are so broad it is impossible to determine what they actually cover, as they cover everything and nothing all at once. And Defendants mistakenly conclude "none of the questions regulated, much less prohibited, any speech at all." Def. Mot. at 21.  As discussed

more thoroughly below, those questions are specifically seeking answers regarding what an individual has said and done, the answer(s) to which could, as specifically occurred to Gebert, cause the respondent to lose their security clearance and their career.  *See generally supra* IV. In addition to finding the Defendants' dishonesty justification as nothing more than a pretext, this Court should also dismiss Defendants Motion as it pertains to Plaintiff's First Amendment claims regarding overbreadth and vagueness since the procedures and/or methods used by the Department in the clearance process are constitutionally defective. Specifically, the two subject questions the Department contends Gebert was dishonest in answering are overbroad, vague, and facially unconstitutional. Am. Compl. ¶ 242-257. Accordingly, they cannot serve as a basis for revoking his clearance.

In *National Federation of Federal Employees v. Greenberg,* 983 F.2d 286, 290 (D.C. Cir. 1993), this Court explained that "[i]t is simply not the case that all security-clearance decisions are immune from judicial review." The Court held that *Department of the Navy v. Egan,* 484 U.S. 518 (1988), presented no bar to a constitutional challenge to the Department of Defense's security clearance questionnaire. *Id.* Although recognizing that the government may have "considerable leeway to determine what information it needs from employees holding security clearances and how to go about getting it . . . [n]o one . . .would suggest [that] the government could, despite the Fourth Amendment, conduct random searches without warrants in the hope of uncovering information about employees seeking security clearance. Still less would anyone consider such unconstitutional searches and seizures to be immune from judicial review." *Id.* In that case, the Court distinguished *Egan* as concerning "a particular employees' security clearance," whereas the *Greenberg* exception allowed review of "the constitutionality of the methods used" for clearance decisions. *Id.*

The Department is interpreting the questions at issue here to require applicants to disclose their political associations and speech as well as their ideological beliefs. These are activities within the freedom of speech, and the concern underlying the overbreadth doctrine – chilling speech – is directly at issue here. In fact, the issues at stake, in this case, are strikingly similar to those present in *Ozonoff v. Berzak,* 744 F.2d 224 (1st Cir. 1984). In that case, J. Breyer held that an Executive Order, which provided that a person's political associations and speech "*may* be considered" in determining whether a security clearance should be granted, violated the First Amendment as being vaguer and broader than the First Amendment allows.

The two questions the Department contends Gebert was dishonest in answering were not a part of the SF-86 and, therefore, have not been approved by the U.S. Office of Personnel Management. Since they did not directly relate to any questions on the SF-86, they exceeded the scope and authority that the interviewer could lawfully inquire about during the personal interview. The Report of Investigation detailing the September 27, 2019, interview reveals that the interviewer essentially tracked the hundreds of questions contained in the 136-page SF-86 questionnaire *almost verbatim,* with the exception of these two particular questions, which were thrown in at the very end of the interview in a "catch-all" manner. With the exception of these two broad, open-ended questions, the remainder of the interview questions were specific and limited to actual topics/subjects covered in the SF-86. Given the broadness of these questions, it is clear they are nothing more than a fishing expedition. Moreover, in almost every single security clearance case, an investigator would be able to justify a clearance revocation after-the-fact, by contending that an individual should have responded affirmatively to one of these broad and ambiguous questions. This, of course, is a serious problem.

**IV.     Defendants' Request to Dismiss Plaintiff's Due Process Claims Fail to Accurately Identify the Property Interests at Stake and the Extent of the Deprivation and Should be**

Denied

**A.    Defendants' claim that Gebert Failed to Plausibly Allege a Substantive Due Process Violation is Baseless and Should be Denied.**

Defendants have largely ignored the major difference between their cited cases and what the Department is bound by when it comes to their employees' right to use accrued leave in these circumstances. As Plaintiff accurately stated in his Amended Complaint, Gebert accrued leave as part of his employment, he was, in fact, entitled to use it as requested and stated in his Amended Complaint, and the Defendants denied Plaintiff's request. Am. Compl. ¶¶ 122-125. The specific policy, however, only further proves how egregious and blatant Defendants' violations actually were. The applicable Department policy, which is titled "Annual Leave in Lieu of Non-Pay Status During Suspension," reads, in pertinent part:

> Annual leave in lieu of non-pay status during suspension may not be granted except when an employee is suspended summarily in the interest of national security under the provisions of 5 U.S.C. 7532.  In such case, the employee may request, and with the approval of the appropriate headquarters office, be granted annual leave not to exceed the balance to the employee's credit as of the date of suspension in lieu of non-pay status.  In the event the employee is restored with back pay, the annual leave charged for the period covered by back pay is restored.

Plaintiff is, according to the Defendants, only "suspended summarily" and it is being done so in the "interest of national security under the provisions of 5 U.S.C. 7532." However, Gebert should have been granted the ability to take his accrued leave, and Plaintiff should have the opportunity to go through discovery to show that the only reason his request was denied was because of the content of his speech. One of the bigger issues and where the harm and deprivation to Gebert is multiplied is when one also reads and considers Department policy on the matter, which authorizes Gebert to only carry over 240 hours of accrued leave. This results in a continuous and ongoing harm as hours are "use or lose," and Gebert continues to lose. *See* 3 FAM 7437.

"To have a property interest in a benefit, a person clearly must have more than an abstract

need or desire for it," or "a unilateral expectation of it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). "He must, instead, have a legitimate claim of entitlement to it." *Id.* Gebert is, of course, entitled to express constitutionally protected opinions, and the claim that this revocation and suspension have been and are based on "dishonesty" is merely pretextual and a complete fabrication. *See supra §* III. A. Additionally, unlike the plaintiff in *Roth*, Gebert has much more than just an "abstract need or desire for it," and more than a "unilateral expectation of" his accrued leave. Accruing leave is part of his compensation package, and denying the use of it only elongated the time period for which he has been without a paycheck, which eclipsed over three years at the time this suit was filed. Am. Compl. ¶¶ 124-125. That, taken together with the hours he has lost and continues to lose based on the Defendants' unreasonable delay for unlawful reasons, and this deprivation has become substantial.

