# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MATTHEW GEBERT,

       *Plaintiff*,

     v.

U.S. DEPARTMENT OF STATE, *et al.*,

       *Defendants.*

No. 22-cv-2939 (DLF)

## ORDER

For the reasons given in the accompanying Memorandum Opinion, it is

**ORDERED** that the defendants' Motion to Dismiss, Dkt. 38, is **GRANTED**. It is further

**ORDERED** that the plaintiff's First Amended Complaint is **DISMISSED**. It is further

**ORDERED** that the plaintiff shall file any motion for leave to file a Second Amended Complaint within thirty (30) days of this order. Otherwise, the Court will dismiss this action. It is further

**ORDERED** that the plaintiff's Motion for Leave to File a Surreply, Dkt. 44, is **DENIED**.

**SO ORDERED.**

March 27, 2024

DABNEY L. FRIEDRICH
United States District Judge

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MATTHEW GEBERT** ) | |
| 270 Philadelphia Ave. ) | |
| Purgitsville, WV 26852 ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| V. ) | |
| ) | |
| **DEPARTMENT OF STATE** ) | **Civil Action No. 22-2939 (DLF)** |
| 2201 C St., NW ) | |
| Washington, District of Columbia 20520 ) | |
| ) | |
| **ANTONY BLINKEN,** ) | |
| Secretary of State ) | |

)
)
**As to each Defendant Serve:** )

    U.S. Attorney for the District of Columbia )
        Attn: Civil Process Clerk )
        555 4th Street, NW )
        Washington, DC 20530 )
)
        Office of the Legal Advisor (L/EX) )
        Department of State )
        Suite 5600 )
        600 19th Street, NW )
        Washington DC 20522 )
)
)
        Defendants. )

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

For his Second Amended Complaint, Matthew Gebert ("Gebert" or "Plaintiff"), by the

undersigned counsel, states as follows:

1.     The Plaintiff brings this action for declaratory, injunctive, and other appropriate relief against the Defendant for actions they have taken and continue to take against their employee, Gebert; specifically, the Defendant has placed Gebert in an indefinite Leave Without Pay (LWOP) status and has revoked his Top Secret security clearance pending the outcome of a suitability determination.

2.     Further, Plaintiff brings this action for injunctive relief and other appropriate relief and seeks the disclosure and release of agency records improperly withheld from the Plaintiff by the Defendant, the Department of State, and their subordinate agencies, pursuant to the Privacy Act of 1974, 5 U.S.C. §552a et seq. and the Freedom of Information Act, 5 U.S.C. §552(a) et seq.

3.     In this case, the Defendant's basis for its employment-related actions were based on violating Plaintiff's: (1) First Amendment protections of free speech,  freedom of association, and freedom of assembly; (2) First Amendment retaliation; (3) Equal Protection; (4) Due Process; and (5) violating the Administrative Procedures Act by failing to follow their own rules and regulations in an arbitrary and capricious manner.

## **PARTIES**

4.     Plaintiff is a United States citizen and a resident of West Virginia.

5.     The Defendant, Department of State, is a "federal government agency" within the meaning of (1) 28 U.S.C. §1346(b), 28 U.S.C. §2401(b), and 28 U.S.C. §2671, and (2) 5 U.S.C. §552(f)(1) and 5 U.S.C. §552a(a)(1). The Defendant is in possession, custody, and control over documents and records about Plaintiff. Defendant is headquartered at the Harry S. Truman Building, 2201 C Street NW, Washington, D.C., U.S. 20520.

## JURISDICTION

6.      The Court has both subject matter jurisdiction over this action and personal jurisdiction over the Defendant pursuant to 5 U.S.C. §552(a)(4)(B), 5 U.S.C. §552a(g)(1),     28 U.S.C. §1331.,

7.      The Court has authority to issue declaratory and injunctive relief under 28 U.S.C § 1361.

8.      Venue is proper in this Court pursuant to 5 U.S.C. §552(a)(4)(B), 5 U.S.C. §552a(g)(5), and 28 U.S.C. §1391 (b) and (e).

9.      The Court has the authority to award attorneys' fees and expenses under 28 U.S.C. § 2412.

## FACTS

10.      The Plaintiff has been employed by the Defendant, State Department, since May 19, 2013, in the role of Foreign Affairs Officer in the Bureau of Energy Resources, Office of Energy Diplomacy, Middle East & Asia Division (ENR/EDP/MEA).

11.      As part of his position, Plaintiff underwent a background investigation that resulted in him being granted a Top Secret security clearance on April 19, 2013; holding and maintaining this level of security clearance is a condition of Plaintiff's employment.

12.      As part of a routine periodic background reinvestigation that was necessary for the Plaintiff to hold his Top Secret security clearance, the Plaintiff was interviewed on January 28, 2019.

13.      In this reinterview, the Plaintiff was asked by Defendant's employees, *inter alia*, the following questions:

   i.  Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

   ii.  Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

   iii.  Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

  14.  The Plaintiff responded in the negative to all three questions.

  15.  This routine reinvestigation was concluded on May 9, 2019.

  16.  On June 7, 2019, Plaintiff was notified that he had been granted continued access, which meant, for all intents and purposes, he "passed" the reinvestigation.

  17.  On August 7, 2019, the Hatewatch blog of the Southern Poverty Law Center (SPLC) published an online article titled, "U.S. State Department Official Involved in White Nationalist Movement, Hatewatch Determines," which made several allegations against Gebert.

  18.  The day after the Hatewatch article was released, on August 8, 2019, several news sources confirmed that Gebert had already been suspended no later than on that day.[1]  Gebert's former supervisor at the State Department, Amos Hochstein, was specifically quoted, "Neo-Nazis are not all shaved heads and tattoos, they are hiding in plain sight. I'm horrified Gebert worked for me at the State Department."

---

[1]  Rolling Stone stated, "According to Politico, however, two sources close to the state department have confirmed that Gebert has been suspended following the Hatewatch report. His former boss, Amos Hochstein, who supervised Gebert during his tenure as coordinator for the State Department's international energy affairs, told Politico he found it 'inconceivable' that Gebert could've gotten security clearance not once, but twice. (The State Department conducts security screenings upon hiring and again after an employee has worked there for five years, according to Hochstein.).
https://www.rollingstone.com/culture/culture-news/matthew-gebert-hatewatch-report-white-supremacy-state-department-869051/.

19.     Gebert was not suspended on August 8, 2019, because he was "dishonest" to questions from a January 2019 interview; the comments by Hochstein more accurately reflect the sentiment of the State Department regarding allegations made against Gebert, and they simply disagreed with his viewpoint.

20.     The Defendant realized their suspension of Gebert on the basis of his viewpoints could not possibly stand, especially after the subsequent September 27, 2019, interview, where Gebert easily refuted and dispelled the allegations that he was a "Neo-Nazi" or some other type of extremist. When finally given the chance to express his pro-white and political beliefs, he clearly articulated beliefs that are protected, and this became problematic for the State Department.

21.     As soon as the Hatewatch Article was published, it resulted in what the Department of State termed a "media frenzy." Dozens of articles were written, shaming the Department for employing Gebert and not vetting him properly during the clearance process. *Id*.

22.     In short, the Department was under immense pressure from the public and even members of Congress to remove Gebert from the Department due to his viewpoints. *Id*.

23.     Throughout the articles, representatives from the Department of State made official statements wherein they explicitly expressed their disapproval of Gebert's ideologies.[2]

24.     In summary, the Hatewatch blog, a non-profit organization, served as the basis for Plaintiff's security clearance suspension.

---

[2]     The FBI, on the other hand, got it right when their official spokesperson in an article explained, in response to the public outrage regarding Gebert's employment, that they "[c]annot investigate people for holding an ideology or belonging to a certain U.S.-based hate group." See https://www.cnn.com/2019/08/15/politics/state-dept-white-supremacist-brother-fbi/index.html

25.     On August 16, 2019, Plaintiff received a memorandum from Defendant informing him that Defendant would be suspending Gebert's security clearance pending the outcome of a "for cause" investigation.

26.     Defendant made the decision in their determination regarding Plaintiff based on a biased blog post that had no proof of actually being reviewed or fact-checked: in short, this is not a credible news source.

27.     More than one year before the SPLC article was published on August 8, 2019, Sludge.com posted an article entitled "Government Employees Donate to White Supremacist Candidate." [3]  This was published in July of 2018.

28.     The article specifically mentioned "Matthew Gebert" by name as well as his position with the Department of State. Id; it further indicates that Gebert made campaign contributions to the House campaign of Paul Nehlen, a "racist" and "openly anti-Semitic white supremacist." *Id*.

29.     In addition, the article mentioned Gebert's prior contributions in 2017 and 2018 to Corey Stewart, a Republican nominee who has been outspoken about preserving public Confederate flags and monuments. Id.

30.     The Defendant was aware of this article, as a Department of State Official is quoted in the article as stating: "Matthew Q. Gebert is employed by the Department of State as a foreign affairs officer assigned to the Bureau of Energy Resources in Washington, D.C. Guidelines regarding the political activity of State Department employees can be found in the Foreign Affairs Manual at 11 FAM 614. The Department of State is committed to providing a workplace free from discriminatory harassment." Id.

---

[3]     See https://readsludge.com/2018/07/03/government-employees-donate-to-white-supremacist-candidate/

31.     The Sludge.com article did not receive as much backlash as the Hatewatch article, and there is no indication of Congressional or State Department pressure at higher echelons to remove or suspend Gebert.

32.     However, it does reveal that as early as July of 2018 the State Department was aware of Gebert's white nationalist beliefs, which supports Gebert's belief the State Department was already aware of his activities, which makes it all the more likely Gebert honestly and legitimately believed that he had no reason to know he should have further disclosed this in any interview or investigation.

33.     Because holding a valid Top Secret security clearance is a condition of employment for Plaintiff, this suspension of his security clearance resulted in a proposal to suspend the Plaintiff from his employment indefinitely without pay from his position as a Foreign Affairs Officer, GS-13, in the Office of Middle East and Asia, Bureau of Energy Resources.

34.     Defendant sent a subsequent memo to Plaintiff on August 16, 2019, that informed Plaintiff that he would be suspended without pay and that he had fifteen (15) calendar days from the date of receipt to respond orally, in writing, or both.

35.     On August 28, 2019, Plaintiff, through his legal representative at the time, submitted a written reply on Plaintiff's behalf.  .

36.     On September 24, 2019, Plaintiff received a written response from Defendant that informed Gebert that the proposed indefinite suspension without pay would be sustained.

37.     The September 24, 2019, letter from Defendant provided a cursory review of Plaintiff's issues; essentially, the letter states nothing more than, in summary: Your security clearance is suspended; security clearance is a condition of employment; because your security

clearance is suspended and you have provided no evidence that it is not suspended, your suspension without pay from your employment is upheld.

38.     The "for cause" investigation was conducted by the Bureau of Diplomatic Security (DS), Office of Special Investigations (DS/DO/OSI) shortly after Plaintiff was notified of his pending suspension.

39.     As part of this "for cause" investigation, Plaintiff was interviewed on September 27, 2019, by Defendant personnel within the Office of Special Investigations with the Bureau of Diplomatic Security, a division under the Defendant State Department, whereby Gebert was confronted with many of the allegations from the Hatewatch blog article, as well as re-questioned regarding his answers to the previous questions identified in Paragraph 13, above.

40.     In this September 27, 2019, interview, Gebert explicitly denied withholding information during his January 2019 interview, affirmed he was not ashamed or embarrassed of any of his views or activities, and specifically stated that the article sensationalized and mischaracterized his activities and involvement to make them seem much more nefarious than they actually were.

41.     During this interview, Gebert specifically and unabashedly articulated the beliefs he expressed on race and immigration, which at the core of his beliefs, are the ideas of advocating (1) for white interests; and (2) against mass immigration. In fact, many of Plaintiff's beliefs center around being an "immigration restrictionist," through which he celebrates federal immigration laws from the 1920's through the mid-1960's that resulted in strict limitations on immigration.

42.     Plaintiff believes that these policies contributed to America's robust economy and our nation's ascension as a global superpower.

43.     Plaintiff followed up his September 2019 interview with additional responses on October 23, 2019, where he informed Defendant personnel that he: did not think any of his writings, podcasts, or tweets would rise to a level that they would ever be considered an embarrassment to himself or the Department of State; was never a member of any formal white nationalist organization; believed he would be protected as his speech and activities were protected by the First Amendment; and never engaged in any illegal activity. For these reasons, Plaintiff believed he had a reasonable and good faith basis to answer the questions from his January 2019 interview in the manner in which he did.

44.     Gebert's personally held beliefs were never represented as State Department opinions at any point in time in any manner or medium, and the State Department has never made an allegation that Gebert represented himself as a State Department employee when he spoke about his personal beliefs.

45.     Most importantly, at no point did Gebert lie or provide any false information on his SF-86 (i.e. security clearance questionnaire) or during any of his interviews or re-interviews.

46.     The Department of State could not find that Gebert had lied on his SF-86 since no questions on the SF-86 ask applicants about their political or ideological beliefs.[4] Indeed, the government cannot point to even a single question on the SF-86 that Gebert's conduct violated. Gebert has never:

- Been a member of an organization dedicated to terrorism (SF-29.1);
- Engaged in acts of terrorism (SF-29.2);
- Been a member of an organization dedicated to the use of violence or force to overthrow the United States Government (SF-29.3);
- Been a member of an organization that advocates or practices commission of acts of force or violence to discourage others from

---

[4]     Rightly so, as this would violate applicants' civil liberties.  See, e.g., Ozonoff v. Berzak, 744 F.2d 224 (1st Cir. 1984).

9

exercising their rights under the U.S. Constitution or any state of the United States (SF-29.4); or
● Engaged in activities designed to overthrow the U.S. government by force (SF-29.5).

47. Gebert was never even asked any questions relating to his political beliefs during the security clearance investigation or reinvestigation process. In the entire 136-page SF-86 application, none of the questions on the SF-86 asked Gebert anything even remotely related to his political beliefs, such as whether he identified as republican, democrat, alt-left, or alt-right, etc. Nor was he asked any questions related to his beliefs regarding race, immigration, or any other ideologies. Id. So too, none of the questions that Gebert was asked during his initial background investigation or during his reinvestigation interview on January 28, 2019, related to any of these issues. Id.

48. Thus, at no point either on the SF-86 or any of the reinvestigation interviews was Gebert ever asked any questions about his political or ideological beliefs, associations, or activities. Id.

49. In fact, in February 2021, members of Congress specifically urged the Director of National Intelligence ("DNI") to update current security clearance guidelines to begin screening for "white supremacists, neo-Nazis, and other far-right extremists."[5]

50. In doing so, they specifically mentioned Gebert's case with the Department. Id. They further explained that "[u]nder current guidelines, individuals are not explicitly required to self-report involvement with extremist groups unless the organization professes to be a terrorist organization, seeks to overthrow the United States government, or uses violence." Id.[emphasis added], further supporting that nothing the Department was able to ask prior to February 2021

---

[5]     Id.https://wexton.house.gov/news/documentsingle.aspx?DocumentID=457, February 21, 2021. Accessed Online July 7, 2023.

would have required Gebert to voluntarily offer up the information the Defendant is specifically stating Gebert was required to provide in response to their questions.

51.     Upon information and belief, the Defendant interviewers conducted what appeared to be a very biased interview, proposing counter-political beliefs to intentionally mischaracterize and sensationalize Plaintiff's own positions, and used a flawed, unsanctioned interpretation of the underlying regulations to improperly and erroneously draw conclusions and make reckless recommendations on their investigative findings.

52.     Upon information and belief, the Defendant's personnel sought to "trap" or "catch" the Plaintiff in a lie or with him providing false information; when that failed, Defendant's personnel attempted to attach Plaintiff to more extreme and hateful viewpoints on race, religion, national origin, immigration, and other political beliefs to what Plaintiff actually subscribed to and spoke and wrote about.

53.     Plaintiff reiterated multiple times that he was a "race realist" and "pro-white," but fell far short of adopting outright neo-Nazism or aligning explicitly or officially with any terrorist organization or criminal entity's platform or belief system.

54.     As he explained throughout his interview, Gebert knows that his opinions are unpopular and that some people may be offended.  Thus, as Gebert explained, unless he knows that you are what he calls a "like-minded person" (i.e., "pro-white" ), he does not talk about his political or other ideological viewpoints with you. In other words, Gebert -- like millions of other Americans -- keeps his political and ideological views private.

55.     Not only were Gebert's coworkers and supervisors not aware of his beliefs, but neither were his neighbors, some of his friends, or most of his acquaintances.  Thus, it wasn't that Gebert was concealing his beliefs from the government out of fear of losing his security

clearance. To the contrary, Gebert did not discuss his views with anyone on an unsolicited basis except for those whom he would consider "like-minded" because he knew that his opinions were controversial.

56. Although Gebert would not expose his beliefs on an unsolicited basis, as was revealed throughout his interview, he prides himself on his integrity. He is and has always been aware of the importance of being honest and truthful throughout the clearance process. Id. Had Gebert ever been asked about his political or ideological beliefs, he would have disclosed them, just as he did during the subsequent investigative interview. As Gebert explained:

> SPECIAL AGENT: And you don't feel that information could be -- have use -- could've been used to exploit you, to blackmail you, coerce you, or anything like that?
>
> MR. GEBERT: A hundred -- a hundred percent no because I'm not ashamed at all of my views. I can't be bought. I believe what I believe. You know, I'm a true believer, not in any cult sense, but in terms of having informed, you know, beliefs and values that unfortunately in this day and age are judged to be beyond that pale. [Gebert Interview 81-15 to 82-3.]

57. The DS/DO/OSI "for cause" investigation after the suspension was completed on March 6, 2020, and determined that Plaintiff had been intentionally misleading in his answers to the questions identified in Paragraph 13, above.

58. Plaintiff received a letter from Defendant dated July 1, 2020, wherein Defendant informed Plaintiff that his security clearance was being revoked under Guideline E (Personal Conduct) concerns. Put more simply, the United States Department of State intended to regulate freedom of association and freedom of speech.

59.     In the July 2020 letter, Plaintiff was specifically cited for violating the following:

i.      refusal to provide, full, frank, and truthful answers to lawful questions of investigators, security officials, or other official representatives in connection with a personnel security or trustworthiness determination;

ii.     deliberately providing false or misleading information; or concealing or omitting information concerning relevant facts to an employer, investigator, security official, competent medical or mental health professional involved in making a recommendation relevant to a national security eligibility determination, or other official government representative;

iii.    personal conduct, or concealment of information about one's conduct that creates a vulnerability to exploitation, manipulation, or duress by a foreign intelligence entity or other individual or group. Such conduct includes:

a.      Engaging in activities which, if known, could affect the person's personal, professional, or community standing.

60.     Upon information and belief, the Defendant heavily relied on making determinations regarding what Plaintiff knew or should have known regarding what thoughts or theories regarding race and immigration should have been "embarrassing" or not.

61.     However, upon information and belief, the Defendant enforced their reasoning unevenly or otherwise failed to apply a similar policy to other groups; namely, authorizing and/or applying significantly reduced application of its harsh position to those who publicly support Black Lives Matter (BLM).

62.     Upon information and belief, the Defendant is not revoking the security clearance and suspending similarly situated employees for failing to disclose their affiliation and/or content created furthering BLM; in fact, to the contrary, the U.S. Office of Special Counsel (OSC) expressly authorizes employees to    publicly       support       the       movement      on the

13

job[6] and in May of 2021 U.S. Secretary of State Antony Blinken authorized U.S. embassies around the world to fly Black Lives Matter (BLM) flags and banners.[7]

63.     Upon information and belief, the Defendants by discriminatory motive or intent, or through reckless or callous indifference, invoked and implemented a policy to intentionally discriminate against the Plaintiff by using the security clearance and national security laws and regulations to impose barriers that could thwart, and in this case, did thwart the exercise of the Plaintiff's constitutional rights based on his association with the D.C. Pilots group.

64.     The D.C. Pilots were not a terrorist organization, criminal entity, or even on the SPLC's radar as a white nationalist group. See https://www.splcenter.org/sites/default/files/splc-2021-year-in-hate-extremism-report.pdf.

65.     In fact, it is only the SPLC, without citing an actual reference or actual law enforcement report or record, that tied the D.C. Pilots to the organization The Right Stuff; there is no official affiliation between the two groups, which further supports the Plaintiff's reasonable belief he was doing nothing wrong.

66.     Further, The Right Stuff is only listed in the SPLC resource cited as a "white nationalist" group.

67.     There are currently members of our Congress who are members of white nationalist groups and/or speak at white nationalist events.

68.     White nationalism, no matter how much someone disagrees with it, is not *per se* unlawful or a prohibited ideology by a government employee. There are varying levels and degrees, as well as different sects within different white nationalism movements; the one specifically endorsed by the Plaintiff is one focused on U.S. policy on immigration, which

---

[6]      https://cdn.govexec.com/media/gbc/docs/pdfs_edit/071620cb1.pdf.

[7]

https://foreignpolicy.com/2021/05/25/black-lives-matter-blm-state-department-embassies-flags-blinken-diplomacy-racial-injustice/

actually mirrors several members' of Congress's beliefs, former President Trump, and multiple members of his Cabinet and senior advisors, and such positions have oscillated in and out of our country's official policy and/or major political parties' platforms on the matter for over 200 years.

69.     In response to Plaintiff's LWOP and revocation of his security clearance, the undersigned counsel provided a written rebuttal on Plaintiff's behalf on February 4, 2021, denying the allegations from the July 1, 2020, memorandum in their entirety.  See Exhibit D.

70.     Plaintiff's undersigned counsel provided a Supplemental Response to the February 2021 rebuttal on November 23, 2021, alleging multiple violations by Defendant of the Freedom of Information Act (FOIA) and the Privacy Act.  See Exhibit E.

71.     On January 30, 2024, the State Department responded to Gebert's rebuttal and supplemental response with a letter notifying Gebert that his security clearance revocation was being upheld.

72.     Regarding Plaintiff's work performance otherwise, outside of the investigation and actions taken in response to an opinion-piece blog, Plaintiff's performance was exemplary and there were no indications whatsoever that his character and/or any personal views held by Plaintiff compromised his work or his full and unbiased cooperation with all State Department employees and partners:

        i.      Plaintiff was a presidential management fellow, a prestigious fellowship, where he was highlighted in George Washington University's *GW Magazine*, https://archives.magazine.gwu.edu/sites/g/files/zaxdzs1136/f/downloads/Summer2013GWMag_ web.pdf;

        ii.     Plaintiff's evaluations for each year since 2013 were "Exceeds expectations";

iii.     Plaintiff received a performance bonus in 2015 for $1,500, the alleged year he began to engaged in white nationalist activities;

iv.     Plaintiff received two performance bonuses in 2019 for $3,000 and $500, the very year he was suspended/placed on leave without pay.

73.     Due to a select few State Department employees disagreeing with the viewpoints held and expressed by Gebert - in his personal capacity and during his personal time - the Defendant has caused irreparable harm to the federal protected rights of the Plaintiff's freedom of speech and association in the attempt to harass, threaten, silence, and/or chill these constitutional rights.

74.     The Defendant has provided a pretextual reason for revoking Plaintiff's security clearance and suspending him without leave; namely, stating Plaintiff failed to disclose, misled, and/or omitted information that are either (1) "relevant facts" that could be "relevant to a national security eligibility determination," (2) "personal conduct" that "creates a vulnerability to exploitation, manipulation, or duress," or (3) engaging in activities, which, if known, could affect the person's personal, professional, or community standing.

75.     Upon information and belief, in couching Plaintiff's removal as a matter of "national security" and suppressing his speech and rights via the revocation of security clearance route, the Defendant appears to cling to and attempt to hide behind *Egan* to allow them complete discretion with no judicial oversight; however, the true basis for the revocation and subsequent state of purgatory that the Defendant believes they can subject the Plaintiff to is predicated on the trampling of constitutionally protected rights.

76.     Upon information and belief, the Defendant has applied highly subjective standards of what might be embarrassing or qualify as "dirt" in the eyes of the State Department, setting a precedent that anything someone finds incorrect or different from their own viewpoint

16

can later qualify as "intentionally omitting" if someone fails to disclose their political ideologies or maybe who they voted for in a previous election if they legitimately believed it was not the answer the Defendant personnel wanted to hear.

77.    Furthermore, upon information and belief, the Defendant seeks to impugn a subjective, moving target of what qualifies as "embarrassing" to the Plaintiff and declare his claim that he did not believe his thoughts, speech, or actions to be embarrassing was "improbable."

78.    The government may not regulate speech based on overbroad policies that encompass a substantial amount of constitutionally protected speech.

79.    These grants of unbridled discretion to Defendant's officials violates the First Amendment because they create a system in which the permissibility of speech is judged without any standards, thus giving employees such as Gebert no way to prove that a denial, restriction, or relocation of their speech was based on unconstitutional considerations.

80.    Because Defendant has failed to establish a compelling government interest that is narrowly tailored governing the decision whether to allow employees to speak about certain topics and which viewpoints they may hold regarding certain topics, and ergo, which viewpoints need to be disclosed as part of an investigation, there is a substantial risk that Defendant officials will engage in content and viewpoint discrimination: exactly what occurred to Plaintiff's detriment as alleged herein.

81.    The questions asked at the end of the subject interview and outlined in paragraph 13 are unconstitutional and violate a security clearance Applicant's First Amendment rights.

**The Defendant's FOIA and Privacy Act Violations**

17

82.     On July 15, 2020, Plaintiff's counsel submitted an initial FOIA request. See Exhibit F.

83.     The email and letter were initially sent to the wrong department in the Defendant State Department, DSPSSCRP, however, this mistake was immediately corrected and the request was submitted via email to FOIArequest@state.gov on July 16, 2020. See Exhibit G.

84.     This request specifically stated that it was regarding the Security Clearance Revocation dated July 1, 2020, of Mathew Q. Gebert and was seeking:

> 1) All interagency and intra-agency correspondence pertaining to the above.
>
> 2) All interagency and intra-agency records related to the individual.
>
> 3) All interagency and intra-agency correspondence pertaining to the Security Clearance Revocation.
>
> 4) All investigation and standard forms pertaining to the above.

85.      The Defendant assigned this request Privacy Act Case # P-2020-00021.

86.     On September 24, 2021, a final determination was made by the Defendant's FOIA and Privacy Act Division, Bureau of Diplomatic Security, which indicated the Defendant would respond and release documents under two separate Segments.

87.     Segment I was said to consist of 509 pages, of which 296 pages were released in full, 124 pages were withheld because "they are about other persons," and a portion of one page and 14 other pages in their entirety originated with other federal agencies and were "referring for their review and direct reply to" Plaintiff.  See Exhibit H .

88.     This response clearly indicates 509 pages were responsive, but the Defendant only provided and described/accounted for 414 pages in their September 24, 2021, letter to Plaintiff.

89.     To date, the Defendant has not supplemented this request or provided an accounting of the missing 95 pages that they are improperly withholding without authority; as such, the Defendant's response is deficient, and they are in violation of the FOIA.

90.     Further, Defendant indicated in Segment I that one partial page and 14 total pages originated with another agency and that the Defendant referred Plaintiff's request to that agency.

91.     To date, no other federal agency has provided responsive records or any response to Plaintiff acknowledging receipt of this referral; the Defendant also failed to disclose to what agency they were referring in order for Plaintiff to even attempt to obtain these records on his own.

92.     Either Defendant performed an improper referral, and, thus, violated FOIA and the Privacy Act, or the agency to which they referred botched the handling of the referral and they violated the FOIA and Privacy Act.[8]

93.     Segment II was said to consist of 456 pages, of which 278 pages were released in full, portions of 171 pages and seven pages in their entirety were released with redactions, and a portion of one page originated with another federal agency and it was "referred for their review and direct reply to" Plaintiff.  See Exhibit I.

**94.**     This response clearly indicates 456 pages were responsive, and while their response may have accounted for 456 pages, the Defendant only provided 420 pages with their September 24, 2021, letter to Plaintiff.  See Exhibit ___.

---

[8]     If it is the latter, once the Defendant provides this information, Plaintiff will seek to amend to add this agency as a defendant to this suit.

**95.**    To date, the Defendant has not supplemented this request or provided an accounting of the missing 36 pages that they are improperly withholding without authority; as such, the Defendant's response is deficient, and they are in violation of the FOIA.

**96.**    Further, Defendant indicated in Segment II that one partial page originated with another agency and that the Defendant referred Plaintiff's request to that agency.

**97.**    To date, no other federal agency has provided responsive records or any response to Plaintiff acknowledging receipt of this referral; the Defendant also failed to disclose to what agency they were referring in order for Plaintiff to even attempt to obtain these records on his own.

98.    Either Defendant performed an improper referral, and, thus, violated FOIA and the Privacy Act, or the agency to which they referred botched the handling of the referral and they violated the FOIA and Privacy Act.[9]

99.    Plaintiff was unable to appeal the releases because the Defendant did not release the documents that they mentioned in the letter nor did they provide justifications for the documents being withheld. Therefore, the Plaintiff has constructive exhaustion since the Defendants have not provided a release that would allow for the Plaintiff to appeal.

**100.**    The Plaintiff did not have an opportunity to administratively appeal the adverse determinations made on their requests because Defendant's releases did not provide the documents identified in the letters, the referring agency, and the statutory basis for the withholding of the missing documents. 5 U.S.C. § 552(a)(6)(A)(i)

---

[9]    If it is the latter, once the Defendant provides this information, Plaintiff will seek to amend to add this agency as a defendant to this suit.

Case 1:22-cv-02939-DLF   Document 48-2   Filed 04/25/24   Page 24 of 173

101.    Defendant sent a subsequent response for Case #P-2020-00021 on December 1, 2021.  See Exhibit J.

102.    This letter indicates that the State Department had advised Plaintiff that five pages remained under review, and that they had now determined that these five pages were being withheld in their entirety under 5 U.S.C. § 552(b)(7)(E).

103.    It is unclear to what State Department was referring to regarding "five pages": the Segment I letter indicated, "Information still under review will be addressed under separate cover"; and the Segment II letter indicated, "By previous correspondence, we advised you that additional information remained under review"; and the December 01, 2020, letter does not indicate what segment or other correspondence this may have been referenced in.

104.    This December 2020 letter cited a FOIA exemption, but it does not provide a Privacy Act exemption, nor does it say why the Privacy Act does not apply despite acknowledging that it was clearly a Privacy Act request.

105.    Again, the Plaintiff is unable to properly appeal the withholding of the five pages because the Defendants have not analyzed the cases under the Privacy Act.

106.    Additionally, prior to Plaintiff making official requests under FOIA and the Privacy Act on July 15, 2020, Gebert requested on July 10, 2020, the investigation materials relied upon by the Department so that he could rebut the July 1, 2020, security clearance revocation.  See Exhibit K.

107.    Of the hundreds of pages provided to Gebert in response to this request, 54 pages that were provided in response to his request were absent in the Defendant's responses to FOIA and Privacy Act requests sent by Plaintiff just five days after Gebert's request.

108.    The only explanation for Defendant's 54-page discrepancy, considering both requests sought the same information, is due to the Defendant still has not processed the Plaintiff's request, or, alternatively, because the Defendant has not performed an adequate search as required by FOIA and the Privacy Act.

**Improper Collection of Plaintiff's Information Under the Privacy Act**
**(5 U.S.C. §552a(e)(3))**

109.    Plaintiff did not sign a Privacy Act Statement before the subject interview where the investigators asked him questions.

110.    The agency is required to have the signed Privacy Act Statement, pursuant to 5 U.S.C. §552a(e)(3), to all persons asked to provide personal information about themselves, which will go into a system of records (i.e., the information will be stored and retrieved using the individual's name or other personal identifier such as a Social Security number).

111.    Any agency that asks for personal information without having a signed Privacy Act is precluded from storing any information about the individual.

