## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MATTHEW GEBERT**                    )
270 Philadelphia Ave.                 )
Purgitsville, WV 26852                )
                                      )
                                      )
            Plaintiff,                )
V.                                    )
                                      )
**DEPARTMENT OF STATE**               )          **Civil Action No. 22-2939 (DLF)**
2201 C St., NW                        )
Washington, District of Columbia 20520 )
                                      )
**ANTONY BLINKEN,**        )
Secretary of State    **)**
_____)
                                      )
**As to each Defendant Serve:**_____)
    U.S. Attorney for the District of Columbia )
        Attn: Civil Process Clerk     )
        555 4th Street, NW            )
        Washington, DC 20530          )
                                      )
        Office of the Legal Advisor (L/EX) )
        Department of State           )
        Suite 5600                    )
        600 19th Street, NW           )
        Washington DC 20522           )
                                      )
                                      )
          Defendants.                 )
_____)

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

For his Second Amended Complaint, Matthew Gebert ("Gebert" or "Plaintiff"), by the

undersigned counsel, states as follows:

1.      The Plaintiff brings this action for declaratory, injunctive, and other appropriate relief against the Defendant for actions they have taken and continue to take against their employee, Gebert; specifically, the Defendant has placed Gebert in an indefinite Leave Without Pay (LWOP) status and has revoked his Top Secret security clearance pending the outcome of a suitability determination.

2.      Further, Plaintiff brings this action for injunctive relief and other appropriate relief and seeks the disclosure and release of agency records improperly withheld from the Plaintiff by the Defendant, the Department of State, and their subordinate agencies, pursuant to the Privacy Act of 1974, 5 U.S.C. §552a et seq. and the Freedom of Information Act, 5 U.S.C. §552(a) et seq.

3.      In this case, the Defendant's basis for its employment-related actions were based on violating Plaintiff's: (1) First Amendment protections of free speech,  freedom of association, and freedom of assembly; (2) First Amendment retaliation; (3) Equal Protection; (4) Due Process; and (5) violating the Administrative Procedures Act by failing to follow their own rules and regulations in an arbitrary and capricious manner.

### PARTIES

4.      Plaintiff is a United States citizen and a resident of West Virginia.

5.      The Defendant, Department of State, is a "federal government agency" within the meaning of (1) 28 U.S.C. §1346(b), 28 U.S.C. §2401(b), and 28 U.S.C. §2671, and (2) 5 U.S.C. §552(f)(1) and 5 U.S.C. §552a(a)(1). The Defendant is in possession, custody, and control over documents and records about Plaintiff. Defendant is headquartered at the Harry S. Truman Building, 2201 C Street NW, Washington, D.C., U.S. 20520.

## JURISDICTION

6.     The Court has both subject matter jurisdiction over this action and personal jurisdiction over the Defendant pursuant to 5 U.S.C. §552(a)(4)(B), 5 U.S.C. §552a(g)(1),     28 U.S.C. §1331.,

7.     The Court has authority to issue declaratory and injunctive relief under 28 U.S.C § 1361.

8.     Venue is proper in this Court pursuant to 5 U.S.C. §552(a)(4)(B), 5 U.S.C. §552a(g)(5), and 28 U.S.C. §1391 (b) and (e).

9.     The Court has the authority to award attorneys' fees and expenses under 28 U.S.C. § 2412.

## FACTS

10.     The Plaintiff has been employed by the Defendant, State Department, since May 19, 2013, in the role of Foreign Affairs Officer in the Bureau of Energy Resources, Office of Energy Diplomacy, Middle East & Asia Division (ENR/EDP/MEA).

11.     As part of his position, Plaintiff underwent a background investigation that resulted in him being granted a Top Secret security clearance on April 19, 2013; holding and maintaining this level of security clearance is a condition of Plaintiff's employment.

12.     As part of a routine periodic background reinvestigation that was necessary for the Plaintiff to hold his Top Secret security clearance, the Plaintiff was interviewed on January 28, 2019.

13.     In this reinterview, the Plaintiff was asked by Defendant's employees, *inter alia*, the following questions:

   i. Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

   ii. Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

   iii. Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

14. The Plaintiff responded in the negative to all three questions.

15. This routine reinvestigation was concluded on May 9, 2019.

16. On June 7, 2019, Plaintiff was notified that he had been granted continued access, which meant, for all intents and purposes, he "passed" the reinvestigation.

17. On August 7, 2019, the Hatewatch blog of the Southern Poverty Law Center (SPLC) published an online article titled, "U.S. State Department Official Involved in White Nationalist Movement, Hatewatch Determines," which made several allegations against Gebert.

18. The day after the Hatewatch article was released, on August 8, 2019, several news sources confirmed that Gebert had already been suspended no later than on that day.[1]  Gebert's former supervisor at the State Department, Amos Hochstein, was specifically quoted, "Neo-Nazis are not all shaved heads and tattoos, they are hiding in plain sight. I'm horrified Gebert worked for me at the State Department."

---

[1] Rolling Stone stated, "According to Politico, however, two sources close to the state department have confirmed that Gebert has been suspended following the Hatewatch report. His former boss, Amos Hochstein, who supervised Gebert during his tenure as coordinator for the State Department's international energy affairs, told Politico he found it 'inconceivable' that Gebert could've gotten security clearance not once, but twice. (The State Department conducts security screenings upon hiring and again after an employee has worked there for five years, according to Hochstein.). https://www.rollingstone.com/culture/culture-news/matthew-gebert-hatewatch-report-white-supremacy-state-department-869051/.

19.     Gebert was not suspended on August 8, 2019, because he was "dishonest" to questions from a January 2019 interview; the comments by Hochstein more accurately reflect the sentiment of the State Department regarding allegations made against Gebert, and they simply disagreed with his viewpoint.

20.     The Defendant realized their suspension of Gebert on the basis of his viewpoints could not possibly stand, especially after the subsequent September 27, 2019, interview, where Gebert easily refuted and dispelled the allegations that he was a "Neo-Nazi" or some other type of extremist. When finally given the chance to express his pro-white and political beliefs, he clearly articulated beliefs that are protected, and this became problematic for the State Department.

21.     As soon as the Hatewatch Article was published, it resulted in what the Department of State termed a "media frenzy." Dozens of articles were written, shaming the Department for employing Gebert and not vetting him properly during the clearance process. *Id*.

22.     In short, the Department was under immense pressure from the public and even members of Congress to remove Gebert from the Department due to his viewpoints. *Id*.

23.     Throughout the articles, representatives from the Department of State made official statements wherein they explicitly expressed their disapproval of Gebert's ideologies.[2]

24.     In summary, the Hatewatch blog, a non-profit organization, served as the basis for Plaintiff's security clearance suspension.

---

[2]     The FBI, on the other hand, got it right when their official spokesperson in an article explained, in response to the public outrage regarding Gebert's employment, that they "[c]annot investigate people for holding an ideology or belonging to a certain U.S.-based hate group." See https://www.cnn.com/2019/08/15/politics/state-dept-white-supremacist-brother-fbi/index.html

25.     On August 16, 2019, Plaintiff received a memorandum from Defendant informing him that Defendant would be suspending Gebert's security clearance pending the outcome of a "for cause" investigation.

26.     Defendant made the decision in their determination regarding Plaintiff based on a biased blog post that had no proof of actually being reviewed or fact-checked: in short, this is not a credible news source.

27.     More than one year before the SPLC article was published on August 8, 2019, Sludge.com posted an article entitled "Government Employees Donate to White Supremacist Candidate." [3]  This was published in July of 2018.

28.     The article specifically mentioned "Matthew Gebert" by name as well as his position with the Department of State. Id; it further indicates that Gebert made campaign contributions to the House campaign of Paul Nehlen, a "racist" and "openly anti-Semitic white supremacist." *Id*.

29.     In addition, the article mentioned Gebert's prior contributions in 2017 and 2018 to Corey Stewart, a Republican nominee who has been outspoken about preserving public Confederate flags and monuments. Id.

30.     The Defendant was aware of this article, as a Department of State Official is quoted in the article as stating: "Matthew Q. Gebert is employed by the Department of State as a foreign affairs officer assigned to the Bureau of Energy Resources in Washington, D.C. Guidelines regarding the political activity of State Department employees can be found in the Foreign Affairs Manual at 11 FAM 614. The Department of State is committed to providing a workplace free from discriminatory harassment." Id.

---

[3]     See https://readsludge.com/2018/07/03/government-employees-donate-to-white-supremacist-candidate/

31.    The Sludge.com article did not receive as much backlash as the Hatewatch article, and there is no indication of Congressional or State Department pressure at higher echelons to remove or suspend Gebert.

