## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MATTHEW GEBERT** | ) | |
| 270 Philadelphia Ave. | ) | |
| Purgitsville, WV 26852 | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| V. | ) | |
| | ) | |
| **DEPARTMENT OF STATE** | ) | **Civil Action No. 22-2939 (DLF)** |
| 2201 C St., NW | ) | |
| Washington, District of Columbia 20520 | ) | |
| | ) | |
| **ANTONY BLINKEN,** | ) | |
| Secretary of State | ) | |
| | ) | |
| | ) | |
| **As to each Defendant Serve:** | ) | |
| U.S. Attorney for the District of Columbia | ) | |
| Attn: Civil Process Clerk | ) | |
| 555 4th Street, NW | ) | |
| Washington, DC 20530 | ) | |
| | ) | |
| Office of the Legal Advisor (L/EX) | ) | |
| Department of State | ) | |
| Suite 5600 | ) | |
| 600 19th Street, NW | ) | |
| Washington DC 20522 | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

For his Second Amended Complaint, Matthew Gebert ("Gebert" or "Plaintiff"), by the

undersigned counsel, states as follows:

1.      The Plaintiff brings this action for declaratory, injunctive, and other appropriate relief against the Defendant for actions they have taken and continue to take against their employee, Gebert. Specifically, the Defendant has placed Gebert in an indefinite Leave Without Pay (LWOP) status and revoked his Top-Secret security clearance pending the outcome of a suitability determination.

2.      Further, Plaintiff brings this action for injunctive relief and other appropriate relief and seeks the disclosure and release of agency records improperly withheld from the Plaintiff by the Defendant, the Department of State, and their subordinate agencies, pursuant to the Privacy Act of 1974, 5 U.S.C. §552a et seq. and the Freedom of Information Act, 5 U.S.C. §552(a) et seq.

3.      In this case, the Defendant's basis for its employment-related actions was based on violating Plaintiff's: (1) First Amendment protections of free speech,  freedom of association, and freedom of assembly; (2) First Amendment retaliation; (3) Equal Protection; (4) Due Process; and (5) violating the Administrative Procedures Act by failing to follow their own rules and regulations in an arbitrary and capricious manner.

## PARTIES

4.      Plaintiff is a United States citizen and a resident of West Virginia.

5.      The Defendant, Department of State, is a "federal government agency" within the meaning of (1) 28 U.S.C. §1346(b), 28 U.S.C. §2401(b), and 28 U.S.C. §2671, and (2) 5 U.S.C. §552(f)(1) and 5 U.S.C. §552a(a)(1). The Defendant is in possession, custody, and control over documents and records about Plaintiff. Defendant is headquartered at the Harry S. Truman Building, 2201 C Street NW, Washington, D.C., U.S. 20520.

## JURISDICTION

6.      The Court has both subject matter jurisdiction over this action and personal jurisdiction over the Defendant pursuant to 5 U.S.C. §552(a)(4)(B), 5 U.S.C. §552a(g)(1), 28 U.S.C. §1331.

7.      The Court has authority to issue declaratory and injunctive relief under 28 U.S.C § 1361.

8.      Venue is proper in this Court pursuant to 5 U.S.C. §552(a)(4)(B), 5 U.S.C. §552a(g)(5), and 28 U.S.C. §1391 (b) and (e).

9.      The Court has the authority to award attorneys' fees and expenses under 28 U.S.C. § 2412.

## FACTS

10.     The Plaintiff has been employed by the Defendant, State Department, since May 19, 2013, in the role of Foreign Affairs Officer in the Bureau of Energy Resources, Office of Energy Diplomacy, Middle East & Asia Division (ENR/EDP/MEA).

11.     As part of his position, Plaintiff underwent a background investigation that resulted in him being granted a Top Secret security clearance on April 19, 2013; holding and maintaining this level of security clearance is a condition of Plaintiff's employment.