The amount of time the Defendants have taken and left Plaintiff in purgatory and the unlawfulness underlying their decision meets the requirements of "grave unfairness"; the level of misconduct by the Defendants rises to the level of the "deliberate flouting of the law that trammels significant personal or property rights" required. *George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 209 (D.C. Cir. 2003). Contrary to Defendants' claim that Plaintiff did not allege Defendants' actions were a "deliberate violation of the law," Plaintiff clearly and specifically identified Defendants' actions as "discriminating against [Gebert]" and they were "inserting unconstitutional criteria into [their] processes." Am. Compl. ¶ 126. And, for the reasons stated above, as well as the clearly pleaded fact that it has been over three years without pay - a substantial amount of time without a paycheck - Gebert has clearly described how "significant" Defendants' violations have been. *Id.* ¶ 77.

**B.    Defendants' Claim that Gebert Failed to Plausibly Allege a Procedural Due Process Violation is Baseless and Should be Denied**

The Defendants attempt to mischaracterize Plaintiff's property interest claim by citing *Doe v. Cheney*, 885 F.2d 898 (D.C. Cir. 1989), *Palmieri v. United States*, 72 F. Supp. 3d 191 (D.D.C. 2014), and *Gill v. Dep't of Just.*, 875 F.3d 677 (D.C. Cir. 2017) and alleging Plaintiff is suggesting he has a property interest in his security clearance. (Def. Mot. at 26-27). In reality, Plaintiff has alleged he is a permanent, full-time federal employee who is entitled to due process before he has numerous benefits guaranteed through his employment arbitrarily and improperly stripped away from him. Additionally, Plaintiff has a protected interest in his speech and reputation, both of which were trampled by the Department with zero regard. Furthermore, while there are procedural due process measures already in place and intended to be provided to Plaintiff through the security clearance process, the Defendants have willfully violated the procedures in place and grossly delayed such due process resulting in no due process at all.

    1.    **Gebert's Protected Interests**

        *a.*    *Gebert's protected interests in job-related benefits*

Typically, a public employee can only be discharged or suspended for cause, and she/he has a constitutionally protected property interest in her/his employment and cannot be suspended or fired without due process. See *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 578 (1972); *Perry v. Sindermann*, 408 U.S. 593, 602-603 (1972). "The protections of the Due Process Clause apply to government deprivation of those perquisites of government employment in which the employee has a constitutionally protected 'property' interest." *Gilbert v. Homar*, 520 U.S. 924, 928 (1997). It is indisputable that Plaintiff is still an employee of the Department, and he has been suspended without pay for almost four years. However, Plaintiff acknowledges that, although, typically, federal employees have a protected interest in their employment, there is a caveat that an employee has no right to a job requiring a clearance. *U.S. Info. Agency v. Krc*, 905 F.2d 389,

397 (D.C. Cir. 1990). Plaintiff also acknowledges Defendants' argument that "the right 'to earn a living' does not extend to jobs requiring a security clearance." *Gill v. Dep't of Just.*, Civ. A. No. 15-0824 (RMC), 2016 WL 3982450, at *6 (D.D.C. July 22, 2016) quoting *Palmieri v. United States*, 72 F. Supp. 3d 191, 207 (D.D.C. 2014).  However, while continued employment and access to a security clearance may not be a protected interest, it would not stand to reason that the benefits already earned and associated with his federal employment would, somehow, lose their protected interest status.

Yet, there is more at play in this case than the Defendants care to acknowledge because Gebert not only lost leave that he earned, but, more importantly, the Defendants intentionally failed to follow their statutory obligations related to his health insurance. Am. Compl. ¶¶ 167-176. Regardless of what specific members of the Department felt about Gebert, or even his spouse whom they like to label as "embarrassing," Gebert has a family and children who relied on his health insurance. At it relates to Gebert's health insurance and collateral employment benefits, it should be accepted that, "Such benefits are a matter of statutory entitlement for persons qualified to receive them."  *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).  Reading the text of *Goldberg*, one can see the clear correlation between the welfare benefits denied to the respondents in that case to Gebert and his family denied his salary and associated, earned benefits for over multiple years: the termination of which involves government "action that adjudicates important rights." *Id*. Further, "The constitutional challenge cannot be answered by an argument," that these employment "benefits are a 'privilege' and not a right.'" *Id*. citing *Shapiro v. Thompson*, 394 U.S. 618, 627 n. 6 (1969).  Further:

> The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be condemned to suffer grievous loss, and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly… consideration

of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.

*Id*. 262-263 (internal citations and quotation marks omitted)

While the Defendants act flippantly regarding the Department's violations of law and policy pertaining to Gebert's health insurance and call it "harmless error" (Def. Mot. at 38), it is the exact type of scenario that could have resulted in "grievous loss" to Gebert and his family; in fact, 40% of bankruptcies in this country are attributed to medical bills.[4]

> b.   *Gebert's protected interests in his speech and opinions*

The Defendants point to Gebert's subsequent silence as a "self-inflicted harm[]," (Def. Mot. at 27) but it is actually only further proof that Defendants' unlawful prohibitions, restrictions, and complete disregard for the Constitution had an actual "chilling" effect on Gebert's speech. While Defendants choose to point to Am. Compl. ¶128 and attack just that one paragraph, the entirety of Plaintiff's Amended Complaint and this motion focus on a multitude of instances of retaliation based on Gebert's protected speech. None of this erases the Defendants' failure to equate Gebert's answers to overbroad and vague questions as "dishonesty." None of this excuses the Department's lying about their reason for suspending Gebert's clearance when, in reality, they based their reasoning on Gebert's constitutionally protected freedom of speech and freedom of association.

> c.   *Gebert's Reputational Injury and Stigma Plus Theory*

This Circuit has recognized two legal theories to establish a due process violation based on reputational injury. The first, known as "reputation plus," requires "the conjunction of official defamation and [an] adverse employment action." *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C.

---

[4]     https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1127305/

Cir. 1998).The second is known as the "stigma plus" theory, which "differs from the [reputation-plus theory] in that it does not depend on official speech, but on a continuing stigma or disability arising from official action." *Id*. "In other words, where a 'reputation plus' theory requires some form of defamatory or stigmatizing speech by the government, the latter depends only on governmental imposition of 'a continuing stigma or other disability arising from official action' that 'foreclosed the plaintiff's freedom to take advantage of other employment opportunities.'" *Jefferson v. Harris*, 170 F. Supp. 3d 194, 205 (D.D.C. 2016) (quoting *O'Donnell*, 148 F.3d at 1140). Gebert has successfully pleaded harm under both legal theories.