112.    In this reinterview, the Plaintiff was asked by Defendant's employees, *inter alia*, the following questions:

i.    Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

ii.     Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

iii.     Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

113.    The Plaintiff responded in the negative to all three questions.

114.    The Defendant revoked the Plaintiff's security clearance because of his answers to those questions.

115.    The collection of the answers to those questions violates 5 U.S.C. §552a(e)(3).

116.    A failure to comply with 5 U.S.C. §552a(e)(3) resulted in an "adverse effect" on the Plaintiff (namely the loss of his security clearance, health insurance, all pay and benefits) which allows Plaintiff to bring a claim under 5 U.S.C. §552a(g)(D).

**The Questions Asked in the Subject Interview are not covered under the State Department's System of Records Notice Act (SORN) Volume 83, Number 116, Public Notice 10450; Page 28058**

117.    Agencies "shall subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include—

1.  the name and location of the system;
2.  the categories of individuals on whom records are maintained in the system;
3.  the categories of records maintained in the system;
4.  each routine use of the records contained in the system, including the categories of users and the purpose of such use;
5.  the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;
6.  the title and business address of the agency official who is responsible for the system of records;
7.  the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;
8.  the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can

contest its content; and

9.   the categories of sources of records in the system;" 5 U.S.C. §552a(e)(4)

118.   The SORN outlines the information that can be collected during the course of the security clearance process. The SORN specifically cites to threats, crimes, or national security related matters.

119.   The SORN does not allow for the agency to ask and collect information about the questions asked above.  More importantly, the Defendants are not allowed to ask about any potentially "embarrassing" involvement, support for, potential criticism of, and / or associations with groups that would be embarrassing to the State Department.

120.   The Agency was not allowed to ask about this information because this information is not allowed to be collected under any of the Agency's SORN.

Improper Collection of First Amendment Information **Under the Privacy Act**

121.   The Privacy Act specifically states that the Agency "shall…

maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

122.   Plaintiff did not expressly authorize the collection of information related to his First Amendment rights.

123.   No security clearance rule, regulation, or policy allows for the collection of First Amendment information.

124.   The security clearance interview was not part of a law enforcement activity nor have there ever been any criminal allegations. More specifically, Guideline J of SEAD 4 is never mentioned or referenced in the Plaintiff's security clearance revocation documents.

125.   There is no statute that allows for the collection of First Amendment information for a security clearance Applicant.

126.    Most importantly, the Agency's own SORN does not allow for the collection of this Information.

**Improper Sharing of Information Under the Routine Use Provision of 5 U.S.C. §552a(e)(3) and 5 U.S.C. §552a(e)(7)**

127.    The Privacy Act specifically identifies conditions for disclosure of collection information, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be:

> ...(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

> …(7) to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

128.    Since the Plaintiff did not sign a Privacy Act Statement for the subject interview nor did he sign a Privacy Act Statement specific to the collection of his First Amendment activity, Defendant violated the routine use of the information collected by storing it in their system of records.

129.    Since the Plaintiff did not sign a Privacy Act Statement for the subject interview nor did he sign a Privacy Act Statement specific to the collection of his First Amendment activity, Defendant violated the routine use of the information collected by storing and sharing the information with the Department of Justice when there was no suggestion of criminal conduct.

<u>**COUNT I**</u>
**Violation of the First Amendment of the United States Constitution By Infringing on Plaintiff's Right of Freedom of Speech**

25

130.    The Plaintiff adopts and incorporates by reference paragraphs 1 through 129    as if fully stated.

131.    The Defendant injured Plaintiff by depriving him of his ability to work for the Agency and earn a living because of protected opinions he expressed in his personal capacity.

132.    The Defendant acted negligently and wrongfully by revoking Plaintiff's security clearance for asserting his personal beliefs without identifying himself as a government employee while on his personal time.

133.    Plaintiff asserted his First Amendment right to freedom of speech for which his clearance was revoked. Not a national security concern, but a constitutional violation.

134.    The First Amendment of the United States Constitution guarantees individuals the right to free speech, association, and the right to assemble.

135.    The Defendant either intentionally, recklessly, or with callous indifference to the federally protected rights of the Plaintiff has threatened, silenced, and/or chilled Plaintiff's rights to freedom of speech and association by using Plaintiff's lawful speech and associations with lawful groups in his private life as the basis to strip him of his security clearance and position in the State Department.

136.    Defendant's actions also serve to violate the freedom of the press, as much of the speech they are attempting to chill, restrict, impede, and prevent was specifically related to Plaintiff's writings on websites and blogs, as well as times he spoke as a guest speaker on radio shows and podcasts.

137.    Defendant's discriminatory actions and associated practices are overbroad because they prohibit and restrict protected expression.

138.    Defendant has not established a sufficient nexus to censor private speech on matters of public concern. The First Amendment protection provided for public employee speech

is limited to speech by a citizen on a matter of public concern where the government does not have an adequate justification for treating an employee differently from another member of the public.

139.   In fact, the Defendant allows for employees to publicly support the BLM movement *in the workplace* while revoking the Plaintiff's security clearance for expressing the same concerns for a different race.

140.   Every day that the Defendant fails to act on the February 2021 response and November 2021 supplemental response is another day that the Plaintiff is irreparably harmed. The Defendant is abusing its power by not only revoking the Plaintiff's security clearance based upon constitutionally protected speech, but they are depriving the Plaintiff of his job and health insurance.

141.   WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights by using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

### <u>COUNT II</u>
### Violation of the First Amendment - Freedom of Association

142.   The Plaintiff adopts and incorporates by reference paragraphs 1 through 141     as fully stated.

143.   The First Amendment of the United States provides the Freedom of Association.

144.   The Defendant violated the Plaintiff's constitutional protected right of a freedom to associate with others who have similar political, religious, and cultural beliefs.

145.     Instead the Defendant revoked the Plaintiff's security clearance because he associated with individuals whom the Defendant deemed expressed beliefs that would bring discredit and embarrassment to the Defendant. This standard on its face violates the Constitution.

146.     The Defendant's actions violated the Plaintiff's right to Freedom of Association.

147.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT III
### Violation of the First Amendment - Freedom of Assembly

148.     The Plaintiff adopts and incorporates by reference paragraphs 1 through 147     as fully stated.

149.     The Defendant revoked the Plaintiff's security clearance for attending meetings, dinners, conferences, gatherings, and the Charlottesville protests because the content of the meetings was deemed offensive and embarrassing.

150.     The Plaintiff's constitutional right to freedom of assembly is being violated and the Constitution does not differentiate between offensive and non-offensive, embarrassing and non-embarrassing because it is subjective and violates the intent of the First Amendment.

151.     Plaintiff has a constitutionally protected right to lawfully assemble with whomever he chooses even if the security clearance adjudicator does not agree with the ideologies held by other attendees.

152.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

**COUNT IV**
**First Amendment Retaliation**

153.     The Plaintiff adopts and incorporates by reference paragraphs 1 through 152   as fully stated.

154.     The Plaintiff engaged in protected speech by discussing matters of public concern (i.e. the country's immigration policies and beliefs on race) on his own time, under pseudonyms, never stating or implying that he was speaking on the behalf of the Defendant.

155.     The Defendant retaliated against the Plaintiff by revoking his security clearance for said speech.

156.     The Defendant notified the Plaintiff that they were revoking the Plaintiff's security clearance for aforementioned speech thereby satisfying the causal link between the conduct and the adverse effect.

157.     Defendant's revocation of Plaintiff's security clearance satisfies the elements of First Amendment retaliation.

158.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff

reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT V
### Violation of the First Amendment of the United States Constitution
### Selective Enforcement

159.  The Plaintiff adopts and incorporates by reference paragraphs 1 through  as fully stated.

160.  Defendant is being untruthful in stating that their reason for suspending Gebert's clearance was due to "dishonesty," which makes the subsequent employment actions taken based on the suspended security clearance, the administrative leave without pay, for instance, equally improper.

161.  Defendant's real reason for suspending Gebert's clearance and placing him in an administrative leave without pay status was due to the backlash from the Hatewatch article, as well an overall disapproval of Gebert's viewpoints by the current personnel in the State Department.

162.  Gebert's speech and associations that formed the content of the Hatewatch article are constitutionally protected, and, therefore, make the Defendant's actions unconstitutional.

163.  Even if the Agency believed Gebert was intentionally withholding his "pro-white" beliefs and that formed the basis of saying he was "dishonest" this would be improper, incorrect, and this is not being applied equally.

164.  Individuals who support Black Lives Matters, for all intents and purposes, are promoting "pro-black" ideals.

165.  Individuals who support BLM are not required to disclose their affiliation or approval of BLM.

166.  In other words, Gebert is being called "dishonest" for not disclosing his

"pro-white" ideals, but similarly situated employees and applicants who are not disclosing their "pro-black" ideals are not being labeled "dishonest."

167.    This means "pro-black" personnel are being treated more favorably than "pro-white" personnel: they are not being investigated; they are not having their clearance suspended; they are not being placed in an LWOP status due to a suspended or revoked clearance, etc.

168.    Plaintiff knows, at a minimum, that on August 27, 2020, Deputy Assistant Secretary of State for African Affairs, Elizabeth Fitzsimmons, outwardly supported BLM at a townhall for the Young African Leaders Initiative (YALI).

169.    Upon information and belief, Ms. Fitzsimmons did not disclose her support of "pro-black" views during any investigation or security clearance questionnaire; she has not been accused of being "dishonest" for failing to disclose her ties during investigations; and she remains employed by the State Department and not in an LWOP status due to her support of BLM and/or her answers to security clearance background investigations regarding BLM.[10]

170.    On February 14, 2022, the BLM flag was raised on the premises of the U.S. Embassy and Consulates in Brazil.

171.    State Department Foreign Affairs officer Douglas Koneff participated in the flag raising ceremony, stating, "Today, we raise this flag to reiterate the importance of black lives around the world."[11]

172.    Upon information and belief, Mr. Koneff did not disclose his support of "pro-black" views during any investigation or security clearance questionnaire; he has not been accused of being "dishonest" for failing to disclose his ties during investigations; and he remains

---

[10]        https://yali.state.gov/yali-town-hall-racism-and-the-black-lives-matter-movement-around-the-world/

[11]

https://br.usembassy.gov/u-s-embassy-and-consulates-fly-black-lives-matters-flag-in-commemoration-of-black-history-month/

employed by the State Department and not in an LWOP status due to his support of BLM and/or his answers to security clearance background investigations regarding BLM.

173.    Upon information and belief, not a single State Department employee or applicant has been labeled "dishonest" for failing to disclose his/her affiliation with or support of BLM ideals.

174.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT VI
### Equal Protection Claim

175.    The Plaintiff adopts and incorporates paragraphs 1 through 174 as fully stated.

176.    Defendant took disciplinary and retaliatory action against Gebert that resulted in years of lost pay based on Gebert's political and ideological speech and associations.

177.    Politics, nationalism, religion, and other topics discussed by Gebert are fundamental rights, and the Defendant's actions violated Gebert's fundamental rights.

178.    A government regulation that implicates political or ideological speech receives strict scrutiny, and the government must show that the law is narrowly tailored to achieve a compelling government interest.

179.    The Defendant is not able to show that punishing protected speech achieves any compelling government interest.

180.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order

that Defendant State Department is in violation of the Constitution (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## **COUNT VII**
Violation of the First Amendment of the United States Constitution
Overbreadth

181.    Gebert realleges paragraphs 1 through 180   as if fully stated herein.

182.    Gebert contends that the procedures or methods used by the Department in the clearance process are constitutionally defective.

183.    Specifically, Gebert contends that the three subject questions the Department contends he was dishonest in answering are overbroad, vague, and facially unconstitutional.

184.    Each of these questions, on its own, is overbroad, vague, and facially unconstitutional, which includes the following:

a.      Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

b.      Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

c.      Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

185.    The Department is interpreting the questions at issue here to require applicants to

disclose their political associations and speech as well as their ideological beliefs. These are clearly activities within the freedom of speech, and the concern underlying the overbreadth doctrine – chilling speech – is directly at issue here.

186.    The policies, procedures, and methods as relied upon and applied by the State Department could, undoubtedly, regulate a substantial amount of constitutionally protected expression.

187.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## **COUNT VIII**
Violation of the First Amendment of the United States Constitution
Vagueness

188.    Gebert realleges paragraphs 1 through 187   as if fully stated herein.

189.    Gebert contends that the procedures or methods used by the Department in the clearance process are constitutionally defective.

189.    Gebert contends that the two subject questions the Department contends he was dishonest in answering are overbroad, vague, and facially unconstitutional.

190.    Each of these questions, on its own, is overbroad, vague, and facially unconstitutional, which includes the following:

a.      Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

b.      Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

c.      Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

191.    Specifically, Defendant's arguments hinge almost entirely on their definition of "embarrassing" and whether or not Gebert should have known his words, actions, and affiliations met the Department's definition of the term "embarrassing."

192.    However, what is "embarrassing" to the State Department is, obviously, not embarrassing to Mr. Gebert, and the State Department's inability to come to that realization three years ago has resulted in a gross violation of Gebert's First Amendment rights and over three years of indefinite suspension without pay.

193.    There was no qualifier, clarification, or context to the word "embarrassing" during Gebert's interview or re-interviews; to expect Gebert to disclose his constitutionally protected speech and associations in response to such an ambiguous question is illogical.

194.    In fact, during this interview - and immediately after the specific question(s) in regard to matters that were "embarrassing" - the interviewer was virtually unintelligible and acknowledged a medical throat issue as explanation; she admitted she would have to retire soon

due to this issue, and, at one point, she handed over papers to sign instead of continuing with the in-person interview questions.[12]

195.    The questions posed to Gebert were not clear enough for him to know what was and was not prohibited and/or required.

196.    The Defendant used the questions posed to Gebert arbitrarily and in a discriminatory fashion to punish Gebert for his "pro-white" views.

197.    Moreover, to require Gebert to volunteer his ideologies and political beliefs in response to overbroad, vague, and facially unconstitutional questions such as these would constitute an enormous invasion of not only Gebert's civil liberties, but also those of all other individuals whose speech and associations would be chilled as a result of such questions.

198.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

**COUNT IX**
**Violation of the Due Process Clause of the Fifth Amendment of the United States Constitution - Reputational Harm**

199.    The Plaintiff adopts and incorporates by reference paragraphs 1 through 198      as if fully stated.

200.    Defendant has failed to meaningfully allow Plaintiff the opportunity to defend himself and clear his name; to date, Plaintiff has issued no public statements, has rejected all

---

[12]       Gebert asserts this in the September 27, 2019 interview, which is found within the FOIA response materials provided to Plaintiff.  This discussion can be found on page 143 of 452 of Department's materials, which is also marked as "page 74" of the interview transcript.

requests for interview, and has never responded to media inquiries regarding his employment with or suspension by Defendant. Absent any guidance from Defendant, this essentially amounts to a three-year voluntary gag order stemming from Plaintiff's belief that such silence would be in his and the Defendants' best interests.

201.    Defendant's failure has deprived Plaintiff of his liberty interest in his reputation.

202.    There is continued stigma and disability arising from the Defendant's official action.

203.    Defendant has tailored his education and dedicated his professional life to a career as a foreign affairs officer through the State Department.

204.    Defendant has dedicated and invested a significant portion of his professional life into public service and time as a civil servant; however, one cannot concurrently hold two federal positions at the same time.

205.    Plaintiff attempted to gain employment through the United States Postal Service (USPS), in February 2020, and the Census Bureau, late 2020 to early 2021, while he was suspended by Defendant. Plaintiff received employment offers from both employers (in writing with the USPS and verbally from the Census Bureau; however, during the pre-onboarding phase with the agencies' respective Human Resources departments both prospective employers specifically stated he would need to resign from the State Department before being further considered for the opportunity.

206.    As the Plaintiff is unwilling, nor should he be forced to, resign his employment with Defendant State Department while they continue to fail to act on his matters.

37

207. Therefore, the Defendant's official action, as well as their lack of action, have had a broad effect of largely precluding Plaintiff from pursuing his chosen career.

208. The Defendant has seriously affected, if not destroyed, his ability to obtain employment in his field.

209. WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the Fifth Amendment; (2) an injunction compelling the Defendant to: (i) cease discriminating against the client; (ii) cease inserting unconstitutional criteria into Defendant's processes; and (iii) adjudicate Plaintiff's clearance issue favorably and reinstate Plaintiff with all benefits, backpay, and compensate him for harm caused; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## <u>COUNT X</u>
**(Violation of the Administrative Procedures Act - Violation of 3 FAM 3600, *et al*., 5 U.S.C. 89 and 5 CFR § 890, et al.**

210. The Plaintiff adopts and incorporates by reference paragraphs 1 through 209    as fully stated.

211. The Defendant provides for a process to notify Plaintiff of his option to continue receiving health insurance for up to 365 days by way of paying his own premiums.

212. The Defendant did not notify Plaintiff of this option, as they were required to by law and policy.

213. Specifically, 5 CFR § 890.502(b) lists several requirements that the employer agency "must" do:

(b) Procedures when an employee enters a leave without pay (LWOP) status or pay is insufficient to cover premium. The employing office must tell the employee about available health benefits choices as soon as it becomes aware that an employee's premium payments cannot be made because he or she will be or is already in a leave without pay (LWOP) status or any other type of nonpay status… The employing office must also tell the employee about available choices when an employee's pay is not enough to cover the premiums.

(1) The employing office must give the employee written notice of the choices and consequences as described in paragraphs (b)(2)(i) and (ii) of this section and will send a letter by first class mail if it cannot give it to the employee directly. (Emphasis added)

214.    Initially during Plaintiff's suspension, Plaintiff's paystubs reflected Defendant had been covering the employer-responsible portion of health benefits, which was consistent with the Provider, Aetna's, practices and procedures.

215.    At some point during the Fall of 2021, prescription and medical bills began getting denied retroactively by the Provider.

216.    Upon information and belief, Defendant, without prior notice to or consent by Plaintiff and without proper authorization, retroactively terminated Plaintiff's health benefits as of the date of his suspension without pay in September 2019.

217.    Not only do Defendants fail to take affirmative steps, such as provide required notice, but Defendants also went the extra step with Gebert to retroactively cancel coverage for periods over which he had already paid the premiums, thereby causing Plaintiff to suffer significant economic damages.

218.    On January 23, 2024, the Plaintiff, Matthew Gebert, received a letter directly from the Defendant, Department of State, concerning the termination of his health benefits while in a non-pay status.  See Exhibit L.

219.    The Defendant specifically states this letter as being sent now "due to the agency's error."

220.     The error which they are now acknowledging is their failure to notify Gebert of his coverage choices.

221.     Both Plaintiff's Complaint, as well as their opposition to the Defendant, Department of State's Motion to Dismiss, cited violations of 3 FAM 3600, et al, as well as 5 CFR § 890.502(b), which lists several requirements that the employer agency "must" do that the State Department clearly violated, including the following:

222.     In light of the Defendant's letter of January 19, 2024, which clearly notes *their* failure to properly inform the Plaintiff of his insurance options in a timely manner, and specifically *prior to his termination*, the Plaintiff is hereby requesting that the Court find that the Defendant violated 3 FAM 3600 and 5 CFR § 890.502(b).

223.     Furthermore, Defendants' letter proves the intent of the Defendant to eliminate Gebert without any consideration of his rights.

224.     The Defendant simply wanted to be able to tell the general public that Gebert no longer received any benefits from the government despite, which among other violations, resulted in violating his entitlement to health insurance for the prescribed period of time after his termination.

225.     This document proves that the Government intentionally put Gebert's health and financial well-being in jeopardy out of spite.

226.     This violation of regulation resulted in financial harm to Gebert and his family during the relevant time period.

227.     Such act by Defendant, either through intentional malice or through gross negligence, was done so in an arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law    , regulation, and policy in violation of     the Administrative Procedures Act.

228.   WHEREFORE, Plaintiff is entitled to relief in the form of a declaratory order that Defendant is in violation of its regulation and an injunction compelling Defendant pursuant to the APA to follow its self-imposed mandate of 3 FAM 3600, *et al*.  Further, by way of the Court granting relief, the Defendant would retroactively cover the expenses incurred during the relevant time period.

## <u>COUNT XI</u>
### Violation of the Privacy Act, 5 U.S.C. §552a (Defendant's Failure to Obtain a Signed Privacy Act Statement)

229.   The Plaintiff adopts and incorporates by reference paragraphs 1 through 228     as fully stated.

230.   The Defendant did not collect nor ask the Plaintiff to sign a Privacy Act Statement before the subject interview where the investigators asked him questions.

231.   The agency is required to have the signed Privacy Act Statement, pursuant to 5 U.S.C. §552a(e)(3), to all persons asked to provide personal information about themselves, which will go into a system of records (i.e., the information will be stored and retrieved using the individual's name or other personal identifier such as a Social Security number).  Specifically, the statute requires the agency to:

**(3)** inform each <u>individual</u> whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the <u>individual</u>—

**(A)** the authority (whether granted by statute, or by executive <u>order</u> of the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary;

**(B)** the principal purpose or purposes for which the information is intended to be used;

**(C)** the <u>routine uses</u> which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; and

**(D)** the effects on him, if any, of not providing all or any part of the requested information;

232.     Gebert was not properly informed via a Privacy Act Statement nor did he consent or provide written acknowledgement that such information could be collected, stored, used, and disseminated.

233.     This is a violation of 5 U.S.C. § 552a(g)(1)(D) as the information collected subsequently to the Defendant's failure to provide the Privacy Notice was and continues to be used against Gebert and had an adverse effect on him in the form of, among other effects, lost wages, benefits, his security clearance, and damage to his reputation.

234.     The Defendant acted in a manner which was intentional and willful.

235.     WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); (4) award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B); and (5) grant such other relief as the Court may deem just and proper.

## COUNT XII
### Violation of the Privacy Act, 5 U.S.C. §552a(e)(3) (Collecting Information that is not contained in the State Department's System of Records Notice Act (SORN) Volume 83, Number 116, Public Notice 10450; Page 28058)

236.     The Plaintiff adopts and incorporates by reference paragraphs 1 through 235     as fully stated.

236.     Agencies "shall subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include—

1.  the name and location of the system;
2.  the categories of <u>individuals</u> on whom <u>records</u> are maintained in the system;
3.  the categories of <u>records</u> maintained in the system;

4.  each <u>routine use</u> of the <u>records</u> contained in the system, including the categories of users and the purpose of such use;

5.  the policies and practices of the <u>agency</u> regarding storage, retrievability, access controls, retention, and disposal of the <u>records</u>;

6.  the title and business address of the <u>agency</u> official who is responsible for the <u>system of records</u>;

7.  the <u>agency</u> procedures whereby an <u>individual</u> can be notified at his request if the <u>system of records</u> contains a <u>record</u> pertaining to him;

8.  the <u>agency</u> procedures whereby an <u>individual</u> can be notified at his request how he can gain access to any <u>record</u> pertaining to him contained in the <u>system of records</u>, and how he can contest its content; and

9.  the categories of sources of <u>records</u> in the system;" 5 U.S.C. §552a(e)(4)

237.   The SORN outlines the information that can be collected during the course of the security clearance process. The SORN specifically cites to threats, crimes, or national security related matters.  It does not reference First Amendment activities.

238.   The SORN does not allow for the agency to ask and collect information about the questions asked above.  More importantly, the Defendants are not allowed to ask about any potentially "embarrassing" involvement, support for, potential criticism of, and / or associations with groups that would be embarrassing to the State Department.

239.   The Agency was not allowed to ask about this information because this information is not allowed to be collected under any of the Agency's SORN.

240.   Plaintiff is being irreparably harmed by reason of Defendant's unlawful collection, use, storage, and dissemination of such information without proper authority. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

241.   This is a violation of 5 U.S.C. § 552a(g)(1)(D) as the information collected and stored in violation and contrary to the SORN was and continues to be used against Gebert and

had an adverse effect on him in the form of, among other effects, lost wages, benefits, his security clearance, and damage to his reputation.

242.   The Defendant acted in a manner which was intentional and willful.

243.   WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); (4) award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B); and (5) grant such other relief as the Court may deem just and proper.

### COUNT XIII
### Violation of the Privacy Act, 5 U.S.C. §552a(e)(7) (Collecting First Amendment Information Without Proper Authority)

244.   Plaintiff realleges paragraphs 1 through 243 as if fully stated herein.

245.   The Privacy Act specifically states that the Agency "shall…

maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

246.   Plaintiff did not expressly authorize the collection of information related to his First Amendment rights.

247.   No security clearance rule, regulation, or policy allows for the collection of First Amendment information.

248.   The security clearance interview was not part of a law enforcement activity nor have there ever been any criminal allegations. More specifically, Guideline J of SEAD 4 is never mentioned or referenced in the Plaintiff's security clearance revocation documents.

249.   There is no statute that allows for the collection of First Amendment information

for a security clearance Applicant.

250.    Most importantly, the Agency's own SORN does not allow for the collection of this Information.

251.    Plaintiff is being irreparably harmed by reason of Defendant's unlawful collection, use, storage, and dissemination of such information without proper authority. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

252.    This is a violation of 5 U.S.C. § 552a(g)(1)(D) as the information collected qualify as records describing how Gebert was exercising his First Amendment rights, which is expressly prohibited without Gebert's consent – which Defendant did not obtain – or authorized by statute, which does not exist.

253.    First Amendment-related information was and continues to be used against Gebert and had an adverse effect on him in the form of, among other effects, lost wages, benefits, his security clearance, and damage to his reputation.

254.    The Defendant acted in a manner which was intentional and willful.

255.    WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); (4) award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B); and (5) grant such other relief as the Court may deem just and proper.

**COUNT XIV**
**Improper Sharing of Information Under the Routine Use Provision of 5 U.S.C. §552a(e)(3)**
**and 5 U.S.C. §552a(e)(7)**

256.    Plaintiff realleges paragraphs 1 through 255  as if fully stated herein.

257.   The Privacy Act specifically identifies conditions for disclosure of collection information, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be:

> …(3) for a <u>routine use</u> as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;
>
> …(7) to another <u>agency</u> or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the <u>agency</u> or instrumentality has made a written request to the <u>agency</u> which <u>maintains</u> the <u>record</u> specifying the particular portion desired and the law enforcement activity for which the <u>record</u> is sought;

258.   Since the Plaintiff did not sign a Privacy Act Statement for the subject interview nor did he sign a Privacy Act Statement specific to the collection of his First Amendment activity, Defendant violated the routine use of the information collected by storing it in their system of records.

**259.**   Since the Plaintiff did not sign a Privacy Act Statement for the subject interview nor did he sign a Privacy Act Statement specific to the collection of his First Amendment activity, Defendant violated the routine use of the information collected by storing and sharing the information with the Department of Justice when there was no suggestion of criminal conduct.

260.   This is a violation of 5 U.S.C. § 552a(g)(1)(D) as the information collected and stored in violation and contrary to the Routine Use notice – or lack theorf - of which Gebert was notified  and this information was and continues to be used against Gebert and had an adverse

effect on him in the form of, among other effects, lost wages, benefits, his security clearance, and damage to his reputation.

261.    The Defendant acted in a manner which was intentional and willful.

262.    WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); (4) award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B); and (5) grant such other relief as the Court may deem just and proper.

### COUNT XV
### Violation of the Privacy Act, 5 U.S.C. §552a

263.    Plaintiff realleges paragraphs 1 through 262    as if fully stated herein.

264.    Plaintiff is an individual seeking access to information about himself.

265.    Any documentation in the possession, custody, and control of Defendant is a record maintained in a system of records, as described 5 U.S.C. §552a(a)(4)- (5).

266.    Upon information and belief, there are records responsive to Plaintiff's request that are being withheld in full and the Defendants violated 5 U.S.C. §552a. The Defendant is wrongfully withholding records and information requested.

267.    The Defendant identified responsive records in their responses, but their explanation does not account for the number of responsive records withheld, nor were the number of records claimed to be releasable actually provided to Plaintiff.

268.    Therefore, the Defendant has not provided an adequate response as required by the Privacy Act, which means they have not complied with the statutory timeline to provide a response.

269.     The Defendant violated the Privacy Act by failing to properly respond within the statutorily mandated time limit, as their September and December 2020 responses were deficient.

270.     The Defendant violated the Privacy Act by failing to cite Privacy Act exemptions in their December 2020 letter, which made the withholding of the five pages in their entirety improper.

271.     The Defendant violated the Privacy Act by failing to properly refer Plaintiff's Privacy Act request to the unnamed agencies it identified as the originating agency within Segments I and II.

272.     The Defendant violated the Privacy Act by failing to conduct an adequate search that led to the agency failing to identify and produce at least 50 pages known to the Plaintiff to exist and be responsive to Plaintiff's Privacy Act request.

273.     The Defendant violated 5 U.S.C. § 552a(g)(1)(B) by refusing to comply with Plaintiff's request under subsection (d)(1) under the statute.

274.     Plaintiff was unable to appeal the releases because the Defendant did not release the documents that they mentioned in their letter nor did they provide justifications for the documents being withheld. Therefore, the Plaintiff has constructive exhaustion since the Defendants have not provided a release that would allow for the Plaintiff to appeal.

275.     The Plaintiff did not have an opportunity to administratively appeal the adverse determinations made on their requests because Defendant's releases did not provide the documents identified in the letters, the referring agency, and the statutory basis for the withholding of the missing documents. , 5 U.S.C. § 552a(6)(A)(i).Plaintiff has exhausted applicable administrative remedies.

276.     Plaintiff has exhausted applicable administrative remedies.

277.    Plaintiff is being irreparably harmed by reason of Defendant's unlawful withholding of requested records. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

278.    Plaintiff is being irreparably harmed by reason of Defendant's unlawful withholding of requested records. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

279.    WHEREFORE, Plaintiff respectfully requests that the Court:  (1) declare that Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. § 552(a)(4)(E); and (4) grant such other relief as the Court deems just and proper.

## COUNT XVI
### Violation of the Freedom of Information Act-5 U.S.C. §552

280.    Plaintiff realleges paragraphs 1 through 279 as if fully stated herein.

281.    Defendant is unlawfully withholding records requested by Plaintiff pursuant to 5 U.S.C. §552.

282.    The Defendant identified responsive records in their responses, but their explanation does not account for the number of responsive records withheld, nor were the number of records claimed to be releasable actually provided to Plaintiff.

283.    Therefore, the Defendant has not provided an adequate response as required by the FOIA, which means they have not complied with the statutory timeline to provide a response.

284.    The Defendant violated the FOIA by failing to properly respond within the statutorily mandated time limit, as their September and December 2020 responses were deficient.

285.    The Defendant violated the FOIA by failing to comply with its obligation of segregability when it made a blanket withholding of five entire pages based on exemption (b)(7)(E), which made the withholding of the five pages in their entirety improper.

286.    The Defendant violated the FOIA by failing to properly refer Plaintiff's FOIA request to the unnamed agencies it identified as the originating agency within Segments I and II.

287.    The Defendant violated the FOIA by failing to conduct an adequate search that led to the agency failing to identify and produce at least 50 pages known to the Plaintiff to exist and be responsive to Plaintiff's FOIA request.   Plaintiff was unable to appeal the releases because the Defendant did not release the documents that they mentioned in the letter nor did they provide justifications for the documents being withheld. Therefore, the Plaintiff has constructive exhaustion since the Defendants have not provided a release that would allow for the Plaintiff to appeal.

**288.**    The Plaintiff did not have an opportunity to administratively appeal the adverse determinations made on their requests because Defendant's releases did not provide the documents identified in the letters, the referring agency, and the statutory basis for the withholding of the missing documents. 5 U.S.C. § 552(a)(6)(A)(i)

289.    Plaintiff has exhausted applicable administrative remedies.

290.    Plaintiff is being irreparably harmed by reason of Defendant's unlawful withholding of requested records. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

291.    WHEREFORE, Plaintiff respectfully requests that the Court: (1) declare that Defendant violated the Freedom of Information Act; (2) order Defendant to immediately disclose

the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5

U.S.C. §552(a)(4)(E); and (4) grant such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF AS TO COUNTS I - X

**WHEREFORE,** the Plaintiff prayerfully requests that this Court:

292.    Declare that the Defendant is acting in violation of the First Amendment of the

United States Constitution;

293.    Declare that the Defendant violated the Plaintiff's protected constitutional rights

under the Due Process Clause of the Fifth Amendment of the United States Constitution;

294.    Enjoin the Defendant from continuing Plaintiff's suspension without leave;

295.    A preliminary and permanent injunction prohibiting Defendant, their agents,

officials, servants, employees, and any other persons acting on its behalf from continually

violating Plaintiff's constitutional rights and associated practices challenged in this Complaint;

296.    Order the Defendant to immediately reinstate Plaintiff's employment, granting

accrued seniority rights to account for his unlawful suspension, and order Defendant to pay all

back pay and front pay;

297.    Order the State Department to pay Plaintiff all back pay for compensation and

benefits, including but not limited to leave, healthcare, retirement, and fringe benefits, which

continue to accrue;

298.    Order the State Department to pay Plaintiff such front pay and future benefits,

including but not limited to leave, healthcare, retirement, and fringe benefits, which continue to

accrue, and other benefits and relief as may be appropriate; and Award Plaintiff his reasonable

attorney fees, litigation expenses, and costs as allowed under applicable laws, and grant such

other relief as this Court deems just to the Plaintiff and his attorneys.