32.    However, it does reveal that as early as July of 2018 the State Department was aware of Gebert's white nationalist beliefs, which supports Gebert's belief the State Department was already aware of his activities, which makes it all the more likely Gebert honestly and legitimately believed that he had no reason to know he should have further disclosed this in any interview or investigation.

33.    Because holding a valid Top Secret security clearance is a condition of employment for Plaintiff, this suspension of his security clearance resulted in a proposal to suspend the Plaintiff from his employment indefinitely without pay from his position as a Foreign Affairs Officer, GS-13, in the Office of Middle East and Asia, Bureau of Energy Resources.

34.    Defendant sent a subsequent memo to Plaintiff on August 16, 2019, that informed Plaintiff that he would be suspended without pay and that he had fifteen (15) calendar days from the date of receipt to respond orally, in writing, or both.

35.    On August 28, 2019, Plaintiff, through his legal representative at the time, submitted a written reply on Plaintiff's behalf.  .

36.    On September 24, 2019, Plaintiff received a written response from Defendant that informed Gebert that the proposed indefinite suspension without pay would be sustained.

37.    The September 24, 2019, letter from Defendant provided a cursory review of Plaintiff's issues; essentially, the letter states nothing more than, in summary: Your security clearance is suspended; security clearance is a condition of employment; because your security

clearance is suspended and you have provided no evidence that it is not suspended, your suspension without pay from your employment is upheld.

38.    The "for cause" investigation was conducted by the Bureau of Diplomatic Security (DS), Office of Special Investigations (DS/DO/OSI) shortly after Plaintiff was notified of his pending suspension.

39.    As part of this "for cause" investigation, Plaintiff was interviewed on September 27, 2019, by Defendant personnel within the Office of Special Investigations with the Bureau of Diplomatic Security, a division under the Defendant State Department, whereby Gebert was confronted with many of the allegations from the Hatewatch blog article, as well as re-questioned regarding his answers to the previous questions identified in Paragraph 13, above.

40.    In this September 27, 2019, interview, Gebert explicitly denied withholding information during his January 2019 interview, affirmed he was not ashamed or embarrassed of any of his views or activities, and specifically stated that the article sensationalized and mischaracterized his activities and involvement to make them seem much more nefarious than they actually were.

41.    During this interview, Gebert specifically and unabashedly articulated the beliefs he expressed on race and immigration, which at the core of his beliefs, are the ideas of advocating (1) for white interests; and (2) against mass immigration. In fact, many of Plaintiff's beliefs center around being an "immigration restrictionist," through which he celebrates federal immigration laws from the 1920's through the mid-1960's that resulted in strict limitations on immigration.

42.    Plaintiff believes that these policies contributed to America's robust economy and our nation's ascension as a global superpower.

43.     Plaintiff followed up his September 2019 interview with additional responses on October 23, 2019, where he informed Defendant personnel that he: did not think any of his writings, podcasts, or tweets would rise to a level that they would ever be considered an embarrassment to himself or the Department of State; was never a member of any formal white nationalist organization; believed he would be protected as his speech and activities were protected by the First Amendment; and never engaged in any illegal activity. For these reasons, Plaintiff believed he had a reasonable and good faith basis to answer the questions from his January 2019 interview in the manner in which he did.

44.     Gebert's personally held beliefs were never represented as State Department opinions at any point in time in any manner or medium, and the State Department has never made an allegation that Gebert represented himself as a State Department employee when he spoke about his personal beliefs.

45.     Most importantly, at no point did Gebert lie or provide any false information on his SF-86 (i.e. security clearance questionnaire) or during any of his interviews or re-interviews.

46.     The Department of State could not find that Gebert had lied on his SF-86 since no questions on the SF-86 ask applicants about their political or ideological beliefs.[4] Indeed, the government cannot point to even a single question on the SF-86 that Gebert's conduct violated. Gebert has never:

- Been a member of an organization dedicated to terrorism (SF-29.1);
- Engaged in acts of terrorism (SF-29.2);
- Been a member of an organization dedicated to the use of violence or force to overthrow the United States Government (SF-29.3);
- Been a member of an organization that advocates or practices commission of acts of force or violence to discourage others from

---

[4]     Rightly so, as this would violate applicants' civil liberties.  See, e.g., Ozonoff v. Berzak, 744 F.2d 224 (1st Cir. 1984).

exercising their rights under the U.S. Constitution or any state of the United States (SF-29.4); or
● Engaged in activities designed to overthrow the U.S. government by force (SF-29.5).

47. Gebert was never even asked any questions relating to his political beliefs during the security clearance investigation or reinvestigation process. In the entire 136-page SF-86 application, none of the questions on the SF-86 asked Gebert anything even remotely related to his political beliefs, such as whether he identified as republican, democrat, alt-left, or alt-right, etc. Nor was he asked any questions related to his beliefs regarding race, immigration, or any other ideologies. Id. So too, none of the questions that Gebert was asked during his initial background investigation or during his reinvestigation interview on January 28, 2019, related to any of these issues. Id.

48. Thus, at no point either on the SF-86 or any of the reinvestigation interviews was Gebert ever asked any questions about his political or ideological beliefs, associations, or activities. Id.

49. In fact, in February 2021, members of Congress specifically urged the Director of National Intelligence ("DNI") to update current security clearance guidelines to begin screening for "white supremacists, neo-Nazis, and other far-right extremists."[5]

50. In doing so, they specifically mentioned Gebert's case with the Department. Id. They further explained that "[u]nder current guidelines, individuals are not explicitly required to self-report involvement with extremist groups unless the organization professes to be a terrorist organization, seeks to overthrow the United States government, or uses violence." Id.[emphasis added], further supporting that nothing the Department was able to ask prior to February 2021

---

[5]        Id.https://wexton.house.gov/news/documentsingle.aspx?DocumentID=457, February 21, 2021. Accessed Online July 7, 2023.

would have required Gebert to voluntarily offer up the information the Defendant is specifically stating Gebert was required to provide in response to their questions.

51.    Upon information and belief, the Defendant interviewers conducted what appeared to be a very biased interview, proposing counter-political beliefs to intentionally mischaracterize and sensationalize Plaintiff's own positions, and used a flawed, unsanctioned interpretation of the underlying regulations to improperly and erroneously draw conclusions and make reckless recommendations on their investigative findings.

52.    Upon information and belief, the Defendant's personnel sought to "trap" or "catch" the Plaintiff in a lie or with him providing false information; when that failed, Defendant's personnel attempted to attach Plaintiff to more extreme and hateful viewpoints on race, religion, national origin, immigration, and other political beliefs to what Plaintiff actually subscribed to and spoke and wrote about.

53.    Plaintiff reiterated multiple times that he was a "race realist" and "pro-white," but fell far short of adopting outright neo-Nazism or aligning explicitly or officially with any terrorist organization or criminal entity's platform or belief system.

54.    As he explained throughout his interview, Gebert knows that his opinions are unpopular and that some people may be offended.  Thus, as Gebert explained, unless he knows that you are what he calls a "like-minded person" (i.e., "pro-white" ), he does not talk about his political or other ideological viewpoints with you. In other words, Gebert -- like millions of other Americans -- keeps his political and ideological views private.

55.    Not only were Gebert's coworkers and supervisors not aware of his beliefs, but neither were his neighbors, some of his friends, or most of his acquaintances.  Thus, it wasn't that Gebert was concealing his beliefs from the government out of fear of losing his security

clearance. To the contrary, Gebert did not discuss his views with anyone on an unsolicited basis except for those whom he would consider "like-minded" because he knew that his opinions were controversial.

56.    Although Gebert would not expose his beliefs on an unsolicited basis, as was revealed throughout his interview, he prides himself on his integrity. He is and has always been aware of the importance of being honest and truthful throughout the clearance process. Id. Had Gebert ever been asked about his political or ideological beliefs, he would have disclosed them, just as he did during the subsequent investigative interview. As Gebert explained:

> SPECIAL AGENT: And you don't feel that information could be -- have use -- could've been used to exploit you, to blackmail you, coerce you, or anything like that?
>
> MR. GEBERT: A hundred -- a hundred percent no because I'm not ashamed at all of my views. I can't be bought. I believe what I believe. You know, I'm a true believer, not in any cult sense, but in terms of having informed, you know, beliefs and values that unfortunately in this day and age are judged to be beyond that pale. [Gebert Interview 81-15 to 82-3.]