12.     As part of a routine periodic background reinvestigation that was necessary for the Plaintiff to hold his Top Secret security clearance, the Plaintiff was interviewed on January 28, 2019.

13.     In this reinterview, the Plaintiff was asked by Defendant's employees, *inter alia*, the following questions:

i.    Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.

ii.    Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.

iii.    Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

14.    The Plaintiff responded in the negative to all three questions.

15.    This routine reinvestigation was concluded on May 9, 2019.

16.    On June 7, 2019, Plaintiff was notified that he had been granted continued access, which meant, for all intents and purposes, he "passed" the reinvestigation.

17.    On August 7, 2019, the Hatewatch blog of the Southern Poverty Law Center (SPLC) published an online article titled, "U.S. State Department Official Involved in White Nationalist Movement, Hatewatch Determines," which made several allegations against Gebert.

18.    The day after the Hatewatch article was released, on August 8, 2019, several news sources confirmed that Gebert had already been suspended no later than on that day.[1]  Gebert's former supervisor at the State Department, Amos Hochstein, was specifically quoted, "Neo-Nazis are not all shaved heads and tattoos, they are hiding in plain sight. I'm horrified Gebert worked for me at the State Department."

---

[1]    Rolling Stone stated, "According to Politico, however, two sources close to the state department have confirmed that Gebert has been suspended following the Hatewatch report. His former boss, Amos Hochstein, who supervised Gebert during his tenure as coordinator for the State Department's international energy affairs, told Politico he found it 'inconceivable' that Gebert could've gotten security clearance not once, but twice. (The State Department conducts security screenings upon hiring and again after an employee has worked there for five years, according to Hochstein.). https://www.rollingstone.com/culture/culture-news/matthew-gebert-hatewatch-report-white-supremacy-state-department-869051/.

19.     Gebert was not suspended on August 8, 2019, because he was "dishonest" to questions from a January 2019 interview; the comments by Hochstein more accurately reflect the sentiment of the State Department regarding allegations made against Gebert, and they simply disagreed with his viewpoint.

20.     The Defendant realized their suspension of Gebert on the basis of his viewpoints could not possibly stand, especially after the subsequent September 27, 2019, interview, where Gebert easily refuted and dispelled the allegations that he was a "Neo-Nazi" or some other type of extremist. When finally given the chance to express his pro-white and political beliefs, he clearly articulated beliefs that are protected, and this became problematic for the State Department.

21.     As soon as the Hatewatch Article was published, it resulted in what the Department of State termed a "media frenzy." Dozens of articles were written, shaming the Department for employing Gebert and not vetting him properly during the clearance process. *Id*.

22.     In short, the Department was under immense pressure from the public and even members of Congress to remove Gebert from the Department due to his viewpoints. *Id*.

23.     Throughout the articles, representatives from the Department of State made official statements wherein they explicitly expressed their disapproval of Gebert's ideologies.[2]

24.     In summary, the Hatewatch blog, a non-profit organization, served as the basis for Plaintiff's security clearance suspension.

---

[2]     The FBI, on the other hand, got it right when their official spokesperson in an article explained, in response to the public outrage regarding Gebert's employment, that they "[c]annot investigate people for holding an ideology or belonging to a certain U.S.-based hate group." See https://www.cnn.com/2019/08/15/politics/state-dept-white-supremacist-brother-fbi/index.html

25.     On August 16, 2019, Plaintiff received a memorandum from Defendant informing him that Defendant would be suspending Gebert's security clearance pending the outcome of a "for cause" investigation.

26.     Defendant made the decision in their determination regarding Plaintiff based on a biased blog post that had no proof of actually being reviewed or fact-checked: in short, this is not a credible news source.

27.     More than one year before the SPLC article was published on August 8, 2019, Sludge.com posted an article entitled "Government Employees Donate to White Supremacist Candidate."[3]  This was published in July of 2018.

28.     The article specifically mentioned "Matthew Gebert" by name as well as his position with the Department of State. Id; it further indicates that Gebert made campaign contributions to the House campaign of Paul Nehlen, a "racist" and "openly anti-Semitic white supremacist." *Id*.