### i.   Gebert's Reputation-Plus Claim

The Hatewatch Article was released on August 7, 2019. Am. Compl. at ¶ 18. In direct response to the article and specific questions about Gebert, it was confirmed Gebert had been suspended and an official spokesperson for the Department made various statements to the media directly expressing how they did not condone or agree with Gebert's viewpoints. *Id*. at ¶ 23-24. Knowing Gebert was suspended and then making a comment regarding "providing a workplace that is free from discriminatory harassment" more than implies that the Department believed the allegations against Gebert to be true and agreed he should be punished for it, which he was when he was suspended on August 8, 2019, and then had his clearance revoked on July 1, 2020. *Id*. at ¶¶ 19, 58. The timing of the statements followed by the adverse action (which, even if we consider the formal definition of "adverse action" would qualify considering he has been suspended for over a 14-day period) meets the requirements that the defamation was accompanied by the adverse action. See *O'Donnell v. Barry*, 148 F.3d 1126, 1140 (D.C. Cir. 1998). Moreover, the action of revoking his security clearance, in and of itself, was intended by the Department to send a clear message to the public that they did not support Gebert. As such, Plaintiff was both defamed and

stigmatized by the Department of State, satisfying the reputation-plus standard.

In addition to what was specifically pleaded in the Amended Complaint, one of the articles incorporated within the pleadings reveals even more direct and defamatory public statements regarding Gebert.[5] Sometime between August 7, 2019 and the day the article came out on August 8, 2019, the Department briefed the Senate Foreign Relations Committee staff specifically about Gebert. *Id.* According to CNN, "One of the sources said the committee was learning about the facts of the situation and why [Gebert] had been placed on leave."

The article goes on to state, "Reached for comment on the report on Wednesday…" which is critical because the article came out on August 9, 2019, so the Wednesday to which they are referring is August 7, 2019: the exact day the Hatewatch Article posted. The CNN article goes on to explain:

> A spokesperson for the top Republican on the House Foreign Affairs Committee… told CNN, 'White supremacy and all forms of bigotry or racism are completely unacceptable and do not belong in our government. Lead Republican McCaul would expect the State Department to hold accountable any employee determined to engage in that type of reprehensible behavior,' the Texas Republican's spokesperson said. Rep. Gregory Meeks, a New York Democrat on the House Foreign Affairs Committee, said he was 'very concerned' about the the Southern Poverty Law Center report. 'It's very dangerous to have anyone with these kind of racist and extreme views in a position of power where they could end up using it, with bias, against anyone in the agency or outside it,' Meeks said. 'It's important to fight back against hateful rhetoric to make sure we don't have more people in power who use their positions for ill will.'

The CNN article along with several other reputable sources had already disclosed at this point that Gebert was suspended. By this time, there was no investigation or corroboration that anything within the Hatewatch Article was even true, yet government officials had already

---

[5]     Hansler, Jennifer. "State Department official on leave after civil rights group accuses him of being involved in white nationalist movement, source says." August 9, 2019. https://www.cnn.com/2019/08/09/politics/matthew-gebert-splc/index.html.

attributed the allegations to Gebert and stated that he would be held accountable for his "reprehensible behavior." Following these statements: Gebert was suspended pending investigation by August 8, 2019 (Am. Compl. at 19-20); his security clearance was suspended on August 16, 2019 (Am. Compl. 28); he was indefinitely suspended without pay by September 24, 2019 (*Id.* at 40); and his security clearance was revoked on July 1, 2020 (*Id.* at 58-59). At no time has Gebert admitted to or has it been proven, among several other allegations, that he is a racist, white supremacist, that having him in his position is dangerous, or that he said and did all of the "reprehensible behavior" alleged in the Hatewatch article. Yet, that is exactly what the government has directly attributed to Matthew Gebert. This is, in short, clearly defamation, which was very closely followed by numerous adverse actions against Gebert.

### ii.   Gebert's Stigma-Plus Claim

Under the stigma-plus line of cases, "a government action that potentially constrains future employment opportunities must involve a tangible change in status." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1527 (D.C. Cir. 1994). Such "tangible change" can be shown in one of two ways. The first is if the government's action "formally or automatically excludes" the plaintiff "from other government employment opportunities," such as by official debarment or some other "binding determination to disqualify." *Id.* at 1528. Defendants' actions are the equivalent of a constructive bar to federal positions for which Plaintiff is qualified. Plaintiff has been a foreign affairs officer for the past 10 years, and his career field on exists within the federal government. Therefore, Plaintiff's employment history requires a security clearance, and he has worked himself into a very specific niche that does not have a civilian equivalent. Am. Compl. ¶¶ 131, 136.

Plaintiff also relies on the second method, which requires that the government action must have "a broad effect of largely precluding [the plaintiff] from pursuing [his] chosen career."

*Kartseva*, 37 F.3d at 1528. The employee must show that the government has "seriously affected, if not destroyed, his ability to obtain employment in [his] field." Id. (quoting *Greene v. McElroy*, 360 U.S. 474, 492 (1959)). Plaintiff has been employed by the Defendant, State Department, since May 19, 2013, in the role of Foreign Affairs Officer in the Bureau of Energy Resources, Office of Energy Diplomacy, Middle East & Asia Division (ENR/EDP/MEA). Am. Compl. ¶ 11. As part of his position, Plaintiff underwent a background investigation that resulted in him being granted a Top Secret security clearance on April 19, 2013; holding and maintaining this level of security clearance is a condition of Plaintiff's employment. *Id*. ¶ 12. This is a very niche career path where the federal government is effectively the only employer, and the jobs that require his skill set require a security clearance.

Further, Plaintiff's security clearance is currently revoked, and the revocation, along with the Defendants' biased, unsupported-by-fact version of events, is in the Defense Information System for Security (DISS).[6] Am. Compl. ¶ 58. This database is accessible by security managers for contractors and every government agency. At a minimum, any potential employer will see that Plaintiff's security clearance has been revoked and will deny him employment.[7] Plaintiff asserted that the revocation of his security clearance prior to Defendants providing him **a complete copy** underlying materials relied upon in making that decision is a clear violation of his due process.

---

[6]      DISS is the system of record to perform comprehensive personnel security, suitability and credential eligibility management for all Military, civilian, and DOD contractor personnel. In other words, DISS is the online, secure database of persons' security clearances and public trust.

[7]      While Plaintiff's Complaint makes mention that he was offered employment opportunities, a suitability determination and review of an applicant's security clearance status does not occur until after the applicant accepts a conditional offer of employment. Compl. ¶ 116. However, Gebert was unable to accept these offers or move on to the next stage because he is not entitled to accept a job offer while maintaining employment with another federal agency. Compl. ¶ 115. Contrary to Defendants' assertions, it is not reasonable for Gebert to have to resign his employment because his employer is violating his rights. Further, a resignation would result in a loss of jurisdiction for adjudicating his security clearance - Plaintiff submitted his response to the revocation in the fall of 2020 - over three years ago.