## PRAYER FOR RELIEF AS TO COUNTS XI-XIV

**WHEREFORE,** the Plaintiff prayerfully request that this Court:

299.    Declare the Defendant's failure to comply with FOIA and the Privacy Act to be unlawful;

300.    Order the Defendant to conduct an independent and comprehensive search of its documents and records in response to Plaintiff's FOIA and Privacy Act Request, control number P-2020-00021;

301.    Order the Defendant to produce all responsive records without further delay or charge;

302.    Enjoin the Defendant from continuing to withhold records responsive to Plaintiff's FOIA and Privacy Act Request;

303.    Award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B);

304.    Award Plaintiff attorney's fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. §552a(g)(4)(B); and

305.    Grant such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF AS TO COUNTS XV-XVI

**WHEREFORE,** the Plaintiff prayerfully request that this Court:

306.    Declare the Defendant's failure to comply with FOIA and the Privacy Act to be unlawful;

307.    Order the Defendant to conduct an independent and comprehensive search of its documents and records in response to Plaintiff's FOIA and Privacy Act Request, control number P-2020-00021;

308.    Order the Defendant to produce all responsive records without further delay or charge;

309. Enjoin the Defendant from continuing to withhold records responsive to Plaintiff's FOIA and Privacy Act Request;

310. Award Plaintiff attorney's fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. §552(a)(4)(E); and

311. Grant such other relief as the Court deems just and proper.

Dated:  April 26, 2024                    Respectfully submitted,

By: /s/ Brett J. O'Brien
BRETT O'BRIEN, ESQ
Bar License #: 1753983
NATIONAL SECURITY LAW FIRM, LLC
1250 Connecticut Avenue
NW Suite 700
Washington, DC 20036
Phone: (202) 600-4996
Fax:     (202) 545-6318

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MATTHEW GEBERT** | ) |
| 270 Philadelphia Ave. | ) |
| Purgitsville, WV 26852 | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| V. | ) |
| | ) |
| **DEPARTMENT OF STATE** | )   Civil Action No. 22-2939 (DLF) |
| 2201 C St., NW | ) |
| Washington, District of Columbia 20520 | ) |
| | ) |
| ~~**ANTONY BLINKEN,**~~ | ) |
| ~~Secretary of State~~ | ) |
| ~~**BRUCE COLE**~~ | ) |
| ~~Executive Director~~ | ) |
| ~~Bureau of Economic and Business Affairs~~ | ) |
| ~~Bureau of Energy Resources~~ | ) |
| | ) |
| ~~**JEANNE M. JULIAO**~~ | ) |
| ~~Deputy Assistant Secretary~~ | ) |
| ~~Office of the Director General~~ | ) |
| ~~Bureau of Human Resources~~ | ) |
| ~~State Department~~ | ) |
| | ) |
| ~~**CALLI FULLER**~~ | ) |
| ~~Acting Director~~ | ) |
| ~~Office of Employee Relations~~ | ) |
| ~~Bureau of Human Resources~~ | ) |
| ~~State Department~~ | ) |
| | ) |
| ~~**DOUGLAS P. QUIRAM**~~ | ) |
| ~~Director~~ | ) |
| ~~Bureau of Diplomatic Security~~ | ) |
| | ) |
| ~~**TODD J. BROWN**~~ | ) |
| ~~Director~~ | ) |
| ~~Diplomatic Security Service~~ | ) |

1

~~JOHN DOE #1~~ )
~~Supervisory Special Agent (SSA)~~ )
~~Diplomatic Security (DS)~~ )
~~Assigned to Office of Special Investigations~~ )
)
~~JOHN DOE #2~~ )
~~Special Agent (SA)~~ )
~~Diplomatic Security (DS)~~ )
~~Assigned to Office of Special Investigations~~ )
)
~~JOHN DOES 1-10~~ )
~~Federal Government Employee~~ )
)
_____ )
)
**As to each Defendant Serve:** )
U.S. Attorney for the District of Columbia )
Attn: Civil Process Clerk )
555 4th Street, NW )
Washington, DC 20530 )
)
Office of the Legal Advisor (L/EX) )
Department of State )
Suite 5600 )
600 19th Street, NW )
Washington DC 20522 )
)
)
Defendants. )
_____ )

**~~FIRST~~ SECOND AMENDED COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

For his ~~First~~Second Amended Complaint, Matthew Gebert ("~~Mr.~~ Gebert" or "Plaintiff"),

by the undersigned counsel, states as follows:

~~1.~~    The Plaintiff brings this action for declaratory, injunctive, and other appropriate

relief against the Defendant~~s~~ for actions they have taken and continue to take against their

2

1. employee, Gebert~~Mr. Gebert (Plaintiff)~~; specifically, the Defendant~~s~~ ha~~s~~ve placed ~~Plaintiff~~ Gebert in an indefinite Leave Without Pay (LWOP) status and ha~~s~~ve revoked his Top Secret security clearance pending the outcome of a suitability determination.

2. Further, Plaintiff brings this action for injunctive relief and other appropriate relief and seeks the disclosure and release of agency records improperly withheld from the Plaintiff by the Defendant, the Department of State, and their subordinate agencies, pursuant to the Privacy Act of 1974, 5 U.S.C. §552a et seq. and the Freedom of Information Act, 5 U.S.C. §552(a) et seq.

~~3.   While the Plaintiff acknowledges security clearance revocations and denials are reserved for the individual agencies' review, these claims satisfy the constitutional exceptions to the rule.~~ In this case, the Defendant'ss¹ basis for ~~their~~ its employment-related actions were based on violating Plaintiff's: (1) First Amendment protections of free speech, ~~; (2) unequal enforcement of SEAD 4, Security Clearance Guidelines; (3)~~ freedom of association, and; ~~(4)~~ freedom of assembly;

3.   ~~(5) due process; (2~~6) First Amendment retaliation; (3) Equal Protection; (4) Due Process; and (5~~7~~) violating the Administrative Procedures Act by failing to follow their own rules and regulations in an arbitrary and capricious manner.

**PARTIES**

4. Plaintiff is a United States citizen and a resident of West Virginia.

5. The Defendant, Department of State, is a "federal government agency" within the meaning of (1) 28 U.S.C. §1346(b), 28 U.S.C. §2401(b), and 28 U.S.C. §2671, and (2) 5 U.S.C. §552(f)(1) and 5 U.S.C. §552a(a)(1). The Defendant is in possession, custody, and control over documents and records about Plaintiff. Defendant is headquartered at the Harry S. Truman Building, 2201 C Street NW, Washington, D.C., U.S. 20520.

6.      All named individual Defendants are/were "employees of the government" and/or "federal officers," at all relevant times herein, within the meaning of (1) 28 U.S.C. §1346(b), 28 U.S.C. §2401(b), and 28 U.S.C. §2671, and (2) *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, acting in their official capacity/acting under color of federal authority.

## JURISDICTION

~~7.~~6.    The Court has both subject matter jurisdiction over this action and personal jurisdiction over the Defendant~~s~~ pursuant to 5 U.S.C. §552(a)(4)(B), 5 U.S.C. §552a(g)(1),    28 U.S.C. §1331., and over the individually-named Defendants under the D.C. Long-Arm Statute, D.C. Code § 13-423 .

~~8.~~7.    The Court has authority to issue declaratory and injunctive relief under 28 U.S.C § 1361.

~~9.~~8.    Venue is proper in this Court pursuant to 5 U.S.C. §552(a)(4)(B), 5 U.S.C. §552a(g)(5), and 28 U.S.C. §1391 (b) and (e).

~~10.~~9.   The Court has the authority to award attorneys' fees and expenses under 28 U.S.C. § 2412.

## FACTS

~~11.~~10.  The Plaintiff has been employed by the Defendant, State Department, since May 19, 2013, in the role of Foreign Affairs Officer in the Bureau of Energy Resources, Office of Energy Diplomacy, Middle East & Asia Division (ENR/EDP/MEA).

12.      As part of his position, Plaintiff underwent a background investigation that resulted in him being granted a Top Secret security clearance on April 19, 2013; holding and maintaining this level of security clearance is a condition of Plaintiff's employment.

11.

~~13.~~12.   As part of a routine periodic background reinvestigation that was necessary for the Plaintiff to hold his Top Secret security clearance, the Plaintiff was interviewed on January 28, 2019.

~~14.~~13.   In this reinterview, the Plaintiff was asked by Defendant ~~State Department~~'s employees, *inter alia*, the following questions:

    i.    Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

    ii.    Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

    iii.    Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

~~15.~~14.   The Plaintiff responded in the negative to all three questions.

~~16.~~15.   This routine reinvestigation was concluded on May 9, 2019.

~~17.~~16.   On June 7, 2019, Plaintiff was notified that he had been granted continued access, which meant, for all intents and purposes, he "passed" the reinvestigation.

~~18.~~17.   On August 7, 2019, the Hatewatch blog of the Southern Poverty Law Center (SPLC) published an online article titled, "U.S. State Department Official Involved in White Nationalist Movement, Hatewatch Determines," which made several allegations against Gebert~~the Plaintiff~~.

19.18.   The day after the Hatewatch article was released, on August 8, 2019, several news sources confirmed that Gebert had already been suspended no later than on that day.[1]  Gebert's former supervisor at the State Department, Amos Hochstein, was specifically quoted, "Neo-Nazis are not all shaved heads and tattoos, they are hiding in plain sight. I'm horrified Gebert worked for me at the State Department."

20.19.   Gebert was not suspended on August 8, 2019, because he was "dishonest" to questions from a January 2019 interview; the comments by Hochstein more accurately reflect the sentiment of the State Department in regard toregarding allegations made against Gebert, and they simply disagreed with his viewpoint.

21.20.   The Defendants realized their suspension of Gebert on the basis of his viewpoints could not possibly stand, especially after the subsequent September 27, 2019, interview, where Gebert easily refuted and dispelled the allegations that he was a "Neo-Nazi" or some other type of extremist. When finally given the chance to express his pro-white and political beliefs, he clearly articulated beliefs that are protected, and this became problematic for the State Department.

22.21.   As soon as the Hatewatch Article was published, it resulted in what the Department of State termed a "media frenzy." Dozens of articles were written, shaming the Department for employing Gebert and not vetting him properly during the clearance process. *Id.*

23.22.   In short, the Department was under immense pressure from the public and even members of Congress to remove Gebert from the Department due to his viewpoints. *Id.*

---

[1]     Rolling Stone stated, "According to Politico, however, two sources close to the state department have confirmed that Gebert has been suspended following the Hatewatch report. His former boss, Amos Hochstein, who supervised Gebert during his tenure as coordinator for the State Department's international energy affairs, told Politico he found it 'inconceivable' that Gebert could've gotten security clearance not once, but twice. (The State Department conducts security screenings upon hiring and again after an employee has worked there for five years, according to Hochstein.). https://www.rollingstone.com/culture/culture-news/matthew-gebert-hatewatch-report-white-supremacy-state-department-869051/.

24.23.   Throughout the articles, representatives from the Department of State made official statements wherein they explicitly expressed their disapproval of Gebert's ideologies. For example, they assured the public that the Department of State was "[c]ommitted to providing an inclusive workplace," and "to providing a workplace that is free from discriminatory harassment."[2] Ironically, the Department did not mention they were committed to including people with different viewpoints, such as Gebert. Rather, they are expressly condemning Gebert's viewpoints.[3]

25.   In summary, the Hatewatch blog, a non-profit organization, served as the basis for Plaintiff's security clearance suspension, alleging, *inter alia*: Plaintiff engaged in activity to keep is involvement with white nationalists secret by utilizing rudimentary online forum protocols such as pseudonyms and utilizing *sophisticated* anti-detection tactics by wearing a hat and sunglasses to the Charlottesville, Virginia, Unite the Right demonstration on August 12, 2017; and that Plaintiff's statement on a podcast is alleged to show proof that he knowingly lied..

26.   Upon information and belief, the Department of State relies heavily on one particular statement that Gebert allegedly made as proof that he intentionally concealed his "white nationalism" from them. Specifically, the Department of State argued that, "Gebert understood that his connection to white nationalism (if discovered) could end his career with the Department of State," when he stated in an article: "There are bigger things than a career and a paycheck, and I don't want to lose mine."

---

[2]   See, e.g., https://nypost.com/2019/08/08/state-department-official-outed-as-white-nationalist-leader/; https://unicornriot.ninja/2019/exposed-state-department-official-posted-in-nazi-charlotteville-chats/; https://www.dailymail.co.uk/news/article-7334157/State-Department-official-accused-running-white-nationalist-chapter.html

[3]   The FBI, on the other hand, got it right when their official spokesperson in an article explained, in response to the public outrage regarding Gebert's employment, that they "[c]annot investigate people for holding an ideology or belonging to a certain U.S.-based hate group." See https://www.cnn.com/2019/08/15/politics/state-dept-white-supremacist-brother-fbi/index.html

27.24.   To the contrary, this statement literally means *the exact opposite* of what the Department of State alleged. While the Department of State interpreted that statement as meaning that Plaintiff will do anything, including lie, in an effort to conceal his white nationalism to keep his job, it actually says just the opposite. While Plaintiff acknowledged that he did not want to lose his job ("I don't want to lose mine"), when read together with the phrase at the beginning of the sentence ("There are bigger things than a career and a paycheck"), it is clear that what Plaintiff was saying is that his beliefs are *more important* to him than his job is. In other words, Plaintiff was saying that if he were ever forced to decide between his beliefs and his career, he would choose his beliefs. Thus, the statement itself negates the very point the Department of State previously alleged that it proved. It also clearly evidences that Plaintiff is proud of his beliefs, that he has integrity and conviction, and that he is not subject to blackmail on the basis of his beliefs.

25.      Defendant State Department became aware of the Hatewatch article, and in response, oOn August 16, 2019, Plaintiff received a memorandum from Defendant, Douglas Quiram, Director of DS/SI/PSS, informingDefendant informing him that Defendant would be suspending Plaintiff's Gebert's security clearance pending the outcome of a "for cause" investigation.

28.      Defendant Quiram made the decision in his their determination regarding Plaintiff based on a biased blog post that had no proof of actually being reviewed or fact-checked: in short, this is not a credible news source. Further, later in the investigation Defendant Quiram, as the director of DS/SI/PSS either willfully partook in the intentional violations of Plaintiff's constitutional rights and/or oversaw the grossly negligent and reckless work of Defendants John Doe #1 and John Doe #2, which, either way, the result was the same: the Plaintiff's constitutionally protected rights were violated and infringed upon.

29.26.   Specifically, the August 16, 2019, memorandum alleged "concerns that [Plaintiff] concealed and omitted information in [his] periodic reinvestigation completed May 9, 2019," and that this raised "serious security concerns that could be disqualifying under National Security Adjudicative Guidelines E (Personal Conduct)."

30.27.   The Department would like this Court to believe that it was not until the Hatewatch Article was published that they first became aware of Gebert's ideologies and, therefore, initiated their investigation, which led them to conclude that Gebert concealed and/or was somehow dishonest about his white nationalism. In fact, an article published by Sludge.com on July 3, 2018 —mMore than one year before the SPLC article was published on August 8, 2019, Sludge.com posted an article entitled "Government Employees Donate to White Supremacist Candidate." [4] This was published in July of 2018.— confirms that the Department of State was aware that Gebert supported white nationalist/pro-white ideologies as early as July of 2018 – if not even sooner.[5]

28.       The article, which is entitled "Government Employees Donate to White Supremacist Candidate," specifically mentioneds "Matthew Gebert" by name as well as his position with the Department of State. Id.; iIt further indicates that Gebert made campaign contributions to the House campaign of Paul Nehlen, a "racist" and "openly anti-Semitic white supremacist." *Id.*

31.29.   -In addition, the article mentioneds Gebert's prior contributions in 2017 and 2018 to Corey Stewart, a Republican nominee who has been outspoken about preserving public Confederate flags and monuments. Id.

30.       Moreover, there is no denying that tThe Department Defendant was well aware of this article, as a Department of State Official is quoted in the article as stating: "Matthew Q. Gebert

---

[4]      See https://readsludge.com/2018/07/03/government-employees-donate-to-white-supremacist-candidate/
[5]      See https://readsludge.com/2018/07/03/government-employees-donate-to-white-supremacist-candidate/

is employed by the Department of State as a foreign affairs officer assigned to the Bureau of Energy Resources in Washington, D.C. Guidelines regarding the political activity of State Department employees can be found in the Foreign Affairs Manual at 11 FAM 614. The Department of State is committed to providing a workplace free from discriminatory harassment." Id.

31.     The Sludge.com article did not receive as much backlash as the Hatewatch article, and there is no indication of Congressional or State Department pressure at higher echelons to remove or suspend Gebert.

32.     However, it does reveal that as early as July of 2018 the State Department was aware of Gebert's white nationalist beliefs, which supports Gebert's belief the State Department was already aware of his activities, which makes it all the more likely Gebert honestly and legitimately believed that he had no reason to know he should have further disclosed this in any interview or investigation.

33.     In addition, the investigative file contains an annotation stating that the Department received an "anonymous tip" on June 21, 2019 (two months prior to the SPLC article being published), that Gebert "had donated to the campaign of a 'pro-white' candidate, as well as to the campaign of a candidate who publicly stated that he wanted to preserve the Confederate flag and monuments, stating doing so was 'taking back our heritage.'"

34.     Despite the Department of State being made aware of his political and ideological beliefs on at least two separate occasions prior to the publishing of the Hatewatch article, upon information and belief, the Department made no referrals, performed no

investigations, and conducted no interviews in response to either of these occasions; in short, they did nothing.

35.     Gebert was never questioned about the Sludge.com article during his routine security clearance reinvestigation interview, which took place on January 28, 2019, just a few months after the Sludge.com article was published.

36.     Upon information and belief, after Plaintiff and his counsel requested information, the State Department and its investigatory agencies never produced any audio clips or transcripts, bolstering the belief the entirety of its investigation relied upon a blog article.

37.33.   Because holding a valid Top Secret security clearance is a condition of employment for Plaintiff, this suspension of his security clearance resulted in a proposal to suspend the Plaintiff from his employment indefinitely without pay from his position as a Foreign Affairs Officer, GS-13, in the Office of Middle East and Asia, Bureau of Energy Resources.

38.34.   Defendant sent Aa subsequent memo was sent to Plaintiff on August 16, 2019, signed by Defendant Calli Fuller who – at best was simply complacent in violating Plaintiff's constitutional rights, and, at worst, one of the main culprits responsible for violating Plaintiff's constitutional rights – that informed Plaintiff that he would be suspended without pay and that he had fifteen (15) calendar days from the date of receipt to respond orally, in writing, or both.

39.35.   On August 28, 2019, Plaintiff, through his legal representative at the time, submitted a written reply on Plaintiff's behalf.  See Exhibit   A   .

40.36.   On September 24, 2019, Plaintiff received a written response from Defendant Jeanne M. Juliao, Deputy Assistant Secretary Bureau of Human Resources for the Department of State, whichthat informed Plaintiff Gebert that the proposed indefinite suspension without pay would be sustained.

11

41.37.   The September 24, 2019, letter from ~~Ms. Juliao who - at best was simply complicit in violating Plaintiff's constitutional rights, and, at worst, the main culprit in effectuating the violation of Plaintiff's constitutional rights -~~ Defendant provided~~,~~ a cursory review of Plaintiff's issues; essentially, ~~Ms. Juliao's~~the letter states nothing more than, in summary: Your security clearance is suspended; security clearance is a condition of employment; because your security clearance is suspended and you have provided no evidence that it is not suspended, your suspension without pay from your employment is upheld.

~~42.      On September 24, 2019, Defendant's Human Resources employee, Carol Marks, sent a memorandum to Defendant Bruce Cole, wherein Marks relayed the decision of Defendant Juliao and mandated the immediate removal and continued suspension of Plaintiff. Similar to the other individual Defendants, Defendant Cole was complicit in violating Plaintiff's constitutional rights, and, at worst, one of the main culprits in effectuating the violation of Plaintiff's constitutional rights.~~

43.38.   The "for cause" investigation was conducted by the Bureau of Diplomatic Security (DS), Office of Special Investigations (DS/DO/OSI) shortly after Plaintiff was notified of his pending suspension.

44.39.   As part of this "for cause" investigation, Plaintiff was interviewed on September 27, 2019, by Defendant~~s John Doe #1 and John Doe #2~~ personnel with~~in~~ the Office of Special Investigations with the Bureau of Diplomatic Security, a division under the Defendant State Department, whereby ~~Plaintiff~~ Gebert was confronted with many of the allegations from the Hatewatch blog article, as well as re-questioned regarding his answers to the previous questions identified in Paragraph 13~~14~~, above.

45.40.   In this September 27, 2019, interview, ~~Plaintiff~~ Gebert explicitly denied withholding information during his January 2019 interview, affirmed he was not ashamed or

embarrassed of any of his views or activities, and specifically stated that the article sensationalized and mischaracterized his activities and involvement to make them seem much more nefarious than they actually were.

41.     During this interview, Gebert ~~the Plaintiff~~ specifically and unabashedly articulated the beliefs he expressed on race and immigration, which at the core of his beliefs, are the ideas of advocating (1) for white interests; and (2) against mass immigration. In fact, many of Plaintiff's beliefs center around being an "immigration restrictionist," through which he celebrates federal immigration laws from the 1920's through the mid-1960's that resulted in strict limitations on immigration.

42.     Plaintiff believes that these policies contributed to America's robust economy and our nation's ascension as a global superpower.

43.     Plaintiff followed up his September 2019 interview with additional responses on October 23, 2019, where he informed Defendant~~s John Doe #1 and John Doe #2~~ personnel that he: did not think any of his writings, podcasts, or tweets would rise to a level that they would ever be considered an embarrassment to himself or the Department of State; was never a member of any formal white nationalist organization; believed he would be protected as his speech and activities were protected by the First Amendment; and never engaged in any illegal activity. For these reasons, Plaintiff believed he had a reasonable and good faith basis to answer the questions from his January 2019 interview in the manner in which he did.

~~46.~~44.   Gebert's personally held beliefs were never represented as State Department opinions at any point in time in any manner or medium, and the State Department has never made an allegation that Gebert represented himself as a State Department employee when he spoke about his personal beliefs.

47.45.    Most importantly, at no point did ~~Plaintiff~~ Gebert lie or provide any false information on his SF-86 (i.e. security clearance questionnaire) or during any of his interviews or re-interviews.

48.46.    The Department of State could not find that Gebert had lied on his SF-86 since no questions on the SF-86 ask applicants about their political or ideological beliefs.[6] Indeed, the government cannot point to even a single question on the SF-86 that Gebert's conduct violated. Gebert has never:

- Been a member of an organization dedicated to terrorism (SF-29.1);
- Engaged in acts of terrorism (SF-29.2);
- Been a member of an organization dedicated to the use of violence or force to overthrow the United States Government (SF-29.3);
- Been a member of an organization that advocates or practices commission of acts of force or violence to discourage others from exercising their rights under the U.S. Constitution or any state of the United States (SF-29.4); or
- Engaged in activities designed to overthrow the U.S. government by force (SF-29.5).

49.47.    Gebert was never even asked any questions relating to his political beliefs during the security clearance investigation or reinvestigation process. In the entire 136-page SF-86 application, none of the questions on the SF-86 asked Gebert anything even remotely related to his political beliefs, such as whether he identified as republican, democrat, alt-left, or alt-right, etc. Nor was he asked any questions related to his beliefs regarding race, immigration, or any other ideologies. Id. So too, none of the questions that Gebert was asked during his initial background investigation or during his reinvestigation interview on January 28, 2019, related to any of these issues. Id.

---

[6]      Rightly so, as this would violate applicants' civil liberties.  See, e.g., Ozonoff v. Berzak, 744 F.2d 224 (1st Cir. 1984).

50.48.   Thus, at no point either on the SF-86 or any of the reinvestigation interviews was Gebert ever asked any questions about his political or ideological beliefs, associations, or activities. Id.d.

49.     In fact, in February 2021, members of Congress specifically urged the Director of National Intelligence ("DNI") to update current security clearance guidelines to begin screening for "white supremacists, neo-Nazis, and other far-right extremists."[7]

50.     In doing so, they specifically mentioned Gebert's case with the Department. Id. They further explained that "[u]nder current guidelines, individuals are not explicitly required to self-report involvement with extremist groups unless the organization professes to be a terrorist organization, seeks to overthrow the United States government, or uses violence." Id.[emphasis added], further supporting that nothing the Department was able to ask prior to February 2021 would have required Gebert to voluntarily offer up the information the Defendant is specifically stating Gebert was required to provide in response to their questions.

51.     Upon information and belief, the Defendant interviewers, John Doe #1 and John Doe #2, conducted what appeared to be a very biased interview, proposing counter-political beliefs to intentionally mischaracterize and sensationalize Plaintiff's own positions, and used a flawed, unsanctioned interpretation of the underlying regulations to improperly and erroneously draw conclusions and make reckless recommendations on their investigative findings.

52.     Upon information and belief, the Defendant's personnels sought to "trap" or "catch" the Plaintiff in a lie or with him providing false information; when that failed, Defendant's personnels attempted to attach Plaintiff to more extreme and hateful viewpoints on race, religion,

---

[7]     Id.https://wexton.house.gov/news/documentsingle.aspx?DocumentID=457,  February  21,  2021.  Accessed Online July 7, 2023.

national origin, immigration, and other political beliefs to what Plaintiff actually subscribed to and spoke and wrote about.

53.     Plaintiff reiterated multiple times that he was a "race realist" and "pro-white," but fell far short of adopting outright neo-Nnazism or aligning explicitly or officially with any terrorist organization or criminal entity's platform or belief system.

54.     As he explained throughout his interview, Gebert knows that his opinions are unpopular and that many some people would may be offended. He knows that society does not accept them. Thus, as Gebert explained, unless he knows that you are what he calls a "like-minded person" (i.e., another white nationalist"pro-white" ), he does not talk about his political or other ideological viewpoints with you. In other words, Gebert -- like millions of other Americans -- keeps his political and ideological views private.

55.     Not only were Gebert's coworkers and supervisors not aware of his beliefs, but neither were his neighbors, some of his friends, or most of his acquaintances.  Thus, it wasn't that Gebert was concealing his beliefs from the government out of fear of losing his security clearance. To the contrary, Gebert did not discuss his views with anyone on an unsolicited basis except for those whom he would consider "like-minded" because he knew that his opinions were controversial.

56.     Although Gebert would not expose his beliefs on an unsolicited basis, as was revealed throughout his interview, he prides himself on his integrity. He is and has always been aware of the importance of being honest and truthful throughout the clearance process. Id. Had Gebert ever been asked about his political or ideological beliefs, he would have disclosed them, just as he did during the subsequent investigative interview. As Gebert explained:

SPECIAL AGENT: And you don't feel that information could be -- have

use -- could've been used to exploit you, to blackmail you, coerce you, or

anything like that?

MR. GEBERT: A hundred -- a hundred percent no because I'm not ashamed

at all of my views. I can't be bought. I believe what I believe. You know,

I'm a true believer, not in any cult sense, but in terms of having informed,

you know, beliefs and values that unfortunately in this day and age are

judged to be beyond that pale. [Gebert Interview 81-15 to 82-3.]

57.      The DS/DO/OSI "for cause" investigation ~~subsequent to~~after the suspension was

completed on March 6, 2020, and determined that Plaintiff had been intentionally misleading in

his answers to the questions identified in Paragraph 13~~14~~, above.

58.      Plaintiff received a letter from Defendant ~~Todd J. Brown, Director of the~~

~~Diplomatic Security Service of the United States Department of State~~ dated July 1, 2020, wherein

Defendant ~~Brown~~ informed Plaintiff that his security clearance was being revoked under Guideline

E (Personal Conduct) concerns. Put more simply, the United States Department of State ~~and the~~

~~individual Defendants~~ intended to regulate freedom of association and freedom of speech.

59.      In the July 2020 letter, Plaintiff was specifically cited for violating the following:

i.          refusal to provide, full, frank, and truthful answers to lawful questions of

investigators, security officials, or other official representatives in connection with a personnel

security or trustworthiness determination;

ii.          deliberately providing false or misleading information; or concealing or

omitting information concerning relevant facts to an employer, investigator, security official,

competent medical or mental health professional involved in making a recommendation relevant

to a national security eligibility determination, or other official government representative;

iii.      personal conduct, or concealment of information about one's conduct that creates a vulnerability to exploitation, manipulation, or duress by a foreign intelligence entity or other individual or group. Such conduct includes:

a.      Engaging in activities which, if known, could affect the person's personal, professional, or community standing.

60.    Upon information and belief, the Defendants heavily relied on making ~~their own~~ determinations regarding what Plaintiff knew or should have known regarding what thoughts or theories regarding race and immigration should have been "embarrassing" or not.

61.    However, upon information and belief, the Defendants enforced their reasoning unevenly or otherwise failed to apply a similar policy to other groups; namely, authorizing and/or applying significantly reduced application of its harsh position to those who publicly support Black Lives Matter (BLM).

~~60.~~62.   Upon information and belief, ~~There is no evidence that t~~the Defendants ~~are~~ is not revoking the security clearance and suspending similarly situated employees for failing to disclose their affiliation and/or content created furthering BLM; in fact, to the contrary, the U.S. Office of Special Counsel (OSC) expressly authorizes employees to   publicly       support       the movement    on the  job~~:~~ ~~https://cdn.govexec.com/media/gbe/docs/pdfs_edit/071620cb1.pdf.~~[8] and in May of 2021 U.S. Secretary of State Antony Blinken authorized U.S. embassies around the world to fly Black Lives Matter (BLM) flags and banners.[9]

~~61.~~63.   Upon information and belief, the Defendants by discriminatory motive or intent, or through reckless or callous indifference, invoked and implemented a policy to intentionally

---

[8]        https://cdn.govexec.com/media/gbe/docs/pdfs_edit/071620cb1.pdf.
[9]        https://foreignpolicy.com/2021/05/25/black-lives-matter-blm-state-department-embassies-flags-blinken-diplomacy-racial-injustice/

discriminate against the Plaintiff by using the security clearance and national security laws and regulations to impose barriers that could thwart, and in this case, did thwart the exercise of the Plaintiff's constitutional rights based on his association with the D.C. Pilots group.

62.64.   The D.C. Pilots were not a terrorist organization, criminal entity, or even on the SPLC's radar as a white nationalist group. See https://www.splcenter.org/sites/default/files/splc-2021-year-in-hate-extremism-report.pdf.

63.65.   In fact, it is only the SPLC, without citing an actual reference or actual law enforcement report or record, that tied the D.C. Pilots to the organization The Right Stuff; there is no official affiliation between the two groups, which further supports the Plaintiff's reasonable belief he was doing nothing wrong.

64.66.   Further, The Right Stuff is only listed in the SPLC resource cited as a "white nationalist" group.

67.      There are currently members of our Congress who are members of white nationalist groups and/or speak at white nationalist events.

65.68.   White nationalism, no matter how much someone disagrees with it, is not *per se* unlawful or a prohibited ideology by a government employee. There are varying levels and degrees, as well as different sects within different white nationalism movements; the one specifically endorsed by the Plaintiff is one focused on U.S. policy on immigration, which actually mirrors several members' of Congress's beliefs, former President Trump, and multiple members of his Cabinet and senior advisors, and such positions have oscillated in and out of our country's official policy and/or major political parties' platforms on the matter for over 200 years.