57.    The DS/DO/OSI "for cause" investigation after the suspension was completed on March 6, 2020, and determined that Plaintiff had been intentionally misleading in his answers to the questions identified in Paragraph 13, above.

58.    Plaintiff received a letter from Defendant dated July 1, 2020, wherein Defendant informed Plaintiff that his security clearance was being revoked under Guideline E (Personal Conduct) concerns. Put more simply, the United States Department of State intended to regulate freedom of association and freedom of speech.

59.     In the July 2020 letter, Plaintiff was specifically cited for violating the following:

i.      refusal to provide, full, frank, and truthful answers to lawful questions of investigators, security officials, or other official representatives in connection with a personnel security or trustworthiness determination;

ii.     deliberately providing false or misleading information; or concealing or omitting information concerning relevant facts to an employer, investigator, security official, competent medical or mental health professional involved in making a recommendation relevant to a national security eligibility determination, or other official government representative;

iii.    personal conduct, or concealment of information about one's conduct that creates a vulnerability to exploitation, manipulation, or duress by a foreign intelligence entity or other individual or group. Such conduct includes:

a.      Engaging in activities which, if known, could affect the person's personal, professional, or community standing.

60.     Upon information and belief, the Defendant heavily relied on making determinations regarding what Plaintiff knew or should have known regarding what thoughts or theories regarding race and immigration should have been "embarrassing" or not.

61.     However, upon information and belief, the Defendant enforced their reasoning unevenly or otherwise failed to apply a similar policy to other groups; namely, authorizing and/or applying significantly reduced application of its harsh position to those who publicly support Black Lives Matter (BLM).

62.     Upon information and belief, the Defendant is not revoking the security clearance and suspending similarly situated employees for failing to disclose their affiliation and/or content created furthering BLM; in fact, to the contrary, the U.S. Office of Special Counsel (OSC) expressly authorizes employees to     publicly      support      the      movement      on      the

job[6] and in May of 2021 U.S. Secretary of State Antony Blinken authorized U.S. embassies around the world to fly Black Lives Matter (BLM) flags and banners.[7]

63.     Upon information and belief, the Defendants by discriminatory motive or intent, or through reckless or callous indifference, invoked and implemented a policy to intentionally discriminate against the Plaintiff by using the security clearance and national security laws and regulations to impose barriers that could thwart, and in this case, did thwart the exercise of the Plaintiff's constitutional rights based on his association with the D.C. Pilots group.

64.     The D.C. Pilots were not a terrorist organization, criminal entity, or even on the SPLC's radar as a white nationalist group. See https://www.splcenter.org/sites/default/files/splc-2021-year-in-hate-extremism-report.pdf.

65.     In fact, it is only the SPLC, without citing an actual reference or actual law enforcement report or record, that tied the D.C. Pilots to the organization The Right Stuff; there is no official affiliation between the two groups, which further supports the Plaintiff's reasonable belief he was doing nothing wrong.

66.     Further, The Right Stuff is only listed in the SPLC resource cited as a "white nationalist" group.

67.     There are currently members of our Congress who are members of white nationalist groups and/or speak at white nationalist events.

68.     White nationalism, no matter how much someone disagrees with it, is not *per se* unlawful or a prohibited ideology by a government employee. There are varying levels and degrees, as well as different sects within different white nationalism movements; the one specifically endorsed by the Plaintiff is one focused on U.S. policy on immigration, which

---

[6]     https://cdn.govexec.com/media/gbc/docs/pdfs_edit/071620cb1.pdf.

[7] https://foreignpolicy.com/2021/05/25/black-lives-matter-blm-state-department-embassies-flags-blinken-diplomacy-racial-injustice/

actually mirrors several members' of Congress's beliefs, former President Trump, and multiple members of his Cabinet and senior advisors, and such positions have oscillated in and out of our country's official policy and/or major political parties' platforms on the matter for over 200 years.

69.     In response to Plaintiff's LWOP and revocation of his security clearance, the undersigned counsel provided a written rebuttal on Plaintiff's behalf on February 4, 2021, denying the allegations from the July 1, 2020, memorandum in their entirety.  See Exhibit D.

70.     Plaintiff's undersigned counsel provided a Supplemental Response to the February 2021 rebuttal on November 23, 2021, alleging multiple violations by Defendant of the Freedom of Information Act (FOIA) and the Privacy Act.  See Exhibit E.

71.     On January 30, 2024, the State Department responded to Gebert's rebuttal and supplemental response with a letter notifying Gebert that his security clearance revocation was being upheld.

72.     Regarding Plaintiff's work performance otherwise, outside of the investigation and actions taken in response to an opinion-piece blog, Plaintiff's performance was exemplary and there were no indications whatsoever that his character and/or any personal views held by Plaintiff compromised his work or his full and unbiased cooperation with all State Department employees and partners:

i.      Plaintiff was a presidential management fellow, a prestigious fellowship, where he    was    highlighted    in    George    Washington    University's    *GW Magazine*, https://archives.magazine.gwu.edu/sites/g/files/zaxdzs1136/f/downloads/Summer2013GWMag_web.pdf;

ii.      Plaintiff's    evaluations    for    each    year    since    2013    were    "Exceeds expectations";

iii.    Plaintiff received a performance bonus in 2015 for $1,500, the alleged year he began to engaged in white nationalist activities;

iv.    Plaintiff received two performance bonuses in 2019 for $3,000 and $500, the very year he was suspended/placed on leave without pay.

73.    Due to a select few State Department employees disagreeing with the viewpoints held and expressed by Gebert - in his personal capacity and during his personal time - the Defendant has caused irreparable harm to the federal protected rights of the Plaintiff's freedom of speech and association in the attempt to harass, threaten, silence, and/or chill these constitutional rights.

74.    The Defendant has provided a pretextual reason for revoking Plaintiff's security clearance and suspending him without leave; namely, stating Plaintiff failed to disclose, misled, and/or omitted information that are either (1) "relevant facts" that could be "relevant to a national security eligibility determination," (2) "personal conduct" that "creates a vulnerability to exploitation, manipulation, or duress," or (3) engaging in activities, which, if known, could affect the person's personal, professional, or community standing.

75.    Upon information and belief, in couching Plaintiff's removal as a matter of "national security" and suppressing his speech and rights via the revocation of security clearance route, the Defendant appears to cling to and attempt to hide behind *Egan* to allow them complete discretion with no judicial oversight; however, the true basis for the revocation and subsequent state of purgatory that the Defendant believes they can subject the Plaintiff to is predicated on the trampling of constitutionally protected rights.

76.    Upon information and belief, the Defendant has applied highly subjective standards of what might be embarrassing or qualify as "dirt" in the eyes of the State Department, setting a precedent that anything someone finds incorrect or different from their own viewpoint

can later qualify as "intentionally omitting" if someone fails to disclose their political ideologies or maybe who they voted for in a previous election if they legitimately believed it was not the answer the Defendant personnel wanted to hear.

77.     Furthermore, upon information and belief, the Defendant seeks to impugn a subjective, moving target of what qualifies as "embarrassing" to the Plaintiff and declare his claim that he did not believe his thoughts, speech, or actions to be embarrassing was "improbable."

78.     The government may not regulate speech based on overbroad policies that encompass a substantial amount of constitutionally protected speech.

79.     These grants of unbridled discretion to Defendant's officials violates the First Amendment because they create a system in which the permissibility of speech is judged without any standards, thus giving employees such as Gebert no way to prove that a denial, restriction, or relocation of their speech was based on unconstitutional considerations.

80.     Because Defendant has failed to establish a compelling government interest that is narrowly tailored governing the decision whether to allow employees to speak about certain topics and which viewpoints they may hold regarding certain topics, and ergo, which viewpoints need to be disclosed as part of an investigation, there is a substantial risk that Defendant officials will engage in content and viewpoint discrimination: exactly what occurred to Plaintiff's detriment as alleged herein.

81.     The questions asked at the end of the subject interview and outlined in paragraph 13 are unconstitutional and violate a security clearance Applicant's First Amendment rights.

**The Defendant's FOIA and Privacy Act Violations**

82.    On July 15, 2020, Plaintiff's counsel submitted an initial FOIA request. See Exhibit F.

83.    The email and letter were initially sent to the wrong department in the Defendant State Department, DSPSSCRP, however, this mistake was immediately corrected and the request was submitted via email to FOIArequest@state.gov on July 16, 2020. See Exhibit G.