29.     In addition, the article mentioned Gebert's prior contributions in 2017 and 2018 to Corey Stewart, a Republican nominee who has been outspoken about preserving public Confederate flags and monuments. Id.

30.     The Defendant was aware of this article, as a Department of State Official is quoted in the article as stating: "Matthew Q. Gebert is employed by the Department of State as a foreign affairs officer assigned to the Bureau of Energy Resources in Washington, D.C. Guidelines regarding the political activity of State Department employees can be found in the Foreign Affairs Manual at 11 FAM 614. The Department of State is committed to providing a workplace free from discriminatory harassment." Id.

---

[3]     See https://readsludge.com/2018/07/03/government-employees-donate-to-white-supremacist-candidate/

31.     The Sludge.com article did not receive as much backlash as the Hatewatch article, and there is no indication of Congressional or State Department pressure at higher echelons to remove or suspend Gebert.

32.     However, it does reveal that as early as July of 2018 the State Department was aware of Gebert's white nationalist beliefs, which supports Gebert's belief the State Department was already aware of his activities, which makes it all the more likely Gebert honestly and legitimately believed that he had no reason to know he should have further disclosed this in any interview or investigation.

33.     Because holding a valid Top Secret security clearance is a condition of employment for Plaintiff, this suspension of his security clearance resulted in a proposal to suspend the Plaintiff from his employment indefinitely without pay from his position as a Foreign Affairs Officer, GS-13, in the Office of Middle East and Asia, Bureau of Energy Resources.

34.     Defendant sent a subsequent memo to Plaintiff on August 16, 2019, that informed Plaintiff that he would be suspended without pay and that he had fifteen (15) calendar days from the date of receipt to respond orally, in writing, or both.

35.     On August 28, 2019, Plaintiff, through his legal representative at the time, submitted a written reply on Plaintiff's behalf.

36.     On September 24, 2019, Plaintiff received a written response from Defendant that informed Gebert that the proposed indefinite suspension without pay would be sustained.

37.     The September 24, 2019, letter from Defendant provided a cursory review of Plaintiff's issues; essentially, the letter states nothing more than, in summary: Your security clearance is suspended; security clearance is a condition of employment; because your security clearance is suspended and you have provided no evidence that it is not suspended, your suspension without pay from your employment is upheld.

38.    The "for cause" investigation was conducted by the Bureau of Diplomatic Security (DS), Office of Special Investigations (DS/DO/OSI) shortly after Plaintiff was notified of his pending suspension.

39.    As part of this "for cause" investigation, Plaintiff was interviewed on September 27, 2019, by Defendant personnel within the Office of Special Investigations with the Bureau of Diplomatic Security, a division under the Defendant State Department, whereby Gebert was confronted with many of the allegations from the Hatewatch blog article, as well as re-questioned regarding his answers to the previous questions identified in Paragraph 13, above.

40.    In this September 27, 2019, interview, Gebert explicitly denied withholding information during his January 2019 interview, affirmed he was not ashamed or embarrassed of any of his views or activities, and specifically stated that the article sensationalized and mischaracterized his activities and involvement to make them seem much more nefarious than they actually were.

41.    During this interview, Gebert specifically and unabashedly articulated the beliefs he expressed on race and immigration, which at the core of his beliefs, are the ideas of advocating (1) for white interests; and (2) against mass immigration. In fact, many of Plaintiff's beliefs center around being an "immigration restrictionist," through which he celebrates federal immigration laws from the 1920's through the mid-1960's that resulted in strict limitations on immigration.

42.    Plaintiff believes that these policies contributed to America's robust economy and our nation's ascension as a global superpower.