Effectively, Defendants' are intentionally excluding Plaintiff from employment opportunities by revoking his security clearance which means he has to wait for a minimum of one year until he can even attempt to reapply for his security clearance.[8]

### 2. Ongoing Deprivation of Due Process Rights

Due process requires that "a deprivation be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Solomon v. Off. of Architect of Capitol*, 539 F. Supp. 2d 347, 350 (D.D.C. 2008). Defendants failed to follow their own policies regarding notice and an opportunity for a hearing. Gebert has been left attempting to rebut a false narrative, and Defendants have deliberately tried to delay responding to Plaintiff's security clearance response leaving him in a three year waiting process - effectively denying him without providing him any of the due process he is entitled to. A deprivation based on "extensively and materially false" information violates due process. *Townsend v. Burke*, 334 U.S. 736, 741 (1948) see also *Stewart v. Erwin*, 503 F.3d 488, 495 (6th Cir. 2007) ("*Townsend* and its progeny are generally viewed as having established a due process 'requirement that a defendant be afforded the opportunity of rebutting derogatory information demonstrably relied upon by the sentencing judge, when such information can in fact be shown to have been materially false.'"). Further, Gebert's reputation is at stake and "where a person's good name, reputation, honor, or integrity is at stake," notice and opportunity to be heard are crucial. *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971).

Defendants have alleged that the Department's clearance revocation procedures offer Gebert an adequate opportunity to clear his name, but his clearance was revoked almost three years ago and he is still awaiting a decision and opportunity to appeal. See *supra* V.A. Surely the intent is for Gebert to be able to clear his name in this lifetime. Defendants attempt to rely on *Casey*, but

---

[8]     See the Defense Counterintelligence and Security Agency's (DCSA) website, the largest issuer of security clearances, https://www.dcsa.mil/mc/pv/mbi/appeals/.

the timeline in that case reveals the clearance-revoking event was learned of on January 28, and the entire process ended on May 11 that same year: less than five months. *Doe v. Casey*, 796 F.2d 1508, 1512 (D.C. Cir. 1986); see also *Doe v. Cheney*, 885 F.2d 898, 902 (D.C. Cir. 1989) (notice of proposed suspension of clearance initiated in November 1982 and final action occurred in February 1984: one year and three months total duration).

### C.    Gebert's Vagueness Claim

"When one must guess what conduct or utterance may lose him his position, one necessarily will steer far wider of the unlawful zone for the threat of sanctions may deter almost as potently as the actual application of sanctions. The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform [employees] what is being proscribed." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603-04 (1967) (holding that restriction on government employee speech was unconstitutionally vague) (internal quotation marks omitted). Further, "[S]tandards of permissible statutory vagueness are strict in the area of free expression because First Amendment freedoms need breathing space to survive," and the "[G]overnment may regulate in the area only with narrow specificity." *N.A.A.C.P. v. Button*, 371 U.S. 415, 432-433 (internal quotation marks omitted).

The Defendants' mistakenly attempt to argue that vagueness can only be analyzed through a due process construct - thereby ignoring Supreme Court caselaw. Def. Mot. at 33. While the vagueness doctrine is "rooted in due process's requirement of 'fair notice,'" the holding in *Ramsingh v. TSA* (40 F. 4th 625 (D.C. Cir. 2022)) does not contradict the progeny of cases analyzing vagueness under the First Amendment and ***not*** the Fifth Amendment.[9]  *Johnson v.*

---

[9]     See, e.g., *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048–51 (1991) (holding that attorney disciplinary rule was unconstitutionally vague as applied); *Arnett v. Kennedy*, 416 U.S. 134, 159-64 (1974) (plurality) (holding employment protection standard not impermissibly vague in regulating speech of federal employees); Id. at 164; *Civil Serv. Comm'n v. Nat'l Ass'n of Letter*

*United States* does not contend that "an agency must provide fair notice only when it is 'taking away someone's life, liberty, or property'"; rather the case states that the Government violates the vagueness doctrine when a, "law [is] so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." 576 U.S. 591, 595 (2015). Similarly, *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077 (D.C. Cir. 2007), does not state that an "agency need not 'provide fair notice' at all if it's not 'depriving a party' of any protected interest in the first place" as Defendants claim; it simply states, "Due process requires the government to provide fair notice before depriving a party of property." Id. at 1088. Lastly, the Defendants cited to *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209 (D.C. Cir. 2013), which is not a "vagueness" case at all.

Defendants next contend that the questions posed to Gebert "do not regulate speech," but it is unclear how Defendants reach that conclusion. Def. Mot. at 34. Defendants' questions are so vague that Gebert's failure to read the investigators mind caused him to lose his security clearance and career. And, once more, Defendants' case law supports Plaintiff's arguments better than their own because the vagueness doctrine applies when a "regulation of speech" is not "clear enough to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "avoid fostering arbitrary and discriminatory application." *Bryant v. Gates*, 532 F.3d 888, 893 (D.C. Cir. 2008). Gebert possesses more than just "ordinary intelligence," yet he clearly found it difficult to determine what was prohibited versus what he was required to disclose. The *Bryant* court cites to *Grayned v. City of Rockford*, which elaborates on several applicable points that are

---

*Carriers*, 413 U.S. 548, 576-79 (1973) (considering void-for-vagueness challenge to restriction on government employee speech, though concluding that rule was not impermissibly vague); *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 970 (9th Cir. 1996) (holding college sexual harassment policy was unconstitutionally vague as applied to professor with provocative teaching style); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183-84 (6th Cir. 1995) (finding public university's discriminatory harassment policy void for vagueness).

key in this case:

> "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abut[s] upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of [those] freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked.

*Grayned*, 408 U.S. at 108-109 (1972) (cleaned up).

First, as Congresswoman Wexton's website release indicates, Gebert was not engaging in unlawful or prohibited conduct even if everything in the Hatewatch article were accurate. Thus, the form of Defendants' questions and the resulting effects resulted in trapping an innocent person without fair warning. Second, the "arbitrary and discriminatory application" is exactly what Plaintiff has alleged occurred by the Department; the interpretation and application of the questions and how one answers undoubtedly would change from investigator to investigator and certainly from one administration to the next depending on the political party in power.