66.69.   In response to Plaintiff's LWOP and revocation of his security clearance, the undersigned counsel provided a written rebuttal on Plaintiff's behalf on February 4, 2021, denying the allegations from the July 1, 2020, memorandum in their entirety.  See Exhibit ___B___.

19

67.70.   Plaintiff's undersigned counsel provided a Supplemental Response to the February 2021 rebuttal on November 23, 2021, alleging multiple violations by Defendants of the Freedom of Information Act (FOIA) and the Privacy Act.  See Exhibit ____C___.

68.71.   To date, Defendants have not responded to either the February 2021 rebuttal nor the November 2021 supplemental response addressing the FOIA concernsOn January 30, 2024, the State Department responded to Gebert's rebuttal and supplemental response with a letter notifying Gebert that his security clearance revocation was being upheld.

69.72.   Regarding Plaintiff's work performance otherwise, outside of the investigation and actions taken in response to an opinion-piece blog, Plaintiff's performance was exemplary and there were no indications whatsoever that his character and/or any personal views held by Plaintiff compromised his work or his full and unbiased cooperation with all State Department employees and partners:

    i.    Plaintiff was a presidential management fellow, a prestigious fellowship, where he   was   highlighted   in   George   Washington   University's   *GW Magazine*, https://archives.magazine.gwu.edu/sites/g/files/zaxdzs1136/f/downloads/Summer2013GWMag_web.pdf;

    ii.    Plaintiff's   evaluations   for   each   year   since   2013   were "Exceeds expectations";

    iii.    Plaintiff received a performance bonus in 2015 for $1,500, the alleged year he began to engaged in white nationalist activities;

    iv.    Plaintiff received two performance bonuses in 2019 for $3,000 and $500, the very year he was suspended/placed on leave without pay.

70.73.   Due to a select few State Department employees – the Defendants – disagreeing with the viewpoints held and expressed by Plaintiff Gebert – in his personal capacity and during

his personal time - the Defendants hasve caused irreparable harm to the federal protected rights of the Plaintiff's freedom of speech and association in the attempt to harass, threaten, silence, and/or chill these constitutional rights.

71.74.   The Defendant has provided a pretextual reason for revoking Plaintiff's security clearance and suspending him without leave; namely, stating Plaintiff failed to disclose, misled, and/or omitted information that are either (1) "relevant facts" that could be "relevant to a national security eligibility determination," (2) "personal conduct" that "creates a vulnerability to exploitation, manipulation, or duress," or (3) engaging in activities, which, if known, could affect the person's personal, professional, or community standing.

72.75.   Upon information and belief, in couching Plaintiff's removal as a matter of "national security" and suppressing his speech and rights via the revocation of security clearance route, the Defendant appears to cling to and attempt to hide behind *Egan* to allow them complete discretion with no judicial oversight; however, the true basis for the revocation and subsequent state of purgatory that the Defendants believes they can subject the Plaintiff to is predicated on the trampling of constitutionally protected rights.

73.76.   Upon information and belief, the Defendant has is have applied highly subjective standards of what might be embarrassing or qualify as "dirt" in the eye of an individual beholder withins of the State Department, setting a precedent that anything someone finds incorrect or different from their own viewpoint can later qualify as "intentionally omitting" if someone fails to disclose their political ideologies or maybe who they voted for in a previous election if they legitimately believed it was not the answer the Defendant personnel specific investigator wanted to hear.

74.77.   Furthermore, upon information and belief, the Defendants seeks to impugn a subjective, moving target of what qualifies as "embarrassing" to the Plaintiff and declare his claim that he did not believe his thoughts, speech, or actions to be embarrassing was "improbable."

75.    Further, the basis of the investigation is rooted in protected speech, activities, and association; therefore, the resulting effects and consequences that stemmed from the investigation – the suspension without pay and revocation of security clearance – only serve to deprive the Plaintiff of his right to engage in protected speech and activities without due process.

76.78.   The government may not regulate speech based on overbroad policies that encompass a substantial amount of constitutionally protected speech.

77.    To date, the Defendants have claimed their letters clearly informed the Plaintiff of his due process rights and was entitled to provide written and oral responses to their actions, to play on the old legal maxim, due process delayed is due process denied. It is now over three years since the Plaintiff was suspended without pay, and there is no end in sight, nor is there any process, other than through this Court, to require or motivate the Defendant to correct its errors.

78.79.   These grants of unbridled discretion to Defendant's officials violates the First Amendment because they create a system in which the permissibility of speech is judged without any standards, thus giving employees such as Plaintiff Gebert no way to prove that a denial, restriction, or relocation of their speech was based on unconstitutional considerations.

80.    Because Defendants hasve failed to establish a compelling government interest that is narrowly tailored governing the decision whether to allow employees to speak about certain topics and which viewpoints they may hold regarding certain topics, and ergo, which viewpoints need to be disclosed as part of an investigation, there is a substantial risk that Defendant officials will engage in content and viewpoint discrimination: exactly what occurred to Plaintiff's detriment as alleged herein.

79.81.   The questions asked at the end of the subject interview and outlined in paragraph 13 are unconstitutional and violate a security clearance Applicant's First Amendment rights.

**The Defendants incorrectly withheld portions of their security clearance investigation under an incorrect application of the Freedom of Information Act (FOIA).The Defendant's FOIA and Privacy Act Violations**

82.   On July 15, 2020, Plaintiff's counsel submitted an initial FOIA request.  See Exhibit ____.

80.   The Defendants signed for the certified mail on July 30, 2020.The FOIA request was both emailed and sent via certified mail, yet the Defendants failed to process the request in a timely manner. The Defendants signed for the certified mail on July 30, 2020.

83.   The email and letter were initially sent to the wrong department in the Defendant State Department, DSPSSCRP, however, this mistake was immediately corrected and the request was submitted via email to FOIArequest@state.gov on July 16, 2020. See Exhibit ____.

84.   This request specifically stated that it was regarding the Security Clearance Revocation dated July 1, 2020, of Mathew Q. Gebert and was seeking:

          1) All interagency and intra-agency correspondence pertaining to the above.

          2) All interagency and intra-agency records related to the individual.

          3) All interagency and intra-agency correspondence pertaining to the Security Clearance Revocation.

          4) All investigation and standard forms pertaining to the above.

81.   65. On October 29, 2020 the Office of Personnel Security and Suitability emailed Plaintiff indicating that the letter was sent to the wrong office and that they had just received it and started to process the request - despite this not being the case. The Defendants incorrectly redacted

documents that were part of the investigation but did not provide the required corresponding FOIA/PA exemptions.

82.     Since Plaintiff filed a Privacy Act request, the Defendants could only assert a (b)(7)(e) exception if it also claimed a (k)(2) exemption, but that would be legally impossible because (k)(2) can only be asserted when the "investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit, or privilege under Federal programs."

83.     The Defendants' actions suggest that the Defendants intentionally tried to frustrate and obfuscate the truth to avoid providing Plaintiff with a reasonable opportunity to respond.

84.     On October 29, 2020, the Office of Personnel Security and Suitability responded that they were consulting with their Legal Advisor and subsequently informed Plaintiff that the Defendants would be processing the records under FOIA/PA; the Defendants also incorrectly stated that they were not obligated to provide the corresponding FOIA/PA exemptions, in an attempt to exempt themselves from federal requirements.

85.     On or about October/November 2020, there was a follow up phone call from the Legal Advisor and Plaintiff's counsel wherein the Defendants advised Plaintiff's counsel that the pages were being redacted under the "National Security" exemption: an exemption that does not exist.

86.     After substantial back and forth between the Office of Personnel Security and Suitability, Plaintiff was forced to submit a supplemental FOIA/PA request on December 23, 2020.

87.     On December 23, 2020 Plaintiff sent an email to the Office of Personnel Security and Suitability following up on the original FOIA request from July 16, 2020, and asking the Defendants to analyze the redacted documents from the initial disclosure of the investigation under

FOIA/PA. On December 29, 2020, the Office of Personnel Security and Suitability responded after

consultation with the FOIA/PA office in pertinent part:

> If, instead, you are asking that we review the set of documents produced to you
> pursuant to E.O. 12968 and indicate the bases for the redactions in those documents
> (separate and apart from your FOIA request), as we informed you on October 30,
> 2020, Executive Order 12968, Sec.5 does not mandate the production of documents
> under the Freedom of Information Act (FOIA) or the Privacy Act (PA), but simply
> requires that they be provided to you "to the extent the documents" would be
> provided if requested under those laws and such, the Department provided you with
> the relevant documents, redacted as relevant and appropriate, but without indication
> the exemptions that are required for requests made under the FOIA or the PA.

88.    On December 30, 2020, Plaintiff resubmitted another FOIA/PA request because

the Defendants were ignoring their responsibilities to process the request.

89.    In the December 30, 2020, FOIA request, Plaintiff requested expedited processing

when he stated:

> All agency record requests must be reviewed under FOIA and the Privacy Act. A
> failure to provide those documents without a corresponding exemption creates a
> significant due process violation that is not supported in law, regulation, or
> executive order and on its face appears retaliatory. **For the aforementioned
> reasons, we ask for an expedited processing of our request since Mr. Gebert
> will not be able to properly defend himself against the proposed action and
> will subsequently lose his job since his clearance is a condition for his
> employment.**

90.    Plaintiff expressing confusion at the State Department's response and saying in

pertinent part, "[the excerpt above]That is effectively denying my request and it is problematic. I

would ask that section 5 is reread because it does not say the FOIA/PA does not apply. The

sentence is saying if documents would be denied under FOIA/PA you can deny them as well—but

that does not mean you do not have to give an explanation. It does not mean that when a FOIA/PA

request is submitted you can deny it under that section. It does not grant any additional authority

for the Defendant."

85.     On September 24, 2021, a final determination was made by the Defendant's FOIA and Privacy Act Division, Bureau of Diplomatic Security, wherein approximately 278 pages of previously-redacted materials were determined to be eligible for release under FOIA. However, the Defendant continues to partially redact 171 pages, and fully redacted 7 pages. The Defendant assigned this request Privacy Act Case # P-2020-00021.

91.86.   On September 24, 2021, a final determination was made by the Defendant's FOIA and Privacy Act Division, Bureau of Diplomatic Security, which indicated the Defendant would respond and release documents under two separate Segments.

92.87.   On September 24. 2021 a final determination was made by the Defendant's FOIA and Privacy Division, Bureau of Diplomatic Security, Segment I was said to consist of 509 pages, of which  wherein approximately 296 pages were released in full, and 124 pages were withheld because "they are about other persons.." and a portion of one page and 14 other pages in their entirety originated with other federal agencies and were "referring for their review and direct reply to" Plaintiff.  See Exhibit ___.

88.     This response clearly indicates 509 pages were responsive, but the Defendant only provided and described/accounted for 414 pages in their September 24, 2021, letter to Plaintiff. See Exhibit ___    Hundreds of pages of "investigative" material in this matter are nothing but copies of media articles discussing Gebert and shaming the Department for employing him. Compl. ¶ 75. Although not required, especially at this early stage of litigation, these articles constitute direct evidence indicating that the Department revoked Gebert's clearance in retaliation for the so-called "embarrassment" the Department endured as a result of Gebert's exercise of his civil liberties.

89.     To date, the Defendant has not supplemented this request or provided an accounting of the missing 95 pages that they are improperly withholding without authority; as such, the Defendant's response is deficient, and they are in violation of the FOIA.

90.     Further, Defendant indicated in Segment I that one partial page and 14 total pages originated with another agency and that the Defendant referred Plaintiff's request to that agency.

91.     To date, no other federal agency has provided responsive records or any response to Plaintiff acknowledging receipt of this referral; the Defendant also failed to disclose to what agency they were referring in order for Plaintiff to even attempt to obtain these records on his own.

92.     Either Defendant performed an improper referral, and, thus, violated FOIA and the Privacy Act, or the agency to which they referred botched the handling of the referral and they violated the FOIA and Privacy Act.[10]

93.     Segment II was said to consist of 456 pages, of which 278 pages were released in full, portions of 171 pages and seven pages in their entirety were released with redactions, and a portion of one page originated with another federal agency and it was "referred for their review and direct reply to" Plaintiff.  See Exhibit ____.

94.     This response clearly indicates 456 pages were responsive, and while their response may have accounted for 456 pages, the Defendant only provided 420 pages with their September 24, 2021, letter to Plaintiff.  See Exhibit ____.

---

[10]     If it is the latter, once the Defendant provides this information, Plaintiff will seek to amend to add this agency as a defendant to this suit.

95.     To date, the Defendant has not supplemented this request or provided an accounting of the missing 36 pages that they are improperly withholding without authority; as such, the Defendant's response is deficient, and they are in violation of the FOIA.

96.     Further, Defendant indicated in Segment II that one partial page originated with another agency and that the Defendant referred Plaintiff's request to that agency.

97.     To date, no other federal agency has provided responsive records or any response to Plaintiff acknowledging receipt of this referral; the Defendant also failed to disclose to what agency they were referring in order for Plaintiff to even attempt to obtain these records on his own.

98.     Either Defendant performed an improper referral, and, thus, violated FOIA and the Privacy Act, or the agency to which they referred botched the handling of the referral and they violated the FOIA and Privacy Act.[11]

99.     Plaintiff was unable to appeal the releases because the Defendant did not release the documents that they mentioned in the letter nor did they provide justifications for the documents being withheld. Therefore, the Plaintiff has constructive exhaustion since the Defendants have not provided a release that would allow for the Plaintiff to appeal.

100.     The Plaintiff did not have an opportunity to administratively appeal the adverse determinations made on their requests because Defendant's releases did not provide the documents identified in the letters, the referring agency, and the statutory basis for the withholding of the missing documents. ~5 U.S.C. § 552(a)(6)(A)(i)

---

[11]     If it is the latter, once the Defendant provides this information, Plaintiff will seek to amend to add this agency as a defendant to this suit.

101.    Defendant sent a subsequent response for Case #P-2020-00021 on December 1, 2021.  See Exhibit ___.

102.    This letter indicates that the State Department had advised Plaintiff that five pages remained under review, and that they had now determined that these five pages were being withheld in their entirety under 5 U.S.C. § 552(b)(7)(E).

103.    It is unclear to what State Department was referring to regarding "five pages": the Segment I letter indicated, "Information still under review will be addressed under separate cover"; and the Segment II letter indicated, "By previous correspondence, we advised you that additional information remained under review"; and the December 01, 2020, letter does not indicate what segment or other correspondence this may have been referenced in.

104.    This December 2020 letter cited a FOIA exemption, but it does not provide a Privacy Act exemption, nor does it say why the Privacy Act does not apply despite acknowledging that it was clearly a Privacy Act request.

105.    Again, the Plaintiff is unable to properly appeal the withholding of the five pages because the Defendants have not analyzed the cases under the Privacy Act.

106.    Additionally, prior to Plaintiff making official requests under FOIA and the Privacy Act on July 15, 2020, Gebert requested on July 10, 2020, the investigation materials relied upon by the Department so that he could rebut the July 1, 2020, security clearance revocation.  See Exhibit ___.

107.    Of the hundreds of pages provided to Gebert in response to this request, 54 pages that were provided in response to his request were absent in the Defendant's responses to FOIA and Privacy Act requests sent by Plaintiff just five days after Gebert's request.

29

108.    The only explanation for Defendant's 54-page discrepancy, considering both requests sought the same information, is due to the Defendant still ~~have~~has not processed the Plaintiff's request, or, alternatively, because the Defendant has not performed an adequate search as required by FOIA and the Privacy Act. ~~– performing an inadequate search in violation of FOIA and the Privacy Act.~~

**Improper Collection of Plaintiff's Information Under the Privacy Act**
**(5 U.S.C. §552a(e)(3))**

~~93.~~109.  Plaintiff did not sign a Privacy Act Statement before the subject interview where the investigators asked him questions.

110.    The agency is required to have the signed Privacy Act Statement, pursuant to 5 U.S.C. §552a(e)(3), to all persons asked to provide personal information about themselves, which will go into a system of records (i.e., the information will be stored and retrieved using the individual's name or other personal identifier such as a Social Security number).

111.    Any agency that asks for personal information without having a signed Privacy Act is precluded from storing any information about the ~~client~~individual.

112.    In this reinterview, the Plaintiff was asked by Defendant's employees, *inter alia*, the following questions:

i.    Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

ii.    Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

iii.    Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

113.    The Plaintiff responded in the negative to all three questions.

114.    The Defendants revoked the Plaintiff's security clearance because of his answers to those questions.

115.    The collection of the answers to those questions violates 5 U.S.C. §552a(e)(3).

116.    A failure to comply with 5 U.S.C. §552a(e)(3) resulted in an "adverse effect" on the Plaintiff (namely the loss of his security clearance, health insurance, all pay and benefits) which allows Plaintiff to bring a claim under 5 U.S.C. §552a(g)(D).

**The Questions Asked in the Subject Interview are not covered under the State Department's System of Records Notice Act (SORN) Volume 83, Number 116, Public Notice 10450; Page 28058**

117.    Agencies "shall subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include—

1.  the name and location of the system;
2.  the categories of individuals on whom records are maintained in the system;
3.  the categories of records maintained in the system;
4.  each routine use of the records contained in the system, including the categories of users and the purpose of such use;
5.  the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;
6.  the title and business address of the agency official who is responsible for the system of records;
7.  the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;
8.  the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and
9.  the categories of sources of records in the system;" 5 U.S.C. §552a(e)(4)

118.    The SORN outlines the information that can be collected during the course of the security clearance process. The SORN specifically cites to threats, crimes, or national security related matters.

119.    The SORN does not allow for the agency to ask and collect information about the

31

questions asked above.  More importantly, the Defendants are not allowed to ask about any potentially "embarrassing" involvement, support for, potential criticism of, and / or associations with groups that would be embarrassing to the State Department.

120.     The Agency was not allowed to ask about this information because this information is not allowed to be collected under any of the Agency's SORN.

**Improper Collection of First Amendment Information Under the Privacy Act**

121.     The Privacy Act specifically states that the Agency "shall…

maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

122.     Plaintiff did not expressly authorize the collection of information related to his ~~his~~ First Amendment rights.

123.     No security clearance rule, regulation, or policy allows for the collection of First Amendment -information.

124.     The security clearance interview was not part of a law enforcement activity nor have there ever been any criminal allegations. More specifically, Guideline J of SEAD 4 is never mentioned or referenced in the Plaintiff's security clearance revocation documents.

125.     There is no statute that allows for the collection of First Amendment information for a security clearance Applicant.

126.     Most importantly, the Agency's own SORN does not allow for the collection of this Information.

**Improper Sharing of Information Under the Routine Use Provision of 5 U.S.C. §552a(e)(3) and 5 U.S.C. §552a(e)(7)**

127.     The Privacy Act specifically identifies conditions for disclosure of collection information, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or another agency, except pursuant to a written request

by, or with the prior written consent of, the individual to whom the record pertains, unless
disclosure of the record would be:

...(3) for a routine use as defined in subsection (a)(7) of this section and
described under subsection (e)(4)(D) of this section;

...(7) to another agency or to an instrumentality of any governmental jurisdiction
within or under the control of the United States for a civil or criminal law
enforcement activity if the activity is authorized by law, and if the head of
the agency or instrumentality has made a written request to
the agency which maintains the record specifying the particular portion desired and
the law enforcement activity for which the record is sought;

128.     Since the Plaintiff did not sign a Privacy Act Statement for the subject interview nor did
he sign a Privacy Act Statement specific to the collection of his First Amendment activity, Defendant's
violated the routine use of the information collected by storing it in their system of records.

——————Since the Plaintiff did not sign a Privacy Act Statement for the subject interview nor did
he sign a Privacy Act Statement specific to the collection of his First Amendment activity, Defendant's
violated the routine use of the information collected by storing and sharing the information with the
Department of Justice when there was no suggestion of criminal conduct.

94.129.

## COUNT I

**Violation of the First Amendment of the United States Constitution By Infringing on
Plaintiff's Right of Freedom of Speech**

95.130.  The Plaintiff adopts and incorporates by reference paragraphs 1 through 93     as
if fully stated.

96.131.  The Defendant injured Plaintiff by depriving him of his ability to work for the
Agency and earn a living, property, because of personal opinions asserted under pseudonyms and
handles - at no point identifying himself as a government employee.  because of protected opinions
he expressed in his personal capacity.

97.132.  The Defendant acted negligently and wrongfully by revoking Plaintiff's security clearance for asserting his personal beliefs without identifying himself as a government employee while on his personal time.

98.133.  Plaintiff asserted his First Amendment right to freedom of speech for which his clearance was revoked. Not a national security concern, but a constitutional violation.

99.134.  The First Amendment of the United States Constitution guarantees individuals the right to free speech, association, and the right to assemble.

100.135.      The Defendant either intentionally, recklessly, or with callous indifference to the federally protected rights of the Plaintiff has threatened, silenced, and/or chilled Plaintiff's rights to freedom of speech and association by using Plaintiff's lawful speech and associations with lawful groups in his private life as the basis to strip him of his security clearance and position in the State Department.

101.136.      Defendant's actions also serve to violate the freedom of the press, as much of the speech they are attempting to chill, restrict, impede, and prevent was specifically related to Plaintiff's writings on websites and blogs, as well as times he spoke as a guest speaker on radio shows and podcasts.

102.137.      Defendant's discriminatory actions and associated practices are also overbroad because they prohibit and restrict protected expression.

138.    Defendant has not established a sufficient nexus to censor private speech on matters of public concern. The First Amendment protection provided for public employee speech is limited to speech by a citizen on a matter of public concern where the government does not have an adequate justification for treating an employee differently from another member of the public.

103.139.      In fact, the Defendant allows for employees to publicly support the BLM movement *in the workplace* while revoking the Plaintiff's security clearance for expressing the same concerns for a different race.

104.140.      Every day that the Defendant fails to act on the February 2021 response and November 2021 supplemental response is another day that the Plaintiff is irreparably harmed. The Defendant is abusing its power by not only revoking the Plaintiff's security clearance based upon constitutionally protected speech, but they are depriving the Plaintiff of his job and health insurance.

105.141.      WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights by using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

### COUNT II
**Due Process Claims against the Defendant for violating the Due Process Clause of the Fifth Amendment of the United States Constitution**

106.     Plaintiff adopts and incorporates by reference paragraphs 1 through 104 as if fully stated.

107.     Plaintiff has a Fifth Amendment right to Due Process of law before the government deprives him of life, liberty, or property.

108.     Plaintiff has protectable liberty interests — fundamental rights — in free speech and association under the First Amendment and due process of law under the Fifth Amendment.

109.     The Defendant, either by discriminatory motive or intent, or through reckless or callous indifference to the Plaintiff's federally protected rights erroneously applied Guideline E in a subjective, erroneous, arbitrary, capricious, and with standardless discretion over what

expressive conduct is characterized as embarrassing or not embarrassing to the Defendant, leaving them free to censor ideas and enforce their own personal preferences.

110.    The Defendant has failed to develop objective standards to ensure that federal civilians in their employ, such as the Plaintiff, were not disenfranchised, harassed, or otherwise deprived of constitutional rights without due process of law.

111.    The threat was imminent and did occur, that the conduct of the Defendant deprived the Plaintiff of due process of law under the laws of the United States on August 16, 2019, and every day since, and the deprivation directly and proximately caused Plaintiff to suffer the loss of his protected freedoms, as well as his career he had worked hard to obtain and maintain, unlawfully depriving him of his means to provide for his family.

112.    The Defendant has violated the Plaintiff's procedural due process by failing to follow the proper processes and procedures for governing security clearances. Instead, the Defendant has held the Plaintiff in purgatory pending an unknown timeline for a decision on the petition submitted in February 2021.

113.    The Defendant violated the Plaintiff's substantive due process by revoking the client's security clearance due to him expressing opinions with which Defendant did not agree. In short, the Plaintiff asserted his fundamental First Amendment right, as a U.S. citizen, and the Defendant is attempting to deprive him of his job and benefits as a result of the Plaintiff exercising that right.

114.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the Fifth Amendment; (2) an injunction compelling the Defendant to: (i) cease discriminating against the client; (ii) cease inserting unconstitutional criteria into Defendant's processes; and (iii) adjudicate Plaintiff's clearance issue favorably and reinstate Plaintiff with all benefits, backpay, and compensate him for harm caused;

(3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

**COUNT III**

**Due Process Claims against the Defendant for violating the Due Process Clause of the Fifth Amendment of the United States Constitution.**

115.    Plaintiff adopts and incorporates by reference paragraphs 1 through 113 as if fully

stated.

116.    Plaintiff is a Foreign Affairs Officer. His employment requires a security clearance.

117.    The Defendants' revoked Plaintiff's security clearance for engaging in protected speech on July 1, 2020.

118.    Plaintiff cannot continue to pursue a career as a Foreign Affairs Officer because his security clearance suspension will prevent him from obtaining a condition of employment, a security clearance.

119.    As a consequence of this deprivation, Plaintiff suffered and continues to suffer adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities.

120.    In short, the Defendant's revocation of Plaintiff's security clearance creates a continuing stigma and disability that foreclose the Plaintiff's freedom to take advantage of other employment opportunities because the all government databases for security clearance will reflect that Plaintiff's security clearance is revoked.

121.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the Fifth Amendment; (2) an injunction compelling the Defendant to: (i) cease discriminating against the client; (ii) cease inserting unconstitutional criteria into Defendant's processes; and (iii) adjudicate Plaintiff's clearance issue

37

favorably and reinstate Plaintiff with all benefits, backpay, and compensate him for harm caused; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT IV

**Due Process Claims against the Defendant for violating the Due Process Clause of the Fifth Amendment of the United States Constitution.**

122.    Plaintiff adopts and incorporates by reference paragraphs 1 through 120 as if fully

stated.

123.    Plaintiff accrued annual leave throughout his employment with the Defendant.

124.    Plaintiff requested to use his annual leave, property, prior to initiation of the Suspension without pay.

125.    Defendant denied the request, thereby depriving Plaintiff of both procedural and substantive due process while depriving him of his property (accrued annual leave).

126.    Defendant is continuing to deny his accrued leave thereby continuing to commit an ongoing constitutional violation.

127.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the Fifth Amendment; (2) an injunction compelling the Defendant to: (i) cease discriminating against the client; (ii) cease inserting unconstitutional criteria into Defendant's processes; and (iii) adjudicate Plaintiff's clearance issue favorably and reinstate Plaintiff with all benefits, backpay, and compensate him for harm caused; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT V

**Due Process Claims against the Defendant for violating the Due Process Clause of the Fifth Amendment of the United States Constitution – Reputational Harm**

38

128.    The Plaintiff adopts and incorporates by reference paragraphs 1 through 126 as if fully stated.

129.    Defendant has failed to meaningfully allow Plaintiff the opportunity to defend himself and clear his name; to date, Plaintiff has issued no public statements, has rejected all requests for interview, and has never responded to media inquiries regarding his employment with or suspension by Defendant. Absent any guidance from Defendant, this essentially amounts to a three-year voluntary gag order stemming from Plaintiff's belief that such silence would be in his and the Defendants' best interests.

130.    Defendant's failure has deprived Plaintiff of his liberty interest in his reputation.

131.    There is continued stigma and disability arising from the Defendant's official action.

132.    Defendant has tailored his education and dedicated his professional life to a career as a foreign affairs officer through the State Department.

133.    Defendant has dedicated and invested a significant portion of his professional life into public service and time as a civil servant; however, one cannot concurrently hold two federal positions at the same time.

134.    Plaintiff attempted to gain employment through the United States Postal Service (USPS), in February 2020, and the Census Bureau, late 2020 to early 2021, while he was suspended by Defendant. Plaintiff received employment offers from both employers (in writing with the USPS and verbally from the Census Bureau; however, during the pre-onboarding phase with the agencies' respective Human Resources departments both prospective employers

specifically stated he would need to resign from the State Department before being further considered for the opportunity.

135.    As the Plaintiff is unwilling, nor should he be forced to, resign his employment with Defendant State Department while they continue to fail to act on his matters.

136.    Therefore, the Defendant's official action, as well as their lack of action, have had a broad effect of largely precluding Plaintiff from pursuing his chosen career.

137.    The Defendant has seriously affected, if not destroyed, his ability to obtain employment in his field.

138.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the Fifth Amendment; (2) an injunction compelling the Defendant to: (i) cease discriminating against the client; (ii) cease inserting unconstitutional criteria into Defendant's processes; and (iii) adjudicate Plaintiff's clearance issue favorably and reinstate Plaintiff with all benefits, backpay, and compensate him for harm caused; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

### COUNT VI
### Unequal Enforcement of SEAD 4 against the Defendant

139.    The Plaintiff adopts and incorporates by reference paragraphs 1 through 137 as if fully stated.

140.    Plaintiff's Fifth Amendment right to equal protection under the law protects him from intentional and arbitrary discrimination.

141.    Even though the Defendant has attempted to point to Plaintiff's alleged misleading or omissions during the security clearance interview process as the basis for its actions, the

40

Defendant admits that the crux of its violations of Plaintiff's constitutional rights stem from what Plaintiff said or failed to say about what the Plaintiff previously said.

142.     In addition, the standardless discretion resulted in the inconsistent enforcement of the Defendant's policies and interpretation of existing laws and regulations regarding speech on the topic of race and immigration and an employee's obligations on whether to disclose certain speech or not that caused violations of the equal protection of the laws afforded to the Plaintiff under the Constitution.

143.     The Defendant's actions deprived the Plaintiff of equal protection under the laws of the United States Constitution at the State Department on August 16, 2022, and every day thereafter.

144.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of SEAD 4; (2) an injunction compelling the Defendant to: (i) cease discriminating against the client; (ii) cease inserting unconstitutional criteria into Defendant's processes; and (iii) adjudicate Plaintiff's clearance issue favorably and reinstate Plaintiff with all benefits, backpay, and compensate him for harm caused; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT VII
### Violation of the First Amendment - Freedom of Association

145.142.          The Plaintiff adopts and incorporates by reference paragraphs 1 through 143 as fully stated.

146.143.          The First Amendment of the United States provides the Freedom of Association.

147.144.          The Defendant violated the Plaintiff's constitutional protected right of a freedom to associate with others who have similar political, religious, and cultural beliefs.

148.145.         Instead the Defendant revoked the Plaintiff's security clearance because he associated with individuals whose whom the Defendant deemed expressed beliefs that would bring discredit and embarrassment to the Defendant. This standard on its face violates the Constitution.

149.146.         The Defendant's actions violated the Plaintiff's right to Freedom of Association.

150.147.         WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT ꓦIII
### Violation of the First Amendment - Freedom of Assembly

151.148.         The Plaintiff adopts and incorporates by reference paragraphs 1 through 149 as fully stated.

152.149.         The Defendant revoked the Plaintiff's security clearance for attending meetings, dinners, conferences, gatherings, and the Charlottesville protests because the content of the meetings was deemed offensive and embarrassing.

153.150.         The Plaintiff's constitutional right to freedom of assembly is being violated and the Constitution does not differentiate between offensive and non-offensive, embarrassing and non-embarrassing because it is subjective and violates the intent of the First Amendment.

154.151.         Plaintiff has a constitutionally protected right to lawfully assemble with whomever he chooses even if the security clearance adjudicator does not agree with the ideologies held by other attendees.

155.152.        WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT IVX
## First Amendment Retaliation

156.153.        The Plaintiff adopts and incorporates by reference paragraphs 1 through 154 as fully stated.

157.154.        The Plaintiff engaged in protected speech by discussing matters of public concern (i.e. the country's immigration policies and beliefs on race) on his own time, under pseudonyms, never stating or implying that he was speaking on the behalf of the Defendant.

158.155.        The Defendant retaliated against the Plaintiff by revoking his security clearance for said speech.

159.156.        The Defendant notified the Plaintiff that they were revoking the Plaintiff's security clearance for aforementioned speech thereby satisfying the causal link between the conduct and the adverse effect.

160.157.        Defendant's revocation of Plaintiff's security clearance satisfies the elements of First Amendment retaliation.