84.    This request specifically stated that it was regarding the Security Clearance Revocation dated July 1, 2020, of Mathew Q. Gebert and was seeking:

> 1) All interagency and intra-agency correspondence pertaining to the above.
>
> 2) All interagency and intra-agency records related to the individual.
>
> 3) All interagency and intra-agency correspondence pertaining to the Security Clearance Revocation.
>
> 4) All investigation and standard forms pertaining to the above.

85.    The Defendant assigned this request Privacy Act Case # P-2020-00021.

86.    On September 24, 2021, a final determination was made by the Defendant's FOIA and Privacy Act Division, Bureau of Diplomatic Security, which indicated the Defendant would respond and release documents under two separate Segments.

87.    Segment I was said to consist of 509 pages, of which 296 pages were released in full, 124 pages were withheld because "they are about other persons," and a portion of one page and 14 other pages in their entirety originated with other federal agencies and were "referring for their review and direct reply to" Plaintiff.  See Exhibit H .

88.    This response clearly indicates 509 pages were responsive, but the Defendant only provided and described/accounted for 414 pages in their September 24, 2021, letter to Plaintiff.

89.     To date, the Defendant has not supplemented this request or provided an accounting of the missing 95 pages that they are improperly withholding without authority; as such, the Defendant's response is deficient, and they are in violation of the FOIA.

90.     Further, Defendant indicated in Segment I that one partial page and 14 total pages originated with another agency and that the Defendant referred Plaintiff's request to that agency.

91.     To date, no other federal agency has provided responsive records or any response to Plaintiff acknowledging receipt of this referral; the Defendant also failed to disclose to what agency they were referring in order for Plaintiff to even attempt to obtain these records on his own.

92.     Either Defendant performed an improper referral, and, thus, violated FOIA and the Privacy Act, or the agency to which they referred botched the handling of the referral and they violated the FOIA and Privacy Act.[8]

93.     Segment II was said to consist of 456 pages, of which 278 pages were released in full, portions of 171 pages and seven pages in their entirety were released with redactions, and a portion of one page originated with another federal agency and it was "referred for their review and direct reply to" Plaintiff.  See Exhibit I.

**94.**     This response clearly indicates 456 pages were responsive, and while their response may have accounted for 456 pages, the Defendant only provided 420 pages with their September 24, 2021, letter to Plaintiff.  See Exhibit ___.

---

[8]       If it is the latter, once the Defendant provides this information, Plaintiff will seek to amend to add this agency as a defendant to this suit.

**95.**     To date, the Defendant has not supplemented this request or provided an accounting of the missing 36 pages that they are improperly withholding without authority; as such, the Defendant's response is deficient, and they are in violation of the FOIA.

**96.**     Further, Defendant indicated in Segment II that one partial page originated with another agency and that the Defendant referred Plaintiff's request to that agency.

**97.**     To date, no other federal agency has provided responsive records or any response to Plaintiff acknowledging receipt of this referral; the Defendant also failed to disclose to what agency they were referring in order for Plaintiff to even attempt to obtain these records on his own.

98.     Either Defendant performed an improper referral, and, thus, violated FOIA and the Privacy Act, or the agency to which they referred botched the handling of the referral and they violated the FOIA and Privacy Act.[9]

99.     Plaintiff was unable to appeal the releases because the Defendant did not release the documents that they mentioned in the letter nor did they provide justifications for the documents being withheld. Therefore, the Plaintiff has constructive exhaustion since the Defendants have not provided a release that would allow for the Plaintiff to appeal.

**100.**     The Plaintiff did not have an opportunity to administratively appeal the adverse determinations made on their requests because Defendant's releases did not provide the documents identified in the letters, the referring agency, and the statutory basis for the withholding of the missing documents. 5 U.S.C. § 552(a)(6)(A)(i)

---

[9]       If it is the latter, once the Defendant provides this information, Plaintiff will seek to amend to add this agency as a defendant to this suit.

101.    Defendant sent a subsequent response for Case #P-2020-00021 on December 1, 2021.  See Exhibit J.

102.    This letter indicates that the State Department had advised Plaintiff that five pages remained under review, and that they had now determined that these five pages were being withheld in their entirety under 5 U.S.C. § 552(b)(7)(E).

103.    It is unclear to what State Department was referring to regarding "five pages": the Segment I letter indicated, "Information still under review will be addressed under separate cover"; and the Segment II letter indicated, "By previous correspondence, we advised you that additional information remained under review"; and the December 01, 2020, letter does not indicate what segment or other correspondence this may have been referenced in.

104.    This December 2020 letter cited a FOIA exemption, but it does not provide a Privacy Act exemption, nor does it say why the Privacy Act does not apply despite acknowledging that it was clearly a Privacy Act request.

105.    Again, the Plaintiff is unable to properly appeal the withholding of the five pages because the Defendants have not analyzed the cases under the Privacy Act.

106.    Additionally, prior to Plaintiff making official requests under FOIA and the Privacy Act on July 15, 2020, Gebert requested on July 10, 2020, the investigation materials relied upon by the Department so that he could rebut the July 1, 2020, security clearance revocation.  See Exhibit K.

107.    Of the hundreds of pages provided to Gebert in response to this request, 54 pages that were provided in response to his request were absent in the Defendant's responses to FOIA and Privacy Act requests sent by Plaintiff just five days after Gebert's request.

108.    The only explanation for Defendant's 54-page discrepancy, considering both requests sought the same information, is due to the Defendant still has not processed the Plaintiff's request, or, alternatively, because the Defendant has not performed an adequate search as required by FOIA and the Privacy Act.

**Improper Collection of Plaintiff's Information Under the Privacy Act**
**(5 U.S.C. §552a(e)(3))**

109.    Plaintiff did not sign a Privacy Act Statement before the subject interview where the investigators asked him questions.

110.    The agency is required to have the signed Privacy Act Statement, pursuant to 5 U.S.C. §552a(e)(3), to all persons asked to provide personal information about themselves, which will go into a system of records (i.e., the information will be stored and retrieved using the individual's name or other personal identifier such as a Social Security number).

111.    Any agency that asks for personal information without having a signed Privacy Act is precluded from storing any information about the individual.

112.    In this reinterview, the Plaintiff was asked by Defendant's employees, *inter alia*, the following questions:

      i.       Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

ii.     Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

iii.     Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

113.    The Plaintiff responded in the negative to all three questions.

114.    The Defendant revoked the Plaintiff's security clearance because of his answers to those questions.

115.    The collection of the answers to those questions violates 5 U.S.C. §552a(e)(3).

116.    A failure to comply with 5 U.S.C. §552a(e)(3) resulted in an "adverse effect" on the Plaintiff (namely the loss of his security clearance, health insurance, all pay and benefits) which allows Plaintiff to bring a claim under 5 U.S.C. §552a(g)(D).

**The Questions Asked in the Subject Interview are not covered under the State Department's System of Records Notice Act (SORN) Volume 83, Number 116, Public Notice 10450; Page 28058**

117.    Agencies "shall subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include—

1.  the name and location of the system;
2.  the categories of individuals on whom records are maintained in the system;
3.  the categories of records maintained in the system;
4.  each routine use of the records contained in the system, including the categories of users and the purpose of such use;
5.  the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;
6.  the title and business address of the agency official who is responsible for the system of records;
7.  the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;
8.  the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can

contest its content; and

9.   the categories of sources of <u>records</u> in the system;" 5 U.S.C. §552a(e)(4)

118.   The SORN outlines the information that can be collected during the course of the security clearance process. The SORN specifically cites to threats, crimes, or national security related matters.

119.   The SORN does not allow for the agency to ask and collect information about the questions asked above.  More importantly, the Defendants are not allowed to ask about any potentially "embarrassing" involvement, support for, potential criticism of, and / or associations with groups that would be embarrassing to the State Department.

120.   The Agency was not allowed to ask about this information because this information is not allowed to be collected under any of the Agency's SORN.

Improper Collection of First Amendment Information <strong>Under the Privacy Act</strong>

121.   The Privacy Act specifically states that the Agency "shall…

maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

122.   Plaintiff did not expressly authorize the collection of information related to his First Amendment rights.

123.   No security clearance rule, regulation, or policy allows for the collection of First Amendment information.

124.   The security clearance interview was not part of a law enforcement activity nor have there ever been any criminal allegations. More specifically, Guideline J of SEAD 4 is never mentioned or referenced in the Plaintiff's security clearance revocation documents.

125.   There is no statute that allows for the collection of First Amendment information for a security clearance Applicant.