43.    Plaintiff followed up his September 2019 interview with additional responses on October 23, 2019, where he informed Defendant personnel that he: did not think any of his writings, podcasts, or tweets would rise to a level that they would ever be considered an embarrassment to himself or the Department of State; was never a member of any formal white

nationalist organization; believed he would be protected as his speech and activities were protected by the First Amendment; and never engaged in any illegal activity. For these reasons, Plaintiff believed he had a reasonable and good faith basis to answer the questions from his January 2019 interview in the manner in which he did.

44.    Gebert's personally held beliefs were never represented as State Department opinions at any point in time in any manner or medium, and the State Department has never made an allegation that Gebert represented himself as a State Department employee when he spoke about his personal beliefs.

45.    Most importantly, at no point did Gebert lie or provide any false information on his SF-86 (i.e. security clearance questionnaire) or during any of his interviews or re-interviews.

46.    The Department of State could not find that Gebert had lied on his SF-86 since no questions on the SF-86 ask applicants about their political or ideological beliefs.[4] Indeed, the government cannot point to even a single question on the SF-86 that Gebert's conduct violated. Gebert has never:

- Been a member of an organization dedicated to terrorism (SF-29.1);
- Engaged in acts of terrorism (SF-29.2);
- Been a member of an organization dedicated to the use of violence or force to overthrow the United States Government (SF-29.3);
- Been a member of an organization that advocates or practices commission of acts of force or violence to discourage others from exercising their rights under the U.S. Constitution or any state of the United States (SF-29.4); or
- Engaged in activities designed to overthrow the U.S. government by force (SF-29.5).

47.    Gebert was never even asked any questions relating to his political beliefs during the security clearance investigation or reinvestigation process. In the entire 136-page SF-86

---

[4]    Rightly so, as this would violate applicants' civil liberties.  See, e.g., Ozonoff v. Berzak, 744 F.2d 224 (1st Cir. 1984).

application, none of the questions on the SF-86 asked Gebert anything even remotely related to his political beliefs, such as whether he identified as republican, democrat, alt-left, or alt-right, etc. Nor was he asked any questions related to his beliefs regarding race, immigration, or any other ideologies. Id. So too, none of the questions that Gebert was asked during his initial background investigation or during his reinvestigation interview on January 28, 2019, related to any of these issues. Id.

48.    Thus, at no point either on the SF-86 or any of the reinvestigation interviews was Gebert ever asked any questions about his political or ideological beliefs, associations, or activities. Id.

49.    In fact, in February 2021, members of Congress specifically urged the Director of National Intelligence ("DNI") to update current security clearance guidelines to begin screening for "white supremacists, neo-Nazis, and other far-right extremists."[5]

50.    In doing so, they specifically mentioned Gebert's case with the Department. Id. They further explained that "[u]nder current guidelines, individuals are not explicitly required to self-report involvement with extremist groups unless the organization professes to be a terrorist organization, seeks to overthrow the United States government, or uses violence." Id.[emphasis added], further supporting that nothing the Department was able to ask prior to February 2021 would have required Gebert to voluntarily offer up the information the Defendant is specifically stating Gebert was required to provide in response to their questions.

51.    Upon information and belief, the Defendant interviewers conducted what appeared to be a very biased interview, proposing counter-political beliefs to intentionally

_____

[5]    Id.https://wexton.house.gov/news/documentsingle.aspx?DocumentID=457, February 21, 2021. Accessed Online July 7, 2023.

mischaracterize and sensationalize Plaintiff's own positions, and used a flawed, unsanctioned interpretation of the underlying regulations to improperly and erroneously draw conclusions and make reckless recommendations on their investigative findings.

52.    Upon information and belief, the Defendant's personnel sought to "trap" or "catch" the Plaintiff in a lie or with him providing false information; when that failed, Defendant's personnel attempted to attach Plaintiff to more extreme and hateful viewpoints on race, religion, national origin, immigration, and other political beliefs to what Plaintiff actually subscribed to and spoke and wrote about.

53.    Plaintiff reiterated multiple times that he was a "race realist" and "pro-white," but fell far short of adopting outright neo-Nazism or aligning explicitly or officially with any terrorist organization or criminal entity's platform or belief system.