The Defendants attempt to argue that the questions are not vague, but specific enough that an applicant would understand the information being sought. Def. Mot. at 34-35. Defendants claim that the questions are not unconstitutionally vague when "read in context."  Yet, they do not point to any context, *because* the context is a security clearance background check that is based on the questions from the SF-86. The SF-86, as discussed herein (*supra* III.A.) and within Congresswoman Wexton's release, is only concerned about questions relating to overthrowing the government and anti-American terrorism. Nothing Gebert said or did even remotely fell under any

of those categories, so, again, the Plaintiff is left questioning "what context?"  The Defendants cite language, with some modification, to *United States v. Safavian*, 528 F.3d 957, 966 n.9 (D.C. Cir. 2008). The Defendants' modification substitutes "jury" for "Department."  See *Id*.  Effectively conceding there are genuine issues of material fact.

Again, Defendants use case law that unintentionally supports Plaintiff's claims. Def. Mot. at 34-35. Yes, as Defendants point out, "the term 'embarrassing' is not fundamentally ambiguous per se." *Id*., citing *United States v. Kerik*, 615 F. Supp. 2d 256, 273 (S.D.N.Y. 2009). However, the court in *Kerik* goes on to describe very similar questions in a very similar context as to that of Gebert, which led them to ultimately determine the use of the word "embarrassing" was, in fact, "fundamentally embarrassing." *Kerik*, 615 F. Supp. 2d at 274. As the court pointed out, "[A]s a question becomes more abstract, such mutual understanding becomes more tenuous and ambiguity swells."  Id.  Specifically, the court went on to provide examples where the term "embarrassing" may not be per se ambiguous:

> For example, a question about embarrassing educational history or embarrassing business dealings would not be fundamentally ambiguous because it provides the answerer with clarity about the specific information sought by his examiner. Moreover, in the context in which questions were asked of Kerik--the vetting process for a high-level executive position--the participants shared a mutual understanding that the questioner sought general information that might be publicly and politically damaging to the nominee or the President.

[*Id*. internal quotation marks omitted]

Then the court moves into the specific questions where they did find fundamental ambiguity:

> With these principles in mind, the Court is troubled by questions one and three… Kerik was asked whether there was anything embarrassing that he would not want the public to know about. In contrast to the questions above, this level of abstraction renders the term embarrassing fundamentally ambiguous. The question does not explicitly limit the context to associations or specific affiliations. Rather, the question is more like a fishing expedition, seeking anything that might embarrass

an applicant. Despite the laundry list of answers the Government wishes Kerik would have supplied, it does not follow that Kerik necessarily understood the question in precisely this way. Question three… provides no greater clarity. Thus, the Court finds that these two questions are fundamentally ambiguous and may not serve as predicates for the false statement charges in the Superseding Indictment.

*Id*. at 272-272 (internal quotation marks omitted).

This could not be any more on point or similar to the questions at issue in this case. Gebert has contended this entire time that he was not required to disclose any of his white nationalist ties nor any of his related associations, conduct, or speech. This is precisely corroborated by Congresswoman Wexton's release, and the Department has at least indirectly and implicitly indicated as such due to, as they state, none of these associations nor the conduct or speech forming the basis of their adverse actions against Gebert. Def. Mot. at 13. Not only was he not required to disclose these activities and this speech, he certainly was not required to disclose these in response to these specific questions posed to him through his security clearance review process: the same questions to which he was accused of providing "misleading" or "dishonest" answers. As the Department tries to claim, Gebert, upon hearing the word "embarrassing," should have immediately opened the floodgates and disclosed all of his political beliefs, associations, affiliations, podcasts he was on, etc. Yes, he should have known this was all embarrassing even though, as Plaintiff points out, nothing had been done to him despite many in the Department being aware of his far-right candidate support as early as July of 2018 through the *Sludge* article. Am. Compl. ¶ 30.

And this highlights an important point that Defendants continue to mischaracterize. The timing of the *Sludge* article emphasizes that neither Gebert nor the Department found those views "embarrassing" at the time Gebert answered interview questions that would later result in years of clearance revocations, suspensions, and this litigation. Nothing changed between the release of

that *Sludge* article and Gebert's January 2019 interview where he was again asked about something "embarrassing," to which he honestly responded in the negative. This answer was acceptable at that time. Then, after that background investigation, the Hatewatch article essentially says "Gebert's words and actions are despicable and embarrassing." Then and only then does the Department declare that Gebert's previous actions were embarrassing; yet, Gebert is expected to have known back in January 2019 that these fit the description of the security interviewer's questions regarding "embarrassing." The Department would not and did not even call what Gebert was saying, doing, who was associated with, etc. embarrassing prior to the Hatewatch article; that is what Plaintiff is saying when he alleges the Department is applying their newly formed opinion of what qualifies as "embarrassing" retroactively.

**D.    Gebert's Equal Protection Claims**

Defendants' equal protection defense fails because they apply the incorrect level of scrutiny; therefore, Defendants' request to dismiss Counts VI and XVII must be denied. See *Hedgepeth v. Wash. Metro. Area Transit Auth.*, 386 F.3d 1148 (D.C. Cir. 2004). For the reasons discussed above, Gebert has demonstrated that his fundamental rights, namely, his First Amendment protected speech and activities and his due process rights have been violated. The Supreme Court has long considered political and ideological speech to be at the core of the First Amendment, including speech concerning "politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). A government regulation that implicates political or ideological speech receives strict scrutiny in the courts, whereby the government must show that the law is narrowly tailored to achieve a compelling government interest. *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U. S. 721, 734 (2011)) (quoting *Citizens United*, 558 U. S. 310, 340 (2010)).

It is the Defendants' burden to demonstrate that their policies and practices, which regulate ideological and political speech, furthers a compelling governmental interest and is narrowly tailored to that end.  See, e.g., *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000). While they may utter the all-encompassing words "national security" to meet the "compelling governmental interest," they have not and cannot demonstrate that it is "narrowly tailored." *McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C. Cir. 1983) ("the government's actions must still be narrowly drawn to restrict no more speech than is necessary to protect that interest.").

Defendants are most confused regarding their basis for revoking Gebert's clearance and suspending him without pay.  On one hand, Defendants argue rational basis applies because Gebert is a "white national[ist]," and they compare him to a Nazi concentration camp guard. Def. Mot. at 36. Then they cut back to Gebert facing adverse action due to his "dishonesty." *Id*. Then, acknowledging that strict scrutiny is the appropriate standard to apply, the Defendants state, "Suspending and revoking Gebert's clearance due to his dishonesty during his clearance adjudication was the least restrictive means to protect that interest…" *Id*. This ignores the obvious: Gebert was not dishonest. Suspending and revoking clearances of honest people cannot possibly be deemed to protect the claimed compelling interest.