158.        WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff

reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT V
### Violation of the First Amendment of the United States Constitution
### Selective Enforcement

159.    The Plaintiff adopts and incorporates by reference paragraphs 1 through  as fully stated.

160.    Defendant is being untruthful in stating that their reason for suspending Gebert's clearance was due to "dishonesty," which makes the subsequent employment actions taken based on the suspended security clearance, the administrative leave without pay, for instance, equally improper.

161.    Defendant's real reason for suspending Gebert's clearance and placing him in an administrative leave without pay status was due to the backlash from the Hatewatch article, as well an overall disapproval of Gebert's viewpoints by the current personnel in the State Department.

162.    Gebert's speech and associations that formed the content of the Hatewatch article are constitutionally protected, and, therefore, make the Defendant's actions unconstitutional.

163.    Even if the Agency believed Gebert was intentionally withholding his "pro-white" beliefs and that formed the basis of saying he was "dishonest" this would be improper, incorrect, and this is not being applied equally.

164.    Individuals who support Black Lives Matters, for all intents and purposes, are promoting "pro-black" ideals.

165.    Individuals who support BLM are not required to disclose their affiliation or approval of BLM.

166.    In other words, Gebert is being called "dishonest" for not disclosing his "pro-white" ideals, but similarly situated employees and applicants who are not disclosing their "pro-black"

ideals are not being labeled "dishonest."

167.    This means "pro-black" personnel are being treated more favorably than "pro-white" personnel: they are not being investigated; they are not having their clearance suspended; they are not being placed in an LWOP status due to a suspended or revoked clearance, etc.

168.    Plaintiff knows, at a minimum, that on August 27, 2020, Deputy Assistant Secretary of State for African Affairs, Elizabeth Fitzsimmons, outwardly supported BLM at a townhall for the Young African Leaders Initiative (YALI).

169.    Upon information and belief, Ms. Fitzsimmons did not disclose her support of "pro-black" views during any investigation or security clearance questionnaire; she has not been accused of being "dishonest" for failing to disclose her ties during investigations; and she remains employed by the State Department and not in an LWOP status due to her support of BLM and/or her answers to security clearance background investigations regarding BLM.[12]

170.    On February 14, 2022, the BLM flag was raised on the premises of the U.S. Embassy and Consulates in Brazil.

171.    State Department Foreign Affairs officer Douglas Koneff participated in the flag raising ceremony, stating, "Today, we raise this flag to reiterate the importance of black lives around the world."[13]

172.    Upon information and belief, Mr. Koneff did not disclose his support of "pro-black" views during any investigation or security clearance questionnaire; he has not been accused of being "dishonest" for failing to disclose his ties during investigations; and he remains employed by the State Department and not in an LWOP status due to his support of BLM and/or his answers to security clearance background investigations regarding BLM.

---

[12]        https://yali.state.gov/yali-town-hall-racism-and-the-black-lives-matter-movement-around-the-world/
[13]        https://br.usembassy.gov/u-s-embassy-and-consulates-fly-black-lives-matters-flag-in-commemoration-of-black-history-month/

173.     Upon information and belief, not a single State Department employee or applicant has been labeled "dishonest" for failing to disclose his/her affiliation with or support of BLM ideals.

174.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

**COUNT VI**
**Equal Protection Claim**

175.     Defendant took disciplinary and retaliatory action against Gebert that resulted in years of lost pay based on Gebert's political and ideological speech and associations.

176.     Politics, nationalism, religion, and other topics discussed by Gebert are fundamental rights, and the Defendant's actions violated Gebert's fundamental rights.

177.     A government regulation that implicates political or ideological speech receives strict scrutiny, and the government must show that the law is narrowly tailored to achieve a compelling government interest.

178.     The Defendant is not able to show that punishing protected speech achieves any compelling government interest.

179.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the Constitution (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

**COUNT VII**

46

**Violation of the First Amendment of the United States Constitution**
**Overbreadth**

180.     Gebert realleges paragraphs 1 through ___ as if fully stated herein.

181.     Gebert contends that the procedures or methods used by the Department in the clearance process are constitutionally defective.

182.     Specifically, Gebert contends that the three subject questions the Department contends he was dishonest in answering are overbroad, vague, and facially unconstitutional.

183.     Each of these questions, on its own, is overbroad, vague, and facially unconstitutional, which includes the following:

a.   Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

b.   Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

c.   Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

184.     The Department is interpreting the questions at issue here to require applicants to disclose their political associations and speech as well as their ideological beliefs. These are clearly activities within the freedom of speech, and the concern underlying the overbreadth doctrine – chilling speech – is directly at issue here.

185.     The policies, procedures, and methods as relied upon and applied by the State Department could, undoubtedly, regulate a substantial amount of constitutionally protected expression.

186.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order

that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

**COUNT VIII**
**Violation of the First Amendment of the United States Constitution**
**Vagueness**

187.    ~~Plaintiff~~Gebert realleges paragraphs 1 through    as if fully stated herein.

188.    Gebert contends that the procedures or methods used by the Department in the clearance process are constitutionally defective.

189.    Gebert contends that the two subject questions the Department contends he was dishonest in answering are overbroad, vague, and facially unconstitutional.

190.    Each of these questions, on its own, is overbroad, vague, and facially unconstitutional, which includes the following:

a.    Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

b.    Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

c.    Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

191.    Specifically, Defendant's arguments hinge almost entirely on their definition of "embarrassing" and whether or not Gebert should have known his words, actions, and affiliations met the Department's definition of the term "embarrassing."

192.    However, what is "embarrassing" to the State Department is, obviously, not embarrassing to Mr. Gebert, and the State Department's inability to come to that realization three years ago has resulted in a gross violation of Gebert's First Amendment rights and over three years of indefinite suspension without pay.

193.    There was no qualifier, clarification, or context to the word "embarrassing" during Gebert's interview or re-interviews; to expect Gebert to disclose his constitutionally protected speech and associations in response to such an ambiguous question is illogical.

194.    In fact, during this interview - and immediately after the specific question(s) in regard to matters that were "embarrassing" - the interviewer was virtually unintelligible and acknowledged a medical throat issue as explanation; she admitted she would have to retire soon due to this issue, and, at one point, she handed over papers to sign instead of continuing with the in-person interview questions.[14]

195.    The questions posed to Gebert were not clear enough for him to know what was and was not prohibited and/or required.

196.    The Defendant used the questions posed to Gebert arbitrarily and in a discriminatory fashion to punish Gebert for his "pro-white" views.

197.    Moreover, to require Gebert to volunteer his ideologies and political beliefs in response to overbroad, vague, and facially unconstitutional questions such as these would constitute an enormous invasion of not only Gebert's civil liberties, but also those of all other individuals whose speech and associations would be chilled as a result of such questions.

161.198.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction

---

[14]    Gebert asserts this in the September 27, 2019 interview, which is found within the FOIA response materials provided to Plaintiff.  This discussion can be found on page 143 of 452 of Department's materials, which is also marked as "page 74" of the interview transcript.

compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

### COUNT IX~~COUNT X~~

~~**(Violation of the Administrative Procedures Act - - Defendant Department of State)**~~
**~~Violation of 12 FAM 230,~~ *et al.*~~.~~**

~~1.      The Plaintiff adopts and incorporates by reference paragraphs 1 through 160 as fully stated.~~

~~2.      The Defendant provides for a process to adjudicate security clearances under 12 FAM 230 wherein the Defendant describes the reasons that a security clearance can be suspended or revoked.~~

~~3.      More specifically, 12 FAM 233.2 describes the thirteen adjudicative guidelines which does not include the constitutionally protected speech.~~

~~4.      The Plaintiff submitted their response to the revocation in February 2021 and a supplemental response in November 2021.~~

~~5.      To date, the Defendant has not responded to either response. Instead the Defendant has continued to keep the Plaintiff in a Leave Without Pay Status and they have removed his ability to receive health insurance.~~

~~6.      WHEREFORE, Plaintiff is entitled to relief in the form of a declaratory order that Defendant is in violation of its regulation and an injunction compelling Defendant pursuant to the APA to follow its self-imposed mandate of 12 FAM 230.~~

**Violation of the Due Process Clause of the Fifth Amendment of the United States Constitution - Reputational Harm**

199.   The Plaintiff adopts and incorporates by reference paragraphs 1 through ___ as if fully stated.

200.   Defendant has failed to meaningfully allow Plaintiff the opportunity to defend himself and clear his name; to date, Plaintiff has issued no public statements, has rejected all requests for interview, and has never responded to media inquiries regarding his employment with or suspension by Defendant. Absent any guidance from Defendant, this essentially amounts to a three-year voluntary gag order stemming from Plaintiff's belief that such silence would be in his and the Defendants' best interests.

201.   Defendant's failure has deprived Plaintiff of his liberty interest in his reputation.

202.   There is continued stigma and disability arising from the Defendant's official action.

203.   Defendant has tailored his education and dedicated his professional life to a career as a foreign affairs officer through the State Department.

204.   Defendant has dedicated and invested a significant portion of his professional life into public service and time as a civil servant; however, one cannot concurrently hold two federal positions at the same time.

205.   Plaintiff attempted to gain employment through the United States Postal Service (USPS), in February 2020, and the Census Bureau, late 2020 to early 2021, while he was suspended by Defendant. Plaintiff received employment offers from both employers (in writing with the USPS and verbally from the Census Bureau; however, during the pre-onboarding phase with the agencies' respective Human Resources departments both prospective employers

specifically stated he would need to resign from the State Department before being further considered for the opportunity.

206.   As the Plaintiff is unwilling, nor should he be forced to, resign his employment with Defendant State Department while they continue to fail to act on his matters.

207.   Therefore, the Defendant's official action, as well as their lack of action, have had a broad effect of largely precluding Plaintiff from pursuing his chosen career.

208.   The Defendant has seriously affected, if not destroyed, his ability to obtain employment in his field.

209.   WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the Fifth Amendment; (2) an injunction compelling the Defendant to: (i) cease discriminating against the client; (ii) cease inserting unconstitutional criteria into Defendant's processes; and (iii) adjudicate Plaintiff's clearance issue favorably and reinstate Plaintiff with all benefits, backpay, and compensate him for harm caused; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

**COUNT XI**
**(Violation of the Administrative Procedures Act - ~~Defendant Department of State)~~**
**Violation of 3 FAM 3600, *et al*., 5 U.S.C. 89 and 5 CFR § 890, et al.**

~~7.~~210.   The Plaintiff adopts and incorporates by reference paragraphs 1 through ~~166~~    as fully stated.

~~8.~~211.   The Defendant provides for a process to notify Plaintiff of his option to continue receiving health insurance for up to 365 days by way of paying his own premiums.

9.212.   The Defendant did not notify Plaintiff of this option, as they were required to by law and policy.

10.213.  Specifically, 5 CFR § 890.502(b) lists several requirements that the employer agency "must" do:

> (b) Procedures when an employee enters a leave without pay (LWOP) status or pay is insufficient to cover premium. The employing office must tell the employee about available health benefits choices as soon as it becomes aware that an employee's premium payments cannot be made because he or she will be or is already in a leave without pay (LWOP) status or any other type of nonpay status… The employing office must also tell the employee about available choices when an employee's pay is not enough to cover the premiums.

> (1) The employing office must give the employee written notice of the choices and consequences as described in paragraphs (b)(2)(i) and (ii) of this section and will send a letter by first class mail if it cannot give it to the employee directly. (Emphasis added)

11.214.      Initially during Plaintiff's suspension, Plaintiff's paystubs reflected Defendant had been covering the employer-responsible portion of health benefits, which was consistent with the Provider, Aetna's, practices and procedures.

12.215.      At some point during the Fall of 2021, prescription and medical bills began getting denied retroactively by the Provider.

13.216.      Upon information and belief, Defendant, without prior notice to or consent by Plaintiff and without proper authorization, retroactively terminated Plaintiff's health benefits as of the date of his suspension without pay in September 2019.

14.217.      Not only do Defendants fail to take affirmative steps, such as provide required notice, but Defendants also went the extra step with Gebert to retroactively cancel coverage for periods over which he had already paid the premiums, thereby causing Plaintiff to suffer significant economic damages.

218.    On January 23, 2024, the Plaintiff, Matthew Gebert, received a letter directly from the Defendant, Department of State, concerning the termination of his health benefits while in a non-pay status.  See Exhibit ___.

219.    The Defendant specifically states this letter as being sent now "due to the agency's error."

220.    The error which they are now acknowledging is their failure to notify Gebert of his coverage choices.

221.    Both Plaintiff's Complaint, as well as their opposition to the Defendant, Department of State's Motion to Dismiss, cited violations of 3 FAM 3600, et al, as well as 5 CFR § 890.502(b), which lists several requirements that the employer agency "must" do that the State Department clearly violated, including the following:

222.    In light of the Defendant's letter of January 19, 2024, which clearly notes *their* failure to properly inform the Plaintiff of his insurance options in a timely manner, and specifically *prior to his termination*, the Plaintiff is hereby requesting that the Court find that the Defendant violated 3 FAM 3600 and 5 CFR § 890.502(b).

223.    Furthermore, Defendants' letter proves the intent of the Defendant to eliminate Gebert without any consideration of his rights.

224.    The Defendant simply wanted to be able to tell the general public that Gebert no longer received any benefits from the government despite, which among other violations, resulted in violating his entitlement to health insurance for the prescribed period of time after his termination.

225.    This document proves that the Government intentionally put Gebert's health and financial well-being in jeopardy out of spite.

226.    This violation of regulation resulted in financial harm to Gebert and his family during the relevant time period.

~~15.~~227. Such act by Defendant, either through intentional malice or through gross negligence, was done so in an arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law~~ ~~, regulation, and policy in violation of      the Administrative Procedures Act.

~~16.~~228. WHEREFORE, Plaintiff is entitled to relief in the form of a declaratory order that Defendant is in violation of its regulation and an injunction compelling Defendant pursuant to the APA to follow its self-imposed mandate of 3 FAM 3600, *et al*.  Further, by way of the Court granting relief, the Defendant would retroactively cover the expenses incurred during the relevant time period.

### ~~COUNT XII~~

#### ~~(Bivens - All Individual Defendants)~~
#### ~~Violation of the First Amendment of the United States Constitution and Threats to the Plaintiffs' Rights of Freedom of Speech~~

~~17.      The Plaintiff adopts and incorporates by reference paragraphs 1 through 176 as fully stated.~~

~~18.      The First Amendment of the United States Constitution guarantees individuals the right to free speech, association, and the right to assemble.~~

~~19.      The individual Defendants either intentionally, recklessly, or with callous indifference to the federally protected rights of the Plaintiff have threatened, silenced, and/or chilled Plaintiff's rights to freedom of speech and association by using Plaintiff's lawful speech and associations with lawful groups in his private life as the basis to strip him of his security clearance and position in the State Department.~~

~~20.      Defendants' actions also serve to violate the freedom of the press, as much of the speech they are attempting to chill, restrict, impede, and prevent was specifically related to Plaintiff's writings on websites and blogs, as well as times he spoke as a guest speaker on radio shows and podcasts.~~

~~21.      Defendants' discriminatory actions and associated practices are also overbroad because they prohibit and restrict protected expression.~~

~~22.      Defendants' discriminatory actions and associated practices unconstitutionally censor or restrict all private speech on this topic – or at least with this specific viewpoint - that occurs outside the State Department.~~

~~23.      Due to these Defendants disagreeing with the viewpoints held and expressed by Plaintiff - again, in his personal capacity and during his personal time - the Defendants have caused irreparable harm to the federal protected rights of the Plaintiff's freedom of speech and association in the attempt to harass, threaten, silence, and/or chill these constitutional rights.~~

~~24.      Because Defendants have failed to establish a compelling government interest that is narrowly tailored governing the decision whether to allow employees to speak about certain topics and which viewpoints they may hold regarding certain topics, and ergo, which viewpoints need to be disclosed as part of an investigation, there is a substantial risk that Defendants will engage in content and viewpoint discrimination: exactly what occurred to Plaintiff's detriment as alleged herein.~~

~~25.      An actual live controversy exists between the Plaintiff and the Defendants in which the parties have genuine and opposing interests that are direct and substantial and of which a judicial determination will be final and conclusive.~~

~~26.      WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendants have violated the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.~~

~~**COUNT XIII**~~
~~(*Bivens* - **All Individual Defendants**)~~
~~**Violation of the First Amendment - Freedom of Association**~~

~~27.      The Plaintiff adopts and incorporates by reference paragraphs 1 through 186 as fully stated.~~

~~28.      The First Amendment of the United States provides the Freedom of Association.~~

~~29.      The Defendants violated the Plaintiff's constitutional protected right of a freedom to associate with others who have similar political, religious, and cultural beliefs.~~

~~30.      Instead, the Defendants revoked the Plaintiff's security clearance because, in their subjective opinion, he associated with individuals whose beliefs would bring discredit and embarrassment to the Defendants. This standard on its face violates the Constitution.~~

~~31.      The Defendants' actions violated the Plaintiff's right to Freedom of Association.~~

~~32.      WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendants have violated the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.~~

~~**COUNT XIV**~~
~~(*Bivens* - **All Individual Defendants**)~~
~~**Violation of the First Amendment - Freedom of Assembly**~~

~~33.      The Plaintiff adopts and incorporates by reference paragraphs 1 through 192 as fully stated.~~

34.     The Defendants revoked the Plaintiff's security clearance for attending meetings, dinners, conferences, gatherings, and the Charlottesville protests because the content of the meetings was, in their subjective opinion, deemed offensive and embarrassing.

35.     The Plaintiff's constitutional right to freedom of assembly is being violated and the Constitution does not differentiate between offensive and non-offensive, embarrassing and non-embarrassing because it is subjective and violates the intent of the First Amendment.

36.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendants have violated the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT XV
### (*Bivens* - All Individual Defendants) First Amendment Retaliation

37.     The Plaintiff adopts and incorporates by reference paragraphs 1 through 196 as fully stated.   The Plaintiff engaged in protected speech by discussing matters of public concern (i.e. the country's immigration policies and beliefs on race) on his own time, under pseudonyms, never stating or implying that he was speaking on the behalf of the Defendants.

38.     The Defendants retaliated against the Plaintiff by revoking his security clearance for said speech.

39.     The Defendants notified the Plaintiff that they were revoking the Plaintiff's security clearance for aforementioned speech thereby satisfying the causal link between the conduct and the adverse effect.

40.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendants have violated the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT XVI
### (*Bivens* - All Other Individual Defendants)
### Due Process Claims against the Defendant for violating the Due Process Clause of the Fifth Amendment of the United States Constitution

41.     Plaintiff adopts and incorporates by reference paragraphs 1 through 200  as if fully

stated.

42.     Plaintiff has a Fifth Amendment right to Due Process of law before the federal government deprives him or her of life, liberty, or property.

43.     Plaintiff has protectable liberty interests — fundamental rights — in free speech and association under the First Amendment and due process of law under the Fifth Amendment.

44.     The Defendants, either by discriminatory motive or intent, or through reckless or callous indifference to the Plaintiff's federally protected rights erroneously applied Guideline E in a subjective, erroneous, arbitrary, capricious, and with standardless discretion over what

expressive conduct is characterized as embarrassing or not embarrassing to the Defendants, leaving them free to censor ideas and enforce their own personal preferences.

45.     The Defendants have failed to develop objective standards to ensure that federal civilians in their employ, such as the Plaintiff, were not disenfranchised, harassed, or otherwise deprived of constitutional rights without due process of law.

46.     The threat was imminent and did occur, that the conduct of the Defendants deprived the Plaintiff of due process of law under the laws of the United States on August 16, 2019, and every day since, and the deprivation directly and proximately caused Plaintiff to suffer the loss of his protected freedoms, as well as his career he had worked hard to obtain and maintain, unlawfully depriving him of his means to provide for his family.

47.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendants have violated the Fifth Amendment; (2) an injunction compelling the Defendants to: (i) cease discriminating against the client; (ii) cease inserting unconstitutional criteria into Defendants' processes; and (iii) adjudicate Plaintiff's clearance issue favorably and reinstate Plaintiff with all benefits, backpay, and compensate him for harm caused; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT XVII
### (*Bivens* - All Other Individual Defendants) Equal Protection Claim against the Defendants

48.     The Plaintiff adopts and incorporates by reference paragraphs 1 through 207 as if fully stated.

49.     Plaintiff's Fifth Amendment right under the law protects them from intentional and arbitrary discrimination. Even though the Defendants have attempted to point to Plaintiff's alleged misleading or omissions during the security clearance interview process as the basis for their actions, the Defendants admit that the crux of its violations of Plaintiff's constitutional rights stem from what Plaintiff said or failed to say about what the Plaintiff previously said.

50.     The standardless discretion resulted in the inconsistent enforcement of the Defendants' policies and interpretation of existing laws and regulations regarding speech on the topic of race and immigration and an employee's obligations on whether to disclose certain speech or not that caused violations of the equal protection of the laws afforded to the Plaintiff under the Constitution.

51.     Because Defendants have failed to establish a compelling government interest that is narrowly tailored governing the decision whether to allow employees to speak about certain topics and which viewpoints they may hold regarding certain topics, and ergo, which viewpoints need to be disclosed as part of an investigation, there is a substantial risk that Defendants will engage in content and viewpoint discrimination: exactly what occurred to Plaintiff's detriment as alleged herein.

52.     The threat was imminent and did occur that Defendants' actions deprived the Plaintiff of equal protection under the laws of the United States Constitution at the State Department on August 16, 2022, and every day thereafter.

53.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendants have violated the Fifth Amendment; (2) an injunction compelling the Defendants to: (i) cease discriminating against the client; (ii) cease inserting unconstitutional criteria into Defendants' processes; and (iii) adjudicate Plaintiff's clearance issue favorably and reinstate Plaintiff with all benefits, backpay, and compensate him for harm caused; (3) award

Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may
deem just and proper.

### COUNT XVIII

54.      Plaintiff realleges paragraphs 1 through 213as if fully stated herein.

55.      At the time and place aforesaid John Does 1-10 and the federal government, acted
in such a manner as to violate the Plaintiff's constitutional rights, acted in retaliation for
constitutionally protected speech, denied the Plaintiff their due process, freedom of assembly,
freedom of speech, freedom of association, the unequal application of SEAD 4 and other
applicable, laws, regulations, and/or policies; and otherwise acted in a manner that harmed the
Plaintiff.

56.      WHEREFORE, Plaintiff, demands judgment against the defendant John Does 1-10
and the federal government individually, jointly and severally plus damages, interest and costs of
suit.

### COUNT XIX

### Violation of the Privacy Act, 5 U.S.C. §552a (Defendant's Failure to Obtain a Signed Privacy Act Statement)

229.      The Plaintiff adopts and incorporates by reference paragraphs 1 through          as
fully stated.

230.      The Defendant did not collect nor ask the Plaintiff to sign a Privacy Act Statement
before the subject interview where the investigators asked him questions.

231.      The agency is required to have the signed Privacy Act Statement, pursuant to 5
U.S.C. §552a(e)(3), to all persons asked to provide personal information about themselves, which
will go into a system of records (i.e., the information will be stored and retrieved using the
individual's name or other personal identifier such as a Social Security number).  Specifically, the
statute requires the agency to:

**(3)** inform each individual whom it asks to supply information, on the form which it uses to
collect the information or on a separate form that can be retained by the individual—

**(A)** the authority (whether granted by statute, or by executive order of the President)
which authorizes the solicitation of the information and whether disclosure of such
information is mandatory or voluntary;

**(B)** the principal purpose or purposes for which the information is intended to be
used;

**(C)** the routine uses which may be made of the information, as published pursuant
to paragraph (4)(D) of this subsection; and

**(D)** the effects on him, if any, of not providing all or any part of the requested
information;

59

232.    Gebert was not properly informed via a Privacy Act Statement nor did he consent or provide written acknowledgement that such information could be collected, stored, used, and disseminated.

233.    This is a violation of 5 U.S.C. § 552a(g)(1)(D) as the information collected subsequently to the Defendant's failure to provide the Privacy Notice was and continues to be used against Gebert and had an adverse effect on him in the form of, among other effects, lost wages, benefits, his security clearance, and damage to his reputation.

234.    The Defendant acted in a manner which was intentional and willful.

235.    WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); (4) award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B); and (5) grant such other relief as the Court may deem just and proper.

**COUNT XII**
**Violation of the Privacy Act, 5 U.S.C. §552a(e)(3) (Collecting Information that is not contained in the State Department's System of Records Notice Act (SORN) Volume 83, Number 116, Public Notice 10450; Page 28058)**

236.    The Plaintiff adopts and incorporates by reference paragraphs 1 through ____ as fully stated.

236.    Agencies "shall subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include—

**1.**  the name and location of the system;
**2.**  the categories of individuals on whom records are maintained in the system;
**3.**  the categories of records maintained in the system;
**4.**  each routine use of the records contained in the system, including the categories of users and the purpose of such use;

**5.** the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;

**6.** the title and business address of the agency official who is responsible for the system of records;

**7.** the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;

**8.** the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and

**9.** the categories of sources of records in the system;" 5 U.S.C. §552a(e)(4)

237.    The SORN outlines the information that can be collected during the course of the security clearance process. The SORN specifically cites to threats, crimes, or national security related matters.  It does not reference First Amendment activities.

238.    The SORN does not allow for the agency to ask and collect information about the questions asked above.  More importantly, the Defendants are not allowed to ask about any potentially "embarrassing" involvement, support for, potential criticism of, and / or associations with groups that would be embarrassing to the State Department.

239.    The Agency was not allowed to ask about this information because this information is not allowed to be collected under any of the Agency's SORN.

240.    Plaintiff is being irreparably harmed by reason of Defendant's unlawful collection, use, storage, and dissemination of such information without proper authority. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

241.    This is a violation of 5 U.S.C. § 552a(g)(1)(D) as the information collected and stored in violation and contrary to the SORN was and continues to be used against Gebert and had an adverse effect on him in the form of, among other effects, lost wages, benefits, his security clearance, and damage to his reputation.

242.    The Defendant acted in a manner which was intentional and willful.

243.     WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); (4) award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B); and (5) grant such other relief as the Court may deem just and proper.

### COUNT XIII
### Violation of the Privacy Act, 5 U.S.C. §552a(e)(7) (Collecting First Amendment Information Without Proper Authority)

244.     Plaintiff realleges paragraphs 1 through    as if fully stated herein.

245.     The Privacy Act specifically states that the Agency "shall…

maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

246.     Plaintiff did not expressly authorize the collection of information related to his First Amendment rights.

247.     No security clearance rule, regulation, or policy allows for the collection of First Amendment information.

248.     The security clearance interview was not part of a law enforcement activity nor have there ever been any criminal allegations. More specifically, Guideline J of SEAD 4 is never mentioned or referenced in the Plaintiff's security clearance revocation documents.

249.     There is no statute that allows for the collection of First Amendment information for a security clearance Applicant.

250.     Most importantly, the Agency's own SORN does not allow for the collection of this Information.

251.     Plaintiff is being irreparably harmed by reason of Defendant's unlawful collection, use, storage, and dissemination of such information without proper authority. Plaintiff will

continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

252.    This is a violation of 5 U.S.C. § 552a(g)(1)(D) as the information collected qualify as records describing how Gebert was exercising his First Amendment rights, which is expressly prohibited without Gebert's consent – which Defendant did not obtain – or authorized by statute, which does not exist.

253.    First Amendment-related information was and continues to be used against Gebert and had an adverse effect on him in the form of, among other effects, lost wages, benefits, his security clearance, and damage to his reputation.

254.    The Defendant acted in a manner which was intentional and willful.

255.    WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); (4) award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B); and (5) grant such other relief as the Court may deem just and proper.

**COUNT XIV**
**Improper Sharing of Information Under the Routine Use Provision of 5 U.S.C. §552a(e)(3) and 5 U.S.C. §552a(e)(7)**

256.    Plaintiff realleges paragraphs 1 through     as if fully stated herein.

257.    The Privacy Act specifically identifies conditions for disclosure of collection information, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be:

...(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

…(7) to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

258.     Since the Plaintiff did not sign a Privacy Act Statement for the subject interview nor did he sign a Privacy Act Statement specific to the collection of his First Amendment activity, Defendant violated the routine use of the information collected by storing it in their system of records.

259.     Since the Plaintiff did not sign a Privacy Act Statement for the subject interview nor did he sign a Privacy Act Statement specific to the collection of his First Amendment activity, Defendant violated the routine use of the information collected by storing and sharing the information with the Department of Justice when there was no suggestion of criminal conduct.

260.     This is a violation of 5 U.S.C. § 552a(g)(1)(D) as the information collected and stored in violation and contrary to the Routine Use notice – or lack theorf - of which Gebert was notified  and this information was and continues to be used against Gebert and had an adverse effect on him in the form of, among other effects, lost wages, benefits, his security clearance, and damage to his reputation.

261.     The Defendant acted in a manner which was intentional and willful.

262.     WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); (4) award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B); and (5) grant such other relief as the Court may deem just and proper.

## COUNT XV

### (Department of State's Violation of the Privacy Act, 5 U.S.C. §552a )

57.263.  Plaintiff realleges paragraphs 1 through 216   as if fully stated herein.

58.264.  Plaintiff is an individual seeking access to information about himself.

59.265.  Any documentation in the possession, custody, and control of Defendant is a record maintained in a system of records, as described 5 U.S.C. §552a(a)(4)- (5).

266.   Upon information and belief, there are records responsive to Plaintiff's request that are being withheld in full and the Defendants violated 5 U.S.C. §552a when the agency closed the Plaintiff's properly referred FOIA/PA request. The Defendant is wrongfully withholding records and information requested.

267.   The Defendant identified responsive records in their responses, but their explanation does not account for the number of responsive records withheld, nor were the number of records claimed to be releasable actually provided to Plaintiff.

268.   Therefore, the Defendant has not provided an adequate response as required by the Privacy Act, which means they have not complied with the statutory timeline to provide a response.

269.   The Defendant violated the Privacy Act by failing to properly respond within the statutorily mandated time limit, as their September and December 2020 responses were deficient.

270.   The Defendant violated the Privacy Act by failing to cite Privacy Act exemptions in their December 2020 letter, which made the withholding of the five pages in their entirety improper.

271.   The Defendant violated the Privacy Act by failing to properly refer Plaintiff's Privacy Act request to the unnamed agencies it identified as the originating agency within Segments I and II.

272.     The Defendant violated the Privacy Act by failing to conduct an adequate search that led to the agency failing to identify and produce at least 50 pages known to the Plaintiff to exist and be responsive to Plaintiff's Privacy Act request.

273.     The Defendant violated 5 U.S.C. § 552a(g)(1)(B) by refusing to comply with Plaintiff's request under subsection (d)(1) under the statute.

274.     Plaintiff was unable to appeal the releases because the Defendant did not release the documents that they mentioned in their letter nor did they provide justifications for the documents being withheld. Therefore, the Plaintiff has constructive exhaustion since the Defendants have not provided a release that would allow for the Plaintiff to appeal.

~~249.~~     The Plaintiff did not have an opportunity to administratively appeal the adverse determinations made on their requests because Defendant's releases did not provide the documents identified in the letters, the referring agency, and the statutory basis for the withholding of the missing documents. , 5 U.S.C. § 552(a)(6)(A)(i).

275.     Plaintiff has exhausted applicable administrative remedies.

276.     Plaintiff has exhausted applicable administrative remedies.

277.     Plaintiff is being irreparably harmed by reason of Defendant's unlawful withholding of requested records. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

278.     Plaintiff is being irreparably harmed by reason of Defendant's unlawful withholding of requested records. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

279.     WHEREFORE, Plaintiff respectfully requests that the Court:  (1) declare that

Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. § 552(a)(4)(E); and (4) grant such other relief as the Court deems just and proper.