126.    Most importantly, the Agency's own SORN does not allow for the collection of this Information.

**Improper Sharing of Information Under the Routine Use Provision of** 5 U.S.C. §552a**(e)(3) and 5 U.S.C. §552a(e)(7)**

127.    The Privacy Act specifically identifies conditions for disclosure of collection information, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be:

> ...(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

> …(7) to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

128.    Since the Plaintiff did not sign a Privacy Act Statement for the subject interview nor did he sign a Privacy Act Statement specific to the collection of his First Amendment activity, Defendant violated the routine use of the information collected by storing it in their system of records.

129.    Since the Plaintiff did not sign a Privacy Act Statement for the subject interview nor did he sign a Privacy Act Statement specific to the collection of his First Amendment activity, Defendant violated the routine use of the information collected by storing and sharing the information with the Department of Justice when there was no suggestion of criminal conduct.

<u>**COUNT I**</u>
**Violation of the First Amendment of the United States Constitution By Infringing on Plaintiff's Right of Freedom of Speech**

130.    The Plaintiff adopts and incorporates by reference paragraphs 1 through 129    as if fully stated.

131.    The Defendant injured Plaintiff by depriving him of his ability to work for the Agency and earn a living because of protected opinions he expressed in his personal capacity.

132.    The Defendant acted negligently and wrongfully by revoking Plaintiff's security clearance for asserting his personal beliefs without identifying himself as a government employee while on his personal time.

133.    Plaintiff asserted his First Amendment right to freedom of speech for which his clearance was revoked. Not a national security concern, but a constitutional violation.

134.    The First Amendment of the United States Constitution guarantees individuals the right to free speech, association, and the right to assemble.

135.    The Defendant either intentionally, recklessly, or with callous indifference to the federally protected rights of the Plaintiff has threatened, silenced, and/or chilled Plaintiff's rights to freedom of speech and association by using Plaintiff's lawful speech and associations with lawful groups in his private life as the basis to strip him of his security clearance and position in the State Department.

136.    Defendant's actions also serve to violate the freedom of the press, as much of the speech they are attempting to chill, restrict, impede, and prevent was specifically related to Plaintiff's writings on websites and blogs, as well as times he spoke as a guest speaker on radio shows and podcasts.

137.    Defendant's discriminatory actions and associated practices are overbroad because they prohibit and restrict protected expression.

138.    Defendant has not established a sufficient nexus to censor private speech on matters of public concern. The First Amendment protection provided for public employee speech

is limited to speech by a citizen on a matter of public concern where the government does not have an adequate justification for treating an employee differently from another member of the public.

139. In fact, the Defendant allows for employees to publicly support the BLM movement *in the workplace* while revoking the Plaintiff's security clearance for expressing the same concerns for a different race.

140. Every day that the Defendant fails to act on the February 2021 response and November 2021 supplemental response is another day that the Plaintiff is irreparably harmed. The Defendant is abusing its power by not only revoking the Plaintiff's security clearance based upon constitutionally protected speech, but they are depriving the Plaintiff of his job and health insurance.

141. WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights by using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT II
### Violation of the First Amendment - Freedom of Association

142. The Plaintiff adopts and incorporates by reference paragraphs 1 through 141    as fully stated.

143. The First Amendment of the United States provides the Freedom of Association.

144. The Defendant violated the Plaintiff's constitutional protected right of a freedom to associate with others who have similar political, religious, and cultural beliefs.

145.    Instead the Defendant revoked the Plaintiff's security clearance because he associated with individuals whom the Defendant deemed expressed beliefs that would bring discredit and embarrassment to the Defendant. This standard on its face violates the Constitution.

146.    The Defendant's actions violated the Plaintiff's right to Freedom of Association.

147.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT III
### Violation of the First Amendment - Freedom of Assembly

148.    The Plaintiff adopts and incorporates by reference paragraphs 1 through 147    as fully stated.

149.    The Defendant revoked the Plaintiff's security clearance for attending meetings, dinners, conferences, gatherings, and the Charlottesville protests because the content of the meetings was deemed offensive and embarrassing.

150.    The Plaintiff's constitutional right to freedom of assembly is being violated and the Constitution does not differentiate between offensive and non-offensive, embarrassing and non-embarrassing because it is subjective and violates the intent of the First Amendment.

151.    Plaintiff has a constitutionally protected right to lawfully assemble with whomever he chooses even if the security clearance adjudicator does not agree with the ideologies held by other attendees.

152.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT IV
### First Amendment Retaliation

153.     The Plaintiff adopts and incorporates by reference paragraphs 1 through 152   as fully stated.

154.     The Plaintiff engaged in protected speech by discussing matters of public concern (i.e. the country's immigration policies and beliefs on race) on his own time, under pseudonyms, never stating or implying that he was speaking on the behalf of the Defendant.

155.     The Defendant retaliated against the Plaintiff by revoking his security clearance for said speech.

156.     The Defendant notified the Plaintiff that they were revoking the Plaintiff's security clearance for aforementioned speech thereby satisfying the causal link between the conduct and the adverse effect.

157.     Defendant's revocation of Plaintiff's security clearance satisfies the elements of First Amendment retaliation.

158.     WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff

reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT V
**Violation of the First Amendment of the United States Constitution**
**Selective Enforcement**

159.     The Plaintiff adopts and incorporates by reference paragraphs 1 through  as fully stated.

160.     Defendant is being untruthful in stating that their reason for suspending Gebert's clearance was due to "dishonesty," which makes the subsequent employment actions taken based on the suspended security clearance, the administrative leave without pay, for instance, equally improper.

161.     Defendant's real reason for suspending Gebert's clearance and placing him in an administrative leave without pay status was due to the backlash from the Hatewatch article, as well an overall disapproval of Gebert's viewpoints by the current personnel in the State Department.

162.     Gebert's speech and associations that formed the content of the Hatewatch article are constitutionally protected, and, therefore, make the Defendant's actions unconstitutional.

163.     Even if the Agency believed Gebert was intentionally withholding his "pro-white" beliefs and that formed the basis of saying he was "dishonest" this would be improper, incorrect, and this is not being applied equally.

164.     Individuals who support Black Lives Matters, for all intents and purposes, are promoting "pro-black" ideals.

165.     Individuals who support BLM are not required to disclose their affiliation or approval of BLM.

166.     In other words, Gebert is being called "dishonest" for not disclosing his

"pro-white" ideals, but similarly situated employees and applicants who are not disclosing their "pro-black" ideals are not being labeled "dishonest."

167.    This means "pro-black" personnel are being treated more favorably than "pro-white" personnel: they are not being investigated; they are not having their clearance suspended; they are not being placed in an LWOP status due to a suspended or revoked clearance, etc.

168.    Plaintiff knows, at a minimum, that on August 27, 2020, Deputy Assistant Secretary of State for African Affairs, Elizabeth Fitzsimmons, outwardly supported BLM at a townhall for the Young African Leaders Initiative (YALI).

169.    Upon information and belief, Ms. Fitzsimmons did not disclose her support of "pro-black" views during any investigation or security clearance questionnaire; she has not been accused of being "dishonest" for failing to disclose her ties during investigations; and she remains employed by the State Department and not in an LWOP status due to her support of BLM and/or her answers to security clearance background investigations regarding BLM.[10]

170.    On February 14, 2022, the BLM flag was raised on the premises of the U.S. Embassy and Consulates in Brazil.

171.    State Department Foreign Affairs officer Douglas Koneff participated in the flag raising ceremony, stating, "Today, we raise this flag to reiterate the importance of black lives around the world."[11]

172.    Upon information and belief, Mr. Koneff did not disclose his support of "pro-black" views during any investigation or security clearance questionnaire; he has not been accused of being "dishonest" for failing to disclose his ties during investigations; and he remains

---

[10]         https://yali.state.gov/yali-town-hall-racism-and-the-black-lives-matter-movement-around-the-world/

[11]

https://br.usembassy.gov/u-s-embassy-and-consulates-fly-black-lives-matters-flag-in-commemoration-of-black-history-month/

employed by the State Department and not in an LWOP status due to his support of BLM and/or his answers to security clearance background investigations regarding BLM.

173.    Upon information and belief, not a single State Department employee or applicant has been labeled "dishonest" for failing to disclose his/her affiliation with or support of BLM ideals.

174.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT VI
## Equal Protection Claim

175.    The Plaintiff adopts and incorporates paragraphs 1 through 174 as fully stated.

176.    Defendant took disciplinary and retaliatory action against Gebert that resulted in years of lost pay based on Gebert's political and ideological speech and associations.

177.    Politics, nationalism, religion, and other topics discussed by Gebert are fundamental rights, and the Defendant's actions violated Gebert's fundamental rights.