54.    As he explained throughout his interview, Gebert knows that his opinions are unpopular and that some people may be offended.  Thus, as Gebert explained, unless he knows that you are what he calls a "like-minded person" (i.e., "pro-white"), he does not talk about his political or other ideological viewpoints with you. In other words, Gebert -- like millions of other Americans -- keeps his political and ideological views private.

55.    Not only were Gebert's coworkers and supervisors not aware of his beliefs, but neither were his neighbors, some of his friends, or most of his acquaintances.  Thus, it wasn't that Gebert was concealing his beliefs from the government out of fear of losing his security clearance. To the contrary, Gebert did not discuss his views with anyone on an unsolicited basis except for those whom he would consider "like-minded" because he knew that his opinions were controversial.

56.    Although Gebert would not expose his beliefs on an unsolicited basis, as was revealed throughout his interview, he prides himself on his integrity. He is and has always been aware of the importance of being honest and truthful throughout the clearance process. Id. Had Gebert ever been asked about his political or ideological beliefs, he would have disclosed them, just as he did during the subsequent investigative interview. As Gebert explained:

> SPECIAL AGENT: And you don't feel that information could be -- have use -- could've been used to exploit you, to blackmail you, coerce you, or anything like that?
>
> MR. GEBERT: A hundred -- a hundred percent no because I'm not ashamed at all of my views. I can't be bought. I believe what I believe. You know, I'm a true believer, not in any cult sense, but in terms of having informed, you know, beliefs and values that unfortunately in this day and age are judged to be beyond that pale. [Gebert Interview 81-15 to 82-3.]

57.    The DS/DO/OSI "for cause" investigation after the suspension was completed on March 6, 2020, and determined that Plaintiff had been intentionally misleading in his answers to the questions identified in Paragraph 13, above.

58.    Plaintiff received a letter from Defendant dated July 1, 2020, wherein Defendant informed Plaintiff that his security clearance was being revoked under Guideline E (Personal Conduct) concerns. Put more simply, the United States Department of State intended to regulate freedom of association and freedom of speech.

59.    In the July 2020 letter, Plaintiff was specifically cited for violating the following:

      i.      refusal to provide, full, frank, and truthful answers to lawful questions of investigators, security officials, or other official representatives in connection with a personnel security or trustworthiness determination;

      ii.      deliberately providing false or misleading information; or concealing or omitting information concerning relevant facts to an employer, investigator, security official, competent medical or mental health professional involved in making a recommendation relevant to a national security eligibility determination, or other official government representative;

      iii.      personal conduct, or concealment of information about one's conduct that creates a vulnerability to exploitation, manipulation, or duress by a foreign intelligence entity or other individual or group. Such conduct includes:

      a.      Engaging in activities which, if known, could affect the person's personal, professional, or community standing.

60.    Upon information and belief, the Defendant heavily relied on making determinations regarding what Plaintiff knew or should have known regarding what thoughts or theories regarding race and immigration should have been "embarrassing" or not.

61.    However, upon information and belief, the Defendant enforced their reasoning unevenly or otherwise failed to apply a similar policy to other groups; namely, authorizing and/or applying significantly reduced application of its harsh position to those who publicly support Black Lives Matter (BLM).

62.    Upon information and belief, the Defendant is not revoking the security clearance and suspending similarly situated employees for failing to disclose their affiliation and/or content created furthering BLM; in fact, to the contrary, the U.S. Office of Special Counsel (OSC) expressly authorizes employees to    publicly    support    the    movement    on    the

job[6] and in May of 2021 U.S. Secretary of State Antony Blinken authorized U.S. embassies around the world to fly Black Lives Matter (BLM) flags and banners.[7]

63.     Upon information and belief, the Defendants by discriminatory motive or intent, or through reckless or callous indifference, invoked and implemented a policy to intentionally discriminate against the Plaintiff by using the security clearance and national security laws and regulations to impose barriers that could thwart, and in this case, did thwart the exercise of the Plaintiff's constitutional rights based on his association with the D.C. Pilots group.