## V.     Gebert has Adequately Claimed Defendants Committed APA Violations

Gebert raises two claims under the APA. First, Count X challenges the Department's failure to follow process and procedure, which is being done in an arbitrary and capricious manner and is an abuse of discretion. Am. Compl. ¶¶ 161-166. Plaintiff has also successfully pleaded the Department's decision is being unlawfully withheld and unreasonably delayed.[10] Count XI challenges the Department's arbitrary, capricious, and unlawful termination of Gebert's health

---

[10]     5 U.S.C. § 555(b); 5 U.S.C. §§ 551–559

insurance coverage. As explained further below, each of these APA claims is properly pleaded, and, thus, Defendants' request for dismissal should be denied.

### A.  Gebert's APA Challenge to Defendants' Flouting of 12 FAM 230, *et al*

The Department did not meaningfully attempt to comply with any of the requirements within their policies spelled out in 12 Fam 230, *et al* - hence, the Plaintiff's use of the term "flouting." Their reason for revoking his security clearance was based and relied on violating Gebert's constitutional rights, which is not an acceptable reason under SEAD 4 or 12 FAM 230 *et al*. to suspend or revoke someone's clearance. The Department then provided a false reason for revoking Gebert's clearance, which obviously is not authorized under the law or the Manual and creates obvious due process issues. Then the Department provided notice and, supposedly, an opportunity for Gebert to respond; considering he responded almost three years ago at this point with no decision, there is actually no proof anyone at the Department has even read Gebert's response let alone considered it. The Department has yet to make any decision at all, which has prevented Gebert from being able to enter an appeal stage, and there is no indication or hope whatsoever that the Department ever intends to make such a decision. All in all, Defendants cannot possibly argue with a straight face that the Department is complying with the Manual.

The Department did notify Gebert of their claimed basis for his security clearance revocation, but their basis was and remains false; at best for the Department, this was a result of their negligence, or possibly incompetence, but most likely it is the result of intentionally attempting to punish Gebert's lawfully protected speech and activities. As such, Gebert is directly petitioning this Court to step in and be the constitutional voice of reason and to determine the actions the Department took regarding revoking Gebert's security clearance were

unconstitutional.[11]

In addition to challenging the Department's decision, Gebert is also challenging the fact that the agency's processes and procedures to reach their conclusion were not followed, the delay in progressing through the process and making a decision is unreasonably long, and that the underlying information relied upon to reach their decision is unconstitutional. So, while the clearance revocation is committed to agency discretion by law, the premise of *Gill* can and should be applied here; the Court is not being asked to make a ruling on an agency's decision, but the Court is in the best position to determine if the decision is being reached with the insert of arbitrary, capricious, abuse of discretion and/or otherwise in violation of the constitution. 875 F.3d at 680.

Plaintiff has already provided significant detail discussing Defendants' actions that run afoul of 12 FAM 234.1. *See supra* IV. B. Defendants issued Plaintiff notice of their decision to revoke his security clearance on July 1, 2020. Am. Compl. ¶ 58. Since that time, Gebert has adhered to the requirements placed on the employee under 12 FAM 234.1(c)2-4, but the Defendants have not. Nor have they moved on to step 5 of 12 FAM 234.1(c), which is to provide notice of and reasons for their decision and notice of his right to appeal. It has now been over three years with no decision for Gebert to even appeal.  Plaintiff submitted their response to the security

---

[11]     This Circuit has consistently held that valid constitutional claims are not foreclosed by Egan. In *Ryan v. Reno*, the court held that, although *Egan* precludes judicial review of an  adverse employment action under Title VII based on the denial or revocation of a security clearance, *Egan* "does not apply to actions alleging deprivation of constitutional rights." 168 F.3d 520, 524 (D.C. Cir. 1999). In *United States Information Agency v. Krc*, the court cautioned that  "judicial authority to consider the  constitutional claims resulting  from agency personnel  decisions" is of "critical importance" because "those constitutional claims may well be the only check on agency actions  that determine  a  person's  career." 905  F.3d  at  400. Accordingly, "[c]ourts have an obligation to listen to those claims clearly and to consider them carefully." Id. And, in *National Federal of Federal Employees v. Greenberg*, the D.C. Circuit held that *Egan* did not bar a constitutional challenge to a Department  of  Defense  security clearance questionnaire, stating that "[i]t is simply not the case that all  security-clearance decisions are immune from judicial review." 983 F.2d 286, 289 (D.C. Cir. 1993).

clearance revocation - three years ago - yet Defendants refuse to respond to the submission despite FAM 234.3  deadlines on Defendants. For example "After receipt of the appeal, DS/SI/PSS will transmit the appeal and other relevant material to the [*Security Appeal Panel] SAP*, which will endeavor to schedule a meeting to hear the appeal within four weeks of receiving the appeal." Defendants have "constructively" denied Plaintiff a meaningful opportunity to respond to the Agency's unconstitutional actions. *Khine v. U.S. Dep't of Homeland Sec.*, 943 F.3d 959, 966 (D.C. Cir. 2019)

The significance of the Department's incredibly unreasonable delay cannot be understated. Knowing Gebert cannot hold more than one federal position at a time and considering Gebert has a family to support and has not had a paycheck from his employer for almost four years, the Department need only wait out Gebert to resign. Gebert resigning would result in the loss of jurisdiction by the Agency over Gebert's security clearance, and he would no longer be able to appeal the agency's security clearance decision. In other words, Gebert resigning would wipe the Defendants' slate clean of their due process and APA violations, as well as their extensive violations of Gebert's First Amendment rights. *See supra* III.[12]

**B.      Defendants' Termination of Gebert's Health Insurance Coverage was Arbitrary, Capricious, an Abuse of Discretion, and Otherwise not in Accordance with Law**

Plaintiff would first point out that Defendants do not deny that their actions regarding Gebert's health insurance were in violation of law; the Defendants merely stated Gebert did not mention the *specific* law. Fortunately, Plaintiff alleged violations of 3 FAM 3600, *et al*. This Manual section is based on, promulgated under, and incorporates 5 U.S.C. 89/5 CFR § 890, *et al*.

---

[12]      50 U.S. Code § 3341(g)(2)(A)(i-ii) provides timeliness guidelines of 60 days for 90 percent of security clearance investigations. Further, the Code does not allow appeals of suspensions for timeliness that are less than one year. 50 U.S. Code § 3341(j)(4)(A).