COUNT XXXXXX
Violation of the Privacy Act, 5 U.S.C. §552a (Failure to Sign a Privacy Act Statement)
COUNT XXXXX
Violation of the Privacy Act, 5 U.S.C. §552a(e)(3) (Collecting Information that is not contained in the State Department's System of Records Notice Act (SORN) Volume 83, Number 116, Public Notice 10450; Page 28058)
COUNT XXXXXX
Violation of the Privacy Act, 5 U.S.C. §552a(e)(7) (Collecting First Amendment Information Without Proper Authority)
COUNT XXXXXX
Improper Sharing of Information Under the Routine Use Provision of 5 U.S.C. §552a(e)(3) and 5 U.S.C. §552a(e)(7)
60.
61.     Plaintiff has exhausted all required and available administrative remedies.

62.     Plaintiff has a legal right under the Privacy Act to obtain the information he seeks, and there is no legal basis for Defendant's denial of said right. Defendant's refusal to provide Plaintiff with the requested records amounts to a deprivation of Plaintiff's federal rights.
The Defendant's failure to respond to Plaintiff's FOIA request violated the statutory deadline imposed by the FOIA in 5 U.S.C. §552(a)(6)(A)(ii).
63.     WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); and (4) grant such other relief as the Court may deem just and proper.

**COUNT XVIX**

~~Department of State's~~ Violation of the Freedom of Information Act-5 U.S.C. §552~~a~~

64.280.  Plaintiff realleges paragraphs 1 through 223 __ as if fully stated herein.

65.281.  Defendant is unlawfully withholding records requested by Plaintiff pursuant to 5 U.S.C. §552.

282.    The Defendant identified responsive records in their responses, but their explanation does not account for the number of responsive records withheld, nor were the number of records claimed to be releasable actually provided to Plaintiff.

283.    Therefore, the Defendant has not provided an adequate response as required by the FOIA, which means they have not complied with the statutory timeline to provide a response.

284.    The Defendant violated the FOIA by failing to properly respond within the statutorily mandated time limit, as their September and December 2020 responses were deficient.

285.    The Defendant violated the FOIA by failing to comply with its obligation of segregability when it made a blanket withholding of five entire pages based on exemption (b)(7)(E), which made the withholding of the five pages in their entirety improper.

286.    The Defendant violated the FOIA by failing to properly refer Plaintiff's FOIA request to the unnamed agencies it identified as the originating agency within Segments I and II.

~~162.~~    The Defendant violated the FOIA by failing to conduct an adequate search that led to the agency failing to identify and produce at least 50 pages known to the Plaintiff to exist and be responsive to Plaintiff's FOIA request.

287.    Plaintiff was unable to appeal the releases because the Defendant did not release the documents that they mentioned in the letter nor did they provide justifications for the documents being withheld. Therefore, the Plaintiff has constructive exhaustion since the Defendants have not provided a release that would allow for the Plaintiff to appeal.

288.    The Plaintiff did not have an opportunity to administratively appeal the adverse determinations made on their requests because Defendant's releases did not provide the documents identified in the letters, the referring agency, and the statutory basis for the withholding of the missing documents. 5 U.S.C. § 552(a)(6)(A)(i)

~~66.~~289.  Plaintiff has exhausted applicable administrative remedies.

67.290.  Plaintiff is being irreparably harmed by reason of Defendant's unlawful withholding of requested records. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

68.    WHEREFORE, Plaintiff respectfully requests that the Court: (1) declare that Defendant violated the Freedom of Information Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5

291.    U.S.C. §552(a)(4)(E); and (4) grant such other relief as the Court deems just and proper.

COUNT XXI

(Violation of the Administrative Procedures Act - - Defendant Department of State) Violation of 3 FAM 3418

69.    Plaintiff realleges paragraphs 1 through 228 as if fully stated herein.

70.    When Gebert was suspended indefinitely by the Department, he requested that he be entitled to use accrued leave so that he could receive pay during his suspension.
71.    Gebert accrued leave as part of his employment, and he was, in fact, entitled to use it.
72.    The applicable State Department policy, which is titled "Annual Leave in Lieu of Non-Pay Status During Suspension," reads, in pertinent part:
Annual leave in lieu of non-pay status during suspension may not be granted except when an employee is suspended summarily in the interest of national security under the provisions of 5 U.S.C. 7532.  In such case, the employee may request, and with the approval of the appropriate headquarters office, be granted annual leave not to exceed the balance to the employee's credit as of the date of suspension in lieu of non-pay status.  In the event the employee is restored with back pay, the annual leave charged for the period covered by back pay is restored.

73.    Plaintiff is, according to the Defendants, only "suspended summarily" and it is being done so in the "interest of national security under the provisions of 5 U.S.C. 7532." However, Gebert should have been granted the ability to take his accrued leave, which was denied, and Plaintiff should have the opportunity to go through discovery to show that the only reason his request was denied was because of the content of his speech.
74.    One of the bigger issues and where the harm and deprivation to Gebert is multiplied is when one also reads and considers 3 FAM 7437, which authorizes Gebert to only carry over 240 hours of accrued leave. This results in a continuous and ongoing harm as hours are "use or lose," and Gebert continues to lose.
75.    Gebert has much more than just an "abstract need or desire for it," and more than a "unilateral expectation of" his accrued leave. Accruing leave is part of his compensation

package, and denying the use of it only elongated the time period for which he has been without a paycheck, which eclipsed over three years at the time this suit was filed.

76.    That, taken together with the hours he has lost and continues to lose based on the Defendants' unreasonable delay for unlawful reasons, and this deprivation has become substantial.

77.    The amount of time the Defendants have taken and left Plaintiff in purgatory and the unlawfulness underlying their decision meets the requirements of "grave unfairness;" the level of misconduct by the Defendants rises to the level of the "deliberate flouting of the law that trammels significant personal or property rights" required. George Wash. Univ. v. District of Columbia, 318 F.3d 203, 209 (D.C. Cir. 2003). Contrary to Defendants' claim that Plaintiff did not allege Defendants' actions were a "deliberate violation of the law,"

78.    Plaintiff clearly and specifically identified Defendants actions as "discriminating against [Gebert]" and they were "inserting unconstitutional criteria into [their] processes." And, for the reasons stated above, as well as the clearly pleaded fact that it has been over three years without pay - a substantial amount of time without a paycheck - Gebert has clearly described how "significant" Defendants' violations have been.

79.    Plaintiff's leave has been unlawfully withheld and/or unreasonably delayed.

80.    Defendants' actions have been arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

81.    WHEREFORE, Plaintiff is entitled to relief in the form of a declaratory order that Defendant is in violation of its regulation and an injunction compelling Defendant pursuant to the APA to follow its self-imposed mandate of 3 FAM 3418.

COUNT XXII

Violation of the First Amendment of the United States Constitution
State Department - Overbreadth

163.    Plaintiff realleges paragraphs 1 through 241 as if fully stated herein.

164.    Gebert contends that the procedures or methods used by the Department in the clearance process are constitutionally defective.

165.    Specifically, Gebert contends that the three subject questions the Department contends he was dishonest in answering are overbroad, vague, and facially unconstitutional.

166.    The Department is interpreting the questions at issue here to require applicants to disclose their political associations and speech as well as their ideological beliefs.

167.    These are clearly activities within the freedom of speech, and the concern underlying the overbreadth doctrine – chilling speech – is directly at issue here.

168.    The policies, procedures, and methods as relied upon and applied by the State Department could, undoubtedly, regulate a substantial amount of constitutionally protected expression.

169.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

COUNT XXIII

Violation of the First Amendment of the United States Constitution
State Department - Vagueness

170.    Plaintiff realleges paragraphs 1 through 248 as if fully stated herein.

171.    Gebert contends that the procedures or methods used by the Department in the clearance process are constitutionally defective.

172.    Gebert contends that the two subject questions the Department contends he was dishonest in answering are overbroad, vague, and facially unconstitutional.

173.    Specifically, Defendants' arguments hinge almost entirely on their definition of "embarrassing" and whether or not Mr. Gebert should have known his words, actions, and affiliations met the Department's definition of the term "embarrassing."

174.    However, what is "embarrassing" to the State Department is, obviously, not embarrassing to Mr. Gebert, and the State Department's inability to come to that realization three years ago has resulted in a gross violation of Mr. Gebert's First Amendment rights and over three years of indefinite suspension without pay.

175.    There was no qualifier, clarification, or context to the word "embarrassing" during Mr. Gebert's interview or re-interviews; to expect Gebert to disclose his constitutionally protected speech and associations in response to such an ambiguous question is illogical.

176.    In fact, during this interview - and immediately after the specific question(s) in regard to matters that were "embarrassing" - the interviewer was virtually unintelligible and acknowledged a medical throat issue as explanation; she admitted she would have to retire soon due to this issue, and, at one point, she handed over papers to sign instead of continuing with the in-person interview questions.[15]

177.    Moreover, to require Gebert to volunteer his ideologies and political beliefs in response to overbroad, vague, and facially unconstitutional questions such as these would constitute an enormous invasion of not only Gebert's civil liberties, but also those of all other individuals whose speech and associations would be chilled as a result of such questions.

178.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## **PRAYER FOR RELIEF AS TO COUNTS I - XI, XXI - XXIII**

**WHEREFORE,** the Plaintiff prayerfully requests that this Court:

82.292.  Declare that the Defendant is acting in violation of the First Amendment of the United States Constitution;

---

[15]    Gebert asserts this in the September 27, 2019 interview, which is found within the FOIA response materials provided to Plaintiff.  This discussion can be found on page 143 of 452 of Department's materials, which is also marked as "page 74" of the interview transcript.

83.293.  Declare that the Defendant violated the Plaintiff's protected constitutional rights under the Due Process Clause of the Fifth Amendment of the United States Constitution;

84.294.  Enjoin the Defendant from continuing Plaintiff's suspension without leave;

85.295.  A preliminary and permanent injunction prohibiting Defendant, their agents, officials, servants, employees, and any other persons acting on its behalf from continually violating Plaintiff's constitutional rights and associated practices challenged in this Complaint;

86.    Order the Defendant to immediately reinstate Plaintiff's employment, granting accrued seniority rights to account for his unlawful suspension, and order Defendant to pay all back pay and front pay;

87.    Award compensatory damages against Defendant in the amount of
1.
2.    $100,000,000.00 (ONE HUNDRED MILLION DOLLARS);
296.

88.297.  Order the State Department to pay Plaintiff all back pay for compensation and benefits, including but not limited to leave, healthcare, retirement, and fringe benefits, which continue to accrue;

89.298.  Order the State Department to pay Plaintiff such front pay and future benefits, including but not limited to leave, healthcare, retirement, and fringe benefits, which continue to accrue, and other benefits and relief as may be appropriate; and Award Plaintiff his reasonable attorney fees, litigation expenses, and costs as allowed under applicable laws, and grant such other relief as this Court deems just to the Plaintiff and his attorneys.

### PRAYER FOR RELIEF AS TO COUNTS XII-XVIII

**WHEREFORE,** the Plaintiff prayerfully requests that this Court:

90. ~~Declare that the Defendants are acting in violation of the First Amendment of the United States Constitution;~~

91. ~~Declare that the Defendants violated the Plaintiff's protected constitutional rights under the Due Process Clause of the Fifth Amendment of the United States Constitution;~~

92. ~~Enjoin the Defendants from continuing Plaintiff's suspension without leave;~~

93. ~~A preliminary and permanent injunction prohibiting Defendants from continually violating Plaintiff's constitutional rights and associated practices challenged in this Complaint;~~

94. ~~Award compensatory and punitive damages against Defendants in the amount of $150,000,000.00 (ONE-HUNDRED FIFTY MILLION DOLLARS); and~~

95. ~~Award Plaintiff his reasonable attorney fees, litigation expenses, and costs as allowed under applicable laws/case law, and grant such other relief as this Court deems just to the Plaintiff and his attorneys.~~

## **PRAYER FOR RELIEF AS TO COUNTS X~~IX AND XX~~I-XIV**

**WHEREFORE,** the Plaintiff prayerfully request that this Court:

~~96.~~299. Declare the Defendant ~~State Department's's~~ failure to comply with FOIA and the Privacy Act to be unlawful;

~~97.~~300. Order the Defendant ~~State Department~~ to conduct an independent and comprehensive search of its documents and records in response to Plaintiff's FOIA and Privacy Act Request, control number P-2020-00021;

~~98.~~301. Order the Defendant ~~Department of State~~ to produce all responsive records without further delay or charge;

302. Enjoin the Defendant ~~Department of State~~ from continuing to withhold records responsive to Plaintiff's FOIA and Privacy Act Request;

~~99.~~303. Award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B);

~~100.~~304.    Award Plaintiff attorney's fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. §5~~§~~52a(g~~a~~)(44)(B~~E~~); and

305.    Grant such other relief as the Court deems just and proper.

**PRAYER FOR RELIEF AS TO COUNTS XV-XVI**

**WHEREFORE,** the Plaintiff prayerfully request that this Court:

306.    Declare the Defendant's failure to comply with FOIA and the Privacy Act to be unlawful;

307.    Order the Defendant to conduct an independent and comprehensive search of its documents and records in response to Plaintiff's FOIA and Privacy Act Request, control number P-2020-00021;

308.    Order the Defendant to produce all responsive records without further delay or charge;

309.    Enjoin the Defendant from continuing to withhold records responsive to Plaintiff's FOIA and Privacy Act Request;

310.    Award Plaintiff attorney's fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. §552(a)(4)(E); and

311.    Grant such other relief as the Court deems just and proper.
~~101.~~

Dated:  April 26, 2024~~May 19, 2023~~                    Respectfully submitted,


                                                By: /s/ *Brett J. O'Brien*
                                                BRETT O'BRIEN, ESQ
                                                Bar License #: 1753983
                                                NATIONAL SECURITY LAW FIRM, LLC

1250 Connecticut Avenue
NW Suite 700
Washington, DC 20036
Phone: (202) 600-4996
Fax:     (202) 545-6318

# EXHIBIT D

# Brett O'Brien Law

1250 Connecticut Avenue, NW
Suite 700
Washington, D.C. 20036

*Admitted in New Jersey
*Admitted in New York

———

202-600-4996
Fax 202-600-4997
Brett@NationalSecurityLawFirm.com

*Not a member of the D.C. Bar, but permitted to practice before federal agencies and tribunals*

February 4, 2021

Department of State
DS/DSS, Attn: Director Todd J. Brown
P.O. Box 13285
Arlington, VA 22219-3285

      RE:  IMO of Matt Q. Gebert Response to Security Clearance Revocation

Dear Mr. Brown:

      Please be advised that I have been retained to represent Matthew Gebert with respect to the above-captioned matter. On July 1, 2020, Gebert's Top Secret security clearance was revoked after it was determined that granting him continued access to classified information was not clearly consistent with the interests of national security.

      For the reasons explained in further detail below, this case raises significant constitutional issues regarding Gebert's substantive due process rights, including his rights to freedom of speech and freedom of association. If Gebert's security clearance is not reinstated, the Department of State's actions will violate these First Amendment rights and his rights under the Civil Rights Act. As such, at this time, I am respectfully requesting a review of this decision.

## A. Correcting The Record Regarding Gebert's Beliefs

      To begin, it is important to correct the record regarding Gebert's beliefs, especially since they form the basis for the revocation of his security clearance in this matter. The Southern Poverty Law Center ("SPLC"), indeed, has painted Gebert out to be a racist, swastika-bearing skinhead. While some people may find his opinions on race and immigration offensive and even ignorant, Gebert is not the angry, racist, white supremacist that he is being made out to be. He has never caused anyone harm, he has never used or advocated for the use of force or violence, he never had a single disciplinary infraction in all of his years of service, and he has never broken any laws. In short, other than holding unpopular (and, perhaps, ill-informed) opinions, Gebert has done nothing wrong.

      Moreover, everyone should agree that, no matter how much they disapprove of someone's beliefs, they should not serve as the basis for the government to strip them of

1

their rights or take away that individual's livelihood. That, however, is exactly what would happen here if Gebert's security clearance is not reinstated.

In order to fully understand Gebert and what he stands for, a careful, unbiased reading of his September 27, 2019, interview is required. At the core of his beliefs are the ideas of advocating (1) for white interests; and (2) against immigration. In fact, many of Gebert's beliefs center around being an "immigration restrictionist," through which he celebrates federal immigration laws from the 1920's through the mid-1960's that resulted in strict limitations on immigration. Gebert believes that these policies contributed to America's robust economy and our nation's ascension as a global superpower.

In short, Gebert recognizes the implications of the decline of the white population in the United States, which has been declining year over year from 90% in 1950 to 60% in 2018.  It is estimated that the white population will drop below 50% in another 25 years. Gebert identifies immigration as the primary cause of the declining white share of the population in the United States and finds this issue relevant to the nation's security and prosperity. He feels it is his duty and obligation to advocate for white interests regardless of how such advocacy may be portrayed. In his own words:

> MR. GEBERT: I mean, yeah. You know, you can call it racial nationalism or ethno-nationalism. Those are not my terms. Those are terms that are out there for the ability for people to identify with their own people as they determine it and have some semblance of self-determination. So in the United States, for example, when there are not any policies imposed from above, whether it's busing in the 50s or 60s, or affirmative action, or diversity quotas, or et cetera,  I think that you would find a natural grouping or freedom of association for whites to tend to, not in all cases, of course, live in a white neighborhood, for blacks to tend to live in a black neighborhood. Of course there are exceptions to that rule, but loosening this, what I see as a stricture on everyone must be jumbled together, diversity is our greatest strength, be harmonious and be happy about it, damn it, and if you disagree, you're a racist bigot Nazi.  That's a little more context to my thinking. So in the United States, you know, ending affirmative action, ending mass immigration, which has been going on since 1965, taking in, you know, rough -- over a million aliens, some of them good, some of them bad, some of them lukewarm, et cetera, and deliberately changing what was the historical immigration policy of the United States, which was favoritism for, first, northwest Europe, then the rest of Europe, that apple cart got upset in 1965 and opened the floodgates that's not my term; that's just a, you know, colloquialism -- to the entire world. And I think that that has been on the whole harmful to American cohesiveness, national strength, and long-term durability.
>
> I think that American interests for people of all races would be best served by an immigration moratorium and an end to illegal immigration, and to give us time to pause, settle down. When we had the mass inflow of immigration from the -- call it -- you know, after the Civil War up until

1924, in 1924, Calvin Coolidge signed the Immigration Act of that year, and it essentially stopped the mass inflows. We had very little, almost zero, net immigration from 1924 to 1965 during which time the United States won World War II, you know, we -- the moon landing. So somehow we were a very strong, dynamic country that moved from, you know, a transcontinental emerging power to a superpower with no immigration, all right? So if you want to get into my mind and the red pill process, immigration is a core aspect of that. And I care about immigration, and I cared about immigration, and I still care about immigration because I care about not just my kids' interest or white racial interests, but because I believe that mass immigration, if left unchecked, will eventually lead to the ruin of this country for a number of reasons.

SPECIAL AGENT Okay. So that's -- it sounds like what you're talking about is replacement theory. Is that the term that's used fairly often?

MR. GEBERT: You know, I have not read replacement theory, but when you see the demographic numbers of declining white share of the population of the United States, that they are celebrated, and that if you speak against it, you are somehow made *persona non grata*, it is not, I believe, unreasonable to draw a conclusion from that that white people are being deliberately, through public policy, being marginalized not just in the United States, but all over the world and in the countries where they either are still lingering majorities or are now minorities and declining. And, again, you know, I'm a white man, and if this were happening to a Bantu tribe in a country, I would think that that would be an offense against them. If it were happening to Tibetans in Tibet, which it is, of course, that is an offense against them. And if it's happening to white people, I think there's a double standard in which we somehow are put out there as like this monolithic boogie man in control of everything. And to oppose what's, to me, apparent in front of us is somehow this evil observation, yeah. It's a difficult thing to -- once you see that it's happening, one feels obligated to speak up against injustice.

[September 27, 2019, Interview with Matthew Quinn Gebert 41-17 to 45-19 (hereinafter "Gebert Interview").]

Gebert acknowledges that his opinions are controversial in society. However, while he identified as being conservative, right wing, pro-white, a race realist, and a white nationalist, he ***does not*** consider himself a white supremacist, a Nazi, or a skinhead. According to Gebert:

Mr. Gebert: If you had to characterize my views in this context, you know --

Special Agent: Sure.

Mr. Gebert: -- just to focus on what you're interested in, I am pro-white.

3

Special Agent: Okay.

Mr. Gebert: Yeah.

Special Agent: Would you consider yourself a white supremacist?

Mr. Gebert: No.

Special Agent: Okay. Why not?

Mr. Gebert: I am going to parse that word because it is thrown around loosely and aggressively with the intent to impugn people. I am a --- what is a, you know, not deliberate, but it's a legitimate term called a race realist. I believe through educated inquiry, that race is a biological reality. Obviously there are blurry lines. There are exceptions to every rule, but there are differences between someone who descends from Europeans or someone who descended from Sub-Saharan Africans or Asians, et cetera, across the board. Now, when you talk about white supremacy, I assume that you mean do you think white supremacy - should whites govern or rule over other races as masters or something like that. The answer to that is no. I believe that the world would be a much more harmonious place in which all manner of people, whether it's racial categories, national categories, ethnic categories, religious categories, were permitted essentially to determine their own fates in sovereign lands, sovereign states, whatever it may be. I believe that would be a more harmonious arrangement for all -- for all people.

Special Agent: Okay. Would it be - would you consider yourself a white separatist?

Mr. Gebert: I wouldn't consider myself a white separatist. I would consider myself a white - an advocate for white interests. Do I think that a county in which whites were explicitly sovereign or, you know - and I will use the Israel corollary, right? Israel is called the Jewish state.

Special Agent: Right.

Mr. Gebert: It's the home for Jews. Do I think that whites would be well served by a country for whites?  Probably. I can't tell for sure, but I think that that's a reasonable outcome if you look at the demographic trends, which are a deliberate policy choice. They are celebrated and they are forever worsening. So I think that any other racial group that saw its component of any nation's population basically going from 90 percent to 60 percent today to 40 percent, and for that not to raise concerns or -- for that not to raise concerns among that population, to me, is irrational, and it is some form of you know, hostile imposition on them. If it were happening

to -- you know, it happens to Tibetans in Tibet, and it's a cause celebre that the Chinese are, you know, intentionally bringing in Chinese to Tibet, why? To maintain control and marginalize them. It's happening to white South Africans in South Africa --

[Gebert Interview 36-12 to 39-20.]

Moreover, a theme that Gebert consistently expressed throughout his interview was that he often felt misunderstood by society regarding his beliefs.  For example, he stated that he is often and quickly and inappropriately labeled by society as a "Nazi," "bigot," "skinhead," or "white supremacist" due to his beliefs. As explained above, however, Gebert does not  identify as any of those things. In his own words: "[P]eople with dissident opinions or unpopular opinions are not, you know, evil men or the caricature of skinheads and swastikas and things like that." [Gebert Interview 55-1 to 55-5.]

In addition, although he acknowledges that his ideas are "not acceptable or popular or empowered essentially in politics and society," he believes that they are gradually and incrementally becoming more acceptable in general discourse.

> I do consider myself still conservative, right wing, and that my political opinions, which are honest and informed, are generally, for whatever reasons, not acceptable or popular or empowered essentially in politics and society, *et cetera*. Increasingly they are, you know. What we call the Overton Window[1] has shifted in terms of acceptable discourse . . . .

[Gebert Interview 34-3 to 34-10.]

Gebert also feels that, if he was a minority, it would be socially acceptable for him to hold the exact same thoughts about his own race.  Since he is a white man, however, he indicates that he is immediately labeled a racist in today's society. In Gebert's mind, that sort of reasoning -- in and of itself -- is racist and unfair. He explained:

> [A]t the bottom of it is about truth and candor, and not being muzzled by what I consider to be counterproductive or hostile or the sort of censorship that prevents people and white people -- I'll say it -- from advocating for their own interests as a group which, of course, other racial groups, religious groups, are not only entitled to, but are celebrated for doing so, and have, you know, increasingly legal protections to do so. I believe that there is a double standard that whites are judged by and that other groups are judged by, and are permitted to provide commentary on.

[Gebert Interview 34-15 to 35-3.]

He further stated:

---

[1] The Overton window is the range of policies politically acceptable to the mainstream population at a given time. It is also known as the window of discourse.

I think it's just a recognition of reality that is somehow permitted to -- every other group except for Euporeans and whites. And when you do speak up about it, you're a white supremacist, evil, Nazi, xenophobe, et cetera. You know, any expression of advocacy for white interests, no matter how inert or safe. Steve King has been, you know, as an example of this, a congressman from Iowa. And it's like instantly the herb descends and calls you the reincarnation of Adolf Hitler.

[Gebert Interview 39-12 to 39-20.]

In short, while Gebert admits that he holds far-right opinions regarding race and immigration that are unpopular in today's society and may even be offensive to some people, he is not the "reincarnation of Adolf Hitler,'" as the SPLC has portrayed him to be. Even if he were, however, for the reasons explained in further detail below, one's political and ideological beliefs, however offensive or disagreeable they may be, do not provide a sufficient basis for revoking an individual's security clearance.

## B. Gebert Did Not Lie or Conceal During the Security Clearance Application or Reinvestigation Process

Gebert did not lie about, nor did he conceal, the fact that he was a white nationalist throughout the security clearance application or reinvestigation process. To the contrary, he truthfully and correctly answered all questions throughout the process.

Indeed, the government is unable to point to even a ***single*** question on the SF-86 that Gebert's conduct violated. Gebert has never:

- Been a member of an organization dedicated to terrorism (SF-29.1);
- Engaged in acts of terrorism (SF-29.2);
- Been a member of an organization dedicated to the use of violence or force to overthrow the United States Government (SF-29.3);
- Been a member of an organization that advocates or practices commission of acts of force or violence to discourage others from exercising their rights under the U.S. Constitution or any state of the United States (SF-29.4); or
- Engaged in activities designed to overthrow the U.S. government by force (SF-29.5).

Further, there have been no findings -- let alone any allegations -- that Gebert has ever broken any laws or caused any harm.  In addition, his allegiance to the U.S. has never been in question. Any one of the above-mentioned considerations would of course give rise to a legitimate security concern.  Yet, none of them are present here.

## 1. Gebert Was Never Even Asked Any Questions Regarding His Political Beliefs.

Gebert was never asked any questions relating to his political beliefs during the security clearance investigation or reinvestigation process. None of the questions on the SF-86 asked Gebert anything even remotely related to his political beliefs, such as whether he identified as Republican, Democrat, alt-left, or alt-right, etc. Nor was he asked any questions related to his beliefs regarding race, immigration, or any other ideologies. So too, none of the questions that Gebert was asked during his initial background investigation or during his reinvestigation interview on January 28, 2019, related to any of these issues.

As one might suspect, there is a good reason for this. The federal government grants security clearances only to those who can be trusted with the nation's secrets. Applicants go through intense and lengthy background checks, interviews, and sometimes lie detector tests, as well as rechecks for suitability every several years. Only after this intense process are applicants allowed to serve in some of the most important intelligence and national security jobs.

The Security Executive Agent Directive 4 provides the National Security Adjudicative Guidelines that outlines the 13 criteria under which personnel are deemed eligible or ineligible for security clearances and access to classified information. Among those criteria are: allegiance to the United States, being subjected to foreign influence, financial considerations, and other relevant considerations. Throughout the rigorous security clearance process, the government asks a great deal of questions regarding those 13 criteria, but the government does not ask applicants any questions relating to their  political views, or their views on race, equality, homosexuality, etc. Indeed none of the 13 criteria, nor any of the specific questions relating to those criteria, delve into the applicant's political or other ideological speech or thought -- ***nor should they.***

If an applicant's political or ideological beliefs are permissible and/or relevant to determining whether or not an applicant is a security threat, as the Department of State here is suggesting, then why are questions relating to these issues not asked directly asked during any stage of the security clearance vetting process? The answer is because, not only are they ***not relevant*** to determining whether an applicant is a security risk, but also because they would ***violate the law***.  More specifically, they violate individual's substantive due process rights, namely the fundamental rights to freedom of speech, religion, thought, and association.  Rights which the Department of State advocates for globally on a daily basis.

Notwithstanding the fact that any direct lines of questioning into his political or ideological beliefs would be illegal and unconstitutional (and of course, that they have no relevance to making a security risk determination), what is even more  concerning in this particular case is that Gebert's security clearance was revoked without him ever being provided with a fair opportunity to answer any relevant questions relating to his political beliefs during the security clearance screening process.

Had he ever been asked any specific questions regarding his political beliefs -- either on the SF-86, during his initial background investigation, or during his reinvestigation interview on January 28, 2019 -- Gebert strongly maintains that he

would have been forthright and honest, just as he truthfully answered all questions during the September 27, 2019, interview with the Office of Special Investigations. Notably, there is not a single allegation that Gebert was not 100% honest, truthful, and candid during that investigation interview.

Instead, due to what can only be seen as the lack of a legitimate reason to revoke his clearance, the Department of State relies on the broad, virtually meaningless, "catch-all" questions that it alleges Gebert failed to answer truthfully. Specifically, the Department of State alleges that Gebert lied when he replied "No" to the following questions:

1. Do you have an association with any person, group or business venture that could be used, even unfairly, to criticize, impugn or attack your character or qualifications for a government position; and

2. Are you aware of any other information, including information about members of your family that could suggest a conflict of interest or be a possible source of harm or embarrassment to you, the Department or the United States.

For the reasons explained in further detail below, however, Gebert not only truthfully, but also ***correctly***, answered "No" to each of these questions.

In sum, security clearance applicants' political and ideological beliefs are irrelevant to making security threat determinations. Despite all of this, Gebert's political beliefs form the basis for the revocation of his security clearance in this matter. The very fact that specific questioning as to a security clearance applicant's political or other ideological beliefs does not take place during the security clearance application and reinvestigation process itself should - *at the very least* - shed light on the fact that the Department of State's actions here are impermissible and unconstitutional. It should also call attention to the fact that the Department of State should not be relying on vague, subjective questions as a basis to revoke Gebert's security clearance due to his political and ideological beliefs. Finally, and perhaps more importantly, Gebert should not be faulted for failing to disclose information that he was ***never even asked***.

In a hyper-partisan media environment that is super-charged by social media, virtually any American could be subjected to a targeted attack by a group with an agenda that is contrary to that individual.  And many have, irrespective of race, religion, or sex, but this should not and cannot be the sole reason to revoke a security clearance.

## 2. Gebert Truthfully and Correctly Answered All Questions During the Security Clearance Application and Reinvestigation Process.

Despite never being asked about his political or ideological beliefs during the security clearance application and reinvestigation process, as justification for revoking Gebert's security clearance, the Department of State alleges that Gebert deliberately

concealed when, during his security clearance periodic background reinvestigation interview on January 28, 2019, he advised the security investigator that:

    a. He did not have an association with any person, group or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position; and

    b. He was not aware of any other information, including information about members of his family that could suggest a conflict of interest or be a possible source of harm or embarrassment to him, the Department or the United States.

According to the Department of State, that fact that Gebert answered "No" in response to those questions constituted a "deliberate concealment" of relevant facts to security officials engaged in an investigation relevant to a national security determination such that his security clearance should be revoked under the National Security Adjudicative Guideline E (Personal Conduct).

Specifically, the Department of State alleges that Mr. Gebert's conduct violated:

1. Guideline E 15(b) by "refusal[ing] to provide full, frank and truthful answers to lawful questions of investigators, security officials, or other official representatives in connection with a personnel security or trustworthiness determination;"

2. Guideline E 16(b) by "deliberately providing false or misleading information concerning relevant facts to an employer, investigator, security official, competent medical authority, or other official government representative;" and

3. Guideline E 16(e) as "personal conduct or concealment of information about one's conduct, that creates a vulnerability to exploitation, manipulation, or duress, such as (1) engaging in activities which, if known, may affect the person's personal, professional, or community standing.

Gebert, however, did not lie or conceal when he answered "No" to the subject questions. Due to the vagueness of the "embarrassment" question, it will be analyzed from all possible viewpoints.

First, Gebert's political beliefs are not a source of embarrassment to himself. It is apparent from a reading of the transcript that Gebert feels just the opposite: he is very proud of his beliefs. This makes sense since, almost without exception, people do not tend to hold views that they themselves are embarrassed by.