178.    A government regulation that implicates political or ideological speech receives strict scrutiny, and the government must show that the law is narrowly tailored to achieve a compelling government interest.

179.    The Defendant is not able to show that punishing protected speech achieves any compelling government interest.

180.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order

that Defendant State Department is in violation of the Constitution (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

**<u>COUNT VII</u>**
Violation of the First Amendment of the United States Constitution
Overbreadth

181.    Gebert realleges paragraphs 1 through 180   as if fully stated herein.

182.    Gebert contends that the procedures or methods used by the Department in the clearance process are constitutionally defective.

183.    Specifically, Gebert contends that the three subject questions the Department contends he was dishonest in answering are overbroad, vague, and facially unconstitutional.

184.    Each of these questions, on its own, is overbroad, vague, and facially unconstitutional, which includes the following:

a.    Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

b.    Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

c.    Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

185.    The Department is interpreting the questions at issue here to require applicants to

33

disclose their political associations and speech as well as their ideological beliefs. These are clearly activities within the freedom of speech, and the concern underlying the overbreadth doctrine – chilling speech – is directly at issue here.

186.    The policies, procedures, and methods as relied upon and applied by the State Department could, undoubtedly, regulate a substantial amount of constitutionally protected expression.


187.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

### COUNT VIII
Violation of the First Amendment of the United States Constitution
Vagueness

188.    Gebert realleges paragraphs 1 through 187    as if fully stated herein.


189.    Gebert contends that the procedures or methods used by the Department in the clearance process are constitutionally defective.

189.    Gebert contends that the two subject questions the Department contends he was dishonest in answering are overbroad, vague, and facially unconstitutional.

190.    Each of these questions, on its own, is overbroad, vague, and facially unconstitutional, which includes the following:

a.      Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

b.      Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

c.      Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

191.    Specifically, Defendant's arguments hinge almost entirely on their definition of "embarrassing" and whether or not Gebert should have known his words, actions, and affiliations met the Department's definition of the term "embarrassing."

192.    However, what is "embarrassing" to the State Department is, obviously, not embarrassing to Mr. Gebert, and the State Department's inability to come to that realization three years ago has resulted in a gross violation of Gebert's First Amendment rights and over three years of indefinite suspension without pay.

193.    There was no qualifier, clarification, or context to the word "embarrassing" during Gebert's interview or re-interviews; to expect Gebert to disclose his constitutionally protected speech and associations in response to such an ambiguous question is illogical.

194.    In fact, during this interview - and immediately after the specific question(s) in regard to matters that were "embarrassing" - the interviewer was virtually unintelligible and acknowledged a medical throat issue as explanation; she admitted she would have to retire soon

due to this issue, and, at one point, she handed over papers to sign instead of continuing with the in-person interview questions.[12]

195.    The questions posed to Gebert were not clear enough for him to know what was and was not prohibited and/or required.

196.    The Defendant used the questions posed to Gebert arbitrarily and in a discriminatory fashion to punish Gebert for his "pro-white" views.

197.    Moreover, to require Gebert to volunteer his ideologies and political beliefs in response to overbroad, vague, and facially unconstitutional questions such as these would constitute an enormous invasion of not only Gebert's civil liberties, but also those of all other individuals whose speech and associations would be chilled as a result of such questions.

198.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## COUNT IX
**Violation of the Due Process Clause of the Fifth Amendment of the United States Constitution - Reputational Harm**

199.    The Plaintiff adopts and incorporates by reference paragraphs 1 through 198    as if fully stated.

200.    Defendant has failed to meaningfully allow Plaintiff the opportunity to defend himself and clear his name; to date, Plaintiff has issued no public statements, has rejected all

---

[12]        Gebert asserts this in the September 27, 2019 interview, which is found within the FOIA response materials provided to Plaintiff.  This discussion can be found on page 143 of 452 of Department's materials, which is also marked as "page 74" of the interview transcript.

requests for interview, and has never responded to media inquiries regarding his employment with or suspension by Defendant. Absent any guidance from Defendant, this essentially amounts to a three-year voluntary gag order stemming from Plaintiff's belief that such silence would be in his and the Defendants' best interests.

201.    Defendant's failure has deprived Plaintiff of his liberty interest in his reputation.

202.    There is continued stigma and disability arising from the Defendant's official action.

203.    Defendant has tailored his education and dedicated his professional life to a career as a foreign affairs officer through the State Department.

204.    Defendant has dedicated and invested a significant portion of his professional life into public service and time as a civil servant; however, one cannot concurrently hold two federal positions at the same time.

205.    Plaintiff attempted to gain employment through the United States Postal Service (USPS), in February 2020, and the Census Bureau, late 2020 to early 2021, while he was suspended by Defendant. Plaintiff received employment offers from both employers (in writing with the USPS and verbally from the Census Bureau; however, during the pre-onboarding phase with the agencies' respective Human Resources departments both prospective employers specifically stated he would need to resign from the State Department before being further considered for the opportunity.

206.    As the Plaintiff is unwilling, nor should he be forced to, resign his employment with Defendant State Department while they continue to fail to act on his matters.

207.    Therefore, the Defendant's official action, as well as their lack of action, have had a broad effect of largely precluding Plaintiff from pursuing his chosen career.

208.    The Defendant has seriously affected, if not destroyed, his ability to obtain employment in his field.

209.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the Fifth Amendment; (2) an injunction compelling the Defendant to: (i) cease discriminating against the client; (ii) cease inserting unconstitutional criteria into Defendant's processes; and (iii) adjudicate Plaintiff's clearance issue favorably and reinstate Plaintiff with all benefits, backpay, and compensate him for harm caused; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

### <u>COUNT X</u>
**(Violation of the Administrative Procedures Act - Violation of 3 FAM 3600, *et al*., 5 U.S.C. 89 and 5 CFR § 890, et al.**

210.    The Plaintiff adopts and incorporates by reference paragraphs 1 through 209    as fully stated.

211.    The Defendant provides for a process to notify Plaintiff of his option to continue receiving health insurance for up to 365 days by way of paying his own premiums.

212.    The Defendant did not notify Plaintiff of this option, as they were required to by law and policy.

213.    Specifically, 5 CFR § 890.502(b) lists several requirements that the employer agency "must" do:

(b) Procedures when an employee enters a leave without pay (LWOP) status or pay is insufficient to cover premium. The employing office must tell the employee about available health benefits choices as soon as it becomes aware that an employee's premium payments cannot be made because he or she will be or is already in a leave without pay (LWOP) status or any other type of nonpay status… The employing office must also tell the employee about available choices when an employee's pay is not enough to cover the premiums.

(1) The employing office must give the employee written notice of the choices and consequences as described in paragraphs (b)(2)(i) and (ii) of this section and will send a letter by first class mail if it cannot give it to the employee directly. (Emphasis added)

214.    Initially during Plaintiff's suspension, Plaintiff's paystubs reflected Defendant had been covering the employer-responsible portion of health benefits, which was consistent with the Provider, Aetna's, practices and procedures.

215.    At some point during the Fall of 2021, prescription and medical bills began getting denied retroactively by the Provider.

216.    Upon information and belief, Defendant, without prior notice to or consent by Plaintiff and without proper authorization, retroactively terminated Plaintiff's health benefits as of the date of his suspension without pay in September 2019.

217.    Not only do Defendants fail to take affirmative steps, such as provide required notice, but Defendants also went the extra step with Gebert to retroactively cancel coverage for periods over which he had already paid the premiums, thereby causing Plaintiff to suffer significant economic damages.

218.    On January 23, 2024, the Plaintiff, Matthew Gebert, received a letter directly from the Defendant, Department of State, concerning the termination of his health benefits while in a non-pay status.  See Exhibit L.

219.    The Defendant specifically states this letter as being sent now "due to the agency's error."

220.   The error which they are now acknowledging is their failure to notify Gebert of his coverage choices.

221.   Both Plaintiff's Complaint, as well as their opposition to the Defendant, Department of State's Motion to Dismiss, cited violations of 3 FAM 3600, et al, as well as 5 CFR § 890.502(b), which lists several requirements that the employer agency "must" do that the State Department clearly violated, including the following:

222.   In light of the Defendant's letter of January 19, 2024, which clearly notes *their* failure to properly inform the Plaintiff of his insurance options in a timely manner, and specifically *prior to his termination*, the Plaintiff is hereby requesting that the Court find that the Defendant violated 3 FAM 3600 and 5 CFR § 890.502(b).