64.     The D.C. Pilots were not a terrorist organization, criminal entity, or even on the SPLC's radar as a white nationalist group. See https://www.splcenter.org/sites/default/files/splc-2021-year-in-hate-extremism-report.pdf.

65.     In fact, it is only the SPLC, without citing an actual reference or actual law enforcement report or record, that tied the D.C. Pilots to the organization The Right Stuff; there is no official affiliation between the two groups, which further supports the Plaintiff's reasonable belief he was doing nothing wrong.

66.     Further, The Right Stuff is only listed in the SPLC resource cited as a "white nationalist" group.

67.     There are currently members of our Congress who are members of white nationalist groups and/or speak at white nationalist events.

68.     White nationalism, no matter how much someone disagrees with it, is not *per se* unlawful or a prohibited ideology by a government employee. There are varying levels and degrees, as well as different sects within different white nationalism movements; the one

---

6       https://cdn.govexec.com/media/gbc/docs/pdfs_edit/071620cb1.pdf.
7       https://foreignpolicy.com/2021/05/25/black-lives-matter-blm-state-department-embassies-flags-blinken-diplomacy-racial-injustice/

specifically endorsed by the Plaintiff is one focused on U.S. policy on immigration, which actually mirrors several members' of Congress's beliefs, former President Trump, and multiple members of his Cabinet and senior advisors, and such positions have oscillated in and out of our country's official policy and/or major political parties' platforms on the matter for over 200 years.

69.    In response to Plaintiff's LWOP and revocation of his security clearance, the undersigned counsel provided a written rebuttal on Plaintiff's behalf on February 4, 2021, denying the allegations from the July 1, 2020, memorandum in their entirety.

70.    Plaintiff's undersigned counsel provided a Supplemental Response to the February 2021 rebuttal on November 23, 2021, alleging multiple violations by Defendant of the Freedom of Information Act (FOIA) and the Privacy Act.

71.    On January 30, 2024, the State Department responded to Gebert's rebuttal and supplemental response with a letter notifying Gebert that his security clearance revocation was being upheld.

72.    Regarding Plaintiff's work performance otherwise, outside of the investigation and actions taken in response to an opinion-piece blog, Plaintiff's performance was exemplary and there were no indications whatsoever that his character and/or any personal views held by Plaintiff compromised his work or his full and unbiased cooperation with all State Department employees and partners:

  i.    Plaintiff was a presidential management fellow, a prestigious fellowship, where he was highlighted in George Washington University's *GW Magazine*, https://archives.magazine.gwu.edu/sites/g/files/zaxdzs1136/f/downloads/Summer2013GWMag_web.pdf;

  ii.    Plaintiff's evaluations for each year since 2013 were "Exceeds expectations";

iii.    Plaintiff received a performance bonus in 2015 for $1,500, the alleged year he began to engaged in white nationalist activities;

iv.    Plaintiff received two performance bonuses in 2019 for $3,000 and $500, the very year he was suspended/placed on leave without pay.

73.    Due to a select few State Department employees disagreeing with the viewpoints held and expressed by Gebert - in his personal capacity and during his personal time - the Defendant has caused irreparable harm to the federal protected rights of the Plaintiff's freedom of speech and association in the attempt to harass, threaten, silence, and/or chill these constitutional rights.

74.    The Defendant has provided a pretextual reason for revoking Plaintiff's security clearance and suspending him without leave; namely, stating Plaintiff failed to disclose, misled, and/or omitted information that are either (1) "relevant facts" that could be "relevant to a national security eligibility determination," (2) "personal conduct" that "creates a vulnerability to exploitation, manipulation, or duress," or (3) engaging in activities, which, if known, could affect the person's personal, professional, or community standing.