See 3 FAM 3611. Specifically, 5 CFR § 890.502(b) lists *several* requirements that the employer agency "must" do that the Department clearly violated:

> **(b) Procedures when an employee enters a leave without pay (LWOP) status or pay is insufficient to cover premium.** The employing office ***must*** tell the employee about available health benefits choices as soon as it becomes aware that an employee's premium payments cannot be made because he or she will be or is already in a leave without pay (LWOP) status or any other type of nonpay status… The employing office ***must*** also tell the employee about available choices when an employee's pay is not enough to cover the premiums.
>
> (1) The employing office ***must*** give the employee written notice of the choices and consequences as described in paragraphs (b)(2)(i) and (ii) of this section and will send a letter by first class mail if it cannot give it to the employee directly. (***Emphasis*** added)

It is clear Defendants had an obligation to provide Plaintiff notice regarding his health insurance options before they terminated them (especially retroactively). It is clear that Plaintiff pleaded Defendants were required to do so and failed to do so. Am. Compl. ¶¶ 168-172.

If this is not arbitrary and capricious behavior occurring as a result of Gebert's specific viewpoints, then the Defendants would ask the Court to believe that the Department routinely violates the Federal Employees Health Benefits (FEHB) Program as a matter of practice. Not only do they fail to take affirmative steps, such as provide required notice, but Defendants also went the extra step with Gebert to retroactively cancel coverage for periods over which he had already paid the premiums, thereby causing Plaintiff to suffer significant economic damages. Am. Compl. ¶ 172. Count XI should not be dismissed because Defendants violated laws, regulations, and policies, and additional discovery will prove Defendants acted in bad faith.

**VI.   Plaintiff's Reasonable Description of Records**

Defendants incorrectly argue that the Plaintiff's FOIA and Privacy Act requests were not specific yet the Defendants provided part of the investigation while conspicuously omitting agent notes and other relevant documents that comprise the investigation.  Am. Compl. ¶¶ 90-93. In

short, the Defendants are being dishonest and deceitful when they knowingly and willfully withheld records that Plaintiff was entitled to under FOIA and the Privacy Act. .

Plaintiff's request specifically references the security clearance revocation and specifically states: "On [Gebert's] behalf, I am requesting all records pertaining to Mr. Gebert that are held by the U.S. Department of State." Under both the Privacy Act and FOIA, an agency must conduct an adequate and reasonable search for relevant records. See *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 *(D.C. Cir. 2009)* (stating that "the Privacy Act, like FOIA, requires that a search 'be reasonably calculated to uncover all relevant documents.'") In this Circuit, courts apply the same standard under both statutes to determine the adequacy of a search. See *Id*.; *Hill v. U.S. Air Force*, 795 F.2d 1067, 1069 (D.C. Cir. 1986) (per curiam) (affirming search's adequacy under Privacy Act for the same reasons the search was affirmed under FOIA). The Defendants understood the request because they provided responsive records, albeit not all the responsive records; therefore, their claims that the request was ambiguous is disingenuous at best.

Further, Plaintiff submitted a subsequent request on December 30, 2020 wherein Plaintiff further clarified that he was asking for all the records related to his security clearance revocation so he could have a meaningful opportunity to defend himself. Am. Compl. ¶¶ 80-81. Plaintiff specifically asks for "all records pertaining to Matthew Gebert's security clearance revocation." The request specifically addressed the failure to provide properly exempted material. *Id.* Defendants' claims that Plaintiff failed to reasonably describe records are inconsistent with Defendants' release of portions of the investigation. Therefore, Defendants' request to dismiss Plaintiff's FOIA and Privacy Act claims should be denied.

**VII.**       **Gebert is Entitled to Damages**

Gebert is entitled to damages under a *Bivens* claim, the Back Pay Act, 5 U.S.C. § 5596, 5

CFR § 550, Subpart H, (2023), 5 U.S.C. § 8912, and 5 CFR § 890 (2023), *et al*. The Back Pay Act provides an explicit waiver to sovereign immunity, as well as the right to seek damages due to the valid constitutional claim Plaintiff has raised. 5 U.S.C. § 5596. In this case, Gebert has been in an indefinite suspension since September 24, 2019. Am. Compl. ¶ 44. An indefinite suspension would meet the criteria of when an "employee is found by an appropriate authority to have been affected by an unjustified or unwarranted personnel action that resulted in the withdrawal, reduction, or denial of all or part of the pay, allowances, and differentials otherwise due to the employee." This subpart should be read together with this section of law. 5 C.F.R. § 550.801 (2023). Further, 5 U.S.C. § 8912, FEHB, specifically provides the federal district courts with original jurisdiction of a "civil action or claim against the United States founded on this chapter." *Empire HealthChoice Assur., Inc. v. McVeigh*, 126 S. Ct. 2121, 2129 (2006).

A.    **Plaintiff's *Bivens* Claims Remain Viable Despite the Recent Ruling in *Egbert***

Plaintiff acknowledges that at this time, "recognizing a cause of action under *Bivens* is a disfavored judicial activity," *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022): Disfavored but not entirely foreclosed. In considering a proposed *Bivens* claim, a court's inquiry proceeds in two stages. *Id.* The court first asks "whether the case presents a new *Bivens* context—i.e., is it meaningfully different from the three cases in which the Court has implied a damages action." *Id.* (cleaned up). If the context is new, then the court must ask "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages" and whether there are "any special factors counseling hesitation before authorizing a new kind of federal litigation." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) (citing *Bush v. Lucas*, 462 U.S. 367, 378 (1983)).

1.    Plaintiff's Due Process Claims do not Arise in a New Context

*Egbert* made recovery for plaintiffs under *Bivens* more difficult, but not impossible, and the door remains open to bringing claims against federal government officials who willfully violate the constitutional rights of others while in their private capacities. Specifically, *Egbert* does not appear to explicitly foreclose *Bivens'* potential extension to Plaintiff's Fifth Amendment claims. Applying this framework, this is a proper case for a *Bivens* claim. First, the context is not new. Even imagining the context was somehow new, there are no special factors, such as a comprehensive remedial scheme or national security in the traditional context previously discussed by precedent, that counsel hesitation applying *Bivens* to Gebert's case.

Gebert's Fifth Amendment claims do not arise in a new context, and he should be allowed to proceed. Gebert's *Bivens* claims align closer to the *Davis* decision by the Supreme Court than the plaintiffs' cases within *Ziglar, Egbert*, and *Hernandez* that attempted and failed to have the Court extend *Bivens* to their claims. Therefore, Gebert's claims warrant a thorough analysis and review.