Moreover, Gebert's decision to keep his political and ideological beliefs private should not be interpreted as him somehow being embarrassed by his own beliefs. As discussed above, Gebert knows that his beliefs are unpopular and offensive to many. In

Gebert's case, he chose to keep his views private so as to not offend people that he came into regular contact with. The mere fact that he chose to keep his unpopular and offensive beliefs private, however, does not mean that he is ashamed or embarrassed by them. To the contrary, Gebert is anything but ashamed or embarrassed by his beliefs. Under the Department of State's reasoning, anyone who is private regarding some aspect of their lives would be a national security risk. Also under the Department of State's reasoning, anyone who holds unpopular beliefs and is private regarding those beliefs would be a national security risk. Being private so as to not offend others or because you know that people will disagree with your beliefs, however, is entirely different from being private due to embarrassment.

In short, Gebert was not aware of any information that would be a source of embarrassment to himself. So, the only way that Gebert that could have dishonestly answered this question was if Gebert had reason to believe that the government would be embarrassed by his views.  However, Gebert provided a very logical and truthful explanation as to why he thought the government would not (or at least *should not* have been) embarrassed by his views.

As Gebert explained, he never engaged in political activity in an official capacity. If he had, then the government might be able to plausibly argue that people could have been confused and/or mistakenly believed that the government endorsed Gebert's viewpoints, thereby causing the government embarrassment.  However, Gebert never engaged in political activity in his official capacity.  In short, the Code of Federal Regulations are the only constitutionally permissible limitations on a federal employees speech because they govern how their speech is exercised in relation to their federal service.  Gebert did not violate: (1) 5 C.F.R. § 2635.702 by misusing his position for his own personal benefit; (2) 5 C.F.R. § 2635.807(b) by engaging in outside activities such as speaking or writing in his personal capacity  and using his official title or position to identify himself in connection with the activity; or (3) 5 C.F.R. § 2635.705 by using his official time by engaging in personal activities.

In fact, the government alleges just the opposite - that Gebert concealed his position as a federal employee when engaging in the conduct at issue. As such, since Gebert always acted in a private capacity when he engaged in political activity, there could be no confusion with respect to the government supporting his opinions, and he, therefore, had no reason to think that the government would be embarrassed by one of its employees' beliefs.

Indeed, the only arguable way that Gebert can be said to have engaged in any misconduct based on the facts of this case would be if he participated in political activity in his official capacity and/or while he was on duty. Perhaps somewhat ironically, even the SPLC itself knew that this would be the only basis for any misconduct in this matter. The subject SPLC article, when addressing grounds for which Gebert could lose his job, specifically explained:

> State Department employees are restricted from engaging in some outside political activities while working for the federal government, according to

the Hatch Act. Some of those restrictions include engaging "in political activity in an official capacity" and engaging in "political activity while on duty or in the workplace."

The SPLC then went on to **admit** that it had been unable to determine whether Gebert violated any of those provisions. Of course, the Department of State also made no finding that Gebert violated any of those provisions. In fact, the Department of State is faulting him for just the **opposite** by alleging that he deliberately concealed his political activities.

Since Gebert himself is not embarrassed by his own views and since there could be no mistaking Gebert's beliefs for the governments,' the only other possible way that Gebert and/or his wife's beliefs could cause embarrassment to the U.S. government would be if the government is embarrassed simply due to the fact that it employs someone like Gebert who holds unpopular beliefs.  We assume that this is the source of "embarrassment" that the government is claiming in this matter, especially considering the government's concern with the "media frenzy" that resulted from the SPLC article. This, however, is very problematic.  Using the security clearance process as subterfuge for firing him for his beliefs is embarrassing.

The United States government **should not** be embarrassed simply by the fact that it employs an individual who happens to hold unpopular opinions. This is exactly what our government, as a democracy, stands for - the refusal to suppress and censor unpopular opinions. To conclude that Gebert somehow should have realized that the government would be embarrassed for employing him is illogical.

Indeed, this is a subjective analysis that -- as Gebert himself correctly noted -- requires a constitutional analysis.  It was perfectly reasonable (and, actually, correct) for Gebert to think that the United States Department of State, as the foremost advocate of freedom in the world, was an inclusive organization that represented diversity of race, religion, and ideology. To Gebert, the fact that he was employed by the Department of State was a sign of strength and not weakness in our government, and was something that he thought the Department would be proud of -- not ashamed of. To Gebert, he was an example of how the American experiment of freedom of speech is possible and works.

Rather than the Department of State being embarrassed for employing someone who holds unpopular opinions, Gebert correctly believed that the Department of State should be proud of that fact. To Gebert and those who truly understand the tenets of our country's First Amendment jurisprudence, governments should not engage in the censorship and silencing of those with unpopular views. This is especially true of the United States of America, which was founded on the principle that those with dissident speech should not be punished or silenced.

Indeed, to those who fully understand the First Amendment, the Department of State should be more embarrassed of revoking the security clearance of an exemplary employee due to the fact that the employee holds unpopular beliefs than it should be of simply employing an individual who holds unpopular beliefs. Likewise, the Department

of State should be more embarrassed of allowing a private, scandal-wracked, far-left organization to use the Department of State as a tool in that organization's mission to fight constitutionally-protected "hate speech" than it should be of standing up for one of its employees' first amendment rights.

Moreover, perhaps only tangentially related, but still worth pointing out, is the fact that the pro-white ideology that Gebert holds is non-violent and significantly less confrontational than statements by the previous President of the United States. A true and accurate copy of the NPR Article, "Debate: Trump Declines to Denounce White Supremacy," is included herein as **Exhibit A.** Despite the previous President's apparent support of far worse ideologies, the government asserts that Gebert should have somehow seen himself as an embarrassment to the United States due to his beliefs. And in all of Gebert's interactions with U.S. and foreign officials in his 6 + years of service, never once was he accused of anything but courtesy, kindness, and professionalism.

Similarly, other high ranking government officials were accused of even more extreme views (on both sides of the spectrum of course) than what Gebert espouses. For example, Stephen Miller (who served as a senior advisor on policy for President Trump nonetheless) likewise was accused of far-right, anti-immigration views and promoted articles from publications like VDARE and American Renaissance. In fact, Miller is on the Southern Poverty Law Center's list of extremists and yet maintained his security clearance and position.

In fact, while Gebert's opinions are fairly unpopular, opinions similar to Gebert's are, in fact, held by other members of the U.S. Department of State, the U.S. military, and members of the public in general. Moreover, as unpleasant as it may be to some, many conservatives (even those who do not consider themselves white nationalists) would agree with Gebert regarding the central tenets of his beliefs, namely that immigration should be restricted and that white people should be able to exercise the same rights of advocacy that other groups do. Should these individuals lose their security clearances? When it comes to one's beliefs, where is the line drawn? How far right too far for the Department of State? These are the issues the government runs into when it decides to regulate its clearance holders' political and ideological beliefs.

In short, Gebert answered these questions appropriately. Gebert is not embarrassed by his views, nor did he ever engage in political activity in his official capacity. Thus, there could be no confusion as to whether the government sponsored or endorsed his views, which could suggest a possible source of embarrassment to the Department or the United States. Thus, the only possibility that we are left with is the fact that the government is embarrassed simply by employing Gebert, due to the fact that he holds unpopular opinions and they were plastered on the news. Gebert, however, was correct for thinking that the government *should not* be embarrassed by employing him, simply due to the fact that he held unpopular beliefs. For these same reasons, Gebert did not think that he held any associations that could be used to attack his character or qualifications for a government position.

12

In support of its argument that Gebert should have seen this his activities could cause the U.S. embarrassment, the government determined that it was "implausible" that Gebert could not see the embarrassment that would result to the U.S. government, especially in light of the media frenzy that the SPLC article caused, as well as the serious effect losing his income had on Gebert's life, which included having to sell his house, and move his family, etc.

This argument, however, ignores two important considerations. First and foremost, it ignores that Gebert correctly answered "No" to the "embarrassment" question. Clearly, the Department of State is upset and embarrassed by the SPLC article and the press that followed, but, for the reasons already explained above, *it shouldn't be*. What the Department should be doing is standing up for its employees' freedom of speech, rather than engaging in censorship. The Department of State cannot be embarrassed for employing someone just because he holds beliefs that society as a whole may not agree with and it cannot use its irrational embarrassment as an excuse to violate its employee's substantive due process rights. Thus, once again, we strongly maintain that Gebert correctly answered this question.

Second, this argument is a perfect example of the adage that "hindsight is 20/20." The questions that the government alleges Gebert answered untruthfully were asked of Gebert on January 28, 2019, which was *prior* to the publishing of the SPLC article on August 7, 2019. At that time, Gebert had absolutely no reason to believe that the SPLC would subsequently publish what Gebert succinctly described as a "hit piece."

Indeed, the SPLC article *was* a hit piece. While it was written in a way that appeared objective and truthful, it took select statements out of context and presented information in a biased manner in an attempt to turn public opinion against Gebert. In fact, while -- as the government points out -- Gebert did substantiate many of the factual details contained in the SPLC article (such as the fact that he posted online under various pseudonyms, appeared on various podcasts, and attended various dinners and events, etc.), he also indicated that he vehemently disagreed with how the SPLC article portrayed him as a "racist, bigot Nazi." Despite how Gebert was portrayed, there can be no denying that his ideology is non-violent and much less extreme than other pro-white ideologies. In short, on January 28, 2019, when Gebert answered the relevant questions during his security clearance reinvestigation, it was completely unforeseeable to Gebert that he would subsequently be the subject of such a false, biased, and inflammatory article. Thus, it is unfair for the government to use the article's fallout in this fashion.

### 3. Gebert Did Not Engage in Concealment and He Is Not Susceptible to Blackmail

To justify the revocation of his security clearance, the core argument advanced by the Department of State centers around Gebert's alleged "concealment" of his white nationalist activities. In doing so, however, the Department of State misinterprets Gebert's privacy regarding his political beliefs.

As explained above, Gebert was never asked any specific questions regarding his political beliefs during the clearance process, and he appropriately answered "No" to the two vague questions that the government alleges he somehow should have disclosed his political activities.  As such, there is simply no basis upon which the government can find any concealment in this matter. Under the Department of State's analysis, a person who does not affirmatively, verbally, and voluntarily reveal the fact that he or she is an advocate of any remotely controversial idea whatsoever would be guilty of concealment. Failure to disclose information -- though never even asked -- constitutes concealment. Also under the Department of State's analysis, anyone who does not affirmatively, verbally reveal the fact that they hold unpopular opinions on any issue would be guilty of concealment.

Nonetheless, it is apparent from reading the record that the government feels as though Gebert (at some point in the clearance process) should have revealed -- on his own initiative -- his political and ideological beliefs to them. In fact, it is clear from reading the record in this matter that the government interprets various instances of Gebert's behavior (such as his use of pseudonyms  online, the fact that he wore a hat and sunglasses to a protest, etc.) as evidencing some sort of calculated scheme on Gebert's behalf to deliberately conceal his political beliefs specifically from the Department of State.  This conclusion, however, could not be further from the truth.

In fact, this conclusion fails to consider the most logical explanation for Gebert's behavior. If one were to put themselves in Gebert's shoes for a moment, knowing that on a daily basis he interacts with non-white or left-wing neighbors, colleagues, co-workers, supervisors, etc., his decision to keep his political and ideological beliefs private can be better understood and, even, possibly even empathized with. Given this, it should be obvious why Gebert chose to keep his political and ideological beliefs private, as he has every right to do.

As he explained throughout his interview, Gebert knows that his opinions are unpopular and that many people would be offended by them. He knows that segments of society do not accept them.  Thus, as Gebert explained, unless he knows that you are what he calls a "like-minded person" (i.e., another white nationalist), he simply does not talk about his political or other ideological viewpoints with you.  In other words, Gebert -- like millions of other Americans -- keeps his political and ideological views private.

Gebert has every right to take this approach. Not only were Gebert's coworkers and supervisors not aware of his beliefs, but neither were his neighbors, some of his friends, or most of his acquaintances.  Thus, it wasn't that Gebert was concealing his beliefs from the government out of fear of losing his security clearance.  To the contrary, Gebert did not discuss his views with anyone on an unsolicited basis except for those that he would consider "like-minded" because he knew that his opinions were controversial.

The fact that people have aspects of their lives that they do not, on their own initiative, tell supervisors, associates, neighbors, co-workers, or even close family members ***does not***, however, imply that those people are security risks. All people have

aspects of their lives, such as their sexual preferences, medical conditions, family issues, or their political or religious viewpoints, that they prefer to keep private. This fact does not mean that those people would be susceptible to blackmail if someone were to learn of the private information.

Indeed, although Gebert would not expose his beliefs on an unsolicited basis, as was revealed throughout his interview, he prides himself on his integrity. He is and has always been aware of the importance of being honest and truthful throughout the clearance process. Has Gebert ever been asked about his political or ideological beliefs, he would have disclosed them, just as he did during the subsequent investigative interview. As Gebert explained:

> SPECIAL AGENT And you don't feel that information could be -- have use -- could've been used to exploit you, to blackmail you, coerce you, or anything like that?
>
> MR. GEBERT: A hundred -- a hundred percent no because I'm not ashamed at all of my views. I can't be bought. I believe what I believe. You know, I'm a true believer, not in any cult sense, but in terms of having informed, you know, beliefs and values that unfortunately in this day and age are judged to be beyond that pale.

[Gebert Inveriew 81-15 to 82-3.]

Indeed, the Department of State relies heavily on one particular statement that Gebert allegedly made as proof that he intentionally concealed his white nationalism from them.  Specifically, the Department of State argues that "Gebert understood that his connection white nationalism (if discovered) could end his career with the Department of State" when he stated in an article: "There are bigger things than a career and a paycheck, and I don't want to lose mine."

To the contrary, this statement literally means ***the exact opposite*** of what the Department of State alleges it does.  While the Department of State somehow interprets that statement as meaning that Gebert will do anything, including lie, in an effort to conceal his white nationalism to keep his job, it actually says just the opposite.  While Gebert acknowledges that he doesn't want to lost his job ("I don't want to lose mine"), when read together with the phrase at the beginning of the sentence ("There are bigger things than a career and a paycheck"), it is clear that what Gebert is saying is that his beliefs are ***more important*** to him than his job is. In other words, Gebert is saying that if he was ever forced to decide between his beliefs and his career, he would choose his beliefs. Thus, the statement itself negates the very point the Department of State alleges that it proves. It also clearly evidences that Gebert is proud of his beliefs, that he has integrity and conviction, and that he is not subject to blackmail on the basis of his beliefs.

In addition, the Department of State points to various other isolated actions that Gebert took in an effort to show a deliberate concealment of his political and ideological

beliefs from the Department of State. For example, pointing to the fact that conducted his activities on the internet under various pseudonyms, such as "Coach Finstock," or that he wore a "hat and sunglasses" to the Charlottesville protest.  In doing so, the Department of State again ignores the most logical and benign explanation -- that Gebert is simply private regarding his political and ideological views, as he has every right to be, since he knows that many people disagree with him. Notwithstanding this, it also ignores the fact that "usernames," are standard privacy procedures for millions of Americans, are just that - they often made up and do not reflect the actual name of the person posting under that name.  So too, with respect to wearing a hat and sunglasses, Gebert explained that he did not want to be recognized by the left at the Charlottesville protest and that he wore a hat and sunglasses for that reason. According to Gebert, he was concerned for his personal safety. In fact, he was severely injured at the protest.

In short, Gebert is private regarding his political beliefs mainly because he knows that they are unpopular and that most people do not agree with them in addition to the fact that they offend many people. This in no way means that Gebert is embarrassed or ashamed by his beliefs, nor does it mean that Gebert is susceptible to blackmail. To the contrary, Gebert is proud of his beliefs and in fact has publicly stated that he values them over even his career and paycheck. Unfortunately for the Department of State, he was never asked about his political beliefs during the clearance process.  Had he actually been asked about them, he would have in fact disclosed his white nationalism. ***However, it is unreasonable for the Department of State to have expected him to disclose his political and ideological beliefs on his own initiative or in response to completely irrelevant questions.***

### C. The Revocation of Gebert's Security Clearance is Subject to Judicial Review and Violates the First Amendment.

*"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."*

*— Supreme Court Justice William J. Brennan*

The First Amendment forbids the government from using its power to punish political speech. That, however, is exactly what would happen here if Gebert's security clearance is not reinstated. Fortunately, however, the courts have sufficient authority to stop constitutional violations of this nature.

The interest of the executive branch in controlling access to information bearing on national security derives from Article II of the United States Constitution. *See Department of Navy v. Egan*, 484 U.S. 519, 525, 108 S.Ct. 818 (1988). The President has the authority to protect such national security information pursuant to both the Executive Power, U.S. Const. Art. II, § 1(1), and as "Commander in Chief of the Army and Navy of the United States," *id.* at § 2(1). As the Supreme Court explained in *Egan*, "[The President's] authority to classify and control access to information bearing on

national security and to determine whether an individual is sufficiently trustworthy . . . [to have] access to such information flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant." 484 U.S. at 527 ( *citing Cafeteria Workers v. McElroy*, 367 U.S. 886, 890, 81 S.Ct. 1743 (1961)). Thus, the federal government's "compelling interest" in controlling access to national security information has been long recognized by the Supreme Court. *See, e.g, Egan*, 484 U.S. at 527.

The speech interests asserted by Gebert, however, are equally fundamental. "The maintenance of the opportunity for free political discussion to the end that the government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg v. California*, 283 U.S. 359, 369, 51 S.Ct. 532 (1931); *see also New York Times v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710 (1976) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions."). The constitutional protection of the freedom of speech "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304 (1957). The First Amendment, said Judge Learned Hand, "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *United States v. Associated Press*, 52 F. Supp. 362, 372 (S.D.N.Y. 1943).

The United States Supreme Court has long considered political and ideological speech to be at the core of the First Amendment, including speech concerning "politics, nationalism, religion, or other matters of opinion." *W. Va. State Ed. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943). As such, government action that implicates political or ideological speech receives strict scrutiny in the courts, whereby the government must show that the law is: (1) narrowly tailored; (2) to achieve a compelling government interest. *Id.*

The federal courts have the power to enjoin the executive branch from revoking security clearances for reasons that violate the First Amendment. While it is sometimes suggested that the Supreme Court's decision in *Egan* precludes judicial review of the decision to revoke a security clearance, this reads *Egan* too broadly. To be sure, *Egan* vests the executive branch with broad discretion to make security clearance determinations. So, as a general matter, courts cannot examine the substance of an agency's decision to revoke a security clearance.

Constitutional challenges to the revocation of security clearances are still judicially reviewable. In fact, *Egan* is largely irrelevant in a circumstance like the one at issue here, where the government threatens to revoke a security clearance for some patently unconstitutional reason. The basis for the holding in *Egan* explains why. The court's decision rests on two premises: (1) that Article II of the Constitution grants the executive branch substantial authority in matters of national security, including control over who has access to classified information; and (2) that the executive branch has the

17

expertise necessary to make determinations about who should be granted access to classified information, which courts are not well-equipped to second-guess. Thus, courts are understandably reluctant to examine decisions about an individual's fitness for a security clearance where an agency has applied its expertise and came to a considered judgment.

But neither of these principles are implicated when the government threatens to revoke a security clearance for a reason that is obviously constitutionally suspect. Whatever the extent of the executive branch's power, it is still subject to other provisions of the Constitution and the Bill of Rights, including the First Amendment. And in such a case, the government has not engaged in a process to which a court would owe deference; certainly, the government has not applied its expert judgment to make a decision based on national security considerations.

Furthermore, even were the government to engage in some process in an attempt to shield its unconstitutional conduct from judicial review, *Egan* would not come to the government's rescue. *Egan* does not provide a green light for the executive branch to use the security clearance process to take actions that the Constitution ordinarily forbids. When dismissing statutory challenges as barred by *Egan*, courts have repeatedly distinguished between statutory and constitutional claims. This distinction between statutory and constitutional claims finds support in the Supreme Court's decision in *Webster v. Doe*, 486 U.S. 592 (1988). In that case, decided just months after *Egan*, the Court held that although the CIA Director's decision to fire an employee on national security grounds was unreviewable under the APA, the employee's colorable constitutional challenge could proceed. *Id.* at 601– 04. The Court distinguished between adjudicating the substance of the Director's decision, which it explained was committed to his discretion by law, and reviewing "colorable constitutional claims arising out of the actions of the Director pursuant to" that law. *Id.* at 603.

The circuit courts have also recognized these limitations on *Egan's* reach. The Third Circuit, noting that "not all claims arising from security clearance revocations violate separation of powers," has held that constitutional claims may proceed. *Stehney v. Perry*, 101 F.3d 925, 932 (3d Cir. 1996). And the Ninth Circuit has recognized that, although security clearance decisions are unreviewable under the APA, *Webster* "is dispositive on [the] question" of whether those decisions are reviewable for constitutional error." *Dubbs v. CIA*, 866 F.2d 1114, 1120 (9th Cir. 1989); *see also Dorfmont v. Brown*, 913 F.2d 1399, 1404 (9th Cir. 1990) (recognizing that "federal courts may entertain colorable constitutional challenges to security clearance decisions"). The Fourth Circuit thought it "arguable" that an equal protection claim might withstand "*Egan's* admonition restraining court review," but has had no occasion to resolve the issue. *Jamil v. Secretary, Department of Defens*e, 910 F.2d 1203, 1209 (4th Cir. 1990); *see id.* ("Whether . . . review of such alleged denial of constitutional rights is reachable by a court in the light of *Egan* presents a difficult question that we do not need to reach in this appeal . . . because . . . nothing in the record . . . indicates that the defendants acted from an improper motivation based on national origin.").

So, for example, if the government decided to revoke the security clearance of every member of an ethnic group or religion, based on its view that members of that group or religion are not trustworthy, it is inconceivable that a court would hold that it lacks the authority to review such a blatant constitutional violation. The same can be said for the revocation of a security clearance for engaging in core First Amendment-protected speech, such as Gebert has done here. In such cases, courts could comfortably exercise their authority to enforce the Constitution without treading on agency expertise.

For example, in *Stillman v. Department of Defense,* 209 F. Supp. 2d 185 (D.D.C. Jun. 7, 2002), the court stated "it would be error to fail to recognize the role played by the sensitive nature of the information at issue here. However, it would equally be error to attribute all of their decisions to the security risk justification. Thus, this Court will analyze the constitutional questions with both of these justifications in mind." Further explaining this delicate balancing test, the court stated:

> To be clear, this Court's review of defendants' actions is limited to determining whether defendants have violated the First Amendment. As will be explained below, that review requires no more than applying the test that was announced in *McGehee* for determining when the speech of former government employees has been impermissibly restricted. 718 F.2d at 1142-43. This Court is not required to make the type of "predictive judgment" about an individual's impact on national security about which the *Egan* Court expressed concern. 484 U.S. at 529. The Court's inquiry focuses on whether defendants' actions implicate protected speech, whether defendants' actions were intended to infringe speech, whether the interests served by defendants' actions were compelling, whether defendants' actions were based on the content or viewpoint of the speech suppressed, whether defendants' actions constitute a prior restraint on speech, and whether defendants' actions were no more restrictive than necessary to further those interests.

> These inquiries could require in some part delving into the legitimacy of defendants' asserted risk to national security. For example, if the Court believes that there is no risk to national security from the potential release of the information, then the interests asserted by the government would no longer be compelling. Furthermore, if it turns out that the government denied access for reasons other than national security risk, the interests asserted by the government may no longer be compelling. The nature of the Court's inquiry into the decision made here is no more intrusive than applying the appropriately deferential standard of review for classification determinations. The Court's analysis of the First Amendment question will be conducted with appropriate deference to the expertise of the Executive Branch where such deference is warranted. *See McGehee*, 718 F.2d 1149 (in the context of reviewing classification determinations, court should give an

appropriate amount of deference to risk predictions by classification experts). However, the fact that this case may implicate an area of Executive expertise does not mean that deference must be complete.

[*Id.* at 190.]

So too, in *High Tech Gays v. Defense Industrial Security Clearance Office,* 895 F.2d 563 (9th Cir. 1990), the court engaged in the exact analysis called for in this case. *High Tech Gays* was a nationwide class action challenge to the Department of Defense's policy of subjecting lesbian and gay applicants for security clearances to expanded investigations due to their sexuality.  The purported policy basis for these expanded investigations was that homosexuality may tend to "cast doubt on the individual's morality, emotional or mental stability" and "may raise questions as to his or her susceptability to coercion or blackmail." *Id.* at 578.

In *High Tech Gays*, the Ninth Circuit held that homosexuality was a "not an immutable characteristic; it is behavioral and hence is fundamentally different from traits such as race, gender, or alienage, which define already existing suspect and quasi-suspect classes." *Id.* at 573. Thus, it held that the classification of homosexuals was not a suspect or quasi-suspect category and, thus, was subject only to the rational basis standard. Putting aside the problematic holding that homosexuality was "behavioral" and not an immutable characteristic, the court then went on to apply the rational basis test and upheld the Defense Department's practice of subjecting gay men and lesbians automatically as a class to more burdensome security clearance procedures. In doing so, the court found a rational basis for the classification in the KGB's purported targeting of homosexuals, among others, as potential traitors, despite little in the record to support this concern. *Id.* at 578.

There are two takeaways from *High Tech Gays*. First, it highlights that, despite *Egan*, federal courts can and will engage in the exact same constitutional test that is applicable here, even when dealing with security clearance issues. Second, although the government ultimately prevailed in *High Tech Gays*, that sucess was largely (if not entirely) due to the level of scrutiny applied. In *High Tech Gays*, the court determined that homosexuality was not a suspect class, thus, it applied rational basis.  Here, in contrast, there can be no doubt that the federal courts would apply strict scrutiny. The Supreme Court has declared that government regulation should be analyzed under strict scrutiny when it: (1) infringes on a protected liberty (like procreation or marriage); (2) infringes on a protected action (like political speech); (3) infringes upon a fundamental right (like free speech); or (4) when it unfairly discriminated against a protected class (like race or national origin).

There can also be no doubt that the governments' claims under both the present matter and *High Tech Gays* would fail under the strict scrutiny standard.  In both the District Court's opinion and the Circuit Court's opinions in  *High Tech Gays,* the courts analyzed in detail the government's alleged security concern regarding the potential for blackmail, particularly as applied to "closeted" homosexuality. In this regard, the District Court explained:

The record in this case is absolutely clear. There is simply no evidence of either a gay applicant for a security clearance having been tempted by blackmail or any lesbians or gay men who have obtained industrial clearance having transmitted classified information to anyone unauthorized to receive it. At the Senate Permanent Subcommittee on Investigations hearings of April 1985, the FBI and the Defense Intelligence Agency produced no evidence of persons being blackmailed because of homosexuality. Of the approximately 40 "significant" espionage cases, two involved gay people; neither of these involved blackmail. Federal Government Security Clearance Programs: Hearings Before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs United States Senate, 99th Cong., 1st Sess. 171-187, 913-926 (1985).

[*High Tech Gays v. Defense Industrial Security Clearance Office*, 668 F. Supp. 1361 (N.D. Cal. 1987).]

Thus, applying strict scrutiny, the District Court found that the Defendant's alleged security concern with regard to secretive homosexuals being subject to blackmail were "not persuasive." *Ibid*.

Similarly to the government's concern in *High Tech Gays* with closeted homosexuals being susceptible to blackmail, the Department of State here likewise alleges that, because Gebert is reserved with respect to publicly expressing his political beliefs, he may be a candidate for blackmail. Thus, according to the government, being private about one's political beliefs is now a disqualifying factor in the adjudicative process.

Even if -- for argument's sake -- one were to conclude that Gebert concealed the fact that he was a white nationalist because he knew it would be embarrassing to the Department of State to employ him, a conclusion we strongly disagree with for the reasons explained above, this purported justification lacks substance and is a mere pretext for discriminating against Gebert based on his political beliefs. In fact, this is the exact same national security concern that was previously used with respect to homosexuals. Specifically, a concern that closeted homosexuals could be blackmailed justified the archaic policies concerning homosexuals and security clearances. Rather than turning out to be an actual concern with blackmail, however, administrative documents and survey data indicated that, instead, it was mere distaste for homosexuals that ungirded such justifications. The history and treatment of homosexuals in this regard is a truly enlightening example of history repeating itself. *See Barriers to Security Clearances for Gay Men and Lesbians: Fear of Blackmail or Fear of Homoexuals?* 539 Journal of Public Administration Research and Theory, Gregory B. Lewis (October 2001), **Exhibit B.**

Likewise, rather than fearing the potential for blackmail, it is clear that the Department of State revoked Gebert's clearance for nothing other than mere distaste for his political and ideological beliefs. The government, however, will be able to set forth

no evidence on the record that Gebert, as a white nationalist, is subject to blackmail. First, as explained above, Gebert unequivocally and publicly rejected that he would ever be subject to blackmail when he stated that his beliefs were more important to him than even his career or a paycheck.

Further, the government will not be able to point to any evidence that would establish that white nationalists, or those who are private regarding their political or ideological beliefs, are more likely to be tempted by blackmail or have in fact transmitted classified information to anyone unauthorized to receive it. In fact, white nationalists and those who hold similar pro-white ideologies are probably some of the least likely citizens to betray the United States, just based on the core tenants of their ideology. Gebert is as "pro-America" a citizen as they come. No one can seriously question Gebert's fitness or loyalty to this county. There is simply no basis to support the Department of State's bald assertion that Gebert would be subject to blackmail.

In order for the government's blackmail theory to make sense, one would have to find that being a white nationalist is such an awful secret, that one would betray one's country to protect it. This theory just doesn't make sense in this context where Gebert is simply not ashamed or embarrassed by his ideology. To the contrary, he is proud of it.

Notwithstanding all of the above, from a practical perspective, even though there was absolutely no potential for blackmail to begin with, there clearly is no longer any threat of blackmail at this point, now that Gebert's political opinions have been made public. There are no teeth to this argument. Instead, the government is left with nothing but an academic argument regarding the blackmail theory.

The record in this matter shows that there is no basis for considering Gebert's privacy regarding his beliefs a national security matter. The record provides no evidence of a compelling relation between this policy and furthering the legitimate goal of ensuring national security. There is no evidence linking privacy regarding one's political beliefs to blackmail. The Department of State's reasoning represents a simplistic approach to complex issues regarding national security and potential blackmail and is not founded on any legitimate basis. The fact that people have aspects of their lives that they do not on their own initiative tell supervisors, associates, neighbors, co-workers, or even close family members does not imply that those people are security risks. The Department of State's actions are founded upon a disdain for white nationalism, not a legitimate basis. Because the Department of State can provide no evidence that Gebert's privacy regarding his political views are narrowly tailored to the compelling interest in protecting national security, the revocation of his security clearance violates the First Amendment.

Clearly, the Department of State does not like or agree with Gebert's ideologies. Either way, however, Gebert was in a lose-lose situation. Had he publicly held himself out as a white nationalist, the Department of State would be revoking his clearance on the basis that it appeared as though the Department had somehow endorsed his views. Since he kept his beliefs private, however, the Department of State instead alleges that he is a security risk due to his privacy regarding his political beliefs.

What is clear in this case is that the Department's purported security concern with blackmail is nothing more than pretext for the real reason it revoked Gebert's clearance: dislike of his ideology. As offensive and unpalatable as his ideology may be, however, it does not provide the government with justification to revoke his clearance. The Supreme Court has made it clear that bias on part of our own citizenry cannot justify governmental discrimination. *See Cleburne,* 473 U.S. at 448 (in zoning against a home for the developmentally disabled. A "city may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic"); *Palmore v. Sidoti,* 466 U.S. 429, 104 S.Ct 1879, 80 L.Ed.2d 421 (1984) (existence of prejudice among public not sufficient to justify removing child from custody of white mother who is living with black man). In short, the government may not adopt the prejudices of its own citizens as a rationale for depriving one of a fundamental right.

The government's interest in protecting national security is undeniably significant. However, the First Amendment forbids the Department of State under the guise of protecting national security to infringe upon Gebert's fundamental rights. An examination of the record shows that the government can put forth no evidence that shows that their policies and procedures are precisely tailored to the government interest. In sum, it is without question that the defendants' policies are neither closely related, substantially related or rationally related to the government's interest such that they do not survive scrutiny under the first amendment.