223.   Furthermore, Defendants' letter proves the intent of the Defendant to eliminate Gebert without any consideration of his rights.

224.   The Defendant simply wanted to be able to tell the general public that Gebert no longer received any benefits from the government despite, which among other violations, resulted in violating his entitlement to health insurance for the prescribed period of time after his termination.

225.   This document proves that the Government intentionally put Gebert's health and financial well-being in jeopardy out of spite.

226.   This violation of regulation resulted in financial harm to Gebert and his family during the relevant time period.

227.   Such act by Defendant, either through intentional malice or through gross negligence, was done so in an arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law    , regulation, and policy in violation of    the Administrative Procedures Act.

228.   WHEREFORE, Plaintiff is entitled to relief in the form of a declaratory order that Defendant is in violation of its regulation and an injunction compelling Defendant pursuant to the APA to follow its self-imposed mandate of 3 FAM 3600, *et al*.  Further, by way of the Court granting relief, the Defendant would retroactively cover the expenses incurred during the relevant time period.

## <u>COUNT XI</u>
### Violation of the Privacy Act, 5 U.S.C. §552a (Defendant's Failure to Obtain a Signed Privacy Act Statement)

229.   The Plaintiff adopts and incorporates by reference paragraphs 1 through 228     as fully stated.

230.   The Defendant did not collect nor ask the Plaintiff to sign a Privacy Act Statement before the subject interview where the investigators asked him questions.

231.   The agency is required to have the signed Privacy Act Statement, pursuant to 5 U.S.C. §552a(e)(3), to all persons asked to provide personal information about themselves, which will go into a system of records (i.e., the information will be stored and retrieved using the individual's name or other personal identifier such as a Social Security number).  Specifically, the statute requires the agency to:

**(3)** inform each <u>individual</u> whom it asks to supply information, on the form which it uses to collect the information or on a separate form that can be retained by the <u>individual</u>—

**(A)** the authority (whether granted by statute, or by executive <u>order</u> of the President) which authorizes the solicitation of the information and whether disclosure of such information is mandatory or voluntary;

**(B)** the principal purpose or purposes for which the information is intended to be used;

**(C)** the <u>routine uses</u> which may be made of the information, as published pursuant to paragraph (4)(D) of this subsection; and

**(D)** the effects on him, if any, of not providing all or any part of the requested information;

232.    Gebert was not properly informed via a Privacy Act Statement nor did he consent or provide written acknowledgement that such information could be collected, stored, used, and disseminated.

233.    This is a violation of 5 U.S.C. § 552a(g)(1)(D) as the information collected subsequently to the Defendant's failure to provide the Privacy Notice was and continues to be used against Gebert and had an adverse effect on him in the form of, among other effects, lost wages, benefits, his security clearance, and damage to his reputation.

234.    The Defendant acted in a manner which was intentional and willful.

235.    WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); (4) award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B); and (5) grant such other relief as the Court may deem just and proper.

## COUNT XII
**Violation of the Privacy Act, 5 U.S.C. §552a(e)(3) (Collecting Information that is not contained in the State Department's System of Records Notice Act (SORN) Volume 83, Number 116, Public Notice 10450; Page 28058)**

236.    The Plaintiff adopts and incorporates by reference paragraphs 1 through 235    as fully stated.

236.    Agencies "shall subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include—

   1.  the name and location of the system;
   2.  the categories of <u>individuals</u> on whom <u>records</u> are maintained in the system;
   3.  the categories of <u>records</u> maintained in the system;

4.  each <u>routine use</u> of the <u>records</u> contained in the system, including the categories of users and the purpose of such use;

5.  the policies and practices of the <u>agency</u> regarding storage, retrievability, access controls, retention, and disposal of the <u>records;</u>

6.  the title and business address of the <u>agency</u> official who is responsible for the <u>system of records;</u>

7.  the <u>agency</u> procedures whereby an <u>individual</u> can be notified at his request if the <u>system of records</u> contains a <u>record</u> pertaining to him;

8.  the <u>agency</u> procedures whereby an <u>individual</u> can be notified at his request how he can gain access to any <u>record</u> pertaining to him contained in the <u>system of records</u>, and how he can contest its content; and

9.  the categories of sources of <u>records</u> in the system;" 5 U.S.C. §552a(e)(4)

237.    The SORN outlines the information that can be collected during the course of the security clearance process. The SORN specifically cites to threats, crimes, or national security related matters.  It does not reference First Amendment activities.

238.    The SORN does not allow for the agency to ask and collect information about the questions asked above.  More importantly, the Defendants are not allowed to ask about any potentially "embarrassing" involvement, support for, potential criticism of, and / or associations with groups that would be embarrassing to the State Department.

239.    The Agency was not allowed to ask about this information because this information is not allowed to be collected under any of the Agency's SORN.

240.    Plaintiff is being irreparably harmed by reason of Defendant's unlawful collection, use, storage, and dissemination of such information without proper authority. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

241.    This is a violation of 5 U.S.C. § 552a(g)(1)(D) as the information collected and stored in violation and contrary to the SORN was and continues to be used against Gebert and

had an adverse effect on him in the form of, among other effects, lost wages, benefits, his security clearance, and damage to his reputation.

242.    The Defendant acted in a manner which was intentional and willful.

243.    WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); (4) award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B); and (5) grant such other relief as the Court may deem just and proper.

**COUNT XIII**
**Violation of the Privacy Act, 5 U.S.C. §552a(e)(7) (Collecting First Amendment Information Without Proper Authority)**

244.    Plaintiff realleges paragraphs 1 through 243  as if fully stated herein.

245.    The Privacy Act specifically states that the Agency "shall…

maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity;

246.    Plaintiff did not expressly authorize the collection of information related to his First Amendment rights.

247.    No security clearance rule, regulation, or policy allows for the collection of First Amendment information.

248.    The security clearance interview was not part of a law enforcement activity nor have there ever been any criminal allegations. More specifically, Guideline J of SEAD 4 is never mentioned or referenced in the Plaintiff's security clearance revocation documents.

249.    There is no statute that allows for the collection of First Amendment information

for a security clearance Applicant.

250.    Most importantly, the Agency's own SORN does not allow for the collection of this Information.

251.    Plaintiff is being irreparably harmed by reason of Defendant's unlawful collection, use, storage, and dissemination of such information without proper authority. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

252.    This is a violation of 5 U.S.C. § 552a(g)(1)(D) as the information collected qualify as records describing how Gebert was exercising his First Amendment rights, which is expressly prohibited without Gebert's consent – which Defendant did not obtain – or authorized by statute, which does not exist.

253.    First Amendment-related information was and continues to be used against Gebert and had an adverse effect on him in the form of, among other effects, lost wages, benefits, his security clearance, and damage to his reputation.

254.    The Defendant acted in a manner which was intentional and willful.

255.    WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); (4) award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B); and (5) grant such other relief as the Court may deem just and proper.

**COUNT XIV**
**Improper Sharing of Information Under the Routine Use Provision of 5 U.S.C. §552a(e)(3)**
**and 5 U.S.C. §552a(e)(7)**

256.    Plaintiff realleges paragraphs 1 through 255  as if fully stated herein.

257.    The Privacy Act specifically identifies conditions for disclosure of collection information, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be:

> …(3) for a <u>routine use</u> as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;
>
> …(7) to another <u>agency</u> or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the <u>agency</u> or instrumentality has made a written request to the <u>agency</u> which <u>maintains</u> the <u>record</u> specifying the particular portion desired and the law enforcement activity for which the <u>record</u> is sought;

258.    Since the Plaintiff did not sign a Privacy Act Statement for the subject interview nor did he sign a Privacy Act Statement specific to the collection of his First Amendment activity, Defendant violated the routine use of the information collected by storing it in their system of records.

**259.**    Since the Plaintiff did not sign a Privacy Act Statement for the subject interview nor did he sign a Privacy Act Statement specific to the collection of his First Amendment activity, Defendant violated the routine use of the information collected by storing and sharing the information with the Department of Justice when there was no suggestion of criminal conduct.

260.    This is a violation of 5 U.S.C. § 552a(g)(1)(D) as the information collected and stored in violation and contrary to the Routine Use notice – or lack theorf - of which Gebert was notified  and this information was and continues to be used against Gebert and had an adverse

effect on him in the form of, among other effects, lost wages, benefits, his security clearance, and damage to his reputation.

261.    The Defendant acted in a manner which was intentional and willful.

262.    WHEREFORE, the Plaintiff requests that this Court award him the following relief: (1) declare the Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552a(g)(3)(B); (4) award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B); and (5) grant such other relief as the Court may deem just and proper.