75.    Upon information and belief, in couching Plaintiff's removal as a matter of "national security" and suppressing his speech and rights via the revocation of security clearance route, the Defendant appears to cling to and attempt to hide behind *Egan* to allow them complete discretion with no judicial oversight; however, the true basis for the revocation and subsequent state of purgatory that the Defendant believes they can subject the Plaintiff to is predicated on the trampling of constitutionally protected rights.

76.    Upon information and belief, the Defendant has applied highly subjective standards of what might be embarrassing or qualify as "dirt" in the eyes of the State Department, setting a precedent that anything someone finds incorrect or different from their own viewpoint

can later qualify as "intentionally omitting" if someone fails to disclose their political ideologies or maybe who they voted for in a previous election if they legitimately believed it was not the answer the Defendant personnel wanted to hear.

77.    Furthermore, upon information and belief, the Defendant seeks to impugn a subjective, moving target of what qualifies as "embarrassing" to the Plaintiff and declare his claim that he did not believe his thoughts, speech, or actions to be embarrassing was "improbable."

78.    The government may not regulate speech based on overbroad policies that encompass a substantial amount of constitutionally protected speech.

79.    These grants of unbridled discretion to Defendant's officials violates the First Amendment because they create a system in which the permissibility of speech is judged without any standards, thus giving employees such as Gebert no way to prove that a denial, restriction, or relocation of their speech was based on unconstitutional considerations.

80.    Because Defendant has failed to establish a compelling government interest that is narrowly tailored governing the decision whether to allow employees to speak about certain topics and which viewpoints they may hold regarding certain topics, and ergo, which viewpoints need to be disclosed as part of an investigation, there is a substantial risk that Defendant officials will engage in content and viewpoint discrimination: exactly what occurred to Plaintiff's detriment as alleged herein.

81.    The questions asked at the end of the subject interview and outlined in paragraph 13 are unconstitutional and violate a security clearance Applicant's First Amendment rights.

**COUNT I**
**(PREVIOUSLY COUNT VII)**
**Violation of the First Amendment of the United States Constitution**
**Overbreadth**

82.    Gebert realleges paragraphs 1 through 81 as if fully stated herein.

83.    Gebert contends that the procedures or methods used by the Department in the clearance process are constitutionally defective.

84.    Specifically, Gebert contends that the three subject questions the Department contends he was dishonest in answering are overbroad, vague, and facially unconstitutional.

85.    Each of these questions, on its own, is overbroad, vague, and facially unconstitutional, which includes the following:

> a. Whether he had any association with any person, group, or business venture that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for a government position.
>
> b. Whether he was aware of any people or organizations that would criticize or oppose his employment in a government position.
>
> c. Lastly, he was asked if there was any information regarding members of his family that would be a possible source of embarrassment to the United States Department of State.

86.    The Department is interpreting the questions at issue here to require applicants to disclose their political associations and speech as well as their ideological beliefs. These are clearly activities within the freedom of speech, and the concern underlying the overbreadth doctrine – chilling speech – is directly at issue here.

87.    The policies, procedures, and methods as relied upon and applied by the State Department could, undoubtedly, regulate a substantial amount of constitutionally protected expression.

88.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling the Defendant to cease violating Plaintiff's constitutional rights through using the

security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff

reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just

and proper.

**COUNT II**
**(PREVIOUSLY COUNT VIII)**
**Violation of the First Amendment of the United States Constitution**
**Vagueness**

89.    Gebert realleges paragraphs 1 through 88  as if fully stated herein.

90.    Gebert contends that the procedures or methods used by the Department in the

clearance process are constitutionally defective.

91.    Gebert contends that the two subject questions the Department contends he was

dishonest in answering are overbroad, vague, and facially unconstitutional.

92.    Each of these questions, on its own, is overbroad, vague, and facially

unconstitutional, which includes the following:

i.    Whether he had any association with any person, group, or business venture

that could be used, even unfairly, to criticize, impugn or attack his character or qualifications for

a government position.

ii.    Whether he was aware of any people or organizations that would criticize or

oppose his employment in a government position.

iii.    Lastly, he was asked if there was any information regarding members of his

family that would be a possible source of embarrassment to the United States Department of State.