2.  No Special Factors Exist in Plaintiff's First Amendment Claims

Regarding Gebert's First Amendment claims, Plaintiff concedes that it would be a new context, but the Supreme Court has repeatedly assumed (without definitively holding as much) that *Bivens* extends to First Amendment claims. See *Wood v. Moss* , 572 U.S. 744, 757 (2014), *Reichle v. Howards*, 566 U.S. 658, 663, n. 4  (2012), and *Ashcroft* v. *Iqbal,* 556 U.S. 662, 675 (2009) (assuming without deciding that a First Amendment free exercise claim is actionable under *Bivens*); But *Cf. Bush* v. *Lucas,* 462 U.S. 367, 368 (1983) (refusing to extend *Bivens* to a First Amendment speech claim involving federal employment).

The Defendants allege that because a security clearance has been discussed in this case that this automatically results in an issue of "national security," which could be found to be a "special

factor." However, courts have had the opportunity to close the door on *all* cases even mentioning national security, but have still refrained from doing so. One of the reasons no such foreclosure has occurred is that not all "national security" issues are alike or carry the same level of importance or exigency.

In several cases in this Circuit where the court has determined that the risk or implications of national security rose to the level of a "special factor," they are all readily distinguishable from Gebert's case.[13] Reviewing these cases, one thing is clear: these cases involve actual serious matters of concern related to our intelligence (including torture tactics), military strategy decisions, and national security in the wake of 9/11. Gebert's case is a case where established due process was clearly not followed in a post-deprivation situation for a U.S. citizen and federal employee who is not a suspected terrorist or accused of jeopardizing national security.

When put into proper context, this is a case in an area that would benefit greatly from judicial intervention in this very limited, fact-specific situation. The Defendants state that "both Congress and the Department have provided alternative remedies for aggrieved parties in [Gebert's] position that independently foreclose a *Bivens* action here. (Def. Mot. at 48). The Defendants go on to discuss how the CSRA would preclude a *Bivens* remedy for civil service employees. However, this argument ignores the very holding in *Egan* that prevents the Merit

---

[13]     *See Meshal v. Higgenbotham*, 804 F.3d 417, 425-26 (D.C. Cir. 2015) ("special factors . . . have foreclosed *Bivens* remedies in cases involving . . . national security, or intelligence" (cleaned up)); *Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012); *Ali v. Rumsfeld*, 649 F.3d 762, 773 (D.C. Cir. 2011); *Rasul v. Myers*, 563 F.3d 527, 532 n.5 (D.C. Cir. 2009) ("The danger of obstructing U.S. national security policy" is a special factor precluding a *Bivens* action); *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008) (fact that a claim would entail "judicial intrusion into matters of national security and sensitive intelligence information" is a special factor weighing against *Bivens* action).

System Protection Board from reviewing the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse action. *Egan*, 484 U.S. at 532.

Regarding the "alternative remedies" allegedly made available by the Department, Gebert's case is distinguishable from the cases cited by Defendants. The defendant agencies in *Egbert, Malesko*, and *Bush* had an established process and went through the process, but the respective plaintiffs disagreed with the process and/or the result. None of these cases contemplate *Bivens* in the context of when the defendant agency blatantly ignores and/or refuses to actually go *through* the process. In Gebert's case, the Defendants have simply grinded the process to a halt, and any semblance of going through any part of the process has been marred with inserting unlawful, subjective criteria into the equation.

The courts have determined that, even in the context of security clearances, a court is in the best position to weigh-in and determine if another branch is violating the Constitution or not. *See Gill*, 875 F.3d at 685. Precluding judicial involvement, especially when determining the constitutionality of established processes and procedures (or lack thereof or lack of following said processes), simply because another branch is designated the authority contradicts the government's system of check and balances. This responsibility falls squarely within the designated powers of the judicial branch.

### B.    The Individual Defendants Are Not Entitled to Qualified Immunity

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021). Considering the positions of the named defendants involved in this case and their egregious violations of constitutional rights, Gebert is alleging they fall under at least one of the buckets of the type of employees excepted under *Bond*. It is well established that "The doctrine of qualified immunity shields officers from

civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right," meaning that "existing precedent [has] placed the statutory or constitutional question beyond debate . . . in light of the specific context of the case"— not simply "as a broad general proposition." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021).

This court has previously stated, "To determine whether an official is entitled to qualified immunity, the Court must consider whether the facts, viewed in the light most favorable to the plaintiff, establish a violation of a constitutional right and, if so, whether that right was clearly established at the time of the alleged violation." *Mpoy v. Fenty*, 901 F. Supp. 2d 144, 157 (D.D.C. 2012) (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). A court has the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Again, this case goes beyond alleging that qualified immunity; the overarching issue remains firmly rooted within the First Amendment and due process under the Fifth Amendment.

Regarding the second prong, "to reject an official's claim of qualified immunity, 'the unlawfulness' of his action must be apparent 'in the light of pre-existing law.'" *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 56 (D.D.C. 2013), citing *Atherton v. Dist. of Columbia Office of Mayor*, 567 F.3d 672, 689-690 (D.C. Cir. 2009). Further, "[A]n official is not shielded where he could be expected to know that certain conduct would violate statutory or constitutional rights." *Id.* citing *Brown v. Fogle*, 819 F. Supp. 2d 23, 28-29 (D.D.C. 2011). This does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

It is well known that public employees are still entitled to a level of free speech. While a government employer may impose restraints on employee speech, the employees have the right to speak on matters of public concern, typically those concerning government policies of interest to the public at large. See *Connick v. Myers,* 461 U.S. 138 (1983); *Pickering v. Board of Ed.*, 391 U.S. 563 (1968). And when they speak or write on their own time on a topic unrelated to their employment, the speech can have First Amendment protection, absent a governmental justification "far stronger than mere speculation" for regulating it. *United States v. National Treasury Emples. Union*, 513 U.S. 454, 465 (1995). Specifically, it is well-known a public employee cannot face adverse employment actions simply because of their political beliefs or affiliations. *Elrod v. Burns*, 427 U.S. 347 (1976).

## CONCLUSION

For the above-mentioned reasons, the Defendants' Motion to Dismiss should be dismissed in its entirety.

Respectfully submitted,

Dated:  August 7, 2023

*/s/ Brett J. O'Brien*
Brett J. O'Brien
Bar 1753983
NATIONAL SECURITY LAW FIRM
1250 Connecticut Ave, Washington, DC 20036
202-600-4996