So too, Gebert's First Amendment right to freedom of association has been violated. The Department of State used the fact that Gebert, at one time or another, may have belonged to a white nationalist group to revoke his security clearance. All citizens, however, have first amendment rights to belong to lawful associations. *Elrod v. Burns*, 427 U.S. 347, 356-68, 96 S.Ct. 2673, 2681-87, 49 L.Ed.2d 547 (1976). This right extends to government employees. *Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984). Governmental actions that significantly impair an individual's first amendment rights must survive "exacting" scrutiny. The government must prove that the interest is "paramount" and of "vital importance." *Id.* at 94; *Elrod v. Burns*, 427 U.S. at 362, 96 S.Ct. at 2684.

The government must show that its actions are the least restrictive means to achieve the government interest. If there is a less "drastic" way of attaining the governmental purpose, the government may not enact a regulation that "broadly stifles the exercise of fundamental personal liberties." *Kusper v. Pontikes*, 414 U.S. 51, 59, 94 S.Ct. 303, 308, 38 L.Ed.2d 260 (1973).

It is without question that the Department of State's use of mere membership in a white nationalist organization to revoke a clearance would violate a plaintiffs' first amendment rights. Being subjected to additional scrutiny and adjudication clearly would chill a plaintiffs' rights to associate in such organizations. Such governmental action is "imbued with the potential for subtle coercion of the individual to abandon his controversial beliefs or associations." *Clark*, 750 F.2d at 94.

Finally, Gebert also has a clear cause of action for First Amendment retaliation. In order to state a claim against a government employer for violation of the First Amendment, an employee must show: (1) that he or she engaged in protected speech; (2) that the employer took "adverse employment action;" and (3) that his or her speech was a "substantial or motivating factor' for the adverse employment action. *See Bd. of County Comm'rs v. Umbehr,* 518 U.S. 668, 675, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996).

There are three separate and distinct ways in which a plaintiff can show that retaliation was a "substantial or motivating factor" behind a defendant's adverse employment actions. First, a plaintiff can introduce evidence regarding the " 'proximity in time between the protected action and the allegedly retaliatory employment decision,' " from which a " 'jury logically could infer [that the plaintiff] was terminated in retaliation for his speech.' " *Coszalter v. City of Salem,* 320 F.3d 968, 977 (9th Cir. 2003). Second, a plaintiff can introduce evidence that "his employer expressed opposition to his speech, either to him or to others." *Id.* Third, the plaintiff can introduce evidence that "his employer's proffered explanations for the adverse employment action were false and pre-textual." *Id.* at 752.

Here, Gebert has no problem satisfying *all three* of these tests, each of which standing alone would support an inference of retaliation. First, he can provide evidence that he received notice that his security clearance was suspended on August 16, 2019 -- just 9 days after the August 7, 2019, Hatewatch article was published. In addition, he can introduce evidence that the Department of State expressed opposition to his speech. Not only did the **investigators themselves** express opposition to his speech, but one of the core arguments made by the Department of State in this case centers around their alleged "embarrassment" regarding Gebert's speech. Finally, as explained in further detail below, the government's proffered explanation for revoking Gebert's security clearance, namely, vulnerability to exploitation, manipulation, and duress, is false and pretextual. Thus, Gebert has a clear *prima facie* case of First Amendment retaliation.

Unlike due process claims, First Amendment retaliation claims do not require a final agency action or a liberty or property entitlement. Rather, the action of which a plaintiff is complaining must only be sufficiently adverse to deter the exercise of First Amendment rights. *Power v. Summers,* 226 F.3d 815, 820-21 (7th Cir.2000); *see also Nunez v. City of Los Angeles,* 147 F.3d 867, 875 n. 11 (9th Cir.1998). Thus, Plaintiff arguably may assert First Amendment retaliation claims even if the agency has discretion in whether to take the administrative actions against Plaintiff.

For each of these reasons, if Gebert's security clearance is not reinstated, the Department of State's actions will violate Gebert's rights to freedom of speech and freedom of association.

## D. The Importance of Protecting Unpopular Speech

***"I disapprove of what you say, but I will defend to the death your right to say it."***

*— S.G. Tallentyre*

There is no doubt that Gebert's opinions regarding race and politics are unpopular in our society. In fact, most people would describe them as offensive, ignorant, and misinformed. If Gebert's speech is so terrible, then why should we protect it?  The answer to that question lies within the principle foundation of free speech. The First Amendment was designed to protect offensive and unpopular speech such as Gebert's. **In fact, it is the hard cases like Gebert's where our commitment to free speech is the most tested -- but also the most important.**

In a free society, all citizens must be able to pursue their own paths, set their own goals, and think for themselves. How a society treats its dissidents says a great deal about how truly free that society is. In some countries, the government silences and punishes those with unpopular viewpoints. America, however, was founded to offer a richer tradition. Under the First Amendment, people are free to express their ideas, even if those ideas are unpopular, offensive, unconventional, or wrong (though, in many cases, they may eventually be proven right). Americans are thus free to participate in protests, wear black armbands to school, and even burn the nation's flag. A speaker may say things that are unpopular, uncomfortable, or downright grotesque. But in a free society, we engage dissent through discussion and debate rather than through censorship and punishment.

Free speech is inextricably linked to prosperity. After all, prosperity comes from ideas, and new ideas can thrive only in a society in which they are free from suppression. Speech that is unpopular today could be widely held tomorrow. It's easy to think of widely embraced ideas that were once controversial—for example, the idea that all children, regardless of race, should have the same educational opportunities, the idea that women should be allowed the right to vote, or even the ideas that slavery and mass genocides are wrong. Thanks to our tradition of free speech, such forward-looking ideas reshaped our society for the better.

In the marketplace of ideas, the good and the bad, the true and the false, and the popular and the unpopular must **_all_** be allowed to coexist without being suppressed. Admittedly, it is easy for one to argue that the speech that they love should be allowed; it is much more difficult to admit that speech that one abhors is, nonetheless, free. For the same reason, it is easy for the general public to see freedom of speech violations in cases where they generally agree with the speech that is being restricted. For example, when Donald Trump revoked CIA director John Brennan's security clearance, the general public was outraged and saw this as a violation of the First Amendment. In those cases where the general public views the targeted speech as offensive, however, such as Gebert's, they have a much harder time seeing that the exact same issue is at play - freedom of speech. Therefore, people are more willing (perhaps unknowingly) to accept censorship. This is a great example of not being able to see the forest through the trees. Thus, it is difficult cases like Gebert's, however, that truly test our commitment to the very foundations of free speech.

A true understanding of the concept of freedom of speech is not found in demands for the government to silence speech that the majority considers vile. Instead, it is found in the ability to stand up for speech that one disagrees with (or, perhaps, even despises) and to argue that this is the ***very type of speech*** that needs protection the most. An enlightening example of this is the strength of David Goldberger, a Jewish attorney with the American Civil Liberties Union. Mr. Goldberger, in fact, argued for the National Socialist Party's right to hold a march in Skokie, Illinois, a small town filled with mostly Jewish residents, some of which were Holocaust survivors, after the town's officials tried to stop the march. There is no question that the words and ideas promoted by the Nazi group were hateful towards Jewish people and even Mr. Goldberger himself, but Mr. Goldberger defended the very people who were spewing hatred about his own culture due to the significant freedom of speech concerns that he recognized were at issue there.

Advocating for the silencing of speech almost always leads to dangerous grounds. Censorship is called a slippery slope for a reason. Once the government begins to suppress speech, there is real concern about where and how to draw boundaries. One problem is that the offensiveness of speech is subjective. Who determines offensiveness and, therefore, gets to act as the "censor"? Is there now an undisclosed litmus test for the personal opinions of U.S. Government employees?

Moreover, our freedom of speech is the most protected under our Constitution when we choose to speak out of matters of public concern: in short, when we join in "political speech," such as the type of speech at issue here. Free political speech is at the very apex of constitutional protections. Disagreement and dialogue are at the heart of our democracy.

So too, while the SPLC's mission is to "fight hate speech," the U.S. Supreme Court has *repeatedly* ruled that hate speech is legally protected free speech under the First Amendment. The most recent Supreme Court case on the issue was in 2017, when the justices unanimously reaffirmed (yet once again) that there is effectively no "hate speech" exception to the free speech rights protected by the First Amendment. *See Matal v. Tam*, 582 U.S. ___, 137 S. Ct. 1744 (2017). There, the Court eloquently explained:

> [The idea that the government may restrict] speech expressing ideas that offend . . . strikes at the heart of the First Amendment. Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express "the thought that we hate."

[*Id.* at 1758.]

For all of the reasons described above, this case raises significant constitutional issues regarding Gebert's substantive due process rights - namely, his rights to freedom of speech and freedom of association. If Gebert's security clearance is not reinstated, the

Department of State's actions will violate these First Amendment rights. Not only will Gebert's personal rights be violated, but so will a wider class of people who are reasonably chilled by the threats - namely, other security clearance holders who, according to the Department of State, hold "unpopular" beliefs. These attacks on the tradition of free speech and association are damaging to a free society and suppress uninhibited, robust, and wide open debate.

### Additional Mitigating Circumstances

Guideline E lists also lists seven <u>mitigating conditions</u> in paragraph 17.  This section will address the mitigating factors listed in Guideline E, notwithstanding the fact that we believe that the investigation failed to establish any misconduct. Gebert was honest and cooperative throughout the investigation.  Even the investigating officers did not allege that Gebert was being untruthful during the investigation.  Gebert was never at risk of exploitation or manipulation because he is not ashamed of his views nor has he ever denied being pro-white.

When conducting a "whole-person" analysis of Gebert, it is important to review Gebert's performance record. In short, he was a stellar employee. Gebert's ratings for each year since 2013 were categorized as "Exceeds expectations."  In addition to his superb performance reviews, Gebert received a performance bonus in 2015 for $1,500. He received two performance bonuses in 2019 for $3,000 and $500, just one month before his clearance was suspended.  Performance bonuses are discretionary and speaks volumes about Gebert performed.  Gebert is an invaluable member of the United States Department of State in the words of his own supervisor.  A true and accurate copy of Gebert's performance records is enclosed herein as **Exhibit C**.

The adjudicator should consider the "whole-person concept" when evaluating Gebert.  Gebert does not have a criminal record nor has he had excessive debt. By all accounts he is a loving father and husband.  He has been an exemplary employee without any incidents.  In short, Gebert's freedom of speech and association should not be held against him.  For the reasons stated above, he never lied and he has always freely admitted his beliefs.  Gebert did not think that the subjective question applied to him, which is reasonable and certainly not a lie that would fall under Guideline E. Guideline is the catchall Adjudicative Factor that is often used to revoke an individual's security clearance, but in this case the use of Guideline E is clearly arbitrary and capricious.

Gebert received several letters of recommendation that reflects positively upon his character and trustworthiness.  In fact, one of the letters was written by a family in their old neighborhood, the wife was Indian and their daughter was bi-racial, and would babysit Gebert's children.  They described Gebert and his family as trustworthy, caring, and genuine. "Matt and Anna [Matt's wife] demonstrated respect for diversity...and were respectful, curious and always interested in learning about Uma."  They continue by saying that they loved having Gebert's family as neighbors and would "love" having them back anytime.  A true and accurate copy of the Marques' Letter of Support is included herein as **Exhibit D**.

Mr. Glen Allen wrote a letter of support for Gebert wherein he described Gebert as generous and willing to mentor other young men on the responsibility of being a good father.  Mr. Allen is a practicing attorney and has an obligation to be truthful and honest in any official correspondence and he unwaveringly speaks glowingly about Gebert and his character. Mr. Allen also highlights the beauty of our nation where we are allowed to have differing opinions and not worry about suffering persecution for those beliefs, unless apparently, you are the investigating officer for a United States Department of State employee.   A true and accurate copy of Mr. Allen's Letter of Recommendation is enclosed herein as **Exhibit E**.

Gebert also received a letter of recommendation from Evan A. Parke who runs his own law firm.  Evan has known Gebert for 14 months and provides important insight about Gebert. He describes Gebert as someone who he "jump at the opportunity to hire" and describes Gebert as someone who always takes the high road.  These assessments are bolstered by Gebert's work performance reviews where it is clear that he is a high performer.  It is the consummate professional who is able to keep his home life from affecting his work life.  Gebert never asked for this attention, instead he is the victim of an organization whose sole purpose is to slowly eradicate freedom of speech and association through vicious personal attacks. A true and accurate copy of Mr. Parke's Letter of Recommendation is enclosed herein as **Exhibit F.**

The final letter of recommendation that Gebert received was written by LCDR John Moore who is a graduate of the United States Naval Academy and has held a security clearance for over a decade.  He has routinely served as a character reference on the behalf of applicants for security clearance and states that "Gebert would unequivocally get my highest recommendation.  Quite simply, Matt is among the most reliable and trustworthy individuals that he knows."  He goes on to explain that Gebert's loyalty to friends, family, and country are "beyond reproach."  A true and accurate copy of Mr. Moore's Letter of recommendation is enclosed herein as **Exhibit G**.

### E. Conclusion

A government that wields security clearances as a cudgel to intimidate public servants from exercising their First Amendment rights should disturb all Americans who care about our political discourse, our national security, and our democracy. As Chief Justice William Rehnquist stated, the Supreme Court has been "particularly vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions." *Hustler v. Falwell*, 485 U.S. 46, 56 (1988). It is hard to conclude that the Department of State's actions are anything other than a sanction to punish and intimidate Gebert and others who happen to hold unpopular opinions. But fear is no way to govern a democracy.

Perhaps even more troubling is the message the Department of State is sending to those who are currently serving in government service. It is pretty clear that this case would send a message that says to think twice before holding political or other opinions that the Department of State does not agree with, and to think twice before expressing a

political or ideological opinion -- even in private. We should all agree that the Department of State should not have the power to remove clearances for reasons that have nothing to do with national security and certainly not because an individual expresses his or her right to free speech.

In sum, for each of the reasons discussed above, it is clearly consistent with the national interest to reinstate Gebert's security clearance.

Very truly yours,

*/s/ Brett J. O'Brien*
Brett J. O'Brien

BO/yml

EXHIBIT E

# National Security Law Firm

1250 Connecticut Avenue
Suite 700
Washington, D.C. 20036

* Admitted in New Jersey
* Admitted in New York
* Admitted in Hawaii
* Admitted in California

———————

202-600-4996
Fax 202-545-6318
Info@NationalSecurityLawFirm.com
*Not a member of the D.C. Bar, but permitted to practice before federal agencies and tribunals*

November 23, 2021

Department of State
DS/DSS, Attn: Director Todd J. Brown
P.O. Box 13285
Arlington, VA 22219-3285

RE: IMO of Mathew Q. Gebert Supplemental Response to Security Clearance Revocation

Dear Mr. Brown:

As you are aware, this office has been retained to represent Mathew Q. Gebert with respect to the above matter. Kindly accept this letter as a supplement to Mr. Gebert's February 4, 2021, petition.

The State Department incorrectly withheld portions of their investigation under the auspices of the Freedom of Information Act (FOIA). On July 15, 2020 our office submitted the initial FOIA request. The FOIA request was both emailed and sent via certified mail, yet the Agency failed to process the request in a timely manner. The Agency signed for the certified mail on July 30, 2020. The email and letter were initially sent to the wrong department in the State Department, DSPSSCRP, however, this mistake was immediately corrected and the request was submitted via email to FOIArequest@state.gov on July 16,2020. A true and accurate copy of the FOIA submission and resubmission is enclosed herein as **Exhibit A**.

On October 29, 2020 the Office of Personnel Security and Suitability emailed my office indicating that the letter was sent to the wrong office and that they had just received it and started to process the request - despite this not being the case as illustrated in **Exhibit A**. A true and accurate copy of the October 29, 2020 email from the Office of Personnel Security and Suitability is enclosed herein as **Exhibit B**.

In response to the October 29, 2020 email, I explained that the Agency redacted documents that were part of the investigation but did not provide the required corresponding FOIA/PA exemptions. I explained that since Mr. Gebert filed a Privacy Act request, the agency would only be able to assert a (b)(7)(e) exception if it also claimed a (k)(2) exemption, but that would be legally impossible because (k)(2) can only

1

be asserted when the "investigatory material compiled for law enforcement purposes, other than criminal, **which did not result in loss of a right, benefit, or privilege under Federal programs**." A true and accurate copy of my email is enclosed herein as **Exhibit C**. The egregious violations of the FOIA and Privacy Act statutes are startling for a federal agency and require correction. Further, the agency's actions suggest that the State Department intentionally tried to frustrate and obfuscate the truth to avoid providing Gebert with a reasonable opportunity to respond.

Unfortunately, this was not the end of the blatant disregard for the federal statute. On October 29, 2020 the Office of Personnel Security and Suitability responded that they were consulting with their Legal Advisor and subsequently informed my office that the State Department would be processing the records under FOIA/PA. The State Department also incorrectly stated that they were not obligated to provide the corresponding FOIA/PA exemptions, in an attempt to exempt themselves from federal requirements. There was a follow up phone call, exact date unknown, from the Legal Advisor wherein the State Department advised me that the pages were being redacted under the "National Security" exemption, an exemption that does not exist. After substantial back and forth between the Office of Personnel Security and Suitability, we were forced to submit a supplemental FOIA/PA request on December 23, 2020. A true and accurate copy of the email exchange is enclosed herein as **Exhibit D**.

On December 23, 2020 I sent an email to the Office of Personnel Security and Suitability wherein I explained that I was following up to my original FOIA request from July 16, 2020, and I asked that the State Department analyze the redacted documents from the initial disclosure of the investigation under FOIA/PA. On December 29, 2020, the Office of Personnel Security and Suitability responded after consultation with the FOIA/PA office in pertinent part:

> If, instead, you are asking that we review the set of documents produced to you pursuant to E.O. 12968 and indicate the bases for the redactions in those documents (separate and apart from your FOIA request), as we informed you on October 30, 2020, Executive Order 12968, Sec.5 does not mandate the production of documents under the Freedom of Information Act (FOIA) or the Privacy Act (PA), but simply requires that they be provided to you "to the extent the documents" would be provided if requested under those laws and such, the Department provided you with the relevant documents, redacted as relevant and appropriate, but without indication the exemptions that are required for requests made under the FOIA or the PA.

I responded the next day expressing confusion at the State Department's response and saying in pertinent part,

> "[the excerpt above]That is effectively denying my request and it is problematic. I would ask that section 5 is reread because it does not say the FOIA/PA does not apply. The sentence is saying if documents would be denied under FOIA/PA you can deny them as well - but that does not

2

mean you do not have to give an explanation.  It does not mean that when a FOIA/PA request is submitted you can deny it under that section.  It does not grant any additional authority for the agency.  A true and accurate copy of the December 23, 2020 through December 29, 2020 email exchange is enclosed herein as **Exhibit E**.

On September 24, 2021, a final determination was made by the United States Department of State's FOIA and Privacy Act Division, Bureau of Diplomatic Security, wherein approximately 278 pages of previously-redacted materials were determined to be eligible for release under FOIA.  However, the State Department continues to partially redact 171 pages, fully redacted 7 pages.  On September 24. 2021 a final determination was made by the United States Department of State's FOIA and Privacy Division, Bureau of Diplomatic Security, wherein approximately 296  pages were released in full and 124 pages were withheld because "they are about other persons." A true and accurate copy of the FOIA and PA determinations is enclosed herein as **Exhibit F**.

  The entire FOIA/PA request timeline is important to understand because it highlights how the State Department continually thwarted any attempt to obtain a copy of the entire investigation in order for Gebert to have a meaningful opportunity to defend himself.  Further, the unredacted documents highlight several improper actions that the State Department took that will be discussed in further detail below.  In short, our efforts to obtain the materials that Gebert was legally entitled to highlight how the State Department has blatantly disregarded federal laws and statutes - now the State Department has the opportunity to correct their mistakes and reinstate Gebert.

In addition to the improper and egregious actions regarding Gebert's FOIA/PA requests, the unredacted documents highlight that the investigation became increasingly politicized.  The politicization of the investigation by the investigators ensured that the investigators were able to achieve a predetermined outcome.  The evidence used was improper, therefore, the investigation was improper and any conclusions made as a result of the investigation are improper.

Even more problematic is that the investigators included a number of newspaper articles describing white supremacists as terrorists.  The problem is that Gebert was **never** violent nor a white supremacist instead he describes himself as a white nationalist.  Therefore, the investigation painted Gebert as a violent terrorist despite not having any facts to support that conclusion.  This situation is akin to saying that all Black Lives Matters members are terrorists wherein only a small percentage of them committed an act of violence and to categorize an entire movement for the actions of a few would be misleading.  A true and accurate copy of pages 363-370 of the unredacted documents titled *White Supremacists Want a Dirty Bomb* is enclosed herein as **Exhibit G**.  This is not investigative work, this is social media research wherein the opinion expressed by the general public has no place for consideration in a federal agency's investigation.  Not to mention that the investigation did not provide a balanced review of the issues, instead the articles picked were primarily inflammatory because of the violent articles included in the investigation. A true and accurate copy of the entire

unredacted responses from the State Department's FOIA and PA office are enclosed herein as **Exhibit H**.

The rest of this supplemental petition will focus on two main issues: (1) the improper investigation leading to improper conclusions that formed the basis of Gebert's security clearance revocation; and (2) the politicization of the Gebert investigation where parts of the investigation included political considerations from Congressmen as well as Gebert's campaign donation history both of which **should never** be part of a security clearance adjudication.

### A. Questionable Intelligence Activity Occurred During Gebert's Investigation

The U.S. State Department's counterintelligence authorities end at the four corners of the buildings that the State Department occupies and once an investigation needs to extend outside the building - all follow-on action has to be directed and controlled by the Federal Bureau of Investigation.  This fact is based upon the intelligence collection authorities derived from Executive Order 12333. This alone requires an investigation by the State Department's Inspector General to ensure that the agency did not exceed their collection authorities and violate a U.S. citizen's constitutional right to privacy.  A true and accurate copy of Executive Order 12333 is enclosed herein as **Exhibit I**.

All intelligence collection activities are derivative of the constitution and codified in Executive Order 12333 wherein the President set forth the intelligence collection authorities delegated to each respective Agency.  Most importantly, the President does not provide the Department of State with explicit counterintelligence authority like the President provides to other federal agencies.  More specifically, the President defines the Department of State's collection authorities in paragraphs 1.4, 1.7(i), and 1.8.  Since the Department of States does not have explicit counterintelligence authority, they are unable to conduct their investigations outside the four corners of their facilities.  Furthermore, their role in any investigation would be as a supporting investigative agency and not the primary investigating agency.

On August 9, 2019 - prior to interviewing Gebert and immediately following the publication of the Southern Poverty Law Center's article - a Special Agent called the police station in Gebert's town and requested that the police provide a static police presence at Gebert's house.  The problem with this request is that the Special Agent was asking a law enforcement agency to conduct surveillance for the State Department's counterintelligence investigation.  This is a clear violation of the rules governing intelligence collection activities of U.S. Persons (USPERS).  A true and accurate copy of the request by the Special Agent is enclosed herein as **Exhibit J**.

As if this was not bad enough, the Department of State collected campaign contribution records as part of their investigation. Specifically citing a candidate's platform as a basis for corroboration and initiating an investigation.  This is a gross misuse of the Agency's investigative authorities.  Not only does this not have any

intelligence value, but it is the intentional collection of U.S. Persons information for intelligence purposes without having the proper mission and authority. The State Department's actions constitute an overt act by the federal government in an attempt to police their employees for the purpose of monitoring who the employees can vote for, causes they donate to, and as this investigation highlights - ultimately what beliefs they are allowed to espouse in their personal capacity. As polarizing as Gebert's rhetoric may be, the actions taken by the Department of State in this investigation are far worse and potentially put the core tenets of our nation - freedom of speech - at risk. One does not have to agree with Gebert's rhetoric to understand how fundamentally problematic the State Department's actions in this case have to date. A true and accurate copy of the Special Agent's notes, page 65 of the unredacted documents provided by the State Department's FOIA / PA office on September 24, 2021, is enclosed herein as **Exhibit K**.

Any overt action or request to collect intelligence outside of the Agency's buildings would be a violation of intelligence laws and require an investigation by the Inspector General. The State Department committed a violation when their Agent requested a law enforcement agency to conduct static surveillance of Gebert's house. The second violation occurred when the agent collected Gebert's campaign contributions and used that information to corroborate and support the need for an investigation. The Inspector General must investigate the State Department's actions of collecting U.S. Persons information, namely Gebert's campaign contributions, without having the appropriate mission and authority.

### B. Bad Investigation Resulted in Bad Findings That Requires the Agency to Reinstate Gebert

Gebert's investigation was improper from the beginning. This statement is supported by the evidence that was included in the investigation and ultimately unredacted on September 24, 2021. The Department of State, on page 65 of the unredacted documents, collected information about Gebert's campaign contribution records. More specifically,

"This information was corroborated through a google search that revealed SUBJECT listed as a DoS employee who had donated to the campaign of a pro-white candidate, as well as to the campaign of a candidate who publicly stated **he wanted to preserve the Confederate flag and monuments stating doing so was "taking back our heritage."** Previously identified as **Exhibit K**

This paragraph provides several important facts that are otherwise indiscernible because of the continued misuse of exemptions. First it describes Gebert as the "SUBJECT." which means he is under either a Law Enforcement, counterintelligence, or administrative investigation. If it was an administrative investigation the investigating agents could not coordinate with local law enforcement to take actions to further their case. It could not be a law enforcement investigation because Gebert is not accused of committing any crimes and the Department of State does not have law enforcement authority for American citizens living and working in the United States. Now we are left

with the third option, a counterintelligence investigation, which makes sense based upon the nature of the allegations. In essence the State Department's concern would be whether there is an insider threat.  This calculated deduction is further corroborated by the State Department electing to revoke Gebert's security clearance.

As if to make matters worse, a review of Gebert's campaign contributions is an unwarranted invasion of his privacy and illustrates how personal the investigation was from its inception.  The Department of State agent performed an intelligence collection activity into Gebert's campaign donation records. These records are not relevant and they highlight the impropriety of the investigation from the beginning.  The timing of this action is incredibly important, the collection of Gebert's campaign donation history is one of the first acts taken by the investigating agent.  This act was performed on June 21, 2019.  This information is documented on **Exhibit K**.

The investigation went from bad to worse when the State Department included tweets from a Congressional Representative, redacted the tweet under the fictitious "National Security" FOIA exemption, and ultimately unredacted it as part of the September 24, 2021 FOIA / PA memorandum.  The tweet was  from Representative Max Rose of the United States House of Representatives wherein he tweets, "The State Dept. has no excuse. Violent foreign white nationalists are antisemitic terrorists according to every definition of the word.  We need to designate them as such and give law enforcement the tools they need to counter the threats of today, not just yesterday." A true and accurate copy of the tweet can be found on page 287 of the unredacted documents provided to Gebert on September 24, 2021 and are enclosed herein as **Exhibit L**.  The tweet was posted on November 14, 2019 shortly after news of Gebert's alleged misconduct made national news and approximately 45 days after Gebert's subject interview.  Congressional representative's opinions should **never** be considered as part of a federal agency's investigation.  Every employee is entitled to fair and impartial investigation, but that is not what occurred.

Even more troubling is the similarities shared by the selectively picked tweet by a Congressional representative, Rep. Max Rose, and the Supervisory Special Agent in the investigation.  Rep. Max Rose is a Democrat and Army Combat veteran, just like the Supervisory Special Agent on the case.  In fact the Supervisory Special Agent engaged in an entire discussion where Gebert's own attorney had to object based upon the inflammatory nature and tone of the questions being asked by the Supervisory Special Special Agent.  A true and accurate copy of the objection is enclosed herein as **Exhibit M**.

The shared views between the Supervisory Special Agent and Rep. Max Rose is illustrated by the entire line of questioning by the Supervisory Special Agent.  In fact, he specifically referenced his service and challenged Gebert's views based upon the Supervisory Special Agent's own personal service to our nation. Supervisory Special Agent specifically stated,

"So I've been--I was in the military and I am currently a cop. Again, what does -- what effect are you trying to have on me, because I can tell you that the military espouses the exact opposite view, that it doesn't matter when you're in a foxhole the color of the skin of the guy next to you. What matters is survival.  A true and accurate copy of the exchange is enclosed herein as **Exhibit N**.

Therefore, it is extremely problematic that Rep. Max Rose's tweet was even included as part of the investigation because it was clearly part of the investigation to further substantiate and reinforce the Supervisory Special Agent's own personal beliefs about Gebert.

When you consider these additional facts along with the hundreds of pages of unredacted documents that primarily comprise newspaper articles, it becomes particularly clear that the purpose of the investigation was to eradicate people with controversial beliefs and ideologies.  The exact antithesis for a federal government agency's purpose.  In essence, the State Department took a political position in an administrative process and the State Department now has an opportunity to correct this miscarriage of justice.

### Conclusion

The State Department should view this investigation as an improper investigation that was flawed from the start.  The investigating agents misused their authorities and conducted social media research to support their investigation.  In short, a bad investigation led to a bad decision to revoke Gebert's security clearance.  These agents allowed their personal views to cloud their actions.  This issue was extremely sensitive and required a thorough understanding of the constitution as well as intelligence collection authorities. Neither of these topics were given their due by the agents who carried out the investigation.  Again, the investigation is a miscarriage of justice that would cause substantial reputation harm to the Agency if it were to be litigated in federal court.

For the reasons explained in further detail in the initial submission, this case raises significant constitutional issues regarding Gebert's substantive due process rights, including his rights to freedom of speech and freedom of association. If Gebert's security clearance is not reinstated, the Department of State's actions will violate these First Amendment rights and his rights under the Civil Rights Act.  As such, at this time, I am respectfully requesting a review of this decision.

Very truly yours,

/s/ Brett J. O'Brien
Brett J. O'Brien

BO/yml

7

EXHIBIT F

# Brett O'Brien Law

1250 Connecticut Avenue, NW
Suite 700
Washington, D.C. 20005

———

202-600-4996
Fax 202-600-4997
Brett@NationalSecurityLawFirm.com

July 15, 2020

**Via Email DSPSSCRP@state.gov and Certified Mail: RRR**

US Department of State
Contractor Review Panel (DS/SI/PSS)
1801 North Lynn Street, 11th Floor
Washington, DC  20522-2008

      Re:    Our Client: Mathew Q. Gebert
             Security Clearance Revocation

Sir/Madam:

Please be advised that I have been retained to represent Mathew Q. Gebert with respect to the Security Clearance Revocation dated July 1, 2020.  On his behalf, I am requesting all records pertaining to Mr. Gebert that are held by the US Department of State.

**Description of Records Sought:**

1) All interagency and intra-agency correspondence pertaining to the above.
2) All interagency and intra-agency records related to the individual.
3) All interagency and intra-agency correspondence pertaining to the Security Clearance Revocation.
4) All investigation and standard forms pertaining to the above.

**Mr. Gebert's verification of identity:**

Full Name:       Mathew Q. Gebert
Social Security No:
Date of Birth:
Place of Birth:
Address:

**Agreement to pay fees:**

My office agrees to pay all applicable fees in accordance with federal law.

**Identity source documents**:

Attached.


**Preferred delivery method**:

Please send all disclosures to 1250 Connecticut Avenue, NW, Suite 700, Washington, DC 20036.

**Mathew Q. Gebert's authorization for release**:

I authorize information pertaining to me to be released to Brett O'Brien, my legal counsel in this matter. I understand that I will not be furnished a duplicate copy of any disclosures. Pursuant to 5 USC 552a(b), I authorize the US Department of State to release my records to Brett O'Brien.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, that I am the person described above. I understand that any falsification of this statement is punishable under the provisions of 18 USC 1001 by a fine of not more than $10,000, or by imprisonment for not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 USC 552a(i)(3) by a fine of not more than $5,000.


_____                    7-15-2020
Mathew Q. Gebert                                    Date


Thank you for your attention to this matter.



Very truly yours,
/s/ Brett John O'Brien

Brett John O'Brien



BO/yl