## COUNT XV
### Violation of the Privacy Act, 5 U.S.C. §552a

263.    Plaintiff realleges paragraphs 1 through 262    as if fully stated herein.

264.    Plaintiff is an individual seeking access to information about himself.

265.    Any documentation in the possession, custody, and control of Defendant is a record maintained in a system of records, as described 5 U.S.C. §552a(a)(4)- (5).

266.    Upon information and belief, there are records responsive to Plaintiff's request that are being withheld in full and the Defendants violated 5 U.S.C. §552a. The Defendant is wrongfully withholding records and information requested.

267.    The Defendant identified responsive records in their responses, but their explanation does not account for the number of responsive records withheld, nor were the number of records claimed to be releasable actually provided to Plaintiff.

268.    Therefore, the Defendant has not provided an adequate response as required by the Privacy Act, which means they have not complied with the statutory timeline to provide a response.

269.    The Defendant violated the Privacy Act by failing to properly respond within the statutorily mandated time limit, as their September and December 2020 responses were deficient.

270.    The Defendant violated the Privacy Act by failing to cite Privacy Act exemptions in their December 2020 letter, which made the withholding of the five pages in their entirety improper.

271.    The Defendant violated the Privacy Act by failing to properly refer Plaintiff's Privacy Act request to the unnamed agencies it identified as the originating agency within Segments I and II.

272.    The Defendant violated the Privacy Act by failing to conduct an adequate search that led to the agency failing to identify and produce at least 50 pages known to the Plaintiff to exist and be responsive to Plaintiff's Privacy Act request.

273.    The Defendant violated 5 U.S.C. § 552a(g)(1)(B) by refusing to comply with Plaintiff's request under subsection (d)(1) under the statute.

274.    Plaintiff was unable to appeal the releases because the Defendant did not release the documents that they mentioned in their letter nor did they provide justifications for the documents being withheld. Therefore, the Plaintiff has constructive exhaustion since the Defendants have not provided a release that would allow for the Plaintiff to appeal.

275.    The Plaintiff did not have an opportunity to administratively appeal the adverse determinations made on their requests because Defendant's releases did not provide the documents identified in the letters, the referring agency, and the statutory basis for the withholding of the missing documents. , 5 U.S.C. § 552a(6)(A)(i).Plaintiff has exhausted applicable administrative remedies.

276.    Plaintiff has exhausted applicable administrative remedies.

277. Plaintiff is being irreparably harmed by reason of Defendant's unlawful withholding of requested records. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

278. Plaintiff is being irreparably harmed by reason of Defendant's unlawful withholding of requested records. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

279. WHEREFORE, Plaintiff respectfully requests that the Court:  (1) declare that Defendant violated the Privacy Act; (2) order Defendant to immediately disclose the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. § 552(a)(4)(E); and (4) grant such other relief as the Court deems just and proper.

## <u>COUNT XVI</u>
### Violation of the Freedom of Information Act-5 U.S.C. §552

280. Plaintiff realleges paragraphs 1 through 279 as if fully stated herein.

281. Defendant is unlawfully withholding records requested by Plaintiff pursuant to 5 U.S.C. §552.

282. The Defendant identified responsive records in their responses, but their explanation does not account for the number of responsive records withheld, nor were the number of records claimed to be releasable actually provided to Plaintiff.

283. Therefore, the Defendant has not provided an adequate response as required by the FOIA, which means they have not complied with the statutory timeline to provide a response.

284. The Defendant violated the FOIA by failing to properly respond within the statutorily mandated time limit, as their September and December 2020 responses were deficient.

285.   The Defendant violated the FOIA by failing to comply with its obligation of segregability when it made a blanket withholding of five entire pages based on exemption (b)(7)(E), which made the withholding of the five pages in their entirety improper.

286.   The Defendant violated the FOIA by failing to properly refer Plaintiff's FOIA request to the unnamed agencies it identified as the originating agency within Segments I and II.

287.   The Defendant violated the FOIA by failing to conduct an adequate search that led to the agency failing to identify and produce at least 50 pages known to the Plaintiff to exist and be responsive to Plaintiff's FOIA request.   Plaintiff was unable to appeal the releases because the Defendant did not release the documents that they mentioned in the letter nor did they provide justifications for the documents being withheld. Therefore, the Plaintiff has constructive exhaustion since the Defendants have not provided a release that would allow for the Plaintiff to appeal.

**288.**   The Plaintiff did not have an opportunity to administratively appeal the adverse determinations made on their requests because Defendant's releases did not provide the documents identified in the letters, the referring agency, and the statutory basis for the withholding of the missing documents. 5 U.S.C. § 552(a)(6)(A)(i)

289.   Plaintiff has exhausted applicable administrative remedies.

290.   Plaintiff is being irreparably harmed by reason of Defendant's unlawful withholding of requested records. Plaintiff will continue to be irreparably harmed unless Defendant is compelled to conform its conduct to the requirements of law.

291.   WHEREFORE, Plaintiff respectfully requests that the Court: (1) declare that Defendant violated the Freedom of Information Act; (2) order Defendant to immediately disclose

the requested records; (3) award Plaintiff reasonable costs and attorney's fees as provided in 5 U.S.C. §552(a)(4)(E); and (4) grant such other relief as the Court deems just and proper.

## <u>PRAYER FOR RELIEF AS TO COUNTS I - X</u>

**WHEREFORE,** the Plaintiff prayerfully requests that this Court:

292.    Declare that the Defendant is acting in violation of the First Amendment of the United States Constitution;

293.    Declare that the Defendant violated the Plaintiff's protected constitutional rights under the Due Process Clause of the Fifth Amendment of the United States Constitution;

294.    Enjoin the Defendant from continuing Plaintiff's suspension without leave;

295.    A preliminary and permanent injunction prohibiting Defendant, their agents, officials, servants, employees, and any other persons acting on its behalf from continually violating Plaintiff's constitutional rights and associated practices challenged in this Complaint;

296.    Order the Defendant to immediately reinstate Plaintiff's employment, granting accrued seniority rights to account for his unlawful suspension, and order Defendant to pay all back pay and front pay;

297.    Order the State Department to pay Plaintiff all back pay for compensation and benefits, including but not limited to leave, healthcare, retirement, and fringe benefits, which continue to accrue;

298.    Order the State Department to pay Plaintiff such front pay and future benefits, including but not limited to leave, healthcare, retirement, and fringe benefits, which continue to accrue, and other benefits and relief as may be appropriate; and Award Plaintiff his reasonable attorney fees, litigation expenses, and costs as allowed under applicable laws, and grant such other relief as this Court deems just to the Plaintiff and his attorneys.

## PRAYER FOR RELIEF AS TO COUNTS XI-XIV

**WHEREFORE,** the Plaintiff prayerfully request that this Court:

299.    Declare the Defendant's failure to comply with FOIA and the Privacy Act to be unlawful;

300.    Order the Defendant to conduct an independent and comprehensive search of its documents and records in response to Plaintiff's FOIA and Privacy Act Request, control number P-2020-00021;

301.    Order the Defendant to produce all responsive records without further delay or charge;

302.    Enjoin the Defendant from continuing to withhold records responsive to Plaintiff's FOIA and Privacy Act Request;

303.    Award Plaintiff actual damages and costs under 5 U.S.C. § 552a(g)(4)(A) and (B);

304.    Award Plaintiff attorney's fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. §552a(g)(4)(B); and

305.    Grant such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF AS TO COUNTS XV-XVI

**WHEREFORE,** the Plaintiff prayerfully request that this Court:

306.    Declare the Defendant's failure to comply with FOIA and the Privacy Act to be unlawful;

307.    Order the Defendant to conduct an independent and comprehensive search of its documents and records in response to Plaintiff's FOIA and Privacy Act Request, control number P-2020-00021;

308.    Order the Defendant to produce all responsive records without further delay or charge;

309.   Enjoin the Defendant from continuing to withhold records responsive to Plaintiff's FOIA and Privacy Act Request;

310.   Award Plaintiff attorney's fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. §552(a)(4)(E); and

311.   Grant such other relief as the Court deems just and proper.


Dated:  April 26, 2024                              Respectfully submitted,


By: /s/ *Brett J. O'Brien*
BRETT O'BRIEN, ESQ
Bar License #: 1753983
NATIONAL SECURITY LAW FIRM, LLC
1250 Connecticut Avenue
NW Suite 700
Washington, DC 20036
Phone: (202) 600-4996
Fax:     (202) 545-6318