93.    Specifically, Defendant's arguments hinge almost entirely on their definition of

"embarrassing" and whether or not Gebert should have known his words, actions, and affiliations

met the Department's definition of the term "embarrassing."

19

94.     However, what is "embarrassing" to the State Department is, obviously, not embarrassing to Mr. Gebert, and the State Department's inability to come to that realization three years ago has resulted in a gross violation of Gebert's First Amendment rights and over three years of indefinite suspension without pay.

95.     There was no qualifier, clarification, or context to the word "embarrassing" during Gebert's interview or re-interviews; to expect Gebert to disclose his constitutionally protected speech and associations in response to such an ambiguous question is illogical.

96.     In fact, during this interview - and immediately after the specific question(s) in regard to matters that were "embarrassing" - the interviewer was virtually unintelligible and acknowledged a medical throat issue as explanation; she admitted she would have to retire soon due to this issue, and, at one point, she handed over papers to sign instead of continuing with the in-person interview questions.[8]

97.     The questions posed to Gebert were not clear enough for him to know what was and was not prohibited and/or required.

98.     The Defendant used the questions posed to Gebert arbitrarily and in a discriminatory fashion to punish Gebert for his "pro-white" views.

99.     Moreover, to require Gebert to volunteer his ideologies and political beliefs in response to overbroad, vague, and facially unconstitutional questions such as these would constitute an enormous invasion of not only Gebert's civil liberties, but also those of all other individuals whose speech and associations would be chilled as a result of such questions.

---

[8]     Gebert asserts this in the September 27, 2019 interview, which is found within the FOIA response materials provided to Plaintiff.  This discussion can be found on page 143 of 452 of Department's materials, which is also marked as "page 74" of the interview transcript.

100.    WHEREFORE, Plaintiff is entitled to relief in the form of (1) a declaratory order that Defendant State Department is in violation of the First Amendment; (2) an injunction compelling Defendant to cease violating Plaintiff's constitutional rights through using the security clearance process to censor his constitutionally protected freedoms; (3) award Plaintiff reasonable costs and attorney's fees; and (4) grant such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff prayerfully requests that this Court:

101.    Declare that the Defendant is acting in violation of the First Amendment of the United States Constitution;

102.    Enjoin the Defendant from continuing Plaintiff's suspension without leave;

103.    Issue a preliminary and permanent injunction prohibiting Defendant, their agents, officials, servants, employees, and any other persons acting on its behalf from continually violating Plaintiff's constitutional rights and associated practices challenged in this Complaint;

104.    Order Defendant to immediately reinstate Plaintiff's employment, granting accrued seniority rights to account for his unlawful suspension, and order Defendant to pay all back pay and front pay;

105.    Order the State Department to pay Plaintiff all back pay for compensation and benefits, including but not limited to leave, healthcare, retirement, and fringe benefits, which continue to accrue;

106.    Order the State Department to pay Plaintiff such front pay and future benefits, including but not limited to leave, healthcare, retirement, and fringe benefits, which continue to accrue, and other benefits and relief as may be appropriate; and Award Plaintiff his reasonable

attorney fees, litigation expenses, and costs as allowed under applicable laws, and grant such other

relief as this Court deems just to the Plaintiff and his attorneys; and

107.    Grant such other relief as the Court deems just and proper.


Dated:  January 22, 2025                    Respectfully submitted,


                                            By: /s/ *Brett J. O'Brien*
                                            BRETT O'BRIEN, ESQ
                                            Bar License #: 1753983
                                            NATIONAL SECURITY LAW FIRM, LLC
                                            1250 Connecticut Avenue
                                            NW Suite 700
                                            Washington, DC 20036
                                            Phone: (202) 600-4996
                                            Fax:     (202) 545